**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRAIG J. HOLLAND, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>9F INC., LEI SUN, YANJUN LIN, YIFAN REN, CHANGXING XIAO, FLYNN XUXIAN HUANG, IVAN XU, JUNSHENG ZHANG, WING HON CHEUNG, FANGXIONG GONG, DAVID CUI, LEI LIU, SIU FUNG MING, CREDIT SUISSE SECURITIES (USA) LLC, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CLSA LIMITED, CHINA INVESTMENT SECURITIES INTERNATIONAL BROKERAGE LIMITED, 9F PRIMASIA SECURITIES LIMITED, and COGENCY GLOBAL INC.,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

1

Plaintiff Craig J. Holland ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding 9F Inc. ("9F," "JFU," or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired the Company's securities: (1) pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with 9F's August 14, 2019 initial public offering (the "IPO" or "Offering"); and/or (2) between August 14, 2019 and September 29, 2020, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities

2

Act of 1933 (the "Securities Act") and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.     In August 2019, Defendants held the IPO, selling approximately 8.9 million American depositary shares ("ADSs") to the investing public at $9.50 per ADS, pursuant to the Registration Statement.

3.     By the commencement of this action, the Company's shares trade significantly below the IPO price. As a result, investors were damaged.

<u>**JURISDICTION AND VENUE**</u>

4.     The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2) and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act and 28 U.S.C. §1331 and §27 of the Exchange Act.

6.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District and §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this District.

8.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of 9F securities in this District.

## PARTIES

9.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosure.

10.     Defendant 9F purports to be a company primarily engaged in the provision of financial investment services in China through a digital financial account platform. The Company's primary products and services include consumer

4

loan products, online wealth management products, and payment facilitation.

11.    The Company is incorporated in the Cayman Islands and its head office is located at the Jiufu Building, Rongxin Technology Center, Chaoyang District, Beijing 100102, People's Republic of China ("PRC"). 9F ADSs trade on the Nasdaq Exchange ("NASDAQ") under the ticker symbol "JFU."

12.    Defendant Lei Sun ("Sun") has served as the Company's Chairman and Chief Executive Officer ("CEO") since 2017 and was at the time of the IPO 9F's CEO and Chairman of the Board of Directors (the "Board"). He is also a co-founder of the Company. Defendant Sun signed the false and misleading Registration Statement. Defendant Sun sold 2.15 million ADSs as a "selling shareholder" in the Company's IPO, through Nine F Capital Limited, a British Virgin Islands company, which he controls. Defendant Sun beneficially owned 77,526,800 ordinary shares (39.1% of the outstanding shares) of 9F just prior to the IPO.

13.    Defendant Yanjun Lin ("Lin") has served as the Chief Financial Officer ("CFO") since 2015 and was at the time of the IPO 9F's CFO and a member of its Board. Defendant Lin has served as the CEO of Defendant 9F Primasia Securities Limited ("Primasia Securities") since 2016. Defendant Lin signed the false and misleading Registration Statement. Defendant Lin beneficially owned 2,490,700 ordinary shares (1.3% of the outstanding shares) of 9F just prior

to the IPO.

14.     Defendants Sun and Lin as sometimes referred to as the "Individual Defendants."

15.     The Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

16.     The Company is liable for the acts of the Individual Defendants and

its employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18.    Defendant Yifan Ren ("Ren") was at the time of the IPO a member of 9F's Board. He is also a co-founder of the Company. Defendant Ren signed the false and misleading Registration Statement. Defendant Ren beneficially owned 43,583,400 ordinary shares (23.3% of the outstanding shares) of 9F just prior to the IPO.

19.    Defendant Changxing Xiao ("Xiao") was at the time of the IPO a member of 9F's Board. Defendant Xiao signed the false and misleading Registration Statement. Defendant Xiao beneficially owned 13,920,300 ordinary shares (7.4% of the outstanding shares) of 9F just prior to the IPO.

20.    Defendant Flynn Xuxian Huang ("Huang") was at the time of the IPO a member of 9F's Board. Defendant Huang signed the false and misleading Registration Statement.

21.    Defendant Ivan Xu ("Xu") was at the time of the IPO a member of 9F's Board. Defendant Xu signed the false and misleading Registration Statement.

Defendant Xu beneficially owned 7,237,000 ordinary shares (3.8% of the outstanding shares) of 9F just prior to the IPO.

22.    Defendant Junsheng Zhang ("Zhang") was at the time of the IPO a member of 9F's Board. Defendant Zhang signed the false and misleading Registration Statement. Defendant Zhang beneficially owned 3,912,700 ordinary shares (2.1% of the outstanding shares) of 9F just prior to the IPO.

23.    Defendant Wing Hon Cheung ("Cheung") was at the time of the IPO a member of 9F's Board. Defendant Cheung signed the false and misleading Registration Statement.

24.    Defendant Fangxiong Gong was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement.

25.    Defendant David Cui ("Cui") was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement.

26.    Defendant Lei Liu ("Liu") was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement. He is also a co-founder of the Company and was, at the time of the IPO, its Executive

President and Chief Risk Officer. Defendant Liu beneficially owned 4,347,600 ordinary shares (2.3% of the outstanding shares) of 9F just prior to the IPO. Defendant Liu became the Company's Chief Risk Officer in June 2020 and replaced Defendant Sun as 9F's CEO in August 2020.

27.   Defendant Siu Fung Ming ("Ming") was at the time of the IPO 9F's duly authorized representative in the United States. Defendant Ming signed the false and misleading Registration Statement on his own behalf and on behalf of Defendant Cogency Global Inc. ("Cogency Global"), Defendant Ming's employer.

