UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRAIG J. HOLLAND, Individually and on behalf of all others similarly situated, | |
| | **Case No: 2:21-cv-00948-MCA-MAH** |
| Plaintiff, | |
| | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| | <u>JURY TRIAL DEMANDED</u> |
| 9F INC., LEI SUN, YANJUN LIN, YIFAN REN, CHANGXING XIAO, FLYNN XUXIAN HUANG, IVAN XU, JUNSHENG ZHANG, WING HON CHEUNG, FANGXIONG GONG, DAVID CUI, LEI LIU, SIU FUNG MING, CREDIT SUISSE SECURITIES (USA) LLC, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CLSA LIMITED, CHINA INVESTMENT SECURITIES INTERNATIONAL BROKERAGE LIMITED, 9F PRIMASIA SECURITIES LIMITED, and COGENCY GLOBAL INC., | |
| Defendants. | |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................ 1

JURISDICTION AND VENUE ............................................................ 5

PARTIES ............................................................................................ 6

SUBSTANTIVE ALLEGATIONS ...................................................... 15

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD ........................................................ 24

PLAINTIFF'S CLASS ACTION ALLEGATIONS ............................. 31

SECURITIES ACT CLAIMS ............................................................. 33

THE TRUTH MATERIALIZES CAUSING PLAINTIFF'S LOSSES ................ 39

EXCHANGE ACT CLAIMS .............................................................. 42

PRAYER FOR RELIEF ...................................................................... 50

JURY TRIAL DEMANDED ............................................................... 50

Lead Plaintiff John S. Wait ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters. These allegations are based upon, *inter alia*, the investigation conducted by his attorneys, which included, among other things, a review of: (1) Defendants' public documents; (2) conference calls and announcements made by Defendants; (3) public filings, wire and press releases published by, and regarding, 9F Inc. ("9F," "JFU," or the "Company"); (4) statements made by former Company employees; and (5) other publicly available information. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired the Company's ADSs[1]: (1) pursuant and/or traceable to the registration statement and related prospectus (collectively

---

[1] American Depositary Shares ("ADS") are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.

"Registration Statement") issued in connection with 9F's August 14, 2019 Initial Public Offering ("IPO" or "Offering"); and/or (2) between August 14, 2019 and September 29, 2020, both dates inclusive ("Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 ("Securities Act") and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.[2]

2.      Defendant 9F is an online peer-to-peer lending intermediary platform in China.  On 9F's platform, its institutional funding partners – usually small or mid-size banks and individuals – lent money to individual borrowers through 9F's loan products.  9F charges facilitation service fees for facilitating loans between lenders and borrowers.   In the first five months of 2019, 9F's net revenue from loan facilitation services accounted for 84% of its total net revenue.

3.      Starting in 2015, China published a series of regulations and judicial interpretations requiring that the total amount of interest and fees that a lender

---

[2]      Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants, the present and former officers and directors of 9F at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

charges a borrower shall not exceed 36%.  The regulations and interpretations further required that lending intermediaries, such 9F, shall not charge fees from borrowers.

4.      To circumvent these restrictions, 9F struck an arrangement with Property and Casualty Company Limited ("PICC"), an insurance company in China, through two agreements.  One agreement, which was publicly disclosed and legal, provided that PICC deducted a certain amount from loan principal that a borrower borrowed on the 9F platform in the name of the insurance premium protecting the lender's loaned fund.  The other agreement, an illegal and secret one only known between 9F and PICC, provided that 95% of the funds that PICC collected disguised as insurance premiums were in fact loan facilitation service fees that PICC would remit to 9F upon receipt.  Such facilitation service fees secretly funneled by 9F via PICC, together with the interest that borrowers had to pay to their lenders, accounted for 50-100% of borrowed principal – much higher than the limit of 36% – and blatantly violated Chinese law.  This arrangement subjected 9F to a significant risk that the arrangement would be deemed illegal, which would then require the seizure of all funds that PICC collected as pure insurance premiums.

5.      The Company, however, failed to disclose this secret arrangement and its associated material risk in 9F's Registration Statement for its IPO. Instead, 9F misleadingly stated that it charged PICC service fees for the loans it referred to PICC.

6.      With the materially misleading Registration Statement, Defendants conducted the IPO in August 2019, selling approximately 8.9 million ADSs to the investing public at $9.50 per ADS, and pocketed $84.55 million from investors.

7.      The risk quickly materialized after 9F's IPO.  On June 12, 2020, 9F disclosed for the first time as a material adverse event that PICC withheld RMB 2.2 billion (US$350 million) in service fees from 9F in 2019.  The Company further disclosed that PICC filed a lawsuit against 9F, claiming that the agreement between 9F and PICC was invalid and that PICC had no duty to pay the service fees.  ("June 12, 2020 6K").  9F also disclosed that it filed a lawsuit against PICC for PICC's non-performance.  The Company, however, did not disclose in the June 12, 2020 6K that the real nature of the dispute related to the loan facilitation service fees that 9F asked PICC to illegally and secretly collect from 9F's borrowers.

