# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CRAIG J. HOLLAND, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>9F INC., LEI SUN, YANJUN LIN, YIFAN REN, CHANGXING XIAO, FLYNN XUXIAN HUANG, IVAN XU, JUNSHENG ZHANG, WING HON CHEUNG, FANGXIONG GONG, DAVID CUI, LEI LIU, SIU FUNG MING, CREDIT SUISSE SECURITIES (USA) LLC, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CLSA LIMITED, CHINA INVESTMENT SECURITIES INTERNATIONAL BROKERAGE LIMITED, 9F PRIMASIA SECURITIES LIMITED, and COGENCY GLOBAL INC.,<br><br>Defendants. | **Case No: 2:21-cv-00948-MCA-MAH**<br><br><br><br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................1

II.    STATEMENT OF FACTS....................................................................4

III.   STANDARD OF REVIEW ...................................................................9

IV.    PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE
       SECURITIES ACT................................................................................9

       A.   The Securities Act Places a Minimal Pleading Burden
            on a Plaintiff ...............................................................................9

       B.   The Heightened Pleading Standards of Rule 9(b) and the PSLRA Do
            Not Apply Because Plaintiff's Securities Act Claims Do Not Sound in
            Fraud..........................................................................................11

       C.   Plaintiff Adequately Alleges that the Company's IPO was False and
            Misleading ................................................................................13

       D.   Defendants' Failure to Disclose the True Nature of the Company's
            Arrangement with PICC Violated GAAP ...........................................19

       E.   Defendants' False and Misleading Statements Represented Known
            Trends that Required Disclosure .......................................................22

       F.   Plaintiff Adequately Alleges a Claim Pursuant to Section 12(a)(2)...23

       G.   Defendants' Falsity Arguments Fail ...................................................24

       H.   Plaintiff Adequately Alleges Control Person Liability Under the
            Securities Act ............................................................................28

V.     PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE
       EXCHANGE ACT ..............................................................................29

A.    Plaintiff Adequately Alleges that Defendants Made Materially False and Misleading Statements.................................................30

1.    Defendants' Statements Made in Connection with the Company's IPO Were False and Misleading............................30

2.    Defendants' Post-IPO Statements Were False and Misleading..........................................................................30

B.    Plaintiff Adequately Alleges that Defendants Acted With Scienter...32

C.    Plaintiff Adequately Alleges Loss Causation ....................................35

D.    Plaintiff Adequately Alleges Control Person Liability Under the Exchange Act ...................................................................................39

VI.    CONCLUSION..........................................................................................40

ii

## TABLE OF AUTHORITIES

### <u>CASES</u>

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ......................................................................33

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021)............................................... 35-36

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................9

*Bauer v. Prudential Fin., Inc.*,
  No. CIV.A. 09-1120 (JLL), 2010 WL 2710443
  (D.N.J. June 29, 2010)............................................................... 12, 13, 27

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................9

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ....................................................................40

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ....................................................................23

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................... 36, 38

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014)....................................................................33

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000) ....................................................................39

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) .................................................................................10

*Fain v. USA Techs., Inc.*,
  707 F. App'x 91 (3d Cir. 2017).................................................................32

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ..................................................................................33

*Gaer v. Educ. Mgmt. Corp.*,
No. CIV.A. 10-1061, 2011 WL 7277447 (W.D. Pa. Aug. 30, 2011) ..................12

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d 2000) ..........................................................................................34

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004) ...................................................................................33

*Hall v. Johnson & Johnson*,
No. CV 18-1833 (FLW), 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ................39

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ...............................................................................................10

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) ........................................................................... 24, 29

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
No. 05-232, 2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ................................... 13, 29

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006) ....................................................................27

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
No. 17-CV-4846 (WFK), 2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020)............25

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) .................................................................................40

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001)..........................................................................35

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008) ..............................................................................39

iv

*In re Envision Healthcare Corp.*,
No. CV 18-1068-RGA, 2019 WL 3494407 (D. Del. Aug. 1, 2019)....................28

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008) ...............................................................27

*In re HEXO Corp. Sec. Litig.*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021) ...............................................................23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) .............................................................................25

*In re Navient Corp. Sec. Litig.*,
No. CV 17-8373 (RBK/AMD), 2019 WL 7288881 (D.N.J. Dec. 30, 2019).......27

*In re Providian Fin. Corp. Sec. Litig.*,
152 F. Supp. 2d 814 (E.D. Pa. 2001)........................................................... 26, 35

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ...............................................................................28

*In re Sotheby's Holdings, Inc.*,
No. 00 CIV. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)...........26

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ....................................................................... *passim*

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
No. CV157658MASLHG,
2017 WL 1658822 n.22 (D.N.J. Apr. 28, 2017)........................................... 12, 27

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009) ...............................................................25

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ....................................................................... 27, 34

*Kanefsky v. Honeywell Int'l Inc.*,
No. 18-CV-15536, 2020 WL 2520669 (D.N.J. May 18, 2020) ..........................39

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) .................................................................... 22, 23

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ...................................................................................34

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) .....................................................................25

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517, (D.N.J. 2010).........................................................28

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) .............................................................................10

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) .....................................................................23

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) .....................................................23

*Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ....................................................................37

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ................................................................ 24-25

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) ................................................................... 33-34

*Sun v. Han*,
    No. 15-703, 2015 WL 9304542 (D.N.J. Dec. 21, 2015).........................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................... *passim*

*Vanderhoef v. China Auto Logistics Inc.*,
    No. 18-CV-10174, 2021 WL 3260849 (D.N.J. July 30, 2021).................... *passim*

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
   No. CV21815530KMJAD, 2020 WL 3169506 (D.N.J. June 12, 2020) ...............38

## STATUTES

15 U.S.C. § 77k ........................................................................................... 9, 10

15 U.S.C. § 77*l*(a)(2) .......................................................................................23

15 U.S.C. § 78j(b) .............................................................................................29

15 U.S.C. § 78t(a) ....................................................................................... 39, 40

15 U.S.C. § 78u-4(b) ................................................................................ 30, 32, 35

## REGULATIONS

17 C.F.R. § 210.4-01(a)(1) .................................................................................20

17 C.F.R. § 229.10 ............................................................................................22

## I.   INTRODUCTION

This is securities class action brought on behalf of persons who purchased or otherwise acquired the American Depository Shares ("ADSs") of 9F Inc. ("9F" or the "Company"): (1) pursuant and/or traceable to the registration statement and related prospectus ("Registration Statement") issued in connection with 9F's August 14, 2019 Initial Public Offering ("IPO" or "Offering"); and/or (2) between August 14, 2019 and September 29, 2020, inclusive ("Class Period").[1]   Plaintiff asserts claims pursuant to the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

Defendant 9F is an online peer-to-peer lending intermediary platform in China.  On 9F's platform, its institutional funding partners – usually small or mid-size banks and individuals – lent money to individual borrowers through 9F's loan

---

[1]      Defendants are 9F, Chief Executive Officer Lei Sun, Chief Financial Officer Yanjun Lin, Board member Yifan Ren, Board member Changxing Xiao, Board member Flynn Xuxian Huang, Board Member Ivan Xu, Board member Junsheng Zhang, Board member Wing Hon Cheung, Director Fangxiong Gong, Director David Cui, Director Lei Liu, Company Representative Siu Fung Ming ("Offering Defendants"), Credit Suisse Securities (USA) LLC, Haitong International Securities Company Limited, CLSA Limited, China Investment Securities International Brokerage Limited, and Primasia Securities ("Underwriter Defendants") (collectively "Defendants").  Unless otherwise indicated, all emphasis is added, all internal citations and quotations are omitted, and all "Rules" references are to the Federal Rules of Civil Procedure.  Unless otherwise stated, all paragraph ("¶") references are to Plaintiff's Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint").

products.  9F charges facilitation service fees for facilitating loans between lenders and borrowers.

