IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY


CRAIG J. HOLLAND, Individually  :        Civil No.
and on behalf of all others              21-cv-948-MCA
similarly situated,             :
                                         TRANSCRIPT OF
                Plaintiff,      :    HEARING ON MOTION

                v.              :

9F INC., et al.,                :

                Defendants.     :
-------------------------------x

                                    Via Zoom Teleconference
                                    November 28, 2022




BEFORE:

        THE HON. MADELINE COX ARLEO, U.S.D.J.



                                    Reported by:
                                    CHARLES P. McGUIRE, C.C.R.
                                    Official Court Reporter




Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.



CHARLES P. McGUIRE, C.C.R.

2

APPEARANCES:

      CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
      5 Becker Farm Road
      Roseland, New Jersey 07068
      BY: DONALD A. ECKLUND, ESQ.
          KEVIN G. COOPER, ESQ.
      And
      GLANCY PRONGAY & MURRAY
      745 Fifth Avenue
      New York, New York 10151
      BY: EX KANO S. SAMS, II, ESQ.
      On Behalf of Lead Plaintiff John S. Wait

      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      One Manhattan West
      New York, New York 10001
      BY: SCOTT D. MUSOFF, ESQ.
          ROBERT A. FUMERTON, ESQ.
          MICHAEL C. GRIFFIN, ESQ.
      On Behalf of Defendant 9F Inc.

      DUGHI, HEWIT & DOMALEWSKI, P.C.
      340 North Avenue
      Cranford, New Jersey 07016
      BY: CRAIG A. DOMALEWSKI, ESQ.
          SCOTT A. HALL, ESQ.
      And
      CAHILL GORDON & REINDEL LLP
      32 Old Slip
      New York, New York 10005
      BY: DAVID JANUSZEWSKI, ESQ.
      On Behalf of Defendant Credit Suisse Securities (USA) LLC

CHARLES P. McGUIRE, C.C.R.

3

(The following takes place via Zoom teleconference)

THE COURT: All right. Good afternoon, everyone. This is Judge Arleo.

We're here for an oral argument in the matter of Holland v. 9F Inc., et al.

Could I have appearances, please?

MR. ECKLUND: Good afternoon, Your Honor.

Don Ecklund from Carella Byrne, liaison counsel for Lead Plaintiff. I'm joined today by my co-counsel, Ex Cano Sams, from Glancy Prongay, who has been admitted pro hac vice in this case, and also my colleague Kevin Cooper from Carella Byrne as well.

MR. MUSOFF: Good afternoon, Your Honor.

Scott Musoff along with my colleagues Robert Fumerton and Michael Griffin from Skadden Arps for Defendant 9F, and Michael Griffin will present argument today for 9F.

MR. JANUSZEWSKI: Good afternoon, Your Honor.

David Januszewski from Cahill Gordon & Reindel, admitted pro hac vice, appearing for Defendant Credit Suisse.

MR. DOMALEWSKI: Good afternoon, Your Honor.

Craig Domalewski, Dughi Hewitt & Domalewski, also on behalf of Credit Suisse.

THE COURT: All right, guys, you dropped off there for a minute as Mr. Ecklund was making his appearances.

4

Want to start again?

MR. ECKLUND:  Of course, Your Honor.

Good afternoon.  Don Ecklund from Carella Byrne, liaison counsel for Lead Plaintiff John Wait.  I'm joined today by my co-counsel, Ex Cano Sams from Glancy Pongay & Murray, who has been admitted pro hac vice in this matter, and also my colleague Kevin Cooper, also from Carella Byrne, and at that point, that's all for Plaintiffs, and I believe Mr. Griffin was speaking after me when you lost signal.

MR. MUSOFF:  Thank you.  Scott Musoff from Skadden Arps, along with my colleagues Robert Fumerton and Michael Griffin, both of whom have been admitted pro hac, for Defendant 9F, and Michael Griffin will present argument today.

