# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRAIG J. HOLLAND, Individually and on behalf of all others similarly situated,<br><br><br><br>Plaintiff,<br><br><br><br>v.<br><br><br><br>9F INC., LEI SUN, YANJUN LIN, YIFAN REN, CHANGXING XIAO, FLYNN XUXIAN HUANG, IVAN XU, JUNSHENG ZHANG, WING HON CHEUNG, FANGXIONG GONG, DAVID CUI, LEI LIU, SIU FUNG MING, CREDIT SUISSE SECURITIES (USA) LLC, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CLSA LIMITED, CHINA INVESTMENT SECURITIES INTERNATIONAL BROKERAGE LIMITED, 9F PRIMASIA SECURITIES LIMITED, and COGENCY GLOBAL INC.,<br><br><br><br>Defendants. | Case No: 2:21-cv-00948-MCA-MAH<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT** |

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................3

      A.    Background ...................................................................................................3

      B.    Increasing Regulatory Restrictions Forced 9F to Abandon its Previous
            Service Fee Practice ....................................................................................4

      C.    9F Partnered with PICC ..............................................................................6

      D.    The Registration Statement Failed to Disclose That 9F Received Loan
            Facilitation Service Fees From PICC and That 9F Was Still Collecting
            Fees That Constituted More Than 36% of Loan Principal ...................6

      E.    The Undisclosed Risks Quickly Materialized, Damaging Investors ....7

III.  STANDARD OF REVIEW....................................................................................8

IV.   PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE
      SECURITIES ACT................................................................................................8

      A.    The Standards Governing Securities Act Claims..................................8

            1.    The Securities Act Places a Minimal Burden on Plaintiffs ........9

            2.    Because Scienter is Not Required Under the Securities Act, the
                  Notice Pleading Standards of Rule 8 Apply and Defendants Are
                  Liable for Their Misrepresentations Based Upon Strict Liability
                  and Negligence.........................................................................10

            3.    The Heightened Pleading Standards of Rule 9(b) and the
                  PSLRA Do Not Apply Because Plaintiffs' Securities Act
                  Claims Do Not Sound in Fraud...................................................11

      B.    Plaintiffs Adequately Allege that the Company's Registration
            Statement was False and Misleading .................................................15

1.  The Registration Statement Misleadingly Suggested that the Full Amounts that PICC Charged Borrowers Were Insurance Premiums to Protect Loans and That 9F Did not Charge PICC Any Service Fees When, in Fact, 9F Used PICC as a Conduit to Collect Service Fees From Borrowers Indirectly and Disguised as Insurance Premiums ..............................................................15

2.  The Registration Statement Was False and Misleading Because it Failed to Disclose that 9F used PICC to Circumvent Chinese Regulatory Bans and That the Borrowing Costs for Borrowers Frequently Exceeded the 36% APR Ban .................................21

3.  The Registration Statement Was False and Misleading Because it Failed to Disclose that the True Nature of the Arrangement between 9F and PICC Violated GAAP....................................27

4.  Defendants Had a Duty to Disclose the Omitted Information..............................................................................28

C.  Plaintiffs Adequately Allege Control Person Liability Under the Securities Act ...............................................................................30

V.  PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE EXCHANGE ACT ..........................................................................31

A.  Plaintiffs Adequately Allege that Defendants Made Materially False and Misleading Statements..............................................................31

1.  Defendants' Statements Made in Connection with the Company's IPO Were False and Misleading...........................31

2.  Defendants' Post-IPO Statements Were False and Misleading..............................................................................32

B.  Plaintiffs Adequately Allege that Defendants Acted with Scienter....33

C.  Plaintiffs Adequately Allege Loss Causation ....................................39

D.    Plaintiffs Adequately Allege Control Person Liability Under the Exchange Act .................................................................................40

VI.    CONCLUSION..................................................................................40

# TABLE OF AUTHORITIES

<u>CASES</u>

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) .......................................................................... 35, 36

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021)....................................................................40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................8

*Bauer v. Prudential Fin., Inc.*,
  No. 09-1120 (JLL), 2010 WL 2710443 (D.N.J. June 29, 2010) ..........................15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................................8

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .................................................................................15

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .............................................................................................40

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) .............................................................................................11

*Fain v. USA Techs., Inc.*,
  707 F. App'x 91 (3d Cir. 2017).............................................................................34

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ...............................................................................35

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................................27

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d 2000) ........................................................................................35

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ............................................................... 9, 10, 11

*In re Adolor Corp. Sec. Litig.*,
   616 F. Supp. 2d 551 (E.D. Pa. 2009)........................................... 15, 17

*In Re 9F Inc. Securities Litigation*,
   No. 654654/2020, 2023 WL 2371874 (N.Y. Sup. Ct. Mar. 06, 2023) ...............29

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
   No. 05-232, 2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ...................... 10, 14, 15, 31

*In re Asbestos Prod. Liab. Litig.*,
   837 F.3d 231 (3d Cir. 2016) ...................................................... 27, 28

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ..................................................... *passim*

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001).....................................................39

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ...........................28

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) ...................................................... *passim*

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ...................................................... *passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ......................................................................35

*Odeh v. Immunomedics, Inc.*,
   No. CV 18-17645, 2020 WL 4381924 (D.N.J. July 31, 2020) ............... 20, 27, 39

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015)............................................................. 10, 11

v

*Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ........................................................................40

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ..........................................................................21

*Roofer's Pension Fund v. Papa*,
No. CV 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) ..................... *passim*

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) ..................................................................... 36, 37

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001) ............................................................................35

*Sun v. Han*,
No. 15-703, 2015 WL 9304542 (D.N.J. Dec. 21, 2015) .............................. 37, 38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................... 8, 34, 35, 39

*Vanderhoef v. China Auto Logistics Inc.*,
No. 18-CV-10174, 2021 WL 3260849 (D.N.J. July 30, 2021).................... passim

STATUTES

15 U.S.C. §77k(a) ..........................................................................................9

15 U.S.C. §77k(b) ..........................................................................................9

15 U.S.C. § 77l(a)(2)......................................................................................10

15 U.S.C. §78j(b) ..........................................................................................31

15 U.S.C. §78u-4(b)(1)(B).............................................................................32

15 U.S.C. §78u-4(b)(2) ..................................................................................34

15 U.S.C. §78u-4(b)(4) ..................................................................................40

REGULATIONS

17 C.F.R. §229.10 ...................................................................................................30

17 C.F.R. §229.105 .................................................................................................29

## I.   INTRODUCTION

This is a securities class action on behalf of all purchasers of 9F's American Depositary Shares ("ADSs") from August 14, 2019 to September 29, 2020, inclusive ("Class Period").[1] Plaintiffs bring claims pursuant to: (1) Sections 11, 12(a), and 15 of the Securities Act of 1933 ("Securities Act") for all purchasers of 9F ADSs pursuant or traceable to the Registration Statement and Prospectus issued in connection with 9F's initial public offering (collectively the "Registration Statement") held on or about August 14, 2019 (the "IPO" or "Offering"); and (2) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") for all purchasers of 9F ADSs during the Class Period.