28.   The Individual Defendants and the defendants named in ¶¶18-27 are sometimes referred to herein as the "Offering Defendants."

29.   Each of the Offering Defendants signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential 9F investors, all motivated by their own and the Company's financial interests.

30.   Defendant Credit Suisse Securities (USA) LLC served as an underwriter for the Company's IPO. Credit Suisse Securities (USA) LLC maintains an office at 2121 Avenue of the Stars, Los Angeles, CA 90067.

31.   Defendant Haitong International Securities Company Limited served

as an underwriter for the Company's IPO. The address of Haitong International Securities Company Limited is 22/F Li Po Chun Chambers, 189 Des Voeux Road Central, Hong Kong Special Administrative Region of the PRC.

32.     Defendant CLSA Limited served as an underwriter for the Company's IPO. The address of CLSA Limited is 18/F, One Pacific Place, 88 Queensway, Hong Kong Special Administrative Region of the PRC.

33.     Defendant China Investment Securities International Brokerage Limited served as an underwriter for the Company's IPO. The address of China Investment Securities International Brokerage Limited is Unit Nos. 7701A & 05B-08 Level 77, International Commerce Center, No. 1 Austin Road West, Kowloon, Hong Kong Special Administrative Region of the PRC.

34.     Defendant Primasia Securities served as an underwriter for the Company's IPO. Primasia Securities is a subsidiary of the Company and its address is Suite 4806-07, 48/F, Central Plaza, No. 18 Harbour Road, Wanchai, Hong Kong Special Administrative Region of the PRC.

35.     The defendants referenced above in ¶¶30-34 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement. In connection with the IPO, the Underwriter Defendants drafted and disseminated the Registration Statement and were collectively paid nearly $8 million in underwriting discounts

and fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

36.   Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)   The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared substantial fees from the IPO collectively. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from 9F, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)   Representatives of the Underwriter Defendants also assisted 9F and the Offering Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had

11

continual access to internal, confidential, current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(c)    In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with the Company's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's securities would be sold; (iii) the language to be used in the Registration Statement; what disclosures about the Company's would be made in the Registration Statement; and (iv) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the Company's existing problems as detailed herein.

37.    The Underwriter Defendants caused the Registration Statement to be

filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

38.     Defendant Cogency Global was 9F's authorized U.S. representative for purposes of the IPO through its employee Defendant Ming, and Defendant Ming signed the Registration Statement for the IPO as an employee of Defendant Cogency Global. Defendant Cogency Global is additionally liable for the securities law violations alleged herein to have been committed by Defendant Ming as it controlled Defendant Ming at the time of the IPO.

39.     The Company, the Offering Defendants, the Underwriter Defendants, and Cogency Global are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background and Overview

40.     9F claims to be a leading digital financial account platform that integrates and personalizes financial services in China. It provides a comprehensive range of financial products and services across loan products, online wealth management products, and payment facilitation, all integrated under a single digital financial account. According to consulting firm Oliver Wyman Group, 9F was the largest online consumer finance platform in terms of outstanding loan balance as of December 31, 2018 among independent

marketplace lending platforms in China. The Company claims to "leverage technology [and] a deep understanding of [its] large user base and strategic partner relationships to create a one-stop experience bringing together borrowers, investors, financial institution partners and merchant partners."

41.    9F offers borrowers a digital alternative to conventional personal finance offerings, which it calls "One Card." The Company claims to have built an "ecosystem" around One Card connecting borrowers, investors, financial institution partners and merchant partners.

42.    9F offers revolving loan products supposedly tailored to the specific spending needs and risk profiles of its "millions of One Card users." The Company's One Card users can utilize their approved credit limits to purchase products from the Company's strategic partners, including China UnionPay, which purportedly has connected more than three million merchants, and from the One Card Mall, the Company's proprietary online shopping platform. One Card users can also draw down cash from approved credit limits to meet other financial needs. The Company provides borrowers with a single point from which to browse products on the "One Card Mall" and finance transactions.

43.    The loan products that 9F offers to borrowers are funded by investors and institutional funding partners. Investors are offered a selection of investment products, including fixed income products, which fund loans on the Company's

platform. Similarly, some of the Company's financial institution partners, such as small and medium-sized banking organization, provide funds to One Card users directly through the Company's direct lending program.

44.    As of June 30, 2019, the Company's institutional funding partners had approved an aggregate funding limit of over RMB70 billion ($10.4 billion) under 9F's direct lending program. The percentage of loan origination volume funded by institutional funding partners (to total loan origination volume) increased significantly from approximately 10.5% for the three months ended March 31, 2019, to 58% for the three months ended June 30, 2019.

45.    To further strengthen its business model, 9F also partnered with Taiping General Insurance Co. Ltd. ("China Taiping") and Property and Casualty Company Limited ("PICC") to provide loan performance guarantee insurance policies on loans with terms of 12 months or fewer. Of particular importance to investors at the time of the IPO was 9F's relationship with PICC, which began in March 2018, as PICC had been the exclusive provider of insurance protection to all new 9F loans with terms of no more than 12 months originated since May 2018 and that were covered by an insurance protection plan. Under the "Cooperation Agreement" between 9F and PICC setting forth the parties' arrangement, in addition to providing insurance protection, PICC was obligated to pay service fees to 9F since, among other things, "it also benefits from [9F's] risk management

capabilities to provide credit insurance on loans of high quality borrowers."

46.     The guarantee insurance policies were issued by PICC, paid for by the borrowers, and protected investors or institutional funding partners in the event of a borrower default. Under the Cooperation Agreement, PICC collected all of the loan facilitation service fees from the borrowers and remitted 9F's portion of the service fees to the Company. If a loan is past due for a certain period, the PICC policies would purportedly protect investors and institutional funding partners up to the full amount of the principal and accrued interest. 9F recorded an account receivable for the service fees confirmed and to be remitted by PICC.