8.      On June 24, 2020, 9F filed its 2019 annual report on Form 20-F ("2019 20F"), revealing for the first time the illegal nature of its agreement with PICC.  9F admitted that in 2019 "PICC collected all of the loan facilitation service fees" from borrowers and remitted 9F's portion upon receipt.  Given that PICC's withholding of 9F's loan facilitation service fees accounted for 29.9% of lost revenue in 2019, the market strongly reacted to 9F's revelation.  Specifically, 9Fs' stock price fell by $0.38 per ADS, or 7.6%, on June 24, 2019, and another $1.12 per ADS, or 24%, over the next three days.

4

9.     9F continued to suffer financially as a result of the materialized risk of the failure to receive facilitation service fees from PICC in 2020.  On September 29, 2020, 9F reported that its loan facilitation services revenue in the first half of 2020 decreased by 85.5% from the second half of 2019.  9F continued its dispute with PICC as one of the primary reasons for such decrease.  On this news, 9F's ADS share price fell $0.20 per ADS, or 18%, to close at $0.91 per ADS on September 30, 2020, further damaging investors.

10.     By the commencement of this action, the Company's shares traded significantly below the IPO price.  As a result, investors were damaged.

## JURISDICTION AND VENUE

11.     The claims alleged herein arise under, and pursuant to, Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 771(a)(2) and 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act and 28 U.S.C. §1331 and §27 of the Exchange Act.

13.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the

exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of Defendants' actions and the subsequent damages took place within this District, and §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this District.

15.     In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of 9F securities in this District.

## **PARTIES**

16.     As set forth in the certification previously filed with the Court (Dkt. 9-2), Plaintiff purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the truth.

17.     Defendant 9F is an online peer-to-peer lending intermediary platform in China. The Company's primary products and services include consumer loan

6

products, online wealth management products, and payment facilitation.   The Company is incorporated in the Cayman Islands and its head office is located at the Jiufu Building, Rongxin Technology Center, Chaoyang District, Beijing 100102, People's Republic of China ("PRC").   9F ADSs trade on the Nasdaq Exchange ("NASDAQ") under the ticker symbol "JFU."

18.      Defendant Lei Sun ("Sun") has served as the Company's Chairman and Chief Executive Officer ("CEO") since 2017 and was at the time of the IPO 9F's CEO and Chairman of the Board of Directors ("Board").   He is also a co-founder of the Company.   Defendant Sun signed the false and misleading Registration Statement.   Defendant Sun beneficially owned 77,526,800 ordinary shares (39.1% of the outstanding shares) of 9F just prior to the IPO.   Defendant Sun sold 2.15 million ADSs as a "selling shareholder" in the Company's IPO, through Nine F Capital Limited, a British Virgin Islands company, which he controls, grossing more than $20 million in proceeds for himself.

19.      Defendant Yanjun Lin ("Lin") has served as the Chief Financial Officer ("CFO") since 2015 and was at the time of the IPO 9F's CFO and a member of its Board.   Defendant Lin has served as the CEO of Defendant 9F Primasia Securities Limited ("Primasia Securities") since 2016.   Defendant Lin signed the false and misleading Registration Statement.   Defendant Lin beneficially owned 2,490,700 ordinary shares (1.3% of the outstanding shares) of 9F just prior to the IPO.

20.     Defendant Yifan Ren ("Ren") was at the time of the IPO a member of 9F's Board.  He is also a co-founder of the Company.  Defendant Ren signed the false and misleading Registration Statement.  Defendant Ren beneficially owned 43,583,400 ordinary shares (23.3% of the outstanding shares) of 9F just prior to the IPO.

21.     Defendant Changxing Xiao ("Xiao") was at the time of the IPO a member of 9F's Board.  Defendant Xiao signed the false and misleading Registration Statement.  Defendant Xiao beneficially owned 13,920,300 ordinary shares (7.4% of the outstanding shares) of 9F just prior to the IPO.

22.     Defendant Flynn Xuxian Huang ("Huang") was at the time of the IPO a member of 9F's Board.  Defendant Huang signed the false and misleading Registration Statement.

23.     Defendant Ivan Xu ("Xu") was at the time of the IPO a member of 9F's Board.  Defendant Xu signed the false and misleading Registration Statement.  Defendant Xu beneficially owned 7,237,000 ordinary shares (3.8% of the outstanding shares) of 9F just prior to the IPO.

24.     Defendant Junsheng Zhang ("Zhang") was at the time of the IPO a member of 9F's Board.  Defendant Zhang signed the false and misleading Registration Statement.  Defendant Zhang beneficially owned 3,912,700 ordinary shares (2.1% of the outstanding shares) of 9F just prior to the IPO.

25.     Defendant Wing Hon Cheung ("Cheung") was at the time of the IPO a member of 9F's Board.   Defendant Cheung signed the false and misleading Registration Statement.

26.     Defendant Fangxiong Gong ("Gong") was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement.

27.     Defendant David Cui ("Cui") was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement.

28.     Defendant Lei Liu ("Liu") was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement.   He is also a co-founder of the Company and was, at the time of the IPO, its Executive President and Chief Risk Officer.   Defendant Liu beneficially owned 4,347,600 ordinary shares (2.3% of the outstanding shares) of 9F just prior to the IPO. Defendant Liu became the Company's Chief Risk Officer in June 2020 and replaced Defendant Sun as 9F's CEO in August 2020.

29.     Defendant Siu Fung Ming ("Ming") was at the time of the IPO 9F's duly authorized representative in the United States.   Defendant Ming signed the false and misleading Registration Statement on his own behalf and on behalf of Defendant

Cogency Global Inc. ("Cogency Global"), Defendant Ming's employer.