Starting in 2015, China published a series of regulations and judicial interpretations requiring that the total amount of interest and fees that a lender charges a borrower shall not exceed 36%.  The regulations and interpretations further required that lending intermediaries, such as 9F, shall not charge fees from borrowers.  To circumvent these restrictions, however, 9F struck an arrangement with Property and Casualty Company Limited ("PICC"), an insurance company in China, through two agreements.  One agreement, which was publicly disclosed and legal, provided that PICC deducted a certain amount from loan principal that a borrower borrowed on the 9F platform in the name of the insurance premium protecting the lender's loaned fund.  The other agreement, an illegal and secret one only known between 9F and PICC, provided that 95% of the funds that PICC collected disguised as insurance premiums were in fact loan facilitation service fees that PICC would remit to 9F upon receipt.  Such facilitation service fees secretly funneled by 9F via PICC, together with the interest that borrowers had to pay to their lenders, accounted for 50-100% of borrowed principal – much higher than the limit of 36% – and blatantly violated Chinese law.

The Company, however, failed to disclose this secret arrangement and its associated material risk in 9F's Registration Statement for its IPO. Instead, 9F

2

misleadingly stated that it charged PICC service fees for the loans it referred to PICC. The risk quickly materialized after 9F's IPO. On June 12, 2020, 9F disclosed for the first time that PICC withheld RMB 2.2 billion (US$350 million) in service fees from 9F in 2019. The Company further disclosed that PICC filed a lawsuit against 9F, claiming that the agreement between 9F and PICC was invalid and that PICC had no duty to pay the service fees. 9F also disclosed that it filed a lawsuit against PICC for PICC's non-performance. On June 24, 2020, moreover, 9F revealed for the first time the illegal nature of its agreement with PICC.

The market strongly reacted to 9F's revelations. Specifically, 9F's stock price fell by 7.6% on June 24, 2019 and another 24% over the next three days. 9F continued to suffer financially when, on September 29, 2020, the Company reported that its loan facilitation services revenue in the first half of 2020 decreased by 85.5% from the second half of 2019. On this news, 9F's ADS share price fell 18%, further damaging investors.

Because Plaintiff has adequately alleged claims under the Securities Act and the Exchange Act, the Court should deny Defendants' Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Amended Class Action Complaint ("Motion"). With respect to Plaintiff's Securities Act claims, Defendants fail to recognize that Plaintiff's claims are governed by Rule 8 rather than Rule 9. Accordingly, Defendants' arguments regarding the particularity required of

Plaintiff's claims under the Securities Act fail. Defendants' arguments with respect to Plaintiff's Exchange Act claims also fail, as Plaintiff has adequately alleged falsity, scienter, and loss causation. The Court should deny Defendants' Motion.

## II.  STATEMENT OF FACTS

Defendant 9F is an online peer-to-peer lending intermediary platform in China. ¶¶2, 44. On 9F's platform, its institutional funding partners lent money to individual borrowers through 9F's loan products. *Id*. 9F charges facilitation service fees for facilitating loans between lenders and borrowers. *Id*. In 2018 and the first five months of 2019, loan facilitation service fees accounted for 89% and 84% of the Company's respective net revenues. *Id*.

Before April 2019, 9F charged loan facilitation service fees directly from borrowers. ¶45. But as stated in 9F's Registration Statement, in recent years, China imposed increasingly stringent restrictions on peer-to-peer lending intermediary service providers like 9F to prevent undue burdens on borrowers. *Id*.

In August 2015, the Supreme People's Court of China, the highest court in China, issued the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases ("2015 Judicial Provisions") providing that the aggregate rate of borrowing cost per year, including annual interest and all fees, shall not exceed 36% of the loan principal. ¶¶3, 45. Additionally, *The Notice on Rectification of Cash Loan Businesses* promulgated at the end of 2017 (the "Circular 141") and

4

*The Notice on Strengthening Business Standards and Risk Prevention by Loan Facilitation Institutions* promulgated in April 2019 (the "2019 Notice") prohibit any institutions providing loan facilitation services in China from collecting any interests or fees from the borrowers. *Id*.

As a result, 9F had to cease collecting loan facilitation services directly from borrowers since April 2019, which adversely impacted its business and financial performance. ¶¶4, 46. To "ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business," 9F designed a mechanism with PICC, an insurance company in China, to circumvent the regulations bans and continue collecting loan facilitation service fees, **secretly and indirectly**, from borrowers via PICC. *Id*. On the surface, as disclosed in the Registration Statement, PICC provided insurance protection to all the new loans with terms of no more than 12 months that had been originated since May 2018 and charged borrowers for insurance premiums for providing such protection. *Id*. 9F claimed that through such a "strategic" partnership with PICC, a borrower paid insurance premiums to PICC simultaneously when the loan principal was released to the borrower. *Id*. PICC would pay compensation to a lender when the borrower was in delinquency. *Id*. 9F claimed that PICC, as part of 9F's "powerful network," "strengthen[ed] the credibility of [its] platform" and helped 9F

5

to "expand its institutional funding partner base and promote the rapid development of [its] direct lending program." *Id*.

Unknown to the market, however, 9F failed to disclose in the Registration Statement that the Company did not inform its borrowers that when borrowers signed their loan agreements in 9F's app, borrowers also simultaneously purchased insurance policies. ¶¶4, 5, 47. Within seconds of the issuance of a loan principal to a borrower's account, the insurance premiums were automatically deducted from the loan principal. *Id*. In this way, 9F ensured that PICC was paid from every loan that 9F directed to PICC. *Id*. Also unknown to the market, approximately 95% of the funds that PICC collected in the name of insurance premiums were, in fact, loan facilitation service fees that should have been remitted to 9F upon PICC's receipt. *Id*. The insurance premiums accounted for 50-100% of loan principal. *Id*. Had 9F directly charged borrowers for the amount of such insurance premiums or loan facilitation service fees, it would have exceeded the 36% limitation for total interest and fees and violated Chinese law. *Id*. 9F also failed to disclose in the Registration Statement that due to the illegal nature of the secret arrangement with PICC, 9F was faced with a material risk that PICC would claim such secret arrangement was invalid and seize all the premiums that it received from borrowers. ¶¶4, 48. With the materially misleading Registration Statement, Defendants conducted the IPO in

6

August 2019, selling approximately 8.9 million ADSs to the investing public at $9.50 per ADS, and pocketed $84.55 million from investors. ¶6.