THE COURT:  All right, everyone.  So, we're here for oral argument in a motion to dismiss filed by the Defendant.

I will tell you at the outset so you can frame your comments accordingly that I do have some concerns with some of the pleading in the amended complaint, but I am inclined to discuss with Plaintiff and Defendants today my concerns and allow them to replead more fulsomely, understanding the concerns the Court has, and in particular, I can give you a little insight that I am concerned about whether the claims are pled with particularity in terms of

the scheme, in terms of the witnesses that corroborate the scheme, and I'm also concerned with scienter, particularly for the individual Defendants here.

So those are some of the issues I'd like to hear about from Plaintiff first, and I'd like to just sort of frame the first argument, which is particularity, which sort of has a couple of different components.

And I start with your complaint, the Plaintiff's complaint at paragraph four that really summarizes the nature of the fraud allegations here, and I'll just read part of it for the record.

The preceding paragraph talks about some changes in Chinese law that require that a borrower cannot charge more than 36 percent interest on a loan.

Paragraph four says:  "To circumvent these restrictions, 9F struck an arrangement with Property and Casualty Insurance Company, known as PICC, an insurance company in China, through two agreements.  One agreement, which was publicly disclosed and legal, provided that PICC deducted a certain amount from loan principal that a borrower borrowed on the 9F platform in the name of the insurance premium protecting the lender's loaned fund.  The other agreement, an illegal and secret one only known between 9F and PICC, provided that 95 percent of the funds that PICC collected disguised as insurance premiums were in

CHARLES P. McGUIRE, C.C.R.

6

fact loan facilitation fees that PICC would remit to 9F upon receipt.  Such facilitation service fees secretly funneled by 9F via PICC, together with the interest that borrowers had to pay to their lenders, accounted for 50-100 percent of borrowed principal - much higher than the limit of 36 - and blatantly violated Chinese law.  This arrangement subjected 9F to a significant risk that the arrangement would be deemed illegal, which would then require the seizure of all funds that PICC collected as pure insurance premiums."

So that is the piece that I start with, and I put it against the backdrop of what was actually disclosed by 9F in the initial IPO and other initial documents where PICC -- or 9F points out in its motion that after the 2019 notice, 9F also included a statement that disclosed that they had an agreement with financial institutional partners "under our direct lending program," and it said, quote:  "Under our direct lending program, we have stopped charging service fees from borrowers since April of 2019.  We currently charge service fees from financial institutional partners under our direct lending program."

So it looks like in this case there was a disclosure that they were working with, quote, "institutional partners" to provide insurance for the loans and that they were receiving a service fee from those loans, which I think most would agree on this call that that would

7

not be enough make a securities fraud case, but the theory is that, in fact, that was just a disguise for an illegal fee, and that such an illegal fee could not be recaptured by PICC if they voluntarily stopped paying, and that would result in the decline of the value of the stock.

So I say that as background because there were some disclosures.  The disclosures never disclosed that there was this illegal arrangement.  They never disclosed the amount of the interest or the amount that was sent back to 9F.  They disclosed that they were being sued, that they had an affirmative lawsuit against PICC, and that it stopped charging service fees directly to borrowers, and instead were responsible for collecting all loan facilitation fees from borrowers and remitting 9F's portion upon receipt.

In terms of the illegal conduct and in terms of the particularity, most or all of the basis for this whole scheme is from third-party statements from different journal articles and web sites, but there's nothing here that I can see where any witness or other than generalized pleading that this was an illegal scheme to really circumvent the Chinese laws on how much loan fees could be charged, and it was in excess of the 36 percent.  There are allegations on this point that it was 95 or 90 percent, it was a 50- to 100-percent markup on the loan that was taken out directly by 9F as soon as the loan proceeds were -- before they were

given back to the borrower.

I just don't see under prevailing 3rd Circuit law how that is enough, those blanket, general statements are enough to meet the heightened standard, at least under 10b-6, and that's what I'd like to have the Plaintiff open on first.

MR. SAMS:  Thank you very much, Your Honor.