Although the Court ruled that Plaintiffs' previous complaint needed more specificity, Plaintiffs' Second Amended Complaint ("SAC") provides the specificity sought by the Court.  As the Court recognized, while the Company made "some

---

[1]     Defendants are 9F, Chief Executive Officer Lei Sun, Chief Financial Officer Yanjun Lin, Board member Yifan Ren, Board member Changxing Xiao, Board member Flynn Xuxian Huang, Board Member Ivan Xu, Board member Junsheng Zhang, Board member Wing Hon Cheung, Director Fangxiong Gong, Director David Cui, Director Lei Liu, Company Representative Siu Fung Ming ("Offering Defendants"), Credit Suisse Securities (USA) LLC, Haitong International Securities Company Limited, CLSA Limited, China Investment Securities International Brokerage Limited, and Primasia Securities ("Underwriter Defendants") (collectively "Defendants").  Unless otherwise indicated, all emphasis is added, all internal citations and quotations are omitted, and all "Rules" references are to the Federal Rules of Civil Procedure.  Unless otherwise stated, all paragraph ("¶") references are to Plaintiff's Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint").

1

disclosures," the "disclosures never disclosed that there was this illegal arrangement" between 9F and Property and Casualty Company Limited ("PICC"), an insurance company in China, and "[t]hey never disclosed the amount of the interest or the amount that was sent back to 9F." *See* Doc. 51-3 at 7.[2] Additionally, the Court reasoned the following:

> [I]f [plaintiffs] made an argument that they were getting right after that '19 notice came out that it was effectively an end run around the Chinese law by taking a fee and having the insurance company charge a fee in excess of that and then kicking the bulk of it back to the Plaintiff -- I mean, not the Plaintiff, to 9F, that would be something that would certainly be enough on a pleading stage to probably get by a motion, because the issue is, if you're disclosing that we're taking a fee, it has to be in compliance with the law, but there was an agreement, we'll call it an insurance payment, but we'll kick it all back to you anyway so you'll get your 50 percent, that would probably be something that should have been disclosed when they made their correction and when they start to lose revenue, but it wasn't disclosed.

Doc. 51-3 at 22-23.   That is exactly what Plaintiffs allege in the SAC. Additionally, the Court rejected Defendants' attempt to impose a standard that the Court did not adopt:

> MR. GRIFFIN: Yes, and that's exactly the critical point that we wanted to highlight, Your Honor, is that, you know, they need to allege some law or regulation under Chinese law that says the amount that they are collecting from PICC is illegal, and that's what's missing here.
>
> THE COURT: No, no, I'm not going to require that, because -- that is not what I said. If they can argue that in response to that 2019 advice

---

[2]    Transcript of Hearing on Motion to Dismiss (November 28, 2022) attached as Exhibit A to the Certification of Scott D. Musoff in Support of Defendants' Joint Motion to Dismiss the Second Amended Class Action Complaint.

that this was really an end run around because the amount was very high, that it was effectively -- for example, the example I used, it was a $50,000 loan and they took 25 percent in insurance premiums and gave 22 percent back, that would be enough for me. And even though that technically doesn't violate, that may not technically violate the law because the fee was taken out by -- was returned by PICC, it probably would be enough to allege securities fraud, because it would be an omission that should have been included and would be detrimental to the shareholders, because, if the Chinese government found that was an end run around their laws, they would risk not ever being able to collect those fees.

Doc. 51-3 at 23-24. Because Plaintiffs adequately allege claims pursuant to the Securities Act and Exchange Act, the Court should deny Defendants' Joint Motion to Dismiss the Second Amended Class Action Complaint ("Motion").

## II. STATEMENT OF FACTS

### A. Background

9F is an online lending intermediary platform in China that enables people to borrow loans on its platform. ¶47. Two sources fund the loans on 9F's platform: (1) funds that 9F receives from individual investors who purchase investment products sold on its platform; and (2) funds provided by 9F's "institutional funding partners" – which are small and medium sized banks – directly through 9F's "direct lending program." *Id.* 9F charges loan facilitation service fees for facilitating loans between borrowers and lenders (*i.e.* individual investors and institutional funding partners). *Id.*

3

Since its inception, 9F's direct lending program grew rapidly and became its main source of funding for loans offered to borrowers immediately before its IPO. ¶49. For the three months ended June 30, 2019 – the completed quarter immediately before 9F's IPO – loan origination volume in the direct lending program represented 58% of 9F's total loan origination volume. *Id.*

## B.    Increasing Regulatory Restrictions Forced 9F to Abandon its Previous Service Fee Practice

Before April 2019, for each loan that 9F referred to its institutional funding partners in the direct lending program, 9F directly charged the borrower a service fee. ¶50. As of March 31, 2019, the outstanding loan balance that 9F had facilitated prior to the promulgation of the below-mentioned Circular 141 (with the aggregated interest and all fees exceeding 36%) accounted for 11.4% of the total outstanding loans that 9F facilitated on its platform. *Id.* But with China's increasing regulation, 9F was forced to abandon this lucrative business model. ¶51.

In August 2015, the Supreme People's Court of China issued the *Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases* ("2015 Judicial Provisions") providing that the aggregate rate of borrowing cost per year, including annual interest and all fees, shall not exceed 36% of the loan principal. ¶52. In December 2017, China promulgated *the Notice on Rectification of Cash Loan Businesses* (the "Circular 141"), which, among other things, required online lending information intermediaries to abide by the 2015 Judicial Provisions

4

and prohibited them from facilitating any loans whose applicable borrowing costs per annum (*i.e.*, the interest and fees) would exceed 36% of the loan principal.  ¶53.

In October 2018, the National Internet Finance Association of China, a regulatory agency that governed online lending information intermediaries, required that any and all fees and interest charged to a borrower who borrows a loan from an online lending intermediary platform (including interest payable to investors, service fees charged by online lending information intermediaries for their loan facilitation services and post-origination services, post-loan service fees payable to third party collection companies for loan collection and arbitration services, prepayment fees and penalty fees) shall be taken into account when calculating the applicable borrowing cost per annum, or APR. ¶54.  Additionally, on April 2, 2019, the Beijing Internet Finance Association, a regulatory agency that governs online lending information intermediaries, issued the Notice on Strengthening Business Standards and Risk Prevention by Loan Facilitation Institutions (the "2019 Notice"), prohibiting, among other things, loan facilitation service providers, such as 9F, from collecting any interests or fees from borrowers.  ¶55.

The ban on collecting any fees from borrowers and the 36% fee ceiling significantly impacted 9F's business and completely impaired one of 9F's most important sources of revenue that represented over half of 9F's business.  ¶56.  As a result, 9F turned to PICC to maintain this significant revenue stream.  ¶57.

5

C.      **9F Partnered with PICC**

9F began working with PICC in March 2018.  ¶58.  Initially, PICC was providing third-party insurance protection to individual investors in the non-direct lending program.  *Id.*  In 2019, faced with "the continuing challenging regulatory environment," 9F was in desperate need of a new model to survive.  ¶59.

As a result, PICC and 9F struck a deal.  *Id.*  On the surface, it appeared that 9F and PICC entered into a normal cooperation agreement through which PICC provided credit insurance to institutional funding partners in 9F's direct lending program.  *Id.*  Unknown to the market, however, the cooperation agreement enabled 9F to use PICC as a conduit to continue funneling service fees from borrowers.  ¶60. As a result, 9F successfully circumvented the regulatory bans on collecting any fees directly from borrowers and continued to collect fees through PICC as a conduit. ¶61.  Furthermore, through its agreement with PICC, 9F was still collecting fees that constituted more than 36% of loan principal at the time of the IPO.  *Id.*

D.      **The Registration Statement Failed to Disclose That 9F Received Loan Facilitation Service Fees From PICC and That 9F Was Still Collecting Fees That Constituted More Than 36% of Loan Principal**

Through its arrangement with PICC, 9F was able to maintain its revenue source in the direct lending program by routing service fees in the name of insurance premiums from borrowers' account to PICC and having PICC remit the fees back to

6

9F. ¶73. But the Registration Statement did not mention that 9F charged loan facilitation service fees from PICC, despite its disclosure that 9F "cooperate[d] with PICC to provide credit insurance to institutional funding partners under our direct lending program." ¶74.