47.     9F claimed that its critical relationship with PICC strengthened the "credibility" of its platform, further enlarged its investor base, helped the Company expand its institutional funding partner base, and promoted the rapid development of 9F's direct lending program.

48.     In August 2019, defendants took 9F public in the United States through the IPO that resulted in 9F ADSs trading on the NASDAQ. While 9F's IPO pricing range was initially estimated to be $7.50 to $9.50 per ADS, the Company ultimately went public at the very top of that range, $9.50 per ADS.

49.     In the IPO, 9F sold over 8 million ADSs (including the full exercise of the Underwriter Defendants' over-allotment option), generating approximately $77 million in proceeds from the offering (before costs and expenses). The selling

shareholder, Defendant Sun, also sold approximately 2.15 million ADSs at $9.50 per ADS in the offering, grossing more than $20 million in proceeds for himself.

50.     The Registration Statement was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding 9F's business, operations and prospects.

51.     Soon after the IPO, on December 5, 2019, 9F reported its third quarter 2019 financial results – the same quarter during which the IPO had been conducted. The Company's net accounts receivable had ballooned in size from RMB180 million as of December 31, 2018 to RMB1.9 billion, a more than ten-fold increase, as of September 30, 2019.

52.     Then, on June 12, 2020, the Company stated that it had been involved in an ongoing dispute with its critical insurance partner, PICC, despite the fact that the dispute had not been disclosed in the Registration Statement. According to 9F, a breakdown in the Company's relationship with PICC had resulted in multiple legal actions in China "due to PICC's nonperformance of a cooperation agreement . . . to pay the outstanding service fees under 9F's direct lending program." The Company further stated that it was seeking damages of approximately RMB2.3 billion from PICC to cover the outstanding service fees and related late payment losses. It also disclosed that PICC was suing 9F in a separate action seeking the

return of previously paid service fees and a ruling that it was not obligated to pay any outstanding fees.

53.     On June 15, 2020, the Company filed with the SEC on Form NT 20-F a notice stating that it would be unable to file its annual report timely. The notice effectively confirmed that the Company's dispute with PICC predated the IPO, stating that it was expected to engender "significant changes in results of operations between 2018 and 2019." The notice continued: "With respect to RMB1.4 billion of the Outstanding Service Fees that has been recorded as accounts receivable, the Company has recognized full valuation allowance" and "has not recognized the remaining Outstanding Service Fees in the amount of approximately RMB0.8 billion, as revenue recognition criteria was not met." As a result, "[t]he dispute with PICC has materially and adversely affected the Company's results of operations and financial condition in 2019."

54.     On June 17, 2020, 9F issued a press release providing its fourth quarter and full year 2019 financial results. The release provided further confirmation that 9F's dispute with PICC predated the IPO and had caused material damage to 9F's business, operations and financial results. For example, the release stated that the Company's dramatic increase in net accounts receivable – which had notably increased in the second quarter 2019 (as reported after the IPO on September 27, 2019) and third quarter 2019 (the same quarter as the IPO) –

was due to its dispute with PICC. The magnitude of the outstanding balance, which stood at more than RMB1.4 billion, also indicated that the amount owed had been increasing for many months prior to the end of 2019. The release stated in pertinent part as follows:

> **Provision (reversal) for doubtful contract assets and receivables** increased from reversed RMB2.6 million in the fourth quarter of 2018 to provision RMB2,148.6 million (US$308.6 million) for the same period of 2019, *primarily because we recognized a full valuation allowance for accounts receivable from PICC amounting to RMB1,432.3 million (US$205.7 million)*.

55.     Subsequent to the IPO, the price of 9F ADSs has plummeted in value. As of the filing of this complaint, 9F ADSs substantially below the IPO price.

<u>**Materially False and Misleading**</u>
<u>**False and Misleading Statements**</u>

56.     On or about July 25, 2019, 9F filed with the SEC a registration statement on Form F-1, which in combination with subsequent amendments on Forms F-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO. The F-1 was signed by the Offering Defendants.

57.     On August 8, 2019, 9F filed one of several amendments to the Registration Statement with the SEC on Form F-1/A, which stated that the offering would be for 8.9 million ADSs (representing 8.9 million Class A ordinary shares), with an option for the Underwriter Defendants to purchase up to 1.335 million

additional ADSs, at an anticipated offering price of between $7.50 and $9.50 per ADS. Of the total, the Company would offer 6.75 million ADSs (plus any exercise of the over-allotment by the Underwriter Defendants) while the selling shareholder, Defendant Sun, would offer 2.15 million ADSs. This F-1/A was signed by Defendants Sun and Ming.

58.     On August 14, 2019, 9F filed its final amendment to the Registration Statement with the SEC on Form F-1/A. The SEC declared the Registration Statement effective after the close of trading that same day. This F-1/A was signed by Defendants Sun and Ming.

59.     On August 15, 2019, the Company filed its prospectus on Form 424B4 with the SEC, which incorporated and also formed part of the Registration Statement.

60.     In the IPO, Defendants offered and sold 8.085 million 9F ADSs (which includes the Underwriter Defendants' over-allotment) and the Selling Shareholder sold 2.15 million ADSs at a price of $9.50 per share. Thus, the IPO raised over $97 million in gross proceeds from investors.

61.     The Registration Statement for the IPO was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding 9F's business, operations and prospects.

20

62.    For example, the Registration Statement stated that 9F's accounts receivable, net of allowance for doubtful accounts, stood at RMB180.1 million ($26.8 million) and RMB246.8 million ($36.78 million) as of December 31, 2018 and March 31, 2019, respectively. In addition, the Registration Statement stated that 9F's allowance for doubtful accounts stood at RMB1.1 million ($157,000) and RMB919,000 ($137,000) as of December 31, 2018 and March 31, 2019, respectively.