30.     The defendants named in ¶¶18-29 are referred to herein as the "Offering Defendants."

31.     Defendants Sun and Lin are referred to herein as the "Individual Defendants."

32.     Each of the Offering Defendants signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential 9F investors, all motivated by their own and the Company's financial interests.

33.     The Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     were directly involved in the day-to-day operations of the Company at the highest levels;

(c)     were privy to confidential proprietary information concerning the Company and its business and operations;

(d)     were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     were directly or indirectly involved in the oversight or implementation of the Company's internal controls; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

34.     The Company is liable for the acts of the Individual Defendants and the Company's employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

35.     Defendant Credit Suisse Securities (USA) LLC served as an underwriter for the Company's IPO.  Credit Suisse Securities (USA) LLC maintains an office at 2121 Avenue of the Stars, Los Angeles, CA 90067.

36.     Defendant Haitong International Securities Company Limited served as an underwriter for the Company's IPO.  The address of Haitong International Securities Company Limited is 22/F Li Po Chun Chambers, 189 Des Voeux Road Central, Hong Kong Special Administrative Region of the PRC.

37.     Defendant CLSA Limited served as an underwriter for the Company's IPO.  The address of CLSA Limited is 18/F, One Pacific Place, 88 Queensway, Hong Kong Special Administrative Region of the PRC.

38.     Defendant China Investment Securities International Brokerage Limited served as an underwriter for the Company's IPO.  The address of China

Investment Securities International Brokerage Limited is Unit Nos. 7701A & 05B-08 Level 77, International Commerce Center, No. 1 Austin Road West, Kowloon, Hong Kong Special Administrative Region of the PRC.

39.     Defendant Primasia Securities served as an underwriter for the Company's IPO.  Primasia Securities is a subsidiary of the Company and its address is Suite 4806-07, 48/F, Central Plaza, No. 18 Harbour Road, Wanchai, Hong Kong Special Administrative Region of the PRC.

40.     The defendants referenced above in ¶¶35-39 are referred to herein as the "Underwriter Defendants."  The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement.  In connection with the IPO, the Underwriter Defendants drafted and disseminated the Registration Statement and were collectively paid nearly $8 million in underwriting discounts and fees in connection therewith.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

41.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

> (a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities.  They served as the underwriters of the IPO and shared

12

substantial fees from the IPO collectively.  The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from 9F, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects;

(b)      Representatives of the Underwriter Defendants also assisted 9F and the Offering Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning the Company's most up-to-date operational and financial results and prospects;

(c)      In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with the Company's lawyers, management and top executives and engaged in "drafting sessions."  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the

terms of the IPO, including the price at which the Company's securities would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company's operations and financial condition would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

42.     Defendant Cogency Global was 9F's authorized U.S. representative for purposes of the IPO through its employee Defendant Ming, and Defendant Ming signed the Registration Statement for the IPO as an employee of Defendant Cogency Global. Defendant Cogency Global is additionally liable for the securities law violations alleged herein to have been committed by Defendant Ming as it controlled Defendant Ming at the time of the IPO.

43.     The Company, the Offering Defendants, the Underwriter Defendants, and Cogency Global are referred to herein collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

44.     9F is an online peer-to-peer lending intermediary platform in China.  It provides various loan products on its platform through which small- and mid-sized banks and individuals lend money to individual borrowers at certain interest rates. 9F charged loan facilitation service fees and post-origination services for managing these loan products.  In 2018 and the first five months of 2019, loan facilitation service fees accounted for 89% and 84% of the Company's respective net revenues.

45.     Before April 2019, 9F charged loan facilitation service fees directly from borrowers.  But as stated in 9F's Registration Statement, in recent years, China imposed increasingly stringent restrictions on peer-to-peer lending intermediary service providers like 9F to prevent undue burdens on borrowers.  In August 2015, the Supreme People's Court of China, the highest court in China, issued the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases ("2015 Judicial Provisions") providing that the aggregate rate of borrowing cost per year, including annual interest and all fees, shall not exceed 36% of the loan principal.  Additionally, *The Notice on Rectification of Cash Loan Businesses* promulgated at the end of 2017 (the "Circular 141") and *The Notice on Strengthening Business Standards and Risk Prevention by Loan Facilitation Institutions* promulgated in April 2019 (the "2019 Notice") prohibit any institutions

providing loan facilitation services in China from collecting any interests or fees from the borrowers.

46.     As a result, 9F had to cease collecting loan facilitation services directly from borrowers since April 2019, which adversely impacted its business and financial performance.  To "ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business," 9F designed a mechanism with PICC to circumvent the regulations bans and continue collecting loan facilitation service fees, *secretly and indirectly*, from borrowers via PICC.  On the surface, as disclosed in the Registration Statement, PICC provided insurance protection to all the new loans with terms of no more than 12 months that had been originated since May 2018 and charged borrowers for insurance premiums for providing such protection.  9F claimed that through such a "strategic" partnership with PICC, a borrower paid insurance premiums to PICC simultaneously when the loan principal was released to the borrower.  PICC would pay compensation to a lender when the borrower was in delinquency.  9F claimed that PICC, as part of 9F's "powerful network," "strengthen[ed] the credibility of [its] platform" and helped 9F to "expand its institutional funding partner base and promote the rapid development of [its] direct lending program."