The risk quickly materialized after 9F's IPO. ¶¶7, 49. On June 12, 2020, 9F disclosed for the first time as a material adverse event that PICC withheld RMB 2.2 billion (US$350 million) in service fees from 9F in 2019. *Id*. The Company further disclosed that PICC filed a lawsuit against 9F, claiming that the agreement between 9F and PICC was invalid and that PICC had no duty to pay the service fees. *Id*. 9F also disclosed that it filed a lawsuit against PICC for PICC's non-performance. *Id*. The Company, however, did not disclose in the June 12, 2020 6K that the real nature of the dispute related to the loan facilitation service fees that 9F asked PICC to illegally and secretly collect from 9F's borrowers. *Id*.

On June 24, 2020, 9F filed its Form 20-F ("2019 20F"), revealing for the first time the illegal nature of its agreement with PICC. ¶¶8, 50. 9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "PICC collected all of the loan facilitation service fees" from borrowers and "***remitted*** [9F's] portion of the service fees to [9F]." *Id*. 9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to borrowers, the Company started to charge service fees "***indirectly through*** … insurance company." *Id*. Given that PICC's withholding of 9F's loan

7

facilitation service fees accounted for 29.9% of lost revenue in 2019, the market strongly reacted to 9F's revelation. ¶8. Specifically, 9Fs' stock price fell by 7.6% on June 24, 2019 and another 24% over the next three days. *Id.*

On June 18, 2020, The China Securities Journal published a news article entitled "*The Drawer Agreement Pierced A "Big Hole"*"; *The Lawsuits Between PICC And Jiufu Highlight The Predicament Of Credit Insurance*," revealing the details of the secret agreement between 9F and PICC on allocation of insurance premiums that PICC charged borrowers. ¶51. A senior expert in the Chinese peer-to-peer lending intermediary industry told The China Securities Journal that when the loan principal was issued to a 9F borrower's account, insurance premiums ranging from a few hundred RMBs to a few thousand RMBs were "transferred within seconds" to PICC from the borrower's account to "automatically be used for purchasing PICC's performance insurance." *Id.* PICC kept 5% of the insurance premiums, while the remaining 95% would "make a twirl" in PICC's account and would be transferred to 9F. *Id.* The expert said that borrowers probably did not know about the "drawer agreement", *i.e.*, the secret fee allocation arrangement, between PICC and 9F. *Id.*

9F continued to suffer financially as a result of the materialized risk of the failure to receive facilitation service fees from PICC in 2020. ¶¶9, 58. On September 29, 2020, 9F reported that its loan facilitation services revenue in the first

8

half of 2020 decreased by 85.5% from the second half of 2019. *Id*. 9F continued its dispute with PICC as one of the primary reasons for such decrease. *Id*. On this news, 9F's ADS share price fell $0.20 per ADS, or 18%, to close at $0.91 per ADS on September 30, 2020, further damaging investors. *Id*. By the commencement of this action, the Company's shares traded significantly below the IPO price. ¶10.

## III. STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety. . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007).

## IV. PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE SECURITIES ACT

### A. The Securities Act Places a Minimal Pleading Burden on a Plaintiff

Section 11 of the Securities Act creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a). "The section was designed to assure

9

compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Herman*, 459 U.S. at 382; 15 U.S.C. §77 k(b).

"Section 11 is a virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter." *Suprema*, 438 F.3d at 269. "Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement – one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015). "Either way, the buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Id.*; *Herman*, 459 U.S. at 381–82. Thus, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements. Other defendants bear the burden of demonstrating due diligence." *Herman*, 459 U.S. at 382; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976). Accordingly, "Section 11 places a relatively minimal burden on a plaintiff." *Herman*, 459 U.S. at 382.

**B.**     **The Heightened Pleading Standards of Rule 9(b) and the PSLRA Do Not Apply Because Plaintiff's Securities Act Claims Do Not Sound in Fraud**

Without any analysis or assessment, Defendants assert in a conclusory fashion that all of Plaintiff's claims are subject to heightened pleading requirements under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") because "Plaintiff's Securities Act claims are indisputably immersed" in allegations of fraud. Motion at 13-14. Defendants are wrong.

As the Third Circuit has declared, fraud "is not a necessary element to establish a prima facie claim under Section 11 or Section 12(a)(2)." *Suprema*, 438 F.3d at 270. "Where a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply." *Id*. "Whether a Securities Act claim is subject to Rule 9(b) requires an assessment of the particular claim to determine whether acts of fraud on the part of the defendants form the basis for the claim against them." *Id*.

First, the Complaint does not sound in fraud because it is carefully structured to draw a distinction between the negligence and fraud claims. Specifically, Plaintiff alleges the Section 11 claims in the first portion of the Complaint and the Exchange Act claims in the latter portion of the Complaint. Importantly, Plaintiff has not incorporated the fraud allegations for the Exchange Act claims into the Section 11 claim. Such a clear delineation between claims supports a determination that the

11

Section 11 claim does not sound in fraud.  *Suprema*, 438 F.3d at 273; *see also Bauer v. Prudential Fin., Inc.*, No. CIV.A. 09-1120 (JLL), 2010 WL 2710443, at *4 (D.N.J. June 29, 2010) ("The allegations in Plaintiff's Amended Complaint are more akin to the expressly negligence-based allegations made in [*Suprema*]."

Second, the allegations in the Section 11 claim are carefully couched in the language of negligence, not fraud.  ¶¶81-88.  Where, as here, "defendants are accused in separate claims of the same complaint of having violated Section 11 . . . and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims."  *Suprema*, 438 F.3d at 272; *see also Gaer v. Educ. Mgmt. Corp.*, No. CIV.A. 10-1061, 2011 WL 7277447, at *20 (W.D. Pa. Aug. 30, 2011), *report and recommendation adopted,* No. CIV.A. 10-1061, 2011 WL 7277578 (W.D. Pa. Sept. 29, 2011) ("As Plaintiffs have expressly pleaded ordinary negligence with respect to the Securities Act claims . . . Rule 8 applies to these claims.").

Third, plaintiffs have disclaimed all allegations of fraud from their Section 11 claim.  ¶81.  While a disclaimer disavowing fraud allegations, standing alone, will not render a claim to sound in negligence rather than fraud, such a disclaimer is significant, as here, when coupled with factual allegations that support the disclaimer.  *Suprema*, 438 F.3d at 270-72; *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. CV157658MASLHG, 2017 WL 1658822, at *13 n.22 (D.N.J. Apr. 28,

12

2017); *Bauer*, 2010 WL 2710443 at \*4; *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, No. 05-232, 2007 WL 81937, at \*6-\*7 (E.D. Pa. Jan. 9, 2007).  Thus, Plaintiff's Securities Act claims are not subject to heightened pleading standards.