Ex Cano Sams from Glancy Prongay & Murray, and I'm happy to address the Court's concerns.

I think it's important to note initially that there are two statutes that are involved here.  First is the --

THE COURT:  Let me just stop you for one second.

I hear you, and we'll talk about this in a minute.

I am inclined to find at least at the pleading stage under the Suprema case that the Securities Act allegations are sufficient, but it still doesn't get us past the 10b-6 allegations for particularity and misrepresentation.  So let's just focus on the particularity and the misrepresentations for now.

MR. SAMS:  Okay.  So, just so I understand the Court, the Court initially believes that the Securities Act claims allegations are sufficient but not --

THE COURT:  I'm inclined, and I'll repeat it again that I'm inclined to let you replead, and there will be a

9

fulsome opinion the next time, and I'll give you another opportunity to plead your claims sufficiently.

I'm concerned primarily on the 10b-6 claims with the particularity of the fraud filing. You have a very broad, a very serious allegation of a scheme, and there's nothing to support it, the way I see it. So I'd like you to focus on that: How am I going to find that it's sufficiently pled based on these three or four web site-type individuals who really can't give me the who, what, where and why of the scheme that I started out my statement with, which was this illegal scheme that 95 percent of the funds collected were disguised as insurance premiums, they were really loan fees, and they were 50 to 100 percent of the principal, and that 9F got kicked back 95 percent of that fee or that insurance premium.

MR. SAMS: Okay. Thank you for that clarification, Your Honor.

And I think I would like to start with the admissions that the company made at the end of the complaint that we allege, and I think those admissions go a long way to demonstrate that Defendants acted with respect to the Securities Exchange Act claim with scienter, and those allegations are detailed within paragraphs 103 through 112 of the complaint.

I'd like to go through just a few of them to show

CHARLES P. McGUIRE, C.C.R.

10

the Court that there were certain admissions that the Defendants made that we think speak to their knowledge and the fact that they designed this workaround to circumvent Chinese law in order to receive these funds improperly.

I think I'd like to start with the disclosure that they made on June 17th, 2020 that's detailed within paragraph 104 of the complaint.

The company disclosed for the first time that it had suspended its cooperation with PICC since December 2019, and that total net revenues decreased by 54 percent and 20 percent in the fourth quarter of 2019 and the full year of 2019, quote, "primarily due to the decreased loan facilitation services rendered," unquote. And this service revenue decreased 90 percent in the fourth quarter of 2019 and 29 percent in the full year of 2019, the company admitted, "primarily because the loan facilitation service revenue under our direct lending program in the fourth quarter of 2019 was not recognized due to our dispute with PICC."

So, as the Court pointed out in the previous paragraph, paragraph four of the complaint, the company had two different agreements with PICC. One was this loan premium contract, which we're not alleging was improper, but there was a second agreement where the company was improperly disguising loan facilitation fees as loan premium

CHARLES P. McGUIRE, C.C.R.

11

fees in order to bypass Chinese law.

So the structure of that second agreement, we contend, shows that Defendants improperly and with scienter tried to work around these Chinese regulations in order to obtain loan facilitation fees that were improper. Basically, they used PICC as a conduit to get these fees that they were --

THE COURT:  Let me stop you for a minute.

It's the same scheme, it's just a matter of degree.  So the first scheme is -- I'll read from your complaint -- "which was publicly disclosed and legal, provided that PICC deducted a certain amount from loan principal that a borrower borrowed on the 9F platform in the name of the insurance premium protecting the lender's loaned fund."

So, the deal was that when the borrower got the money from 9F, 9F deducted the insurance premium.  Right?

MR. SAMS:  That's correct.

THE COURT:  Okay.  And they deducted an insurance premium, and then they gave it to PICC, and then they kept the loan facilitation fee.  That's the legal agreement; right?

MR. SAMS:  Correct.