### E.     The Undisclosed Risks Quickly Materialized, Damaging Investors

The undisclosed risks quickly materialized after 9F proceeded with its IPO. ¶¶84, 87. On June 12, 2020, the Company disclosed that 9F and PICC filed lawsuits against each other regarding the RMB 2.2 billion (US$350 million) service fees that PICC refused to pay 9F. *Id*. But 9F did not disclose that such service fees were, in fact, loan facilitation service fees that 9F funneled through PICC to bypass legal restrictions. *Id*.

On June 24, 2020, the Company revealed for the first time the illegal nature of 9F's partnership with PICC. ¶88. 9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "***PICC collected all of the loan facilitation service fees***" (not insurance premiums) from borrowers and "***remitted*** [9F's] portion of the service fees to [9F]." *Id*. 9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to borrowers, the Company started to charge service fees "***indirectly through*** … insurance company." *Id*. Additionally, on June 18, 2020, The China

7

Securities Journal published a news article entitled "*The Drawer Agreement Pierced A "Big Hole*"; *The Lawsuits Between PICC And Jiufu Highlight The Predicament Of Credit Insurance*," revealing with the insight of an expert the details of the secret agreement between 9F and PICC on allocation of the purported "insurance premiums" that PICC charged borrowers. ¶89. Subsequently, the price of 9F ADSs plummeted in value, and as of the filing of the initial complaint, 9F ADSs were 85% below the IPO price. ¶90.

## III.    STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety. . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## IV.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE SECURITIES ACT

### A.    The Standards Governing Securities Act Claims

Notably, Defendants fail to discuss the unique standards governing Plaintiffs' Securities Act claims. Defendants fail to do so because they realize that Plaintiffs have satisfied these standards.

8

### 1.    The Securities Act Places a Minimal Burden on Plaintiffs

Section 11 of the Securities Act creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. §77k(a). "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

"A Section 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Herman*, 459 U.S. at 382; 15 U.S.C. §77k(b). Accordingly, "Section 11 places a relatively minimal burden on a plaintiff." *Herman*, 459 U.S. at 382.

"Section 12(a)(2) provides for civil liability for anyone who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make

9

the statements, in light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. § 77*l*(a)(2). "To state a prima facie claim under Section 12(a)(2), the plaintiff must allege the purchase of securities pursuant to a materially false or misleading prospectus or oral communication." *Suprema*, 438 F.3d at 269; *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, No. 05-232, 2007 WL 81937, at *9 (E.D. Pa. Jan. 9, 2007).

### 2. Because Scienter is Not Required Under the Securities Act, the Notice Pleading Standards of Rule 8 Apply and Defendants Are Liable for Their Misrepresentations Based Upon Strict Liability and Negligence

By failing to distinguish between Plaintiffs' Securities Act claims and Exchange Act claims, Defendants conflate the state-of-mind standards for the different claims. "Section 11 is a virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter." *Suprema*, 438 F.3d at 269. "Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement – one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015). "Either way, the buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Id.*; *Herman*, 459 U.S. at 381–82. And "[l]ike Section 11, Section 12(a)(2) is a virtually absolute liability provision that does not require an allegation that defendants possessed scienter." *Suprema*, 438

10

F.3d at 269.  Indeed, fraud "is not a necessary element to establish a prima facie claim under Section 11 or Section 12(a)(2)" and "[w]here a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply."  *Suprema*, 438 F.3d at 270.  Thus, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements.  Other defendants bear the burden of demonstrating due diligence." *Herman*, 459 U.S. at 382; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976).

> **3.     The Heightened Pleading Standards of Rule 9(b) and the PSLRA Do Not Apply Because Plaintiffs' Securities Act Claims Do Not Sound in Fraud**

Defendants do not seriously contend that Plaintiffs' Securities Act claims sound in fraud.  Indeed, in an assertion relegated solely to a footnote, Defendants contend that Plaintiffs' Securities Act claims purportedly sound in fraud.  Motion at 22 n.7.  Defendants are wrong.

As the Third Circuit held in reversing a district court's ruling that Securities Act claims sounded in fraud, "[w]hether a Securities Act claim is subject to Rule 9(b) requires an assessment of the particular claim to determine whether acts of fraud on the part of the defendants form the basis for the claim against them" (*Suprema*, 438 F.3d at 270) – an assessment that Defendants failed to adequately conduct here. Defendants' conclusory assertion that Plaintiffs' allegations are "classic accusations of fraud" (Motion at 22 n.7) is no different from the district court's holding that

11

*Suprema* reversed, where the district court held that "the wording and imputations of the complaint[s] are classically associated with fraud." *Suprema*, 438 F.3d at 271.

A proper examination reveals Defendants' failures. First, the Complaint is carefully structured to draw a distinction between the negligence and fraud claims. As the Third Circuit declared:

> Lead Class Plaintiff carefully segregated its allegations of negligence against the Officers and BDO from its allegations of fraud against those defendants. It did so by pleading its Section 11 and Section 12(a)(2) claims in negligence before—and wholly apart from—pleading its fraud-based Section 10(b) claims. This manner of pleading makes for a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud.

*Suprema*, 438 F.3d at 273. That is exactly the case here: Plaintiffs allege the Section 11 and 12(a)(2) claims in the first portion of the Complaint (¶¶1-174) and the Exchange Act claims in the latter portion. (¶¶175-210). Importantly, Plaintiffs have not incorporated the fraud allegations for the Exchange Act claims into the Securities Act claims. Such a clear delineation between claims demonstrates that the Securities Act claims do not sound in fraud. *Suprema*, 438 F.3d at 273.

Second, Plaintiffs' Securities Act claims are based upon strict liability and negligence, not fraud. ¶¶46, 106, 135, 147, 150-51, 153, 160, 162.[3] Indeed, as the

---

[3] *See, e.g.*, ¶46 ("The allegations for this count are . . . premised on the fact that there were material misrepresentations and omissions in the Registration Statement, and the negligence of all Defendants in failing to recognize this fact, including, but not limited to, the negligence of the Underwriter Defendants in failing to properly conduct due diligence to discover the material misrepresentations and omissions in

the Registration Statement."); ¶106 ("The Registration Statement for the IPO was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding 9F's business, operations, and prospects."); ¶135 ("the Underwriter Defendants' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement"); ¶¶147, 160 ("This cause of action is based solely on strict liability as to 9F and negligence as to the remaining Defendants."); ¶¶150 ("None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading."); ¶151 ("The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts"); ¶153 ("The Underwriter Defendants, as underwriters of the ADSs offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Underwriter Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading."); ¶162 ("Defendants owed Plaintiffs and the other members of the Class who purchased the Company's securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above."). Contrary to Defendants' assertion (Moton at 39-40), these allegations also specifically allege the negligence of the Underwriter Defendants.  ¶¶117-35.