63.    Under a section entitled "Accounts Receivable," the Registration Statement described 9F's accounts receivable in pertinent part as follows:

> **Our accounts receivable, net of allowance for doubtful accounts of RMB27.7 million, RMB29.6 million, RMB1.1 million (US$0.2 million) and RMB0.9 million (US$0.1 million) as of December 31, 2016, 2017, 2018 and March 31, 2019, respectively, primarily includes the service fees receivable from investors and accounts receivable from customers in connection of our business of online direct sales of upscale products.**

* * *

> Our accounts receivable decreased by 40.0% from RMB300.1 million as of December 31, 2017 to RMB180.1 million (US$26.8 million) as of December 31, 2018 primarily due to the change of products mix as we offered more fixed income products with the service fees charged to investors at the inception of the investment commitment period in 2018.

> **Our accounts receivable increased by 37.0% from RMB180.1 million (US$26.8 million) as of December 31, 2018 to RMB246.8 million (US$36.8 million) as of March 31, 2019, primarily because we had RMB46.0 million (US$6.9 million) in the accounts receivable from our business of online direct sales of upscale**

*products and RMB47.0 million (US$7.0 million) in accounts receivable from our direct lending program, each as of March 31, 2019.*

(Emphasis added.)

64.     Similarly, under a section entitled "Allowance for doubtful accounts,"

the Registration Statement stated, in pertinent part, as follows:

Accounts receivable, other receivables and loan receivables are stated at the historical carrying amount net of write-offs and allowance for uncollectible accounts. The Group establishes an allowance for uncollectible accounts receivable, other receivables and loan receivables based on estimates, historical experience and other factors surrounding the credit risk of specific customers. Uncollectible receivables are written off when a settlement is reached for an amount that is less than the outstanding historical balance or when the Group has determined the balance will not be collected. ***The allowance for doubtful accounts for the three months ended March 31, 2018 and 2019 is as follows***:

| | Accounts receivable RMB | Other receivables RMB | Loan receivables RMB | Total RMB |
|---|---|---|---|---|
| Balance at January 1, 2018 | 29,611 | 5,010 | — | 34,621 |
| Reversal | (335) | — | — | (335) |
| Balance at March 31, 2018 | 29,276 | 5,010 | — | 34,286 |
| Balance at January 1, 2019 | 1,053 | 5,010 | — | 6,063 |
| Provision for doubtful accounts | — | — | 20,036 | 20,036 |
| Reversal | (134) | — | — | (134) |
| Balance at March 31, 2019 | 919 | 5,010 | 20,036 | 25,965 |

(Emphasis added.)

65.     As set forth herein, the description of 9F's accounts receivable, provision for doubtful accounts, and related matters, as set forth at ¶¶56-64, above,

were materially false, misleading, and incomplete. The Registration Statement failed to disclose the following material facts that existed at the time of the IPO including that: (1) 9F's provision for doubtful accounts receivable mainly related to accounts receivable with a single party, PICC; (2) 9F and PICC had been engaged in an ongoing contractual dispute regarding payment of service fees under the Cooperation Agreement; (3) PICC was challenging, delaying, and/or otherwise failing to pay service fees to 9F under the Cooperation Agreement; (4) the amount of service fees under the Cooperation Agreement that were unpaid or at serious risk of being unpaid was material and trending upward; (5) as a result of the foregoing, the collectability of service fees owed to 9F by PICC under the Cooperation Agreement was in doubt and at serious risk of non-payment; and (6) as a result of the foregoing, the Registration Statement had materially misrepresented the amount of 9F's accounts receivable and materially understated the Company's allowance for doubtful accounts.

66.     The Registration Statement also touted 9F's relationship with PICC, stating that the Cooperation Agreement improved the Company's business, operations and financial results. For example, the Registration Statement stated that 9F's partnership with PICC "strengthens the credibility of [the Company's] platform and further enlarges [its] investor base." The Registration Statement further claimed that PICC "provides credit insurance to institutional funding

partners, helping [9F] to expand [its] institutional funding partner base and promote the rapid development of [its] direct lending program, which may ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business." The Registration Statement similarly stated that 9F had carefully cultivated its relationship with PICC, claiming that the Company was "selective in working with partners who are additive to [its] ecosystem" and that 9F would "continue to seek to develop relationships that will enhance the experience of [the Company's] borrowers, investors, institutional funding partners and merchant partners."

67.    Under a section entitled "Our Business," the Registration Statement further extolled the purported benefits of 9F's partnership with PICC, which it claimed had bolstered 9F's important network of financial institution partners, stating in pertinent part as follows:

> **Financial institution partners.** We work with financial institution partners to provide funding to borrowers as well as insurance and guarantee protection to our investors. Our institutional funding partners, such as small and medium sized financial institutions, provide funds to our One Card users directly through our direct lending program. We enable our institutional funding partners to access our borrower base, through our strong risk management capabilities, and in most cases, in collaboration with an insurance company. We have been developing our direct lending program rapidly since 2018 and intend to cooperate with more institutional funding partners to further diversify our funding sources. As of June 30, 2019, our institutional funding partners had approved the funding limit in the aggregate amount of over RMB70 billion (US$10.4 billion) under our direct lending program. The percentage of loan

origination volume funded by our institutional funding partners to our total loan origination volume has increased significantly from approximately 10.5% for the three months ended March 31, 2019 to 58.0% for the three months ended June 30, 2019. Our cooperation with financial institution partners is not subject to the relevant local regulatory requirements on online lending platforms providing online lending information intermediary services, such as our company, to reduce such platforms' business scale and number of borrowers and lenders during the administrative verification period. Therefore, our strengthened cooperation with financial institution partners may ease the pressure brought about by the continuing challenging regulatory environment that has negatively affected the growth of our business. *We also cooperate with other financial institutions, including insurance companies and a third-party guarantee company to provide insurance and guarantee protection to our investors. An insurance company, when it is engaged under our direct lending program, provides credit insurance protection to institutional funding partners; on the other hand, it also benefits from our risk management capabilities to provide credit insurance on loans of high quality borrowers.*

(Emphasis added.)