47.     Unknown to the market, however, 9F failed to disclose in the Registration Statement that the Company did not inform its borrowers that when

borrowers signed their loan agreements in 9F's app, borrowers also simultaneously purchased insurance policies.  Within seconds of the issuance of a loan principal to a borrower's account, the insurance premiums were automatically deducted from the loan principal.[3]  In this way, 9F ensured that PICC was paid from every loan that 9F directed to PICC.  Also unknown to the market, pursuant to a secret agreement between 9F and PICC, approximately 95% of the funds that PICC collected in the name of insurance premiums were, in fact, loan facilitation service fees that should have been remitted to 9F upon PICC's receipt.  The insurance premiums accounted for 50-100% of loan principal.  Had 9F directly charged borrowers for the amount of such insurance premiums or loan facilitation service fees, it would have exceeded the 36% limitation for total interest and fees and violated Chinese law.

48.     9F also failed to disclose in the Registration Statement that due to the illegal nature of the secret arrangement with PICC, at the time of the IPO, 9F was faced with a material risk that PICC would claim such secret arrangement was invalid and seize all the premiums that it received from borrowers.

49.     On June 12, 2020, 9F disclosed in the June 12, 2020 6K that 9F and PICC filed lawsuits against each other regarding the RMB 2.2 billion (US$350

---

[3] http://m.caijing.com.cn/api/show?contentid=4644856, last viewed on January 3, 2022.

million) service fees that PICC refused to pay 9F.  But the June 12, 2020 6K did not disclose that such service fees were, in fact, loan facilitation service fees that 9F funneled through PICC to bypass legal restrictions.

50.     On June 24, 2020, the Company's 2019 20F revealed for the first time the illegal nature of 9F's partnership with PICC.  9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "PICC collected all of the loan facilitation service fees" from borrowers and "*remitted* [9F's] portion of the service fees to [9F]."  9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to borrowers, the Company started to charge service fees "*indirectly through* … insurance company."

51.     On June 18, 2020, The China Securities Journal[4] published a news article entitled "*The Drawer Agreement Pierced A "Big Hole*"; *The Lawsuits Between PICC And Jiufu Highlight The Predicament Of Credit Insurance*," revealing the details of the secret agreement between 9F and PICC on allocation of

_____

[4] The China Securities Journal is a national securities newspaper in China owned by Chinese central government and is one of the most important publications in the financial field.

insurance premiums that PICC charged borrowers.[5]  A senior expert in the Chinese peer-to-peer lending intermediary industry told The China Securities Journal that when the loan principal was issued to a 9F borrower's account, insurance premiums ranging from a few hundred RMBs to a few thousand RMBs were "transferred within seconds" to PICC from the borrower's account to "automatically be used for purchasing PICC's performance insurance."   PICC kept 5% of the insurance premiums, while the remaining 95% would "make a twirl" in PICC's account and would be transferred to 9F.  The expert said that borrowers probably did not know about the "drawer agreement", *i.e.*, the secret fee allocation arrangement, between PICC and 9F.

52.    9F Former Employee 1 ("FE 1") confirms that neither 9F nor PICC informed borrowers that PICC collected loan facilitation service fees from borrowers for 9F disguised as insurance premiums.  FE1 worked as a Finance Manager at Jiufu Shuke Technology Group Co., Ltd. ("Jiufu Shuke") – the primary operating subsidiary of 9F – from March 2019 to May 2020.  His main job responsibilities included: (i) adjusting the differences between the Company's Chinese and the U.S. financial statements in accordance with the US Generally Accepted Accounting

---

[5] https://www.cs.com.cn/jg/05/202006/t20200618_6068596.html, last viewed on January 3, 2022.

principles ("GAAP"); (ii) preparing monthly, quarterly, and annual financial statements for the purposes of filing with the SEC; and (iii) conducting financial analysis, accounting, tax planning, year-end auditing.  According to FE 1, borrowers on 9F's platform were not aware that 9F received service fees from the insurance company because it was not specified in the insurance contracts into which borrowers entered.  FE 1 stated that "on the surface of [9F's] financial statements, it is claimed that PICC were obligated to pay service fees to 9F pursuant to the agreement.  But in fact, 9F gave such funds to PICC.  This was just a *formality*.  PICC should return such funds to 9F."  FE1's statements are consistent with the fact that 9F transferred insurance premiums to PICC directly from borrowers' accounts on 9F's platform.

53.    Additionally, Sina Black Cat – an online consumer complaint platform widely used by Chinese consumers to expose product and service problems – revealed that 9F borrowers filed 11,076 complaints against 9F regarding the prohibitively high insurance premiums that 9F forcibly and secretly charged.  A search of "9F beheading interest" on Sina Black Cat further revealed 4,936 complaints filed against 9F.  "Beheading interest" is a term commonly used in China referring to prohibitively high interest rate or usury.  All these complaints reveal that in 2019 9F secretly charged large amounts of insurance premiums from loan principals without informing borrowers in advance or even afterwards.  Borrowers

were also not allowed to cancel the insurance policies 9F purchased for them or to request refunds.  Borrowers complained that premiums and interest on the premiums usually accounted for 50-100% of the loan principal they received and were usury in blatant violation of Chinese law.