## C.    Plaintiff Adequately Alleges that the Company's IPO was False and Misleading

The Registration Statement for the IPO was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding 9F's business, operations, and prospects.  ¶63.  Specifically, the Registration Statement stated, in relevant part, that:

> "We partner with financial institutions such as China Taiping and PICC to provide third-party insurance protection to investors that invest in loans we facilitate, which strengthens the credibility of our platform and further enlarges our investor base. PICC, when it is engaged under our direct lending program, also provides credit insurance to institutional funding partners, helping us to expand our institutional funding partner base and promote the rapid development of our direct lending program, which may ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business."

> \* \* \*

> "[A]s with other types of insurance, PICC may refuse to pay compensation if PICC determines the relevant institutional funding partners are not entitled to compensation…. If PICC decides to terminate the insurance arrangements under our direct lending program, not to renew such arrangements after the expiry of our cooperation agreements or to significantly increase the insurance premium, our service may become less attractive to institutional funding partners, which may negatively affect the development of our direct lending

program and our business and results of operations could be materially and adversely affected."

* * *

"Loan facilitation services fees are the portion of service fees we charge to borrowers with whom we have stopped charging service fees since April 2019 or financial institutional partners in relation to the services we provide such as traffic referral services and credit assessment."

¶64.  The above statements were materially false and misleading because they implied that the full amounts that PICC charged borrowers for were insurance premiums to be used for protecting loans and that 9F only charged PICC for "traffic referral service fees" for referring business to PICC.  ¶65.  In contrast to these representations, 9F used PICC as a conduit to circumvent Chinese laws to continue collecting exorbitantly high amounts of loan facilitation service fees *indirectly and disguised as insurance premiums* from borrowers.  *Id*.  The Registration Statement also failed to disclose that the so called "strategic" partnership with PICC was illegal and subjected 9F to an imminent and material risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan facilitation service fees that 9F transferred from borrowers' accounts to PICC's account.  *Id*. The Registration Statement failed to disclose that if such risk materialized, it would significantly impact 9F's financial performance.  *Id*.

The Registration Statement also stated, in relevant part, that:

"As of the date of this prospectus, we do not have any outstanding loan balance that we have facilitated since the promulgation of Circular 141

14

with an APR of higher than 36%, even inclusive of any additional fees incurred by borrowers in relation to third-party insurance and guarantee protection, such as insurance premiums to the insurer, money contributions to the depository account and guarantee fee to the guarantee company."

* * *

"Loan facilitation services fees are the portion of service fees we charge to borrowers with whom we have stopped charging service fees since April 2019 or financial institutional partners in relation to the services we provide such as traffic referral services and credit assessment."

¶66.  The above statements were materially false and misleading because 9F did not stop charging loan facilitation service fees from borrowers since April 2019. In fact, 9F continued collecting exorbitantly high amounts of loan facilitation service fees, **_indirectly and disguised as insurance premiums_**, from borrowers via PICC.

¶67.  9F's practices violated the 2015 Judicial Provisions, Circular 141 and 2019 Notice.  *Id*.  9F transferred the "insurance premiums" from borrowers' accounts to PICC's accounts the moment borrowers received their loan principal without borrowers' knowledge.  *Id*.  Borrowers were not allowed to cancel their insurance policies and were threatened by debt collectors if they refused to pay premiums.  *Id*.

For instance, 9F Former Employee 1 ("FE 1") confirms that neither 9F nor PICC informed borrowers that PICC collected loan facilitation service fees from borrowers for 9F disguised as insurance premiums.  ¶52.  FE1 worked as a Finance Manager at Jiufu Shuke Technology Group Co., Ltd. ("Jiufu Shuke") – the primary operating subsidiary of 9F – from March 2019 to May 2020.  *Id*.  His main job

responsibilities included: (i) adjusting the differences between the Company's Chinese and the U.S. financial statements in accordance with the US Generally Accepted Accounting principles ("GAAP"); (ii) preparing monthly, quarterly, and annual financial statements for the purposes of filing with the SEC; and (iii) conducting financial analysis, accounting, tax planning, year-end auditing. *Id*. According to FE 1, borrowers on 9F's platform were not aware that 9F received service fees from the insurance company because it was not specified in the insurance contracts into which borrowers entered. *Id*. FE 1 stated that "on the surface of [9F's] financial statements, it is claimed that PICC were obligated to pay service fees to 9F pursuant to the agreement. But in fact, 9F gave such funds to PICC. This was just a ***formality***. PICC should return such funds to 9F." *Id*. FE1's statements are consistent with the fact that 9F transferred insurance premiums to PICC directly from borrowers' accounts on 9F's platform. *Id*.

Additionally, Sina Black Cat – an online consumer complaint platform widely used by Chinese consumers to expose product and service problems – revealed that 9F borrowers filed 11,076 complaints against 9F regarding the prohibitively high insurance premiums that 9F forcibly and secretly charged. ¶53. A search of "9F beheading interest" on Sina Black Cat further revealed 4,936 complaints filed against 9F. *Id*. "Beheading interest" is a term commonly used in China referring to prohibitively high interest rate or usury. *Id*. All these complaints reveal that in 2019

16

9F secretly charged large amounts of insurance premiums from loan principals without informing borrowers in advance or even afterwards. *Id*. Borrowers were also not allowed to cancel the insurance policies 9F purchased for them or to request refunds. *Id*. Borrowers complained that premiums and interest on the premiums usually accounted for 50-100% of the loan principal they received and were usury in blatant violation of Chinese law. *Id*.

For example, Borrower 1 complained on Sina Black Cat that he borrowed a RMB22,300 loan on January 28, 2019 with an annual interest rate of 8.7% on 9F's platform. ¶54. 9F, without informing Borrower 1, simultaneously sold Borrower 1 two PICC insurance policies. *Id*. Pursuant to such insurance policies, Borrower should pay a total of RMB 6961.51 for the insurance premiums and interest on the premiums by 12-month installments. *Id*. Such insurance premiums, interest on the premiums, and the expressly required 8.7% interest on the loan, in total, accounted for 40% of the loan principal and exceeded the 36% limitation for total interest and fees set by Chinese regulations. *Id*. Based on the secret arrangement that the 95% of the insurance premiums were actually loan facilitation service fees for 9F, 9F would have received RMB 6,613.43 in kickbacks from PICC. *Id*.