THE COURT:  So the legal agreement is that same thing, but just to a greater degree.  It's saying that the

12

fee you took was like 50 percent to a hundred -- it was like a crazy amount, it was like 50 percent of the loan was insurance that the lender may or may not have known about. That's another issue, because that's about the lender and what PICC was doing. But they took this fee -- 9F took it out, gave it back to PICC, and then PICC kicked 95 percent of it back to 9F. That's the theory. That's what made it illegal.

So it's the same alleged scheme, it's just that you exceeded proper boundaries in terms of what was allowed under Chinese laws and which you should have told your investors about if it was that much of your income, that you were doing this really to circumvent Chinese law, because what made it illegal was that there was a lawsuit and PICC -- what made it dangerous to the investors, right, and you say it in your complaint, the risk that the arrangement would be deemed illegal and that it would require the seizure of all funds, and then you wouldn't have the money, your stock would not be worth what it was.

So it's not two separate schemes, it's just the degree of the scheme; right? Everyone agrees if they were taking five or 10 percent, it would be perfectly fine. It's that they were taking a huge amount of insurance premium, they were kicking the bulk of it back to 9F, and you do have allegations at paragraph 104 that said the revenues

CHARLES P. McGUIRE, C.C.R.

13

decreased because you weren't getting loan facilitation fees, but what's really ambiguous about this whole complaint to me is, so what -- is the 39 percent what the Chinese law prohibited, anything above 39 percent?  Right?  Isn't that right?

MR. SAMS:  That's one aspect, Your Honor.

THE COURT:  Right.  So, in other words, what if it's 25 percent?  What if they were taking -- they were charging a loan premium of whatever insurance -- because some of these loans I'm sure were very risky, because these were people that couldn't go to regular lenders, they're going to 9F, they're taking these loans with insurance premiums, and they're even getting 25 percent back.  They did disclose in their initial registration statements that they were doing this, they were getting -- we can go back to the language.  They said that they were -- let's see.

"We currently charge service fees from financial institutional partners under our direct lending program.  If our direct lending program is deemed to be in violation of Circular 141 of the 2019 Notice -- " -- that's the Chinese authority -- " -- we may be required to modify our business practices..."

So they disclosed they were taking this fee, and they disclosed that they were in a lawsuit with PICC, and they disclosed that PICC was responsible for collecting all

CHARLES P. McGUIRE, C.C.R.

14

loan facilitation fees from borrowers and remitting 9F's portion.

So the whole thing is about the degree; right? And so that's where there's a lot of ambiguity in this complaint.

What is the theory?  The theory in paragraph four says they were taking this huge amount.  They said they were taking -- "95 percent of the funds that PICC collected disguised as insurance premiums were in fact loan facilitation fees that PICC would remit to 9F upon receipt. Such facilitation service fees secretly funneled by 9F via PICC, together with the interest that borrowers had to pay to their lenders, accounted for 50-100 percent of borrowed principal..."

So a hundred percent means, if I take out a $10,000 loan, whatever the equivalent denomination was, let's say for argument a $50,000 loan, you know, you're paying 25 percent back in insurance premiums, and then that 25 percent, 9F is taking 95 percent of it; they're taking, you know, 22,000 or something.  That's the scheme, and I get it.  I understand the scheme.  I just don't see where you pled it.  Is it 25 percent?  Is it 90 percent?  Is it all over the place?  What evidence do you have for the who, what, where, when and why that this was the scheme, that PICC was charging outrageous fees and they were kicking 95

CHARLES P. McGUIRE, C.C.R.

15

percent of it back to 9F?

MR. SAMS:  Okay.  We're happy to address some of those details through amendment, but I think the point that we wanted to make through our current complaint was that it was improper for the company to charge those fees directly to borrowers, so what the company did, what we allege is that it used PICC as a conduit to get around that law improperly.

THE COURT:  Let me stop you for a minute.