Court recognized regarding the FAC, "[y]ou pled negligence; it's in there, you made it clear."  Doc. 51-3 at 20.  And it is even more explicit in the SAC.  *See Am. Bus.*, 2007 WL 81937 at *6 (holding that identical allegations sounded in negligence, not fraud).  "Rule 8 pleading merely requires a short and plain statement of the claim showing that the pleader is entitled to relief."  *Suprema*, 438 F.3d at 270. Defendants, however, completely ignore these allegations.  "[W]here, as here, individual defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims."  *Id*. at 272.

Third, Plaintiffs have expressly disclaimed all allegations of fraud from their Securities Act claims.  ¶¶46, 147, 160, 168.  Because Plaintiffs' disclaimers are consistent with the allegations as a whole, the pleading requirements of Rule 8 apply to the Securities Act claims.  *Bauer v. Prudential Fin., Inc.*, No. CIV.A. 09-1120 (JLL), 2010 WL 2710443, at *4 (D.N.J. June 29, 2010); *Am. Bus.*, 2007 WL 81937 at *6.  Thus, "[b]ecause the Section 11 and Section 12(a)(2) claims of the plaintiffs here were expressly negligence-based and pled distinctly in the complaint from the

14

fraud-based claims," it would be "error for the District Court to hold that they sound in fraud." *Suprema*, 438 F.3d at 274.[4]

> **B.  Plaintiffs Adequately Allege that the Company's Registration Statement was False and Misleading**
>
> **4.  The Registration Statement Misleadingly Suggested that the Full Amounts that PICC Charged Borrowers Were Insurance Premiums to Protect Loans and That 9F Did not Charge PICC Any Service Fees When, in Fact, 9F Used PICC as a Conduit to Collect Service Fees From Borrowers Indirectly and Disguised as Insurance Premiums**

The Registration Statement was false and misleading because it suggested that the full amounts that PICC charged borrowers were insurance premiums to protect loans and that 9F did not charge PICC any service fees from PICC's insurance premiums. In fact, 9F used PICC as a conduit to collect service fees from borrowers indirectly and disguised as insurance premiums. For instance, the Registration Statement stated the following:

> "We partner with financial institutions such as China Taiping and PICC to provide third-party insurance protection to investors that invest in loans we facilitate, which strengthens the credibility of our platform

---

[4]  Defendants' cases do not help them. *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) is distinguishable because "[u]nlike the plaintiffs in *CALPERS*, plaintiffs in this case do not merely disavow already-pled allegations of fraud in connection with their Section 11 and Section 12(a)(2) claims." *Suprema*, 438 F.3d at 272. Rather, "plaintiffs have expressly pled negligence in connection with their Section 11 and 12(a)(2) claims. We regard this difference in pleading as dispositive." *Id*. *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551 (E.D. Pa. 2009) is distinguishable for the same reason.

and further enlarges our investor base. PICC, when it is engaged under our direct lending program, also provides credit insurance to institutional funding partners, helping us to expand our institutional funding partner base and promote the rapid development of our direct lending program, which may ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business."

\* \* \*

"Loan facilitation services fees are the portion of service fees we charge to borrowers with whom we have stopped charging service fees since April 2019 or financial institutional partners in relation to the services we provide such as traffic referral services and credit assessment."

¶107.   The above statements were materially false and misleading.   ¶108.   For instance, on June 24, 2020, the Company revealed for the first time the illegal nature of 9F's partnership with PICC.   ¶88.   9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "***PICC collected all of the loan facilitation service fees***" (not insurance premiums) from borrowers and "***remitted*** [9F's] portion of the service fees to [9F]."   *Id*.   9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to borrowers, the Company started to charge service fees "***indirectly through*** … insurance company."   *Id*.

Moreover, on June 18, 2020, The China Securities Journal published a news article entitled "*The Drawer Agreement Pierced A "Big Hole*"; *The Lawsuits Between PICC And Jiufu Highlight The Predicament Of Credit Insurance*,"

16

revealing the details of the secret agreement between 9F and PICC on allocation of the purported "insurance premiums" that PICC charged borrowers.  ¶89. A senior expert in the Chinese peer-to-peer lending intermediary industry told The China Securities Journal that when the loan principal was issued to a 9F borrower's account, insurance premiums ranging from a few hundred RMBs to a few thousand RMBs were "transferred within seconds" to PICC from the borrower's account to "automatically be used for purchasing PICC's performance insurance." *Id*. PICC kept 5% of the insurance premiums, while the remaining 95% would "make a twirl" in PICC's account and would be transferred to 9F. *Id*. The expert said that borrowers probably did not know about the "drawer agreement", *i.e.*, the secret fee allocation arrangement, between PICC and 9F. *Id*.[5]

Additionally, FE 1 confirms that neither 9F nor PICC informed borrowers that PICC collected loan facilitation service fees, disguised as insurance premiums, from borrowers for 9F.  ¶82. FE1 worked as a Finance Manager at Jiufu Shuke – the primary operating subsidiary of 9F – from March 2019 to May 2020. *Id*. His main job responsibilities included: (1) adjusting the differences between the Company's Chinese and U.S. financial statements in accordance with U.S. Generally Accepted

---

[5]    Contrary to Defendants' assertions (Motion at 24-25), courts frequently rely upon the accounts of anonymous sources in securities actions. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009).

17

Accounting principles ("GAAP"); (2) preparing monthly, quarterly, and annual financial statements for the purposes of filing with the SEC; and (3) conducting financial analysis, accounting, tax planning, year-end auditing. *Id*.

According to FE 1, borrowers on 9F's platform were not aware that 9F received service fees from the insurance company because it was not specified in the insurance contracts into which borrowers entered. *Id*. FE 1 stated that "on the surface of [9F's] financial statements, it is claimed that PICC was obligated to pay service fees to 9F pursuant to the agreement. But in fact, 9F gave such funds to PICC. This was just a *formality*. PICC should return such funds to 9F." *Id*. FE1's statements are consistent with the fact that 9F was in control of deciding which borrowers should pay how much insurance premiums and transferring such funds to PICC directly from borrowers' accounts on 9F's platform. *Id*.

With the secret arrangement with PICC, since April 2019, 9F was able to maintain its revenue source in the direct lending program by routing service fees in the name of insurance premiums from borrowers' account to PICC and having PICC remit the fees back to 9F. ¶73. But *the Registration Statement did not mention that 9F charged loan facilitation service fees from PICC*, despite its disclosure that 9F "cooperate[d] with PICC to provide credit insurance to institutional funding partners under our direct lending program." ¶74.

18

Furthermore, a penalty notice issued by China Banking and Insurance Regulatory Commission regarding PICC's violations in its partnership with 9F reveals that 9F, not PICC, was in complete control of PICC's issuing insurance policies to borrowers on 9F's platform. ¶81. The penalty notice reveals that in the arrangement between 9F and PICC, PICC ignored its role and duties as an insurer under the Chinese law requiring an insurer to independently determine the insurance rate on a case-by-case basis and failed to charge premiums according to the rates pre-approved by the Commission. *Id*. Instead, 9F unilaterally and completely controlled and determined which borrowers should buy PICC insurance policies and how much insurance premium a borrower should pay to PICC. *Id*. According to the penalty notice, PICC issued over seven million insurance policies to 9F's borrowers from March 2018 to December 2019. *Id*. Thus, the Registration Statement was false and misleading.