68.    Under a section entitled "Quality assurance fund liability," the

Registration Statement further described 9F's purportedly strong working

relationship with PICC, stating in pertinent part as follows:

In January 2018, we announced further upgrades to the enhanced investors' protection plan with respect to loans with terms of over 12 months whereby the borrower signs a guarantee contract with Guangdong Success. According to the contract, when a borrower defaults and meanwhile, if the balance of the guarantee fund reserve account is insufficient to cover the unpaid amounts, Guangdong Success will make additional repayment up to a cap equal to five times of the guarantee fee paid by the borrowers. For loans with terms of no more than 12 months, the borrower paid insurance premium and signed "Loan Performance Guarantee Insurance Policy" with either China Taiping or PICC with whom we began to collaborate in March

2018. China Taiping's insurance protection obligation under our Taiping insurance program with respect to loans with terms of no more than 12 months that we facilitated between September 18, 2017 and May 15, 2018 will be fulfilled on August 15, 2019. ***PICC has provided insurance protection to all the new loans with terms of no more than 12 months that have been originated since May 2018 and covered by the insurance protection plan.***

(Emphasis added.)

69.     Similarly, under a section entitled "Users and Partners," the Registration Statement characterized 9F's partnership with PICC as an "upgrade[]" that had substantially improved 9F's business and operations, stating in pertinent part as follows:

***Financial Institution Partners***
Financial institution partners include institutional funding partners under our direct lending program, and other financial institutions that provide insurance and guarantee protection to our investors and institutional funding partners.

* * *

***In 2018, we upgraded our direct lending program introducing a tri-party cooperation model where we, PICC, when it is engaged as an insurance company providing credit insurance, and the institutional funding partner leverage each other's respective capabilities and to collectively deliver a competitive credit solution to borrowers. Our value proposition is enablement, where we provide our institutional funding partners access to a high quality borrower base as well as our risk management capabilities, and in most cases, in collaboration with PICC. PICC, when it is engaged, provides credit insurance to the institutional funding partners; meanwhile, PICC benefits from our risk management capabilities to provide credit insurance on loans of high quality borrowers.*** The institutional funding partners make the final credit decision based on a credit assessment and also fund and service the loans. We also provide

services after loan origination such as repayment facilitation and loan collection. This is particularly valuable for small and medium sized financial institutions that tend to lack the scale and technology to effectively compete with the larger financial institutions. ***We charge service fees, while PICC, when it is engaged as an insurance company providing credit insurance, charges insurance premiums.***

(Emphasis added.)

70.     As set forth herein, the description of 9F's financial institution partners, the insurance and guarantee protection offered by PICC, the value and benefits of its tri-party cooperation business model, and related matters, as set forth at ¶¶66-69, above, were materially false, misleading, and incomplete. The Registration Statement failed to disclose the following material facts that existed at the time of the IPO: (1) the purported value and benefits of the Company's financial institution partners and its tri-party cooperation business model did not in fact exist and/or were materially overstated, given that 9F and PICC had been engaged in an ongoing contractual dispute regarding payment of service fees under the Cooperation Agreement; (2) the collectability of service fees owed to 9F by PICC under the Cooperation Agreement was in doubt and at serious risk of non-payment; (3) there was a significant risk that PICC would no longer provide credit insurance and guarantee protection to investors and institutional funding partners; and (4) as a result of the foregoing, the Company's platform, business model, reputation and financial results had been materially impaired.

71.     Rather than disclose the breakdown in 9F's relationship with PICC

and the negative effects and implications of this adverse fact on the Company's business, financial results and prospects, the Registration Statement misleadingly indicated that the only reason that PICC would not pay compensation under the Cooperation Agreement was if it were inappropriate under the applicable policy. The Registration Statement also acknowledged the material importance of PICC to 9F's business and financial results, stating that if the relationship was lost it "may negatively affect the development of [9F's] direct lending program and [9F's] business and results of operations," but misleadingly failed to disclose that the Company was already in a business dispute with PICC and that the loss of PICC as a business partner was imminent. The Registration Statement further failed to disclose that PICC had already challenged, delayed, and/or failed to pay service fees to 9F under the parties' Cooperation Agreement and that the Company's ongoing relationship with PICC was already in doubt and at serious risk of termination. The Registration Statement stated in pertinent part as follows:

> We maintain an insurance arrangement with Taiping General Insurance Co., Ltd. ("China Taiping") or PICC Property and Casualty Company Limited ("PICC"), each a reputable third-party insurance provider, to provide insurance to investors for the majority of loans with terms of no more than 12 months. However, such investor protection mechanism may not function in certain scenarios. . . . If China Taiping or PICC decides to terminate our insurance arrangements, not to renew such arrangements after the expiry of our cooperation agreements or to significantly increase the insurance premiums, our investment opportunities may become less attractive to investors.