54.    For example, Borrower 1 complained on Sina Black Cat that he borrowed a RMB22,300 loan on January 28, 2019 with an annual interest rate of 8.7% on 9F's platform.[6]  9F, without informing Borrower 1, simultaneously sold Borrower 1 two PICC insurance policies.  Pursuant to such insurance policies, Borrower should pay a total of RMB 6961.51 for the insurance premiums and interest on the premiums by 12-month installments.  Such insurance premiums, interest on the premiums, and the expressly required 8.7% interest on the loan, in total, accounted for 40% of the loan principal and exceeded the 36% limitation for total interest and fees set by Chinese regulations.  Based on the secret arrangement that the 95% of the insurance premiums were actually loan facilitation service fees for 9F, 9F would have received RMB 6,613.43 in kickbacks from PICC.

55.    Similarly, Borrower 2 complained that on August 5, 2019, he requested a RMB 5,000 loan on 9F's platform.  Without Borrower 2's knowledge, 9F issued a

---

[6] https://tousu.sina.com.cn/complaint/view/17349166037/, last viewed on January 3, 2022.

RMB 7,890 loan (*i.e.* RMB 5,000 plus RMB 2,890) to his account and in four seconds of the issuance, transferred RMB 2,890 to PICC as insurance premiums.[7] Such so called insurance premiums accounted for 58% of the loan principal.  When Borrower 1 told 9F that he refused to pay the insurance premiums, 9F insisted that he must pay the insurance premiums to clear his debt.  Eventually Borrower 2's credit record was negatively impacted due to his refusal to pay the premiums for insurance he never agreed to purchase.  Based on the secret arrangement that 95% of the insurance premiums were actually loan facilitation service fees for 9F, 9F would have received RMB 2,745.5 in kickbacks from PICC.

56.      Additionally, Borrower 3 complained that 9F issued a RMB36,050 loan to his account on October 20, 2019.[8]  Without Borrower 3's knowledge, 9F immediately transferred RMB 13,250 to PICC as an insurance premium.  Borrower 3 ended up actually receiving only RMB 22,800, and never received any insurance policy from PICC.  Borrower 3 had paid RMB37576.02 by installment and nearly doubled the loan principal he actually received, but still kept receiving threatening telephone calls and text messages demanding more payments.  The insurance

---

[7] https://tousu.sina.com.cn/complaint/view/17353758383/, last viewed on January 3, 2022.
[8] https://tousu.sina.com.cn/complaint/view/17355817330/, last viewed on January 3, 2022.

premium and all other interest and fees accounted for 65% of the loan principal. Based on the secret arrangement that 95% of the insurance premiums were actually loan facilitation service fees for 9F, 9F would have received RMB 12,587.5 in kickbacks from PICC.

57.     A penalty notice issued by China Banking and Insurance Regulatory Commission regarding PICC's violations in its partnership with 9F also confirms that 9F, not PICC, played the leading role in collecting insurance premium.[9]  The penalty notice revealed the PICC issued over 7 million insurance policies to 9F's borrowers from March 2018 to December 2019.  The penalty notice also revealed that 9F, not PICC, determined the exact amount of insurance fees and interest that PICC should collect from each borrower in contravention of existing insurance premium rates pre-approved by the Commission that PICC should have followed.

58.     Since the exposure of PICC's refusal to remit 9F's RMB 2.2 billion service fees and the illegal nature of the collaboration between 9F and PICC, the price of 9F ADSs has plummeted in value.  As of the filing of the initial complaint, 9F ADSs were 85% below the IPO price.

_____

[9]  https://news.cnstock.com/news,bwkx-202101-4640974.htm,  last  viewed  on January  3,  2022;  https://finance.caixin.com/2021-01-06/101647196.html,  last viewed         on         January         3,         2022; https://m.thepaper.cn/yidian_promDetail.jsp?contid=10682964&from=yidian, last viewed on January 3, 2022.

23

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### 9F's IPO Registration Statement

59.    On or about July 25, 2019, 9F filed with the SEC a registration statement on Form F-1, which in combination with subsequent amendments on Forms F-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO.  The F-1 was signed by the Offering Defendants.

60.    On August 14, 2019, 9F filed its final amendment to the Registration Statement with the SEC on Form F-1/A.  The SEC declared the Registration Statement effective after the close of trading that same day.  This F-1/A was signed by the Offering Defendants.

61.    On August 15, 2019, the Company filed its prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement.

62.    In the IPO, 9F sold 8.9 million ADSs (including the full exercise of the Underwriter Defendants' over-allotment option), generating approximately $84.55 million in proceeds from the offering (before costs and expenses).

63.    The Registration Statement for the IPO was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding 9F's business, operations, and prospects.

64.    Specifically, the Registration Statement stated, in relevant part, that:

"We partner with financial institutions such as China Taiping and PICC to provide third-party insurance protection to investors that invest in loans we facilitate, which strengthens the credibility of our platform and further enlarges our investor base. PICC, when it is engaged under our direct lending program, also provides credit insurance to institutional funding partners, helping us to expand our institutional funding partner base and promote the rapid development of our direct lending program, which may ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business."

* * *

"[A]s with other types of insurance, PICC may refuse to pay compensation if PICC determines the relevant institutional funding partners are not entitled to compensation…. If PICC decides to terminate the insurance arrangements under our direct lending program, not to renew such arrangements after the expiry of our cooperation agreements or to significantly increase the insurance premium, our service may become less attractive to institutional funding partners, which may negatively affect the development of our direct lending program and our business and results of operations could be materially and adversely affected."