Similarly, Borrower 2 complained that on August 5, 2019, he requested a RMB 5,000 loan on 9F's platform. ¶55. Without Borrower 2's knowledge, 9F issued a RMB 7,890 loan (*i.e.* RMB 5,000 plus RMB 2,890) to his account and in

17

four seconds of the issuance, transferred RMB 2,890 to PICC as insurance premiums. *Id.* Such so called insurance premiums accounted for 58% of the loan principal. *Id.* When Borrower 1 told 9F that he refused to pay the insurance premiums, 9F insisted that he must pay the insurance premiums to clear his debt. *Id.* Eventually Borrower 2's credit record was negatively impacted due to his refusal to pay the premiums for insurance he never agreed to purchase. *Id.* Based on the secret arrangement that 95% of the insurance premiums were actually loan facilitation service fees for 9F, 9F would have received RMB 2,745.5 in kickbacks from PICC. *Id.*

Additionally, Borrower 3 complained that 9F issued a RMB36,050 loan to his account on October 20, 2019. ¶56. Without Borrower 3's knowledge, 9F immediately transferred RMB 13,250 to PICC as an insurance premium. *Id.* Borrower 3 ended up actually receiving only RMB 22,800, and never received any insurance policy from PICC. *Id.* Borrower 3 had paid RMB37576.02 by installment and nearly doubled the loan principal he actually received, but still kept receiving threatening telephone calls and text messages demanding more payments. *Id.* The insurance premium and all other interest and fees accounted for 65% of the loan principal. *Id.* Based on the secret arrangement that 95% of the insurance premiums were actually loan facilitation service fees for 9F, 9F would have received RMB 12,587.5 in kickbacks from PICC. *Id.*

18

Furthermore, a penalty notice issued by China Banking and Insurance Regulatory Commission regarding PICC's violations in its partnership with 9F also confirms that 9F, not PICC, played the leading role in collecting insurance premium. ¶57. The penalty notice revealed the PICC issued over 7 million insurance policies to 9F's borrowers from March 2018 to December 2019. *Id*. The penalty notice also revealed that 9F, not PICC, determined the exact amount of insurance fees and interest that PICC should collect from each borrower in contravention of existing insurance premium rates pre-approved by the Commission that PICC should have followed. *Id*.

### D. Defendants' Failure to Disclose the True Nature of the Company's Arrangement with PICC Violated GAAP

Failure to disclose the true nature of the arrangement with PICC in the Registration Statement also violated GAAP. GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. ¶68. The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the U.S. Financial Accounting Standards Board ("FASB"). ¶69. The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. *Id*. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with

19

generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing financial statements that conform to GAAP, as provided in the Public Company Accounting Oversight Board standards that govern financial statement auditors ("PCAOB Standards").  *Id*.

ASC 606 requires 9F "to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. To achieve that objective, an entity shall disclose qualitative and quantitative information about all of the following: a. Its contracts with customers…."  ¶70.  (citing ASC 606-10-50-1).  Specifically, it required 9F to "aggregate or disaggregate disclosures so that useful information is not obscured by either the inclusion of a large amount of insignificant detail or the aggregation of items that have substantially different characteristics."  *Id*.  It also required the Company to "disclose all of the … amounts of …. revenue recognized from contracts with customers, which the entity shall disclose separately from its other sources of revenue."  *Id*.  Additionally, pursuant to ASC 606, 9F was required to "disaggregate revenue recognized from contracts with customers into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors."  *Id*.  9F was also required to disclose "the opening and closing balances of receivables from contracts

20

with customers, if not otherwise separately presented or disclosed." *Id.* ASC 450-20 requires a loss contingency to be accrued by a charge to income if it is probable and estimable. *Id.* A disclosure is required if: (1) there has been a manifestation of an unaccreted claim; or (2) it is probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable. *Id.*

Accordingly, 9F should have separately disclosed in the Registration Statement, but failed to disclose, revenue recognized from its lending contracts with its borrowers that 9F indirectly collected via PICC. ¶71. Additionally, 9F should have separately disclosed, but failed to disclose, the opening and closing balances of receivables from PICC because such receivables are loan facilitation service fees that 9F collected from its borrower via PICC. *Id.* Such disclosures do not require subjective judgment because the timing and the amount of revenues to recognize are indisputable. *Id.*

Furthermore, contingent liabilities apply to any financial reporting period when 9F was exposed to the risk that borrowers would assert claims that 9F improperly charged loan fees, either in violation of the law, or by deceiving borrowers into thinking they were paying insurance premiums which, unknown to them, included service fees. ¶72. PICC started to charge 9F's borrowers for insurance premiums since May 2018, starting which time 9F was subject to the risk that borrowers would assert claims against 9F for its improper charges. *Id.*

Therefore, the Registration Statement was false and misleading because it should have disclosed 9F's contingent liability. *Id*.

### E. Defendants' False and Misleading Statements Represented Known Trends that Required Disclosure

In addition, the undisclosed adverse facts and circumstances alleged presented known trends, uncertainties, and risks that required disclosure in the Registration Statement. ¶73. SEC Regulation S-K (17 C.F.R. § 229.10) provides that registration statements such as the one filed by 9F on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." *Id*. Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". *Id*. Item 303 of SEC Regulation S-K required the Company to disclose "any known trends or uncertainties that have had or that [9F] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Id*. Moreover, Item 105 of Regulation S-K required disclosure in the Registration Statement of "the most significant factors that ma[d]e an investment in [the IPO] speculative or risky," and an explanation of "how the risk affect[ed] [9F] or the securities being offered." *Id*. As detailed herein, the Registration Statement failed to disclose material facts necessary to apprise ADS purchasers of the true risks inherent in investing in the Company and of known adverse trends and uncertainties. *Id*.; *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011)

22

("plaintiffs have adequately pleaded a presently existing trend, event, or uncertainty, and the sole remaining issue is whether the effect of the known information was reasonably likely to be material for the purpose of Item 303 and, in turn, for the purpose of Sections 11 and 12(a)(2).").[2]

**F.      Plaintiff Adequately Alleges a Claim Pursuant to Section 12(a)(2)**

Section 12(a)(2) provides for civil liability for anyone who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. § 77*l*(a)(2). Like Section 11, Section 12(a)(2) is a "virtually absolute" liability provision that does not require an allegation that defendants possessed scienter. *Suprema*, 438 F.3d at 269–70. Accordingly, for the same reasons noted above regarding Plaintiff's Section 11 claim, Plaintiff has also

---

[2]      Defendants' cases do not hold otherwise. Motion at 19 n.5. In *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 303 (S.D.N.Y. 2021), unlike here, plaintiffs failed to raise Item 303 of Regulation S-K in their complaint and the argument was based upon facts that are inapplicable here. *Id.* at 303. The facts of *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) are similarly distinguishable because there were no allegations in *UBS* that the company entered into a secret agreement unknown to investors to circumvent applicable regulations. Additionally, Defendants cite to *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 617 (2d Cir. 2009), but the decision was followed by the Second Circuit's decisions in *Litwin* and *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120-22 (2d Cir. 2012) in which the Court upheld claims based upon Item 303 of Regulation S-K.

stated a claim under Section 12(a)(2). *Id*.; *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 274 n.7 (3d Cir. 2004).

### G.    Defendants' Falsity Arguments Fail

Defendants contend that Plaintiff has not adequately alleged falsity because (1) the Company purportedly disclosed adjustments to its business following Chinese regulatory changes; (2) the alleged conduct was purportedly not illegal; and (3) Plaintiff supposedly has not pled the alleged conduct with particularity.  Motion at 31.  Each argument fails.