When you say -- what is -- it's not illegal if they -- so, there are two ways of getting the money from the borrowers.  One is that when the loan proceeds are given to the borrower, you take out, before they -- if you borrow $50,000, you get back 25, because 25 of it is going to be the insurance premium; right?  So 9F takes it out.  9F gives that 25 to PICC, and then PICC gives 95 percent of it back.  That's your theory; right?

So, you know, that is like an example of what I don't see in this complaint, because it's not illegal that they're charging an insurance premium.  It's not illegal that a loan facilitation fee is given back from the insurance company to PICC; right?  I mean, to 9F; right?

MR. SAMS:  We believe that that's improper, that second --

THE COURT:  What is improper, that --

CHARLES P. McGUIRE, C.C.R.

16

MR. SAMS:  For the --

THE COURT:  But here's the thing.  You can say it's improper, but is it fraudulent?  Because, read what they said.  This was the -- because the IPO occurred after the 2019 notice by the Chinese government, it also included the following statement:  We have stopped charging fees. "We currently charge service fees from financial institutional partners under our direct lending program."

They say that.  They say, we're charging fees from financial institution partners; i.e., PICC.  So the fact that they're charging PICC -- I mean, that they're saying to PICC, we're sending this borrower to you, we want a service fee; you may think that's wrong, but it's not fraudulent under the securities law, because they disclosed it.

I don't understand how that in itself could give rise to a securities fraud case.  How could it?  They disclosed it.

MR. SAMS:  We believe it gives rise to a claim, Your Honor, because they didn't disclose the fact that they had this arrangement with PICC specifically, and when they did --

THE COURT:  What arrangement with PICC?  We're going around in circles.  It's "Who's On First"?  I'm very confused, because they disclosed it.  They said, "We currently charge service fees from financial institutional

CHARLES P. McGUIRE, C.C.R.

17

partners under our direct lending program."  If it seems to be in violation of the 2019 notice, we may be required to modify our business practice.

They say, we're doing it, and then they say, afterwards, when everything blew up in 2020, in June of 2020, they say, we've been sued.  Then they said PICC was responsible for collecting all loan facilitation fees from borrowers and remitting 9F's portion upon receipt.  That is the illegal deal we talked about that's in your complaint. What's illegal about it is the degree of it, because the lenders know -- I mean, the stockholders know that they are getting a fee from the institutional partners, they're getting a fee from PICC.  They know that.  That's been disclosed to them.  What changed in 2020 is your allegation that it wasn't a fulsome disclosure, it was a half lie -- it was a half truth, because, in fact, they were getting the same amount they were getting before 2019, if not more, through this illegal scheme, which was a way to get fees that exceeded the 39 percent limit from the Chinese government.

So, what I'm saying is, you have a couple of statements -- look at how you plead with particularity.  You talk about these Chinese news sources that talk about that lenders were charged -- one lender, it's sort of vague, said on some web site, anonymous web site that they were charged

CHARLES P. McGUIRE, C.C.R.

18

some very high, exorbitant rates for their loan; when they took out a $50,000 loan, they only got 25, that hypothetically, that all was for the insurance payments; right?  That's what they're saying.  And that's half of it. The other half is, then they kicked it all back to 9F.

But you don't have any evidence or any pleading, the who, what, where, and why that this was truly the scheme.  You say it's the scheme, but there's nothing here to support the scheme, other than what you pointed to in paragraph four, which I think you were alluding to was, well, the fact that their revenues dropped so much is evidence that they were getting a lot of money from PICC.

But I don't think that's enough on its face.  I think you need more.  I think you need a witness.  You need somebody to say this is -- you can't just say a scheme exists; you have to give the who, what, when, where and why, and how it was illegal.  It can't be, it was 20 percent, because the whole theory is, it has to be illegal, it was over the 39 percent, and that's why they kept it secret.

MR. SAMS:  We understand the Court's concern. We're happy --

THE COURT:  So, I'm going to give you an opportunity.  I'm very concerned about that, I'll be honest with you.

I'm also concerned about scienter, particular for

CHARLES P. McGUIRE, C.C.R.