Defendants' suggestion that the Company's disclosures were adequate to inform investors of the risks alleged is inaccurate.[6] For instance, none of the disclosures upon which Defendants attempt to rely disclose the fact that "***PICC***

---

[6]    For instance, Defendants claim that "the Company disclosed that (i) the 2019 Notice prohibits 'institutions providing loan facilitation services [such as 9F] . . . from collecting any interests or fees from the borrowers'; (ii) 9F thus 'stopped charging service fees from borrowers since April 2019' under its direct lending program; and (iii) instead 'charge[s] service fees from financial institutional partners,' such as PICC." Motion at 15. And contrary to Defendants' assertion (Motion at 16), Plaintiffs do allege that the risks alleged materialized. ¶¶84-90.

19

*collected all of the loan facilitation service fees*" (not insurance premiums) from borrowers and "*remitted* [9F's] portion of the service fees to [9F]."  ¶88.  These disclosures also failed to reveal that 9F started to charge service fees "*indirectly through* … insurance company."  *Id*.  Moreover, Defendants' disclaimers that "PICC may refuse to pay compensation," could "decide[] to terminate the insurance arrangements under our direct lending program," "may not perform as expected under our agreements with them, and we may have disagreements or disputes with them, which could adversely affect our brand and reputation," and that in turn, "our business will be harmed" (Motion at 16) are ineffective because, as Plaintiffs adequately allege and as this Court has declared, a company can be liable "for misleading investors when it describes as hypothetical a risk that has already come to fruition." *Odeh v. Immunomedics, Inc.*, No. CV 18-17645, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Additionally, although the Registration Statement stated that 9F charged loan facilitation service fees in the direct lending program "to borrowers with whom we have stopped charging service fees since April 2019 or financial *institutional* partners in relation to the services we provide such as traffic referral services and credit assessment" (¶75), the Registration Statement did not define "financial *institutional* partners." *Id*. Neither did the Registration Statement refer to PICC as a financial institutional partner. *Id*. Rather, considering the context of the

20

Registration Statement, investors can **only** reasonably infer that the "financial institutional partners" **only** were "institutional funding partners", *i.e.* banks—and did **not** include insurance companies—because only banks entered "loan agreements" with borrowers, and only banks issued loans to borrowers.  ¶76.[7]

> **5.  The Registration Statement Was False and Misleading Because it Failed to Disclose that 9F used PICC to Circumvent Chinese Regulatory Bans and That the Borrowing Costs for Borrowers Frequently Exceeded the 36% APR Ban**

The Registration Statement was also false and misleading because it failed to disclose that 9F used PICC as a conduit to circumvent Chinese regulatory bans and that borrowing costs for borrowers on 9F's platform frequently exceeded the 36% APR ban.  Indeed, 9F's Registration Statement represented that:

---

[7]    In contrast, "financial **institution** partners" was an explicitly defined term and the Registration Statement described PICC as a member of 9F's financial **institution** partners.  ¶77.  Although the Registration Statement specifically stated that 9F provided traffic referral services and credit assessment services to its **institutional** funding partners, *i.e.*, banks, the Registration Statement never mentioned that 9F provided traffic referral services and credit assessment services to financial institution partners, insurance companies or, in this case, specifically to PICC.  ¶78.  Therefore, reasonable investors would not have discovered that 9F provided either traffic referral services or credit assessment services to PICC.  ¶79. Additionally, reasonable investors would not have discovered the existence of an arrangement pursuant to which PICC would pay 9F service fees from the insurance premiums PICC collected from borrowers.  *Id*.  Furthermore, reasonable investors would not have discovered that 9F unilaterally and completely controlled the credit insurance that PICC provided in the direct lending program. ¶80.  Defendants' suggestion to the contrary (Motion at 16 n.5) fails to appreciate that courts must view the allegations "in the light most favorable to plaintiff . . . ." *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1420 (3d Cir. 1997).

As of the date of this prospectus, we ***do not have*** any outstanding loan balance that we have facilitated since the promulgation of Circular 141 with an APR of ***higher than 36%, even inclusive of any additional fees incurred by borrowers*** in relation to third-party insurance and guarantee protection, ***such as insurance premiums to the insurer***, money contributions to the depository account and guarantee fee to the guarantee company….We may continue to facilitate loans at or above the APR of 24% but no more than 36%.

¶¶62, 109.  The statements were materially false and misleading because 9F used PICC as a conduit to circumvent Chinese regulatory bans and the borrowing cost for borrowers frequently exceeded the 36% APR ceiling.  ¶60.  This is the precise theory that the Court held could be actionable.  Doc. 51-3 at 22-23.

According to the secret arrangement between 9F and PICC, PICC charged borrowers, as part of PICC's insurance premiums, loan facilitation service fees that 9F had previously directly charged borrowers before April 2019.  *Id*.  PICC then remitted the loan facilitation service fees back to 9F.  *Id*.  In this arrangement, PICC ignored its role and duties as an insurer under the Chinese law requiring an insurer to independently determine the insurance rate that an insurance policyholder should pay on an individual basis.  *Id*.  Instead, PICC allowed 9F to unilaterally determine which borrowers should buy PICC insurance policies and how much insurance premium a borrower should pay to PICC.  *Id*.  Indeed, 9F deducted the insurance premiums from the borrower's account for PICC within seconds of the issuance of a loan principal to the borrower.  *Id*.  Then, the majority of the allegedly "insurance premiums" went from PICC's account back to 9F.  *Id*.  The insurance premiums set

22

by 9F for borrowers to pay PICC ranged from 50-100% of loan principals, ***and approximately 95% of the purported insurance premiums were returned by PICC to 9F***. *Id.*

Indeed, a search of 9F's Chinese company name on Sina Black Cat – an online consumer complaint platform on which consumers must provide evidentiary records to support their complaints – revealed that 9F borrowers filed 70,026 complaints against 9F regarding its questionable practices, including the prohibitively high fees that 9F forcibly and secretly charged. ¶64. In fact, a search of the term "9F Usuary" on Sina Black Cat revealed 10,345 complaints filed against 9F, and a search of "9F beheading interest" (a term commonly used in China referring to prohibitively high interest rate or usury) on revealed 8,256 complaints filed against 9F. *Id.* Complaints on 9F's "beheading interest" reveal that in 2019, 9F secretly charged large amounts of insurance premiums from loan principals without informing borrowers in advance or afterwards. *Id.* Additionally, borrowers were not allowed to cancel the insurance policies 9F purchased for them or request refunds, and tens of thousands of borrowers complained that premiums and interest on the premiums usually accounted for 50-100% of the loan principal and were illegal usury. *Id.*

For example, Ms. Xiaolin Liu stated that on July 18, 2019, she applied for a RMB 20,000 loan with a repayment term of 24 months on 9F's platform (less than one month before 9F's IPO) and got approved. ¶65. She was required to pay a RMB

23

1,435.11 installment every month for 24 months. *Id.* The borrowing cost for Ms. Liu was 72.2% of her RMB 20,000 loan principal. *Id.* The APR Ms. Liu had to pay was 36.1%, [*i.e.*, ((1,435.11 * 24 – 20,000)/20,000)/(365*2)*365*100], exceeding the legally allowed 36% APR ceiling. *Id.*

Ms. Liu stated that because she only received RMB 20,000, the exact amount she had requested, at her disposal, she had never suspected something was wrong with her loan until she later realized she had been paying larger installments than she thought she would have to pay. ¶66. Ms. Liu later learned that 9F issued an extra RMB11,100 loan, without her knowledge, to her account in addition to the RMB 20,000 loan she explicitly requested, and immediately removed the RMB11,100 from her account to buy a PICC policy. *Id.* When Ms. Liu contacted 9F, 9F rejected Ms. Liu's demand to cancel the insurance policy or to return the insurance premium balance. *Id.* Ms. Liu is now required to repay the additional RMB 11,100 loan/insurance premium and the interest levied on it as part of her repayment obligation. *Id.* The account record shows that Ms. Liu borrowed this loan from Jincheng Bank in 9F's direct lending program. *Id.*[8]

---

[8] The insurance policy that Ms. Liu later obtained shows PICC as the insurer, policy No. PBAH20194406Q500H67008, Ms. Liu the policy holder, the insured Tianjing Jincheng Bank, the issuance date July 18, 2019, the covered loan principal RMB 31,100 (including RMB 20,000 Ms. Liu explicitly applied for and RMB 11,100 that 9F made her borrow without her knowledge or consent), and the covered interest RMB 3342.62 (including the interest Ms. Liu had to pay on the RMB 11,100 policy that 9F secretly purchased for her). ¶67.