28

\*\*\*

We cooperate with PICC to provide credit insurance to institutional funding partners under our direct lending program. See "Business-Users and Partners- Financial Institution Partners" for details. However, there are loans referred by us to our institutional funding partners under our direct lending program that are not covered by PICC's credit insurance where the relevant institutional funding partners may suffer losses if the borrowers default. ***Furthermore, as with other types of insurance, PICC may refuse to pay compensation if PICC determines the relevant institutional funding partners are not entitled to compensation.*** The requirements and restrictions under the Interim Measure for the Credit Guarantee also apply to the credit insurance arrangements under our direct lending program. ***If PICC decides to terminate the insurance arrangements under our direct lending program, not to renew such arrangements after the expiry of our cooperation agreements or to significantly increase the insurance premium, our service may become less attractive to institutional funding partners, which may negatively affect the development of our direct lending program and our business and results of operations could be materially and adversely affected.***

(Emphasis added.)

72.   In addition, the undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties and risks that required disclosure in the Registration Statement under SEC rules. Specifically, Item 303 of SEC Regulation S-K required the Company to disclose "any known trends or uncertainties that have had or that [9F] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K required disclosure in the Registration Statement of "the most significant factors that ma[d]e an

investment in [the IPO] speculative or risky," and an explanation of "how the risk affect[ed] [9F] or the securities being offered." As detailed herein, the Registration Statement failed to disclose material facts necessary to apprise ADS purchasers of the true risks inherent in investing in the Company and of known adverse trends and uncertainties.

73.     Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

74.     SEC Regulation S-K, 17 C.F.R. § 229.503, required the "Risk Factor" section of the Registration Statement to discuss the most significant factors that made the IPO risky or speculative and that each risk factor adequately described the risk.

75.     The statements contained in ¶¶56-64, ¶¶66-69, and ¶71 are materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them.

Specifically, Defendants' made false and/or misleading statements and/or failed to disclose that: (1) the purported value and benefits of the Company's financial institution partners and its tri-party cooperation business model did not in fact exist and/or were materially overstated, given that 9F and PICC had been engaged in an ongoing contractual dispute regarding payment of service fees under the Cooperation Agreement; (2) the collectability of service fees owed to 9F by PICC under the Cooperation Agreement was in doubt and at serious risk of non-payment; (3) there was a significant risk that PICC would no longer provide credit insurance and guarantee protection to investors and institutional funding partners; (4) as a result of the foregoing, the Company's platform, business model, reputation and financial results had been materially impaired; and (5) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

76.     Soon after the IPO, several directors resigned from 9F's Board. On October 10, 2019, Defendant Cheung resigned from 9F's Board purportedly for "personal reasons." Defendant Xu resigned on January 20, 2020, also purportedly for personal reasons. Defendants Zhang and Huang resigned on March 16 and March 27, 2020, respectfully, also purportedly for personal reasons. Defendant Cui

also subsequently resigned his directorship despite serving in the position for only approximately one year.

77.    During this period, 9F reported a dramatic increase in its accounts receivable, which the Company would later connect to the deterioration of its business relationship with PICC. On September 27, 2019, 9F reported its second quarter 2019 financial results – the quarter prior to the IPO. The Company stated that its net accounts receivable had increased from RMB277 million as of March 31, 2019 to RMB858 million as of June 30, 2019, a 210% sequential increase.

78.    On this news, ADSs of 9F fell $0.59 per ADS, or 5%, to close at $10.35 per ADS on September 27, 2019, damaging investors.

79.    Then on December 5, 2019, 9F reported its third quarter 2019 financial results—the same quarter during which the IPO had been conducted. The Company's net accounts receivables had ballooned in size from RMB180 million as of December 31, 2018 to RMB1.9 billion—more than ten-fold increase—as of September 30, 2019.

80.    On this news, ADSs of 9F fell $0.50 per ADS over the next two trading days, or nearly 5%, to close at $9.60 per ADS on December 6, 2019, damaging investors.

81.    On June 12, 2020, 9F filed a Form 6-K with the SEC in which the Company belatedly discussed its ongoing dispute with PICC. According to 9F, the

dispute involved RMB2.2 billion ($324.5 million) in unpaid service fees and RMB1.4 billion ($206.5 million) in service fees that had previously been recorded as accounts receivable and which were now recognized as fully impaired, resulting in multiple legal actions in China. The press release stated in pertinent part as follows:

> ***9F Inc. ("9F" or the "Company") is filing this current report on Form 6-K to disclose legal actions that its PRC affiliates and PICC Property and Casualty Company Limited Guangdong Branch (the "PICC") are pursuing against each other relating to a contractual dispute.*** Jiufu Shuke Technology Group Co., Ltd., a variable interest entity of 9F (the "Jiufu Shuke") recently commenced a legal proceeding against PICC by submitting a complaint with a local court in Beijing (the "Beijing Local Court") due to PICC's non-performance of a cooperation agreement, as amended (the "Cooperation Agreement") to pay the outstanding service fees under 9F's direct lending program (the "9F Initiated Legal Action"). In 2019, under 9F's direct lending program, PICC is obligated to pay service fees as agreed in the Cooperation Agreement to Jiufu Shuke for its services. ***PICC paid a portion of service fees, but has failed to fulfill its remaining payment obligations for the rest of the service fees amounting to approximately RMB2.2 billion for a period covered under the Cooperation Agreement (the "Outstanding Service Fees").*** With respect to RMB1.4 billion of the Outstanding Service Fees that has been recorded as accounts receivable, the Company has recognized full valuation allowance. The Company has not recognized the remaining Outstanding Service Fees in the amount of approximately RMB0.8 billion, as revenue recognition criteria was not met. ***The dispute with PICC has materially and adversely affected the Company's results of operations and financial condition in 2019. With respect to the 9F Initiated Legal Action, Jiufu Shuke is seeking damages of approximately RMB2.3 billion from PICC to cover the Outstanding Service Fees and related late payment losses.***

After Jiufu Shuke commenced the 9F Initiated Legal Action at the Beijing Local Court, PICC filed a civil lawsuit (the "PICC Initiated

Legal Action") against Jiufu Shuke and Beijing Jiufu Lianyin Technology Co., Ltd., a wholly owned subsidiary of 9F (the "Jiufu Lianyin"), at a local court in Guangzhou (the "Guangzhou Local Court") claiming that the second amendment under the Cooperation Agreement is invalid. PICC requests that Jiufu Shuke return a portion of the paid service fees under the Cooperation Agreement and the accrued interest, and claims that PICC is not obligated to pay the Outstanding Service Fees.