* * *

"Loan facilitation services fees are the portion of service fees we charge to borrowers with whom we have stopped charging service fees since April 2019 or financial institutional partners in relation to the services we provide such as traffic referral services and credit assessment."

65.    The above statements were materially false and misleading because they implied that the full amounts that PICC charged borrowers for were insurance premiums to be used for protecting loans and that 9F only charged PICC for "traffic referral service fees" for referring business to PICC.   In contrast to these

25

representations, 9F used PICC as a conduit to circumvent Chinese laws to continue collecting exorbitantly high amounts of loan facilitation service fees ***indirectly and disguised as insurance premiums*** from borrowers.  The Registration Statement also failed to disclose that the so called "strategic" partnership with PICC was illegal and subjected 9F to an imminent and material risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan facilitation service fees that 9F transferred from borrowers' accounts to PICC's account.  The Registration Statement failed to disclose that if such risk materialized, it would significantly impact 9F's financial performance.

66.    The Registration Statement also stated, in relevant part, that:

"As of the date of this prospectus, we do not have any outstanding loan balance that we have facilitated since the promulgation of Circular 141 with an APR of higher than 36%, even inclusive of any additional fees incurred by borrowers in relation to third-party insurance and guarantee protection, such as insurance premiums to the insurer, money contributions to the depository account and guarantee fee to the guarantee company."

* * *

"Loan facilitation services fees are the portion of service fees we charge to borrowers with whom we have stopped charging service fees since April 2019 or financial institutional partners in relation to the services we provide such as traffic referral services and credit assessment."

67.    The above statements were materially false and misleading because 9F did not stop charging loan facilitation service fees from borrowers since April 2019. In fact, 9F continued collecting exorbitantly high amounts of loan facilitation service

fees, ***indirectly and disguised as insurance premiums***, from borrowers via PICC. 9F's practices violated the 2015 Judicial Provisions, Circular 141 and 2019 Notice. 9F transferred the "insurance premiums" from borrowers' accounts to PICC's accounts the moment borrowers received their loan principal without borrowers' knowledge.  Borrowers were not allowed to cancel their insurance policies and were threatened by debt collectors if they refused to pay premiums.

68.     Failure to disclose the true nature of the arrangement with PICC in the Registration Statement also violated GAAP.  GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

69.     The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the U.S. Financial Accounting Standards Board ("FASB").  *See* Release Nos. 33-8221; 34-47743; IC-26028; FR-70.  The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1.  SEC and NASDAQ rules and regulations require that publicly traded companies such as 9F include financial statements that comply with GAAP in their annual and quarterly reports, as well as registration statements filed with the

SEC.  *See* §13 of the Exchange Act; Regulation S-X.  SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing financial statements that conform to GAAP, as provided in the Public Company Accounting Oversight Board standards that govern financial statement auditors ("PCAOB Standards").

70.     ASC 606 requires 9F "to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. To achieve that objective, an entity shall disclose qualitative and quantitative information about all of the following: a. Its contracts with customers…."  ASC 606-10-50-1.  9F "shall aggregate or disaggregate disclosures so that useful information is not obscured by either the inclusion of a large amount of insignificant detail or the aggregation of items that have substantially different characteristics."   ASC 606-10-50-2. Additionally, 9F "shall disclose all of the … amounts of …. revenue recognized from contracts with customers, which the entity shall disclose separately from its other sources of revenue." ASC 606-10-50-4.   Furthermore, 9F "shall disaggregate revenue recognized from contracts with customers into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected

by economic factors." ASC 606-10-50-5.  9F shall also disclose "the opening and closing balances of receivables from contracts with customers, if not otherwise separately presented or disclosed." ASC 606-10-50-8.  ASC 450-20 requires a loss contingency to be accrued by a charge to income if it is probable and estimable. ASC 450-20-25-2.  A disclosure is required if: (1) there has been a manifestation of an unaccreted claim; or (2) it is probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable. ASC 450-20-50-3.

71.     Accordingly, 9F should have separately disclosed in the Registration Statement, but failed to disclose, revenue recognized from its lending contracts with its borrowers that 9F indirectly collected via PICC.   ASC 606-10-50-4. Additionally, 9F should have separately disclosed, but failed to disclose, the opening and closing balances of receivables from PICC because such receivables are loan facilitation service fees that 9F collected from its borrower via PICC.  ASC 606-10-50-8.  Such disclosures do not require subjective judgment because the timing and the amount of revenues to recognize are indisputable.

72.     Furthermore, contingent liabilities apply to any financial reporting period when 9F was exposed to the risk that borrowers would assert claims that 9F improperly charged loan fees, either in violation of the law, or by deceiving borrowers into thinking they were paying insurance premiums which, unknown to them, included service fees.  PICC started to charge 9F's borrowers for insurance

29

premiums since May 2018, starting which time 9F was subject to the risk that borrowers would assert claims against 9F for its improper charges.  Therefore, the Registration Statement should have disclosed 9F's contingent liability.  ASC 450-20.