First, none of the disclosures that Defendants identify (Motion at 15-20) revealed that 9F and PICC entered into a secret agreement that provided that 95% of the funds that PICC collected disguised as insurance premiums were, in fact, loan facilitation service fees that PICC would remit to 9F upon receipt.  ¶¶4, 5, 47.  Had 9F directly charged borrowers for the amount of such insurance premiums or loan facilitation service fees, it would have exceeded the 36% limitation for total interest and fees and violated Chinese law.  *Id*.  Additionally, the disclosures upon which Defendant attempt to rely were ineffective because they warned of risks that were of greater magnitude than portrayed.  Motion at 16-20.  For instance, warning that "we charge service fees from financial institutional partners" (Motion at 16) does not inform borrowers that 9F secretly charged large amounts of insurance premiums from loan principals without informing borrowers.  ¶¶53-58; *see also Rombach v.*

*Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (holding that it is ineffective to warn "there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"); *In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17-CV-4846 (WFK), 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.").  Additionally, if the market were truly aware of the information as Defendants assert, Defendants cannot explain the drop in the Company's ADS price after the information was disclosed.  ¶¶103-12; *see, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) ("While defendants argue that . . . the market had already absorbed the news, they can point to no reason why the stock declined").[3]

Second, Defendants contend that Plaintiff purportedly fails to plead that Defendants' conduct was illegal.  Motion at 20-23.  The Complaint, however, is replete with allegations demonstrating the illegality of Defendants' conduct and how Defendants' representations regarding such conduct were false and misleading.  For instance, among other things, Plaintiff alleges that a penalty notice issued by China

---

[3]    Defendants suggest that they had no duty to disclose the omitted information. Motion at 18, 19 n.5, 20.  However, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).

Banking and Insurance Regulatory Commission regarding PICC's violations in its partnership with 9F also confirms that 9F, not PICC, played the leading role in collecting insurance premium. ¶57. The penalty notice revealed the PICC issued over 7 million insurance policies to 9F's borrowers from March 2018 to December 2019. *Id*. The penalty notice also revealed that 9F, not PICC, determined the exact amount of insurance fees and interest that PICC should collect from each borrower in contravention of existing insurance premium rates pre-approved by the Commission that PICC should have followed. *Id*.

Plaintiff also alleges that on June 12, 2020, 9F disclosed for the first time that PICC withheld RMB 2.2 billion (US$350 million) in service fees from 9F in 2019. ¶7. The Company further disclosed that PICC filed a lawsuit against 9F, claiming that the agreement between 9F and PICC was invalid and that PICC had no duty to pay the service fees. *Id*. These allegations, among the others alleged, are sufficient. *See, e.g.*, *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001) (holding that allegations that defendants "engaged in a series of illegal or fraudulent business practices" were sufficient because they "would clearly alter the mix of information available to the public"); *In re Sotheby's Holdings, Inc.*, No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) ("[w]hen a corporation does make a disclosure-whether it be voluntary or required-there is a duty to make it complete and accurate" and "[t]his duty to disclose exists even where

the omitted information relates to allegedly illegal conduct").[4]

Finally, Defendants' contention that Plaintiff fails to allege conduct with particularity is meritless. As demonstrated above, because "plaintiff's Section 11 [and] Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply" and therefore pleading with particularity is not required. *Suprema*, 438 F.3d at 270; *Valeant*, 2017 WL 1658822, at *13 n.22; *Bauer*, 2010 WL 2710443 at *4.

Nevertheless, Plaintiff's allegations are, in fact, particularized and are based upon detailed facts, including information from several confidential witnesses. *See, e.g.*, ¶¶51-56. Initially, courts in the Third Circuit have repeatedly Defendants' suggestion that courts cannot rely upon the accounts of confidential witnesses. Motion at 25; *see, e.g.*, *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) (holding that allegations based upon confidential witnesses are proper when plaintiffs have appropriately described the positions formerly held by the sources as well as the basis of the sources' personal knowledge); *In re Navient Corp. Sec. Litig.*, No. CV 17-8373 (RBK/AMD), 2019 WL 7288881, at *8-*9 (D.N.J. Dec.

---

[4]    Defendants' cases are distinguishable. In *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) and *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006), the courts found that the allegations were not alleged with sufficient particularity. Not only are the claims alleged here with particularity, but, regarding Plaintiff's Securities Act claims (unlike the Exchange Act claims in *FBR* and *Axis*), particularity is not required. *Suprema*, 438 F.3d at 270.

30, 2019).   Contrary to Defendants' assertions (Motion at 23-31), the Complaint

describes the confidential witnesses with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the

information alleged.   ¶¶51-56; *Vanderhoef v. China Auto Logistics Inc.*, No. 18-CV-

10174, 2021 WL 3260849, at *3 n.5 (D.N.J. July 30, 2021).[5]

## H.   Plaintiff Adequately Alleges Control Person Liability Under the Securities Act

Contrary to Defendants' assertion (Motion at 39-40), Plaintiff has sufficiently

alleged a control person claim under Section 15 of the Securities Act.   As

demonstrated above, Plaintiff has sufficiently alleged claims under Sections 11 and

12(a)(2) of the Securities Act.   Plaintiff has also adequately alleged that the Offering

---

[5]   Defendants' reliance upon *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, (D.N.J. 2010) is misplaced.   First, as noted above, Plaintiff's Securities Act claims (unlike the Exchange Act claims in *Pharmanet*), do not require pleading with particularity.   *Suprema*, 438 F.3d at 270.   Additionally, the court in *Pharmanet* cautioned that "the Court is not suggesting that these witnesses could not have possessed first-hand knowledge of the allegations in the Amended Complaint" but rather that the complaint did not connect the information to the allege misrepresentations.   *Pharmanet*, 720 F. Supp. 2d at 547.   Plaintiff has done so here.   Moreover, Defendants' suggestion that Borrower 3 has no relevant information because of the timing of his loan (Motion at 28-29) is meritless.   *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light on whether class period statements were false or materially misleading is relevant.").   Defendants' other factual disputes (Motion at 29-31) are inappropriate for resolution on a motion to dismiss.   *See In re Envision Healthcare Corp.*, No. CV 18-1068-RGA, 2019 WL 3494407, at *7 (D. Del. Aug. 1, 2019), *report and recommendation adopted,* No. 18-CV-01068-RGA, 2019 WL 4536554 (D. Del. Sept. 19, 2019) ("factual disputes must be resolved in plaintiff's favor on a motion to dismiss").