19

the individuals, because I know what you have, I know you have, you know, they were well compensated and that they resigned, and the general allegations, but you don't have anything beyond that they were sort of involved, they had knowledge of this scheme, other than they had stock, they were well compensated, they resigned, and that they didn't follow GAAP.  That's the core of your scienter complaint.  You need a little bit -- I'd like to see under the case law a little bit more pleading under scienter before I make the final ruling on scienter.

MR. SAMS:  We understand the Court's concerns.

THE COURT:  And those are my primary concerns.

I'm inclined to let the -- I think it's a close call, frankly, on Suprema.  I read the Suprema case very carefully.  There was a theory there that some lower-level folks at the Paterson cheese plant had this kickback scheme with cheese, and the 3rd Circuit said, you could have that massive fraud, but as long as you plead that your theory about the individuals is in negligence, that's enough.  It may be enough on the pleading stage if I read very, you know, very straight-up Suprema, although I don't know how you have a negligence claim here.  It seems a little bit different than what was happening in Suprema.

But I'm inclined to let the securities claim go forward, at least to that degree, not because they have to

CHARLES P. McGUIRE, C.C.R.

20

plead a fraud.  You pled negligence; it's in there, you made it clear.  I'm going to let that go forward.  Let's see how you replead loss causation after you replead the particularity, the fraud and scienter.

But those are the things that I have the biggest concern about are scienter and pleading with particularity.  I'll let you replead it, and then the next time, I'm inclined to call it straight if it's pled sufficiently.  But rather than write a lengthy opinion, I thought it was best to give you the benefit of the doubt in light of some of the other issues that 9F has raised and that the Court is concerned about before I make a final ruling.

Anything that 9F wants to add?

MR. GRIFFIN:  Yes, Your Honor, very briefly.  Thank you.

Just two points.  First, on the pleading standard issue and the Suprema issue, we agree with your Honor that if they plead negligence, if they actually plead facts that would demonstrate some negligent behavior here, that could be enough for an independent claim, but our position is that they have not pled that there.

THE COURT:  Let me stop you.

I'm not asking them to do that.  I mean, they can do it, and that's easy.  I think there's a way to plead negligence, and they should.  They do say this is -- I don't

CHARLES P. McGUIRE, C.C.R.

21

have the complaint -- I do have it in front of me, actually. But I think you're right:  They don't go through the elements of the negligence, but they just say, this is not fraud, this is negligence.

So, when they replead -- that's well taken -- they can make it clear that they're pleading negligence, although the 3rd Circuit in Suprema just says they have to make clear that it is -- I think the 3rd Circuit says -- it says on page, I think, my copy is 15, it says -- it was careful in that introductory section not to accuse any particular defendant of acting with fraudulent intent.  As it's claimed against the outside directors and underwriters in particular, there are no allegations of fraud whatsoever in any count of plaintiff's pleadings.

So, I hear you, but that's well taken.  They can clean up the Securities Act pleading and clarify it.

MR. GRIFFIN:  Understood, Your Honor, yes, and that leads into the second point that I had, which is the second of only two, so I'll be brief, but that's, you know, regardless of the state of mind here, regardless of whether it's negligent or intent, the first element of both the section 11 and the 10b claims is misstatement.  You know, as Your Honor --

THE COURT:  Right.  I'm with you.

MR. GRIFFIN:  And so, you know, whether or not

CHARLES P. McGUIRE, C.C.R.

22

they've alleged in this statement under either section, you know, we submit should rise and fall together, even setting aside the state of mind.

THE COURT:  It could be an omission; right?  It could be a misstatement or an omission.

MR. GRIFFIN:  Correct.  They haven't alleged either here.

THE COURT:  Right.  That's right.

MR. GRIFFIN:  Exactly, it's exactly what Your Honor pointed to, which is, what is it exactly that makes this alleged scheme illegal.  The 36 percent cap that Your Honor referenced and that's discussed in the papers and was discussed in the offering documents, that's a regulation that applies to online intermediaries, information intermediaries like 9F, not to insurance companies like PICC.