Mr. Kai Xu had the same experience.  ¶68.  On August 5, 2019, Mr. Xu applied for, and was approved for, a RMB 5,000 loan with a three-year term on the 9F platform.  *Id*.  Mr. Xu's bank account received RMB 5,000.  *Id*.  After he reviewed the detailed transaction records, Mr. Xu surprisingly saw that 9F had secretly issued a RMB7,890 loan, not the RMB 5,000 he had explicitly requested, through an "online lending new asset loan issuance transitioning account" on August 5, 2019, at 14:48:51.  *Id*.  Four seconds later at 14:48:55, 9F removed RMB 2,890 from Mr. Xu's account to PICC's account.  *Id*.  The main page of Mr. Xu's 9F app shows that he indeed borrowed RMB 5,000.  *Id*.  But when he clicked the RMB 5,000 loan entry for details, it showed that 9F issued RMB7,890 to his account and immediately used RMB 2,890 of the issued RMB7,890 to buy a PICC policy.  *Id*.  Mr. Xu's 9F records showed that Ningxia Yellow River Agriculture Commercial Bank funded the entire RMB 7,890 in 9F's direct lending program.  *Id*.  Based on Mr. Xu's monthly installment of RMB 336, the borrowing cost was RMB 7,096, an astonishing **1.42 times** his RMB 5,000 loan principal.  *Id*.  **His APR was 47%** [*i.e*., (336*36-5,000)/5,000/(365*3))*365*100], well exceeding the 36% APR ceiling.  *Id*.[9]

The same is true for Mr. Jiaxu Xiong.  Mr. Xiong stated that he borrowed a

---

[9]     Mr. Xu stated that when Sina Black Cat connected Mr. Xu with 9F, 9F insisted that Mr. Xu had a duty to pay the insurance premium.  ¶69.  The comments that 9F made on Mr. Xu's complaint page at the Sina Black Cat website also show 9F's refusal to return the insurance premium.  *Id*.

RMB 4,900 loan with the 12-month loan term from 9F's platform on May 25, 2019. ¶70.   According to the insurance policy issued by PICC, Mr. Xiong's insurance premium was RMB882 and the funding institution was Tianjing Jincheng Bank.  Mr. Xiong stated that he repaid the total of RMB6443.67 and RMB882 to pay off this RMB4900 loan.  *Id*.  **The APR for this loan was 49.5%,** well exceeding the 36% APR ceiling.  *Id*.  Mr. Xiong stated further that he borrowed another RMB 5,000 loan with the 12-month loan term from 9F's platform on the same day.   ¶71. According to the insurance policy issued by PICC, Mr. Xiong's insurance premium for this RMB5,000 loan was RMB1,274.5 and the funding institution was Tianjing Jincheng Bank.  *Id*.  Mr. Xiong stated that he repaid the total of RMB6796.45 and RMB1,274.5 to pay off the RMB5,000 loan.  *Id*.  **The APR for this loan was 61.4%,** well exceeding the 36% APR ceiling.  *Id*.  These facts demonstrate falsity.  *Odeh*, 2020 WL 4381924, at *7.[10]

---

[10]   Defendants' purported risk disclosures (Motion at 17-18) were overshadowed by Defendants' representation that the Company did not have an outstanding loan balance with an APR higher than 36%.  *See Freudenberg v. E*Trade Fin. Corp*., 712 F. Supp. 2d 171, 194 (S.D.N.Y. 2010) ("Defendants' misleading Class Period statements are alleged to have contradicted, and thus nullified any risk disclosures"). Additionally, while Defendants attempt to dispute Plaintiffs' methodology and APR estimates (Motion at 27-28), the court cannot entertain Defendants' factual disputes at the pleading stage since "[f]actual disputes such as this are best left to the jury." *In re Asbestos Prod. Liab. Litig. (No. VI)*, 837 F.3d 231, 238 (3d Cir. 2016).  And Defendants' repeated argument that "Plaintiffs fail to allege facts showing that it is illegal for PICC to pass on to consumers (in the form of higher premiums) the cost of the service fees that 9F charged PICC" (Motion at 29) was rejected by the Court. Doc. 51-3 at 23-24.

26

**6.** **The Registration Statement Was False and Misleading Because it Failed to Disclose that the True Nature of the Arrangement between 9F and PICC Violated GAAP**

Defendants' failure to disclose the true nature of the arrangement with PICC in the Registration Statement also violated GAAP. ¶¶111-115. Specifically, under GAAP, 9F should have separately disclosed in the Registration Statement revenue recognized from its lending contracts with its borrowers that 9F indirectly collected through PICC. *Id*. Additionally, 9F should have separately disclosed the opening and closing balances of receivables from PICC because such receivables are loan facilitation service fees that 9F collected from its borrower through PICC. *Id*. Such disclosures do not require subjective judgment because the timing and the amount of revenues to recognize are indisputable. *Id*.

Furthermore, contingent liabilities apply to any financial reporting period when 9F was exposed to the risk that borrowers would assert claims that 9F improperly charged loan fees, either in violation of the law, or by deceiving borrowers into thinking they were paying insurance premiums which, unknown to them, included service fees. *Id*. PICC started to charge 9F's borrowers for insurance premiums since May 2018, starting which time 9F was subject to the risk that borrowers would assert claims against 9F for its improper charges. *Id*. Therefore, the Registration Statement should have disclosed 9F's contingent liability. *Id*.

27

Although Defendants argue that "Plaintiffs do not contend that any of 9F's reported financial results were inaccurate" (Motion at 18), "some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128, at *15 (E.D. Pa. Mar. 25, 2020). "For that reason, the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers." *Id*. And contrary to Defendants' assertion (Motion at 19-20), the Company did not disclose the true nature of its arrangement with PICC. As the Court recognized, the "disclosures never disclosed that there was this illegal arrangement" and "[t]hey never disclosed the amount of the interest or the amount that was sent back to 9F." *See* Doc. 51-3 at 7.[11]

### 7.    Defendants Had a Duty to Disclose the Omitted Information

Defendant had a duty to disclose the omitted information. First, as this Court has recognized, "once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that

---

[11]    Plaintiffs also allege that the contingent liability was probable and estimable contrary to Defendants' assertion. ¶115. Defendants' reliance upon *In Re 9F Inc. Securities Litigation*, No. 654654/2020, 2023 WL 2371874 (N.Y. Sup. Ct. Mar. 06, 2023), is misplaced because Plaintiffs here allege facts that were not alleged in state court action. For instance, the court there held that "Plaintiffs do not allege that there was an accounting violation for failure to take a doubtful account allowance." *Id*. *1. Plaintiffs here make those allegations (¶¶111-15) among numerous others.

issue so as to make the disclosure misleading." *Roofer's Pension Fund v. Papa*, No. CV 16-2805, 2018 WL 3601229, at *14 (D.N.J. July 27, 2018). Thus, "[b]y putting the issue . . . in play, Defendants acquire[d] a duty to disclose information relating to that topic." *Id*. at *13.