For the 9F Initiated Legal Action, the Company will vigorously assert its rights against PICC. With respect to the PICC Initiated Legal Action, the Company intends to defend the action vigorously. However, both actions remain at the preliminary stage, and it is not possible at this stage to ascertain the outcome of either of the lawsuits. If the Company does not prevail in either of the lawsuits completely or in part, or fails to reach a favorable settlement with PICC, *the Company's results of operations, financial condition, liquidity and prospects may be materially and adversely affected.*

(Emphasis added.)

82.    On June 15, 2020, 9F filed a Form NT 20-F with the SEC stating that the Company could not timely file its annual report because of its dispute with PICC. The Form NT 20-F stated that the issues impacted 9F's results of operations going back to 2018—i.e., several months before the IPO. The Form NT 20-F stated in pertinent part as follows:

*The Company anticipates that there will be significant changes in results of operations between 2018 and 2019 as a result of the dispute and legal proceedings with PICC Property and Casualty Company Limited Guangdong Branch (the "PICC").* In 2019, under the direct lending program of the Company, PICC is obligated to pay service fees as agreed in the cooperation agreement, as amended (the "Cooperation Agreement") to Jiufu Shuke Technology Group Co., Ltd., a variable interest entity of the Company (the "Jiufu Shuke") for its services. PICC paid a portion of service fees, but has failed to fulfil

its remaining payment obligations for the rest of the service fees amounting to approximately RMB2.2 billion for a period covered under the Cooperation Agreement (the "Outstanding Service Fees"). With respect to RMB1.4 billion of the Outstanding Service Fees that has been recorded as accounts receivable, the Company has recognized full valuation allowance. The Company has not recognized the remaining Outstanding Service Fees in the amount of approximately RMB0.8 billion, as revenue recognition criteria was not met. ***The dispute with PICC has materially and adversely affected the Company's results of operations and financial condition in 2019.***

(Emphasis added.)

83.    On June 17, 2020, 9F issued a press release on a Form 6-K which provided the Company's fourth quarter and full-year 2019 financial results, which described the devastating financial consequences of the Company's dispute with PICC. The Form 6-K stated in pertinent part as follows:

"Since November 2019, under our online lending information intermediary services, new loans with terms of no more than 12 months are no longer covered by the insurance protection plan of PICC Property and Casualty Company Limited Guangdong Branch, or the PICC. ***We have also suspended our cooperation with PICC on new loans under our direct lending program since December 2019. We and PICC are pursuing legal actions against each other*** as PICC is obligated to pay service fees as agreed in the cooperation agreement to us under our direct lending program, and ***we are seeking damages of approximately RMB2.3 billion from PICC to cover the outstanding service fees amounting to RMB2.2 billion and related late payment losses.*** With respect to RMB1.4 billion of the outstanding service fees that has been recorded as accounts receivable, we have recognized full valuation allowance. We have not recognized the remaining outstanding service fees in the amount of approximately RMB0.8 billion, as revenue recognition criteria was not met."

**Fourth Quarter 2019 Financial Results**

35

*Total net revenues decreased by 54.4%* from RMB1,027.8 million in the fourth quarter of 2018 to RMB469.0 million (US$67.4 million) in the same period of 2019, *primarily due to the decrease in loan facilitation services revenue*.

- *Loan facilitation services revenue decreased by 90.5%* from RMB925.4 million in the fourth quarter of 2018 to RMB88.0 million (US$12.6 million) in the same period of 2019. *The decrease of loan facilitation services revenue was primarily because the loan facilitation services revenue under our direct lending program in the fourth quarter of 2019 was not recognized due to our dispute with PICC*.

*** 

**Provision (reversal) for doubtful contract assets and receivables** increased from reversed RMB2.6 million in the fourth quarter of 2018 *to provision RMB2,148.6 million (US$308.6 million) for the same period of 2019, primarily because we recognized a full valuation allowance for accounts receivable from PICC amounting to RMB1,432.3 million (US$205.7 million)*.

*Operating loss* was RMB3,096.4 million (US$444.8 million) in the fourth quarter of 2019, *compared with operating income RMB177.9 million in the same period of 2018.*

*** 

*Net loss* was RMB2,863.1 million (US$411.3million) in the fourth quarter of 2019, *compared with the net income of RMB167.2 million for the same period of 2018.*

*Adjusted net loss* was RMB2,656.5 million (US$381.6 million) in the fourth quarter of 2019, *compared with the adjusted net income of RMB297.2 million in the same period of 2018.*

**Fiscal Year 2019 Financial Results**
*Total net revenues decreased by 20.4%* from RMB5,556.5 million in 2018 to RMB4,425.0 million (US$635.6 million) in 2019, *primarily due to the decrease in loan facilitation services revenue.*

36

- ***Loan facilitation services revenue decreased by 29.9%*** from RMB4,960.7 million in 2018 to RMB3,477.9 million (US$499.6 million) in 2019. ***The decrease of loan facilitation services revenue was primarily because the loan facilitation services revenue under our direct lending program in the fourth quarter of 2019 was not recognized due to our dispute with PICC***.