73.    In addition, the undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the Registration Statement.  SEC Regulation S-K (27 CFR 229.10) provides that registration statements such as the one filed by 9F on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. 229.10.  Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.  Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 n.1.  Item 303 of SEC Regulation S-K required the Company to disclose "any known trends or uncertainties that have had or that [9F] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K required disclosure in the Registration Statement of "the most significant factors that ma[d]e an investment in [the IPO] speculative or risky," and an explanation of "how

the risk affect[ed] [9F] or the securities being offered." As detailed herein, the Registration Statement failed to disclose material facts necessary to apprise ADS purchasers of the true risks inherent in investing in the Company and of known adverse trends and uncertainties.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

74.    Plaintiff brings this action as a class action on behalf of all those who purchased the Company's securities pursuant and/or traceable to the Registration Statement and/or during the Class Period ("Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

75.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

76.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws;

(b)     whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and to what extent the members of the Class have sustained damages and the proper measure of damages;

(c)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(d)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the

statements made, in light of the circumstances under which they were made, not misleading;

(e)   whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(g)   whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)   to what extent the members of the Class have sustained damages and the proper measure of damages.

79.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT CLAIMS

### COUNT I
### For Violations of Section 11 of the Securities Act
### Against All Defendants

80.   Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

81.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  For purposes of this Count, Plaintiff expressly disclaims any allegations based upon fraud.

82.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

83.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

84.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

85.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

86.     Plaintiff acquired the Company's securities pursuant to the Registration Statement.

87.     At the time of their purchases of 9F securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

88.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering.  It is therefore timely.

## COUNT II
## Violations of Section 12(a)(2) of the Securities Act
## Against All Defendants

89.     Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

90.     By means of the defective Prospectus, Defendants promoted, solicited, and sold 9F securities to Plaintiff and other members of the Class.

91.     The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased the Company's securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

92.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired 9F securities.

93.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2).  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased 9F securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares.  Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein.  Class members who have sold their securities seek damages to the extent permitted by law.

94.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering.  It is therefore timely.

## COUNT III
## Violations of Section 15 of the Securities Act
## Against the Offering Defendants

95.     Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

96.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

97.     The Offering Defendants were controlling persons of 9F by virtue of their positions as directors or senior officers of the Company. The Offering Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of the Company.  The Company controlled the Offering Defendants and all of 9F employees.

98.     The Company and the Offering Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

99.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering.  It is therefore timely.

**Post-IPO Materially False and Misleading Statements**

100.    On June 12, 2020, 9F filed the June 12, 2020 6K disclosing its ongoing dispute with PICC.  According to 9F, the dispute involved RMB2.2 billion ($324.5

million) in unpaid service fees and RMB1.4 billion ($206.5 million) in service fees that had previously been recorded as accounts receivable and which were then recognized as fully impaired, resulting in multiple legal actions in China.  The June 12, 2020 6K is materially false and misleading because it failed to disclose that the dispute represented a materialized risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan facilitation service fees that 9F transferred from borrowers' accounts to PICC's account.

101.   On June 15, 2020, 9F filed a Form NT 20-F with the SEC stating that the Company could not timely file its annual report because of its dispute with PICC. The Form NT 20-F is materially false and misleading because it failed to disclose that the dispute constituted a materialized risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan facilitation service fees that 9F transferred from borrowers' accounts to PICC's account.

102.   On June 17, 2020, 9F issued a press release on a Form 6-K ("June 17, 2020 6K") which provided the Company's fourth quarter and full-year 2019 financial results and the financial consequences of the Company's dispute with PICC.  The June 17, 2020 6K is materially false and misleading because it failed to disclose that the dispute represented a materialized risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan facilitation service fees that 9F transferred from borrowers' accounts to PICC's account.

38

## THE TRUTH MATERIALIZES CAUSING PLAINTIFF'S LOSSES

103.   Soon after the IPO, several directors resigned from 9F's Board.  On October 10, 2019, Defendant Cheung resigned from 9F's Board purportedly for "personal reasons."  Defendant Xu resigned on January 20, 2020, also purportedly for personal reasons.  Defendants Zhang and Huang resigned on March 16 and March 27, 2020, respectfully, also purportedly for personal reasons.  Defendant Cui also subsequently resigned his directorship despite serving in the position for only approximately one year.

104.   On June 17, 2020, 9F issued the June 17, 2020 6K which provided the Company's fourth quarter and full-year 2019 financial results, which described the devastating financial consequences of the Company's dispute with PICC.  The June 17, 2020 6K disclosed for the first time that since November 2019, PICC had stopped providing insurance protections to 9F's new loans with terms of no more than 12 months.  The June 17, 2020 6K further disclosed for the first time that 9F had suspended its cooperation with PICC since December 2019.  9F's total net revenues decreased by 54.4% and 20.4% in the fourth quarter of 2019 and in full-year 2019 "primarily due to the decrease in loan facilitation services revenue."  Loan facilitation services revenue decreased by 90.5% and 29.9% in the fourth quarter of 2019 and in full-year 2019 "primarily because the loan facilitation services revenue under our direct lending program in the fourth quarter of 2019 was not recognized

due to our dispute with PICC."

105.   On this news, shares of 9F fell $0.165 per ADS, or 2.7%, from its close on June 16, 2020 to close at $6.00 per ADS on June 17, 2020, damaging investors.

106.   As the result of failure to manage the material risk associated with the partnership with PICC causing severe damages to 9F's businesses, on June 22, 2020, after the market closed, 9F issued a press release on Form 6-K ("June 22, 2020 6K"), announcing that Zengxiao Jin was removed from the chief risk officer position.  Lei Liu, president of 9F directly assumed the role of chief risk officer.

107.   On this news, shares of 9F fell $1.13 per ADS, or 18%, from its close on June 22, 2020, to close at $5.00 per ADS on June 23, 2020, further damaging investors.

108.   On June 24, 2020, the Company filed a 2019 20-F with the SEC, revealing for the first time the illegal nature of 9F's partnership with PICC.  9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "PICC collected all of the loan facilitation service fees" from borrowers and "*remitted* [9F's] portion of the service fees to [9F]."  9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to the borrowers, the Company started to charge service fees "*indirectly through* … insurance company."

40

109.   On this news, 9F's ADS price fell by $0.38 per ADS or 7.6% on June 24, 2019 and another $1.12 per ADS or 24% over the next three days.

110.   On September 29, 2020, after the market closed, 9F reported its first half 2020 financial results.   9F's financial performance continued drastically declining because 9F was no longer able to collect large amount of loan facilitation fees from borrowers via a conduit like PICC.  The Company's total net revenues had plummeted 61% during the first half of 2020 as compared to the latter half of 2019.

111.   On this news, ADSs of 9F fell $0.20 per ADS, or 18%, to close at $0.91 per ADS on September 30, 2020, further damaging investors.

112.   Subsequent to the IPO, the price of 9F ADSs has plummeted in value. As of the filing of the initial complaint, 9F ADSs were trading at about $1.40 per ADS.

113.   Since the IPO, and as a result of the disclosure of material adverse facts omitted from the Company's Registration Statement, 9F's stock price has significantly fallen below its IPO price, damaging Plaintiff and Class members.

114.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## EXCHANGE ACT CLAIMS

### COUNT IV
### Violation of Section 10(b) of The Exchange Act and SEC Rule 10b-5
### Against Defendants 9F and the Individual Defendants

115.   Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.   This Count is asserted against 9F and Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

116.   9F is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

117.   The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to 9F under *respondeat superior* and agency principles.

### Applicability of Presumption of Reliance:
### *Affiliated Ute*

118.   The statements made by 9F and the Individual Defendants during the Class Period were misleading for omitting to disclose information as alleged above which rendered statements in the Registration Statement and subsequent SEC filings misleading.

119.   Neither plaintiff nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972).  All that is necessary is that the facts that 9F withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### Application of Presumption of Reliance:
### *Fraud on the Market*

120.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) 9F and the Individual Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) 9F ADSs were traded in efficient markets during the Class Period.

121.   9F's ADSs were traded in efficient markets during the Class Period for the following reasons: (i) the ADSs were traded on NASDAQ; (ii) on average shares representing more than 2.0% of the securities' float were traded weekly during the Class Period; (iii) during the Class Period, 9F was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were widely

distributed and publicly available; (iv) 9F met the criteria for eligibility to file a Registration Statement during the Class Period; (v) 9F could timely file all required annual, quarterly and material event reports with the SEC during the Class Period; (vi) 9F regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vii) the price of 9F ADSs responded quickly to incorporate and reflect new public information concerning 9F during the Class Period; (viii) numerous market makers made a market in 9F ADSs during the Class Period.

122.   During the Class Period, 9F and the Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class.  9F and the Individual Defendants also made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class

Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of 9F ADSs; and (iii) cause Plaintiff and other members of the Class to purchase 9F ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, 9F and Individual Defendants, and each of them, took the actions set forth herein.

123.    Pursuant to the above plan, scheme, conspiracy and course of conduct, 9F and each of the Individual Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for 9F ADSs.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about 9F's finances and business prospects.

124.    By virtue of their positions at 9F, 9F and Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, 9F and Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the

statements made, although such facts were readily available to 9F and Individual Defendants.   Said acts and omissions of 9F and Individual Defendants were committed willfully or with reckless disregard for the truth.   In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

125.   Information showing that 9F and Individual Defendants acted knowingly or with reckless disregard or the truth is peculiarly within the knowledge and control of 9F and Individual Defendants.   As the senior managers and/or directors of 9F, the Individual Defendants had knowledge of the details of 9F internal affairs.

126.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of 9F.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to 9F's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market prices of 9F securities were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning 9F's business and financial condition

which were concealed by 9F and Individual Defendants, Plaintiff and the other members of the Class purchased 9F ADSs at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by 9F and Individual Defendants and were damaged thereby.

127.   During the Class Period, 9F ADSs were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased 9F securities at prices artificially inflated by the wrongful conduct of 9F and Individual Defendants.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of 9F ADSs was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of 9F securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

128.   By reason of the conduct alleged herein, 9F and Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

129.   As a direct and proximate result of the wrongful conduct of 9F and Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT V**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

130.   Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

131.   During the Class Period, the Individual Defendants participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, the Individual Defendants knew the adverse non-public information regarding the Company's business practices.

132.   As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

133.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

134.   By reason of their senior management positions and/or being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.  The Individual Defendants also had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.   Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to

49

control or influence the particular transactions giving rise to the securities violations.

135.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)   declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)   awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)   awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 3, 2022

Respectfully submitted,

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**

By:   */s/ James E. Cecchi*
James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994 -1700

*Liaison Counsel for Lead Plaintiff and the
Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

*Counsel for Lead Plaintiff and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*