Defendants were officers or directors of the Company, signed the Registration Statement, and/or authorized the signing of the Registration Statement. ¶¶18-29, 32. These allegations suffice to demonstrate control. *See, e.g.*, *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, No. 05-232, 2007 WL 81937, at *12 (E.D. Pa. Jan. 9, 2007) ("Allegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator are sufficient to withstand a motion to dismiss."). Thus, Plaintiff has sufficiently pled claims under the Securities Act.[6]

## V.  PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  "To state a viable claim for securities fraud under Section 10(b) and Rule 10b-5 of the Exchange Act, Plaintiffs must plead: (1) a material misrepresentation or omission; (2) scienter; (3) a

---

[6]     Defendants suggest that an affirmative defense of negative causation impacts the propriety of Plaintiff's Securities Act claims.  Motion at 34.  The Third Circuit has made it clear, however, that "[u]nder sections 11 and 12(a)(2), plaintiffs do not bear the burden of proving causation." *Adams*, 381 F.3d at 277.  "It is the defendants who may assert, as an affirmative defense, that a lower share value did not result from any nondisclosure or false statement." *Id*. "While a defendant may be able to prove this negative causation theory, an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." *Id*.

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Vanderhoef*, 2021 WL 3260849 at *3.  Although Rule 9(b) and the PSLRA do not apply to Plaintiff's Securities Act claims, these standards do apply to Plaintiff's Exchange Act claims.  *Id*.  Defendants challenge the Complaint with respect to falsity, scienter, and loss causation.

### A.   Plaintiff Adequately Alleges that Defendants Made Materially False and Misleading Statements

Under the PSLRA, a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).

#### 1.   Defendants' Statements Made in Connection with the Company's IPO Were False and Misleading

As demonstrated above, Plaintiff adequately alleges that the Company's Registration Statement for the IPO was false and misleading.   Accordingly, these false and misleading IPO statements also demonstrate falsity for Plaintiff's Exchange Act claims.

#### 2.   Defendants' Post-IPO Statements Were False and Misleading

Defendants' post-IPO statements were also false and misleading. Specifically, on June 12, 2020, 9F filed the June 12, 2020 6K disclosing its ongoing dispute with PICC.  ¶100.  According to 9F, the dispute involved RMB2.2 billion

($324.5 million) in unpaid service fees and RMB1.4 billion ($206.5 million) in service fees that had previously been recorded as accounts receivable and which were then recognized as fully impaired, resulting in multiple legal actions in China. *Id*. The June 12, 2020 6K is materially false and misleading because it failed to disclose that the dispute represented a materialized risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan facilitation service fees that 9F transferred from borrowers' accounts to PICC's account. *Id*.

Additionally, on June 15, 2020, 9F filed a Form NT 20-F with the SEC stating that the Company could not timely file its annual report because of its dispute with PICC. ¶101. The Form NT 20-F is materially false and misleading because it failed to disclose that the dispute constituted a materialized risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan facilitation service fees that 9F transferred from borrowers' accounts to PICC's account. *Id*.

On June 17, 2020, moreover, 9F issued a press release on a Form 6-K ("June 17, 2020 6K") which provided the Company's fourth quarter and full-year 2019 financial results and the financial consequences of the Company's dispute with PICC. ¶102. The June 17, 2020 6K is materially false and misleading because it failed to disclose that the dispute represented a materialized risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan

31

facilitation service fees that 9F transferred from borrowers' accounts to PICC's account.  *Id.*  Thus, Plaintiff has adequately alleged falsity under the Exchange Act.

### B.    Plaintiff Adequately Alleges that Defendants Acted With Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  To adequately plead scienter, a complaint must state with particularity facts giving rise to a strong inference that the defendants acted with intent to defraud.  *Fain v. USA Techs., Inc.*, 707 F. App'x 91, 95 (3d Cir. 2017).  Importantly, "courts must consider the complaint in its entirety . . . [t]he inquiry is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original).  A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324-26.  A Plaintiff establishes a "strong inference" of scienter by alleging facts showing that Defendants had "motive and opportunity to commit fraud" or "circumstantial evidence of either reckless or conscious behavior."  *Fain*, 707 F. App'x at 95.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the

32

smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Tellabs*, 551 U.S. at 324. Moreover, "a tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

Here, Plaintiff adequately alleges scienter based upon motive and opportunity and circumstantial evidence of reckless or conscious behavior. First, Plaintiff alleges that Defendants were all motived by their own and the Company's financial interests (¶32) and that Defendants beneficially owned 9F shares or obtained proceeds through the sale of their shares in the Company's IPO. ¶¶18-21, 23-24, 28. Unlike the situation in *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) cited by Defendants, where, as here, "financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *Frank v. Dana Corp.*, 646 F.3d 954, 960-62 (6th Cir. 2011). Because these allegations demonstrate that there was "a likelihood that defendants could realize concrete benefits through the deception," Plaintiff has adequately alleged motive and opportunity. *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87,

33

100 (2d Cir. 2001); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d 2000).[7]

Second, Plaintiff adequately alleges scienter based upon circumstantial evidence of reckless and conscious behavior.  For instance, Defendants' GAAP violations support a strong inference of scienter.  ¶¶68-72.  Numerous courts have recognized that violations of GAAP can contribute to allegations supporting a strong inference of scienter.  *Vanderhoef*, 2021 WL 3260849, at *4–5; *Sun v. Han*, No. 15-703, 2015 WL 9304542, at *15–16 (D.N.J. Dec. 21, 2015).  Here, Plaintiff alleges numerous significant GAAP violations that provide powerful evidence of scienter.  ¶¶68-72.  As demonstrated above, the accounts of the confidential witnesses support a strong inference of scienter.  ¶¶51-56; *see also Avaya*, 564 F.3d at 263 (3d Cir. 2009) (holding that allegations based upon confidential witnesses support a strong inference of scienter); *Vanderhoef*, 2021 WL 3260849, at *3 n.5 (same).

Additionally, the resignations alleged in the Complaint further bolster the strong inference of scienter alleged.  ¶¶103, 106.  Specifically, on October 10, 2019, Defendant Cheung resigned from 9F's Board, Defendant Xu resigned on January 20, 2020, and Defendants Zhang and Huang resigned on March 16 and March 27, 2020, respectfully.  ¶103.  Defendant Cui also subsequently resigned his directorship

---

[7]    The Supreme Court has also declared that the "absence of a motive allegation" is "not dispositive."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *see also Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").

despite serving in the position for only approximately one year, and on June 22, 2020, Zengxiao Jin was removed from the chief risk officer position. ¶¶103, 106. These allegations also add to the strong inference of scienter alleged. *Vanderhoef*, 2021 WL 3260849, at *4–5. Finally, the allegations relate to 9F's core business. Indeed, in 2018 and the first five months of 2019, loan facilitation service fees accounted for 89% and 84% of the Company's respective net revenues. ¶¶2, 44. Where allegations "permeated core aspects" of a company's business, an inference arises that company executives were reckless in not knowing of the circumstances alleged, thereby supporting a strong inference of scienter. *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001); *see also In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business"). When considering these facts collectively – as the Court is required to do under *Tellabs* (551 U.S. at 323) – Plaintiff has adequately alleged scienter.

### C.    Plaintiff Adequately Alleges Loss Causation

Plaintiff has also sufficiently alleged loss causation under the Exchange Act. The PSRLA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "Importantly, as to loss causation there is not a heightened standard of pleading." *Allegheny Cty.*

35

*Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 239 (E.D. Pa. 2021). To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiff has satisfied this standard. ¶¶103-12.

Defendants' arguments to the contrary fail. First, Defendants contend that the June 17, 2020 Form 6-K, the June 22, 2020 Form 6-K, and 9'F September 29, 2020 announcement did not reveal to the market the falsity of Defendants' misrepresentations. Motion at 34-37. Defendants are incorrect. With respect to the June 17, 2020 disclosure, Defendants **concede** that Plaintiff alleges that it revealed for the first time since November 2019 that PICC had stopped providing insurance protections to 9F's new loans with terms of no more than 12 months and that 9F had suspended its cooperation with PICC since December 2019. Motion at 35; ¶104. Indeed, 9F's total net revenues decreased by 54.4% and 20.4% in the fourth quarter of 2019 and in full-year 2019 "primarily due to the decrease in loan facilitation services revenue." ¶104. Loan facilitation services revenue decreased by 90.5% and 29.9% in the fourth quarter of 2019 and in full-year 2019 "primarily because the loan facilitation services revenue under our direct lending program in the fourth quarter of 2019 was not recognized due to our dispute with PICC." *Id*. On this news, shares of 9F fell 2.7%. ¶105.

36

Second, Defendants further *concede* that Plaintiff alleges that as the result of failure to manage the material risk associated with the partnership with PICC causing severe damages to 9F's businesses, 9F announced that Zengxiao Jin was removed from the chief risk officer position.  Motion at 36 n.8; ¶106.  On this news, shares of 9F fell 18%.  ¶107.  *See Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014) ("While nothing in the resignation announcement alone reveals the truth behind earlier misstatements . . . this too may constitute a portion of the totality that we must consider.").

Third, Defendants further *concede* that Plaintiff alleges that on September 29, 2020, 9F announced that the Company's financial performance continued to drastically decline because 9F was no longer able to collect large amount of loan facilitation fees from borrowers via a conduit like PICC.  Motion at 36-37; ¶110. Indeed, the Company's total net revenues plummeted 61%.  ¶110.  On this news, 9F ADSs fell 18%.  ¶111.

Additionally, on June 24, 2020, the Company filed a 2019 20-F with the SEC, revealing for the first time the illegal nature of 9F's partnership with PICC.  ¶108. 9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "PICC collected all of the loan facilitation service fees" from borrowers and "*remitted* [9F's] portion of the service

37

fees to [9F]." *Id.* 9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to the borrowers, the Company started to charge service fees "***indirectly through*** … insurance company." *Id.* On this news, 9F's ADS price fell 7.6% on June 24, 2019 and another 24% over the next three days. ¶109. These allegations provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.

Defendants, moreover, improperly seek to impose a mirror-image requirement for loss causation and improperly view the disclosures in isolation rather than collectively. "To be significant, such a corrective disclosure must at least relate back to the misrepresentation and not to some other negative information about the company." *Zhengyu He v. China Zenix Auto Int'l Ltd.*, No. CV21815530KMJAD, 2020 WL 3169506, at *11 (D.N.J. June 12, 2020); *Vanderhoef*, 2021 WL 3260849 at *5. "The corrective disclosure need not, however precisely mirror the earlier misrepresentation." *Zhengyu*, 2020 WL 3169506, at *11; *Vanderhoef*, 2021 WL 3260849, at *5. "[N]either a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation." *Zhengyu*, 2020 WL 3169506, at *11; *Vanderhoef*, 2021 WL 3260849, at *5. "Instead, a plaintiff need only allege that the market was able to infer from the corrective disclosure that the misrepresentation at issue had occurred." *Vanderhoef*, 2021 WL 3260849, at *5; *Zhengyu*, 2020 WL 3169506, at

*12.  Plaintiff has done so here.  Plaintiff also adequately alleges loss causation under a materialization-of-the-risk theory.  ¶¶7, 9, 101-102; *Kanefsky v. Honeywell Int'l Inc.*, No. 18-CV-15536, 2020 WL 2520669, at *7 (D.N.J. May 18, 2020).  Finally, the Third Circuit has cautioned courts that loss causation is ordinarily an issue for the trier of fact.  *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884-85 (3d Cir. 2000).  Thus, Plaintiff has adequately alleged loss causation.[8]

## D.    Plaintiff Adequately Alleges Control Person Liability Under the Exchange Act

"To state a claim under Section 20(a), Plaintiffs must demonstrate: (1) a violation of the Exchange Act, and (2) that the Individual Defendants were controlling persons of the corporation."  *Vanderhoef*, 2021 WL 3260849, at *6; *Suprema*, 438 F.3d at 284, n.16; 15 U.S.C. § 78t(a).  Contrary to Defendants' assertion (Motion at 39-40) – and as demonstrated above – Plaintiff has adequately pled a primary violation and the Individual Defendants' control over the Company.

---

[8]    Defendants suggest that because Plaintiff purportedly purchased his ADSs after the June 17, 2020, he cannot have suffered a loss.  Motion at 36.  Courts have rejected this assertion.  *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 (E.D. Pa. 2008) ("An investor who purchases a security after the disclosure of adverse information still relies on the fact that the newly released information will be absorbed by the market and therefore reflected in the post-disclosure price.").  Finally, Defendants' assertions that the Company's disclosures were consistent with the Offering Documents (Motion at 37-38) constitute factual disputes that "cannot be adjudicated at this early, motion to dismiss stage of the litigation."  *Hall v. Johnson & Johnson*, No. CV 18-1833 (FLW), 2019 WL 7207491, at *28 (D.N.J. Dec. 27, 2019).

¶¶18-19, 30-34, 130-35; 15 U.S.C. § 78t(a).[9]

## VI.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend.  *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1435 (3d Cir. 1997) ("Ordinarily where a complaint is dismissed on Rule 9(b) failure to plead with particularity grounds alone, leave to amend is granted.").


DATED: April 4, 2022                    Respectfully submitted,

                                        **CARELLA, BYRNE, CECCHI,
                                        OLSTEIN, BRODY & AGNELLO, P.C.**

                                        By:   */s/ James E. Cecchi*
                                        James E. Cecchi
                                        Lindsey H. Taylor
                                        Donald A. Ecklund
                                        5 Becker Farm Road
                                        Roseland, New Jersey 07068
                                        Telephone: (973) 994 -1700

                                        *Liaison Counsel for Movant and the Class*

---

[9] Defendants' citation to *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) is misplaced because unlike here, Plaintiffs in *Chubb* did not adequately plead a predicate violation.  Additionally, Defendants' standing argument is meritless.  Motion at 39.  The Complaint alleges that "Plaintiff acquired the Company's securities pursuant to the Registration Statement."  ¶86.  The question is "a factual one, to be resolved through discovery, as to whether plaintiffs can demonstrate that the shares they allegedly purchased are in fact traceable to the registration statement alleged to be false and misleading."  *Suprema*, 438 F.3d at 274 n.7.

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

*Counsel for Movant and Proposed Lead
Counsel for the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

41