THE COURT:  I hear you.  But if they made an argument that they were getting right after that '19 notice came out that it was effectively an end run around the Chinese law by taking a fee and having the insurance company charge a fee in excess of that and then kicking the bulk of it back to the Plaintiff -- I mean, not the Plaintiff, to 9F, that would be something that would certainly be enough on a pleading stage to probably get by a motion, because the issue is, if you're disclosing that we're taking a fee, it

CHARLES P. McGUIRE, C.C.R.

23

has to be in compliance with the law, but there was an agreement, we'll call it an insurance payment, but we'll kick it all back to you anyway so you'll get your 50 percent, that would probably be something that should have been disclosed when they made their correction and when they start to lose revenue, but it wasn't disclosed.

So, I hear you, and I'm well aware that it's not illegal for the insurance company to do that. But if that was done in reaction to the 2019 notice, they'd probably get pretty close to pleading a material omission or misrepresentation.

MR. GRIFFIN: Yes, and that's exactly the critical point that we wanted to highlight, Your Honor, is that, you know, they need to allege some law or regulation under Chinese law that says the amount that they are collecting from PICC is illegal, and that's what's missing here.

THE COURT: No, no, I'm not going to require that, because -- that is not what I said. If they can argue that in response to that 2019 advice that this was really an end run around because the amount was very high, that it was effectively -- for example, the example I used, it was a $50,000 loan and they took 25 percent in insurance premiums and gave 22 percent back, that would be enough for me. And even though that technically doesn't violate, that may not technically violate the law because the fee was taken out by

CHARLES P. McGUIRE, C.C.R.

24

-- was returned by PICC, it probably would be enough to allege securities fraud, because it would be an omission that should have been included and would be detrimental to the shareholders, because, if the Chinese government found that was an end run around their laws, they would risk not ever being able to collect those fees.

But they don't have that. And that's what I'm concerned about, and that's the issue, and if you want to argue if there is a legal issue that no matter what they did with PICC, none of that would ever be illegal because -- none of that would ever constitute securities fraud because there's no Chinese law that says that, again, it goes back to the matter of degree. If they took 75 percent of the loan, a hundred percent of the loan and gave 99 percent of it back, I think that they're going to be able to plead securities fraud, at least plead it.

So that's where I'm going to leave it. But they haven't even done that. Their theory that they allege in paragraph four is not developed well in their complaint, and that has my concern. Okay?

I'm not going to address the other issues. I know there were issues about standing and loss causation. I'm satisfied at this stage that they can correct any issues that have been raised, and I want to let them address everything that you've raised in your motion when they

CHARLES P. McGUIRE, C.C.R.

25

replead their second amended complaint, and then we can address every issue with a lot of detail. All right?

How much time will the Plaintiff need to replead, to file an amended pleading?

MR. SAMS: In light of the holidays, Your Honor, we would request 60 days.

THE COURT: Okay, but I'm going to hold you to the 60 days, all right?

So, this is November 28th.

February 1st. Let me see what day of the week February 1st is.

February 1st is a Wednesday. All right? And then I will wait -- I'm not going to give a briefing schedule. You can meet and confer on when you think you can do an amended brief, and I'm sure there will be a new motion to dismiss.

So just send me a letter and let me know what schedule you've agreed on. I'm sure it won't be a problem at this end.

MR. GRIFFIN: Great. That works for Defendants. Thank you.

THE COURT: All right. Guys, have a happy, Covid-free holiday, all right?

MR. SAMS: Thank you, Your Honor.

MR. GRIFFIN: Thank you, Your Honor.

CHARLES P. McGUIRE, C.C.R.

THE COURT:  Thank you.

(Matter concluded)

Pursuant to Section 753, Title 28, United States Code, the foregoing transcript is certified to be an accurate record as taken stenographically in the above entitled proceedings.

s/CHARLES P. McGUIRE, C.C.R.

CHARLES P. McGUIRE, C.C.R.