Second, Defendants had an affirmative obligation to disclose material risks under Item 105. ¶¶92-94. Issuers are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105; ¶92. At the time of the IPO, with the partnership with PICC, borrowing costs for borrowers on 9F's platform frequently exceeded the 36% APR ceiling, contrary to 9F's own representations. ¶93. The secret arrangement between 9F and PICC allowed 9F to continue collecting service fees from borrowers through PICC as a conduit. *Id*. Such an arrangement with PICC subjected 9F to a material risk that PICC would claim that the arrangement (according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance regulations) was invalid. *Id*. Therefore, at the time of the IPO, 9F was subject to a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all such funds as purely insurance premiums. *Id*. Thus, Defendants had a duty to disclose their failure to comply with the regulatory authorities' express order and the associate material under Item 105. ¶94.

29

Third, Defendants had an affirmative obligation to disclose the alleged risks pursuant to Item 5(d).  ¶¶95-105.  SEC Regulation S-K (17 C.F.R. 229.10) provides that registration statements such as the one filed by 9F on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act."  ¶¶95-96.  Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact on the company must be disclosed.  ¶97.  Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K."  ¶¶98-103.  As alleged, the same reasons that mandated disclosure under Item 105 mandated disclosure under Item 5(d).  ¶¶104-05.

### C.     Plaintiffs Adequately Allege Control Person Liability Under the Securities Act

Plaintiffs have sufficiently alleged a control person claim under Section 15 of the Securities Act by adequately alleging primary liability and that the Offering Defendants were officers or directors of the Company, signed the Registration Statement, and/or authorized the signing of the Registration Statement.  ¶¶22-32; *see, e.g.*, *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, No. 05-232, 2007 WL 81937, at *12 (E.D. Pa. Jan. 9, 2007) ("Allegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator are sufficient to withstand a motion to dismiss.").  Thus, Plaintiffs have sufficiently pled claims under the Securities Act.

## V.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."   15 U.S.C. §78j(b).   "To state a viable claim for securities fraud under Section 10(b) and Rule 10b-5 of the Exchange Act, Plaintiffs must plead: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."   *Vanderhoef v. China Auto Logistics Inc.*, No. 18-CV-10174, 2021 WL 3260849, at *3 (D.N.J. July 30, 2021).

### A.    Plaintiffs Adequately Allege that Defendants Made Materially False and Misleading Statements

Under the PSLRA, a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).

#### 1.    Defendants' Statements Made in Connection with the Company's IPO Were False and Misleading

As demonstrated above, Plaintiffs adequately allege that the Company's Registration Statement for the IPO was false and misleading.   Accordingly, these

31

false and misleading IPO statements also demonstrate falsity for Plaintiffs' Exchange Act claims.[12]

### 2. Defendants' Post-IPO Statements Were False and Misleading

On June 12, 2020, 9F filed the June 12, 2020 6K disclosing its ongoing dispute with PICC. ¶176. According to 9F, the dispute involved RMB2.2 billion ($324.5 million) in unpaid service fees and RMB1.4 billion ($206.5 million) in service fees that had previously been recorded as accounts receivable and which were then recognized as fully impaired, resulting in multiple legal actions in China. *Id.* The June 12, 2020 6K was materially false and misleading, however, because it failed to disclose the disputed service fees in the two lawsuits were, in fact, loan facilitation service fees that 9F collected from borrowers through PICC pursuant to a secret agreement between PICC and 9F to help 9F circumvent regulatory bans on collecting fees from borrowers that exceeded the 36% APR ceiling. *Id.* The June 12, 2020 6K was materially false and misleading also because it failed to disclose that the lawsuits represented transpiration of the material risks that: (i) PICC would claim that the secret arrangement—according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance

---

[12] As the Court held in *Suprema*, the fact that the same misrepresentations form the basis of Securities Act claims and Exchange Act claims does not mean that the Securities Act claims sound in fraud. *Suprema*, 438 F.3d at 273.

32

regulations—was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%; and (ii) therefore, PICC would seize all the funds that 9F transferred from borrower to PICC, claiming all funds as purely insurance premiums. *Id.*

On June 15, 2020, 9F filed a Form NT 20-F with the SEC stating that the Company could not timely file its annual report because of its dispute with PICC. ¶177. Additionally, on June 17, 2020, 9F issued a press release on a Form 6-K ("June 17, 2020 6K") which provided the Company's fourth quarter and full-year 2019 financial results and the financial consequences of the Company's dispute with PICC. ¶178. The Form NT 20-F and the June 17, 2020 6K were materially false and misleading for the same reasons stated above regarding the June 12, 2020 6K. ¶¶177, 178.

### B.    Plaintiffs Adequately Allege that Defendants Acted with Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). To adequately plead scienter, a complaint must state with particularity facts giving rise to a strong inference that the defendants acted with intent to defraud. *Fain v. USA Techs., Inc.*, 707 F. App'x 91, 95 (3d Cir. 2017). Importantly, "courts must consider the complaint in its entirety . . . [t]he inquiry is whether ***all*** of

the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original). A plaintiff establishes a "strong inference" of scienter by alleging facts showing that Defendants had "motive and opportunity to commit fraud" or "circumstantial evidence of either reckless or conscious behavior." *Fain*, 707 F. App'x at 95. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Tellabs*, 551 U.S. at 324.

Here, Plaintiffs adequately allege scienter based upon motive and opportunity and circumstantial evidence of reckless or conscious behavior. First, Plaintiffs allege that Defendants were all motived by their own and the Company's financial interests (¶44) and that Defendants beneficially owned 9F shares or obtained proceeds through the sale of their shares in the Company's IPO. ¶¶22-25, 27-28, 32. Where, as here, "financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *Frank v. Dana Corp.*, 646 F.3d 954, 960-62 (6th Cir. 2011). Because these allegations demonstrate that there was "a likelihood that defendants could realize concrete benefits through the deception," Plaintiffs have

34

adequately alleged motive and opportunity. *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d 2000).[13]

Second, Plaintiffs adequately allege scienter based upon circumstantial evidence of reckless and conscious behavior. For instance, Defendants' admissions and the accounts of confidential witnesses can support a strong inference of scienter. *See Aldridge*, 284 F.3d at 76-83 (holding that subsequent public statements supported "an extremely reasonable inference" that the company had previously engaged in improper conduct); *Avaya*, 564 F.3d at 263 (holding that allegations based upon confidential witnesses support a strong inference of scienter); *Papa*, 2018 WL 3601229, at *23 (same).

Here, for instance, Defendants admitted that in 2019 "***PICC collected all of the loan facilitation service fees***" (not insurance premiums) from borrowers and "***remitted*** [9F's] portion of the service fees to [9F]." 9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to borrowers, the Company started to charge service fees "***indirectly through*** . . . [an] insurance company." ¶11. Thus, "Defendants' own response to the issue contributes

---

[13] The Supreme Court has also declared that the "absence of a motive allegation" is "not dispositive." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *see also Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"). And contrary to Defendants' mischaracterization (Motion at 32-33), the Court did not make a final ruling on scienter. Doc. 51-3 at 19.

35

to an inference of scienter here." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016). Additionally, FE 1 confirmed that neither 9F nor PICC informed borrowers that PICC collected loan facilitation service fees, disguised as insurance premiums, from borrowers for 9F. ¶82. FE1 worked as a Finance Manager at Jiufu Shuke – the primary operating subsidiary of 9F – from March 2019 to May 2020. *Id*. His main job responsibilities included: (1) adjusting the differences between the Company's Chinese and U.S. financial statements in accordance with GAAP; (2) preparing monthly, quarterly, and annual financial statements for the purposes of filing with the SEC; and (3) conducting financial analysis, accounting, tax planning, year-end auditing. *Id*.

According to FE 1, borrowers on 9F's platform were not aware that 9F received service fees from the insurance company because it was not specified in the insurance contracts into which borrowers entered. *Id*. FE 1 stated that "on the surface of [9F's] financial statements, it is claimed that PICC was obligated to pay service fees to 9F pursuant to the agreement. But in fact, 9F gave such funds to PICC. This was just a *formality*. PICC should return such funds to 9F." *Id*. FE1's statements are consistent with the fact that 9F was in control of deciding which borrowers should pay how much insurance premiums and transferring such funds to PICC directly from borrowers' accounts on 9F's platform. *Id*. Contrary to

36

Defendants' assertions (Motion at 22-24), these allegations support a strong inference of scienter. *Papa*, 2018 WL 3601229, at *23.

Additionally, violations of GAAP can contribute to allegations supporting a strong inference of scienter. *Vanderhoef*, 2021 WL 3260849, at *4–5; *Sun v. Han*, No. 15-703, 2015 WL 9304542, at *15–16 (D.N.J. Dec. 21, 2015). Here, Defendants' failure to disclose the true nature of the arrangement with PICC in the Registration Statement also violated GAAP. ¶¶111-115. Specifically, under GAAP, 9F should have separately disclosed in the Registration Statement, but failed to disclose, revenue recognized from its lending contracts with its borrowers that 9F indirectly collected through PICC. *Id.* Additionally, 9F should have separately disclosed, but failed to disclose, the opening and closing balances of receivables from PICC because such receivables are loan facilitation service fees that 9F collected from its borrower through PICC. *Id.* Furthermore, contingent liabilities apply to any financial reporting period when 9F was exposed to the risk that borrowers would assert claims that 9F improperly charged loan fees, either in violation of the law, or by deceiving borrowers into thinking they were paying insurance premiums which, unknown to them, included service fees. *Id.* PICC started to charge 9F's borrowers for insurance premiums since May 2018, starting which time 9F was subject to the risk that borrowers would assert claims against 9F

37

for its improper charges. *Id.* Thus, Defendants' GAAP violations add to the strong inference of scienter alleged.

Additionally, the resignations alleged in the Complaint further bolster the strong inference of scienter alleged. *Vanderhoef*, 2021 WL 3260849, at *4–5. Here, soon after the IPO, several directors resigned from 9F's Board. ¶179. On October 10, 2019, Defendant Cheung resigned from 9F's Board purportedly for "personal reasons." *Id.* Defendant Xu resigned on January 20, 2020, also purportedly for personal reasons. *Id.* Defendants Zhang and Huang resigned on March 16 and March 27, 2020, respectfully, also purportedly for personal reasons. *Id.* Defendant Cui also subsequently resigned his directorship despite serving in the position for only approximately one year. *Id.* These allegations also add to the strong inference of scienter alleged. *See Papa*, 2018 WL 3601229, at *20 ("given the timing of the announcement, the Court finds some probative value in [defendant's] resignation").

Finally, the allegations relate to 9F's core business. As this Court has recognized, "the Court keeps" allegations regarding core operations "in consideration when viewing the entirety of the Amended Complaint." *Papa*, 2018 WL 3601229, at *24; *Odeh*, 2020 WL 4381924, at *8. Indeed, in 2018 and the first five months of 2019, loan facilitation service fees accounted for 89% and 84% of the Company's respective net revenues. ¶47. Thus, "knowledge may be imputed to individual defendants when the disclosures involve the company's core business."

38

*In re Campbell Soup Co. Sec. Litig*., 145 F. Supp. 2d 574, 599 (D.N.J. 2001).  When considering these facts collectively – as the Court is required to do under *Tellabs* (551 U.S. at 323) – Plaintiffs have adequately alleged scienter.

### C.      Plaintiffs Adequately Allege Loss Causation

Plaintiffs have also sufficiently alleged loss causation.  The PSRLA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. §78u-4(b)(4).  "Importantly, as to loss causation there is not a heightened standard of pleading."  *Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 239 (E.D. Pa. 2021).  To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Plaintiffs have satisfied this standard by alleging that after Defendants revealed the omitted information – including the fact that when 9F stopped charging service fees directly to the borrowers, the Company started to charge service fees "***indirectly through*** … insurance company" – 9F's ADS price fell significantly and caused losses to Plaintiffs and the class.  ¶¶179-189.[14]

---

[14]      Defendants' arguments to the contrary fail.  Motion at 34-38.  Neither the June 12, 2020 nor the June 15, 2020 revealed the information that 9F subsequently disclosed.  For instance, the June 17, 2020 disclosure revealed for the first time since November 2019 that PICC had stopped providing insurance protections to 9F's new loans with terms of no more than 12 months and that 9F had suspended

**D.     Plaintiffs Adequately Allege Control Person Liability Under the Exchange Act**

"To state a claim under Section 20(a), Plaintiffs must demonstrate: (1) a violation of the Exchange Act, and (2) that the Individual Defendants were controlling persons of the corporation." *Vanderhoef*, 2021 WL 3260849, at *6. Plaintiffs have done so. ¶¶22-23; 205-10.[15]

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiffs respectfully request leave to amend. *See Burlington*, 114 F.3d at 1435 ("Ordinarily where a complaint is dismissed on Rule 9(b) failure to plead with particularity grounds alone, leave to amend is granted.").

---

its cooperation with PICC since December 2019. ¶180. Plaintiffs also allege that on September 29, 2020, 9F announced that the Company's financial performance continued to drastically decline because 9F was no longer able to collect large amount of loan facilitation fees from borrowers via a conduit like PICC. ¶186. Indeed, the Company's total net revenues plummeted 61%. *Id*. On this news, 9F ADSs fell 18%. ¶187. All of this was new information to investors. And contrary to Defendants' argument, 9F's announcement that Zengxiao Jin was removed from the chief risk officer position supports Plaintiffs' loss causation allegations. ¶¶182-83; *see Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014) ("While nothing in the resignation announcement alone reveals the truth behind earlier misstatements . . . this too may constitute a portion of the totality that we must consider.").

[15] Plaintiffs adequately allege standing for their Securities Act claims. ¶¶19-20; *Suprema*, 438 F.3d at 274 n.7. Although Defendants argue otherwise (Motion at 38-39), the question is "a factual one, to be resolved through discovery." *Suprema*, 438 F.3d at 274 n.7. *Suprema* is controlling authority.

DATED: May 3, 2023                    Respectfully submitted,

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**

By:   */s/ James E. Cecchi*
James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994 -1700

*Liaison Counsel for Plaintiffs and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

*Counsel for Plaintiffs and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

41

## PROOF OF SERVICE

I hereby certify that on this 3rd day of May 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ James E. Cecchi*
James E. Cecchi