\*\*\*

**Provision (reversal) for doubtful contract assets and receivables** increased from reversed RMB2.6 million in 2018 to provision RMB2,148.6 million (US$308.6 million) in 2019, ***primarily because we recognized a full valuation allowance for accounts receivable from PICC amounting to RMB1,432.3 million (US$205.7 million)***. **Operating loss** was RMB2,360.3 million (US$339.0 million) in 2019, compared with operating income RMB2,208.2 million in 2018.

\*\*\*

***Net loss*** was RMB2,153.6 million (US$309.4 million) in 2019, ***compared with the net income of RMB1,975.2 million in 2018***.

***Adjusted net loss*** was RMB1,644.6 million (US$236.2 million) in 2019, ***compared with the adjusted net income of RMB2,483.3 million in 2018***.

(Emphasis added.) (Footnote omitted.)

84.    On this news, shares of 9F fell $0.31 per ADS, or nearly 5%, from its close on June 11, 2020 to close at $6.00 per ADS on June 17, 2020, further damaging investors.

85.    On June 24, 2020, the Company filed a Form 20-F with the SEC, which further indicated that the harm caused by the breakdown in the relationship

between 9F and PICC predated the IPO, because the Company recognized in the Form 20-F a full valuation allowance for the accounts receivable from PICC of more than RMB1.4 billion. The dramatic increase in accounts receivable was first reported by the Company after the IPO in connection with its second quarter 2019 financial results (as reported on September 27, 2019) and third quarter 2019 financial results. Furthermore, the magnitude of the outstanding payments indicated that the delinquent payments had begun accruing long before the IPO.

86.    The Company's Form 20-F further confirmed the financial and operational damage that would be suffered by 9F as a result of the loss of PICC as a partner, stating in pertinent part as follows:

> In addition, investors or institutional funding partners may perceive protections provided by financing guarantee companies inferior to PICC's insurance protection, which may make our services less attractive to investors or institutional funding partners, which ***may negatively affect our services and our business and results of operations could be materially and adversely affected***.

(Emphasis added.)

87.    On this news, shares of 9F fell $0.57 per ADS, or 14%, to close at $4.05 per ADS on June 25, 2020, further damaging investors.

88.    On September 29, 2020, 9F reported its first half 2020 financial results. The Company stated that its loan origination volume had fallen over 90%, the number of active borrowers utilizing the 9F platform had decreased over 80%

and the Company's total net revenues had plummeted over 60% during the first half of 2020 as compared to the latter half of 2019.

89.     On this news, ADSs of 9F fell $0.20 per ADS, or 18%, to close at $0.91 per ADS on September 29, 2020, further damaging investors.

90.     Subsequent to the IPO, the price of 9F ADSs has plummeted in value. As of the filing of this complaint, 9F ADSs were trading at about $1.40 per ADS.

91.     Since the IPO, and as a result of the disclosure of material adverse facts omitted from the Company's Registration Statement, 9F's stock price has significantly fallen below its IPO price, damaging Plaintiff and Class members.

92.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action as a class action on behalf of all those who purchased the Company's securities pursuant and/or traceable to the Registration Statement and/or during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

94.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws;

(b)     whether the Registration Statement contained false or misleading statements of material fact and omitted material

40

information required to be stated therein; and to what extent the members of the Class have sustained damages and the proper measure of damages;

(c)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(d)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(f)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(g)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    to what extent the members of the Class have sustained

damages and the proper measure of damages.

98.    A class action is superior to all other available methods for the fair

and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to

them. There will be no difficulty in the management of this action as a class

action.

## COUNT I
### For Violations of Section 11 of the Securities Act
### Against All Defendants

99.    Plaintiff incorporates all the foregoing by reference.

100.   This Count is brought pursuant to §11 of the Securities Act, 15

U.S.C. §77k, on behalf of the Class, against all Defendants.

101.   The Registration Statement contained untrue statements of material

facts, omitted to state other facts necessary to make the statements made not

misleading, and omitted to state material facts required to be stated therein.

102.   Defendants are strictly liable to Plaintiff and the Class for the

misstatements and omissions.

103.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

104.   By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

105.   Plaintiff acquired the Company's securities pursuant to the Registration Statement.

106.   At the time of their purchases of 9F securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

107.   This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT II
### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

108.   Plaintiff incorporates all the foregoing by reference.

109.   By means of the defective Prospectus, Defendants promoted, solicited, and sold 9F securities to Plaintiff and other members of the Class.

110.   The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased the Company's securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

111.   Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired 9F securities.

112.   By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased 9F securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the

Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

113.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT III

### Violations of Section 15 of the Securities Act

### Against the Offering Defendants

114.    Plaintiff incorporates all the foregoing by reference.

115.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

116.    The Offering Defendants were controlling persons of 9F by virtue of their positions as directors or senior officers of the Company. The Offering Defendants each had a series of direct and indirect business and personal

relationships with other directors and officers and major shareholders of the Company. The Company controlled the Offering Defendants and all of 9F employees.

117. The Company and the Offering Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

118. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT IV

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5

### Against Defendants 9F and the Individual Defendants

119. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

120. This Count is asserted against the Company and the Offering Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

121.   During the Class Period, Defendants 9F and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122.   Defendants 9F and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

123.   Defendants 9F and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such

statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

124. The Individual Defendants, who is a senior officer and director of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

125. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the

integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

126.   Had Plaintiff and the other members of the Class been aware that the market price of 9F securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

127.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

128.   By reason of the foregoing, the Company and the Offering Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT V

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

129.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

131.   As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

132.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a)

of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

133.   The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and being a director of the Company, they had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

134.   By reason of the above conduct, the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)   declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 20, 2021                **THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff