1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

CRAIG J. HOLLAND,
Individually and on behalf
of all others similarly          CIVIL ACTION NUMBER:
situated,
                                 2:21-cv-948-MEF
     Plaintiffs,
                                 Oral argument
          vs.

9F INC., et al.,

     Defendants.
_____

     Frank R. Lautenberg Post Office and Courthouse
     Two Federal Square
     Newark, New Jersey  07102
     May 21, 2024


B E F O R E:                THE HONORABLE MICHAEL E. FARBIARZ,
                            UNITED STATES DISTRICT COURT JUDGE


A P P E A R A N C E S:

     GLANCY PRONGAY & MURRAY LLP, BY:
     EX KANO S. SAMS II, ESQ.
     1925 Century Park East
     Suite 2100
     Los Angeles, California  90067
          and


               *Lisa A. Larsen, RPR, RMR, CRR, FCRR*
                    Official Court Reporter
                  Lisa_Larsen@njd.uscourts.gov
                       (973)776-7741


     **Proceedings recorded by mechanical stenography.**
     **Transcript produced by computer-aided transcription.**

*UNITED STATES DISTRICT COURT*
*Newark, New Jersey*

**A P P E A R A N C E S:** (Cont'd.)

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C., BY:
DONALD A. ECKLUND, ESQ.
KEVIN G. COOPER, ESQ.
5 Becker Farm Road
Roseland, New Jersey  07068

    appeared on behalf of the plaintiffs;

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, BY:
SCOTT D. MUSOFF, ESQ.
ROBERT A. FUMERTON, ESQ.
MICHAEL C. GRIFFIN, ESQ.
One Manhattan West
New York, New York  10001

    appeared on behalf of the defendants; and

CAHILL GORDON & REINDEL LLP, BY:
SHEILA C. RAMESH, ESQ.
32 Old Slip
New York, New York  10005
    and
DUGHI, HEWIT & DOMALEWSKI, P.C., BY:
CRAIG A. DOMALEWSKI, ESQ.
340 North Avenue
Cranford, New Jersey  07016

    appeared on behalf of the underwriter defendants.

*United States District Court*
*District of New Jersey*

(PROCEEDINGS held in open court before the HONORABLE MICHAEL E. FARBIARZ, United States District Court Judge, on May 21, 2024.)

THE DEPUTY CLERK:  All rise.

THE COURT:  Good morning, everyone.  Let's have a seat, please.

We are here today for *Holland vs. 9F Inc.*, 21-civ-948.  We're here in particular for the defendants' motion to dismiss under 12(b)(6).

Let's start with appearances, please, for the record, beginning with plaintiffs' counsel.

MR. SAMS:  Good morning, Your Honor.  Ex Kano Sams --

THE COURT:  Speak up a little bit, if you don't mind.

MR. SAMS:  Sure.  Good morning, Your Honor.  Ex Kano Sams from Glancy Prongay & Murray on behalf of plaintiffs.

THE COURT:  Good morning to you, Sir.

MR. ECKLUND:  Good morning, Your Honor.  Don Ecklund from Carella, Byrne, also on behalf of the plaintiffs.

THE COURT:  Good morning.

MR. COOPER:  Good morning, Your Honor.  Kevin Cooper from Carella, Byrne as well on behalf of the plaintiffs.

THE COURT:  Folks, sit down.  There's a lot of standing.  You're okay.

Who is going to be doing the talking today for the plaintiffs?

MR. SAMS:  I will, Your Honor.

THE COURT:  Say your name again one more time.  Forgive me, I didn't hear it when we were having the low microphone interaction.

MR. SAMS:  Sure.  Ex Kano Sams, S-A-M-S.

THE COURT:  Okay.  Got it.  Appreciate it.  Thank you, Mr. Sams.

And thank you to all of you.

For the defense.

MS. MUSOFF:  Good morning, Your Honor.  Scott Musoff from Skadden, Arps, along with my colleagues Michael Griffin and Robert Fumerton.  We also have colleagues Sarah Delaney (phonetic) and Isaiah Strong with us.

Michael Griffin, who argued before Judge Arleo and Justice Borrok in New York Supreme, will be arguing today.

THE COURT:  Okay.  Good morning to all of you.  Thank you.

MS. RAMESH:  Good morning, Your Honor.  Sheila Ramesh from Cahill Gordon for the underwriter defendants.  We'll leave the bulk of the arguing to our friends at Skadden.

THE COURT:  Undoubtedly.

MR. DOMALEWSKI:  Good morning, Your Honor.  Craig Domalewski, Dughi, Hewit & Domalewski, also on behalf of the underwriter defendants.

THE COURT:  Good morning, Mr. Domalewski.  Good to see

you.

So we're here for the defendants' motion, and I want to start there, but there's a threshold issue I want to ask the plaintiffs to address, which is, for want of a better term, the statutory standing question under the 33 Act claims.

Can you explain to me how that works here.

MR. SAMS:  Sure, Your Honor.  Would you prefer me to use the podium?

THE COURT:  You can speak from the podium or the table, whatever is better for you.

MR. SAMS:  Thank you, Your Honor.

THE COURT:  Stand up from the table, though.

MR. SAMS:  Yes.

So for the Section 11 claims the standing has to do with whether or not plaintiffs purchased pursuant to the offering.  And there are allegations in the complaint regarding the two plaintiffs in this case stating that they purchased their shares pursuant to the offering that was issued in 2019.

THE COURT:  Well, but hang on for a second.  I don't actually -- the standard for Section 11 claims is essentially traceability to the registration statement.  Right?

MR. SAMS:  Yes.

THE COURT:  So what allegations do you have to support traceability here?

Look, the defendants don't make much of this, although they make enough of it that it's an issue before the Court, and your papers don't much respond to it.

What's the answer on traceability with respect to the Section 11 claim?

MR. SAMS:  That's covered by the *Suprema* case which we cited in the previous motion to dismiss, and I think there's also a reference to it within the --

THE COURT:  Right.  I got that.  I got that.

Here is the difficulty, I think, which is *Suprema* is a pre-*Iqbal* case.  And what you have alleged with respect to traceability is you've recited the legal standard which *Iqbal* says is not enough.

It therefore won't do to go back to a pre-*Iqbal* case and to say -- which is to say *Suprema* -- and say "but there's *Suprema*."

I'm not sure what I point to in your papers that tells me there's a non-conclusory, good-enough-after-*Iqbal* way to show traceability.

MR. SAMS:  Perhaps I can make a distinction between the 10(b) cases and the Section 11 case that can satisfy Your Honor.

As you're aware, there's a different standard that applies with respect to a Section 11 claims, a Securities Act claims as opposed to the 10(b) claims.

THE COURT:  Right, right.

MR. SAMS:  So under the 10(b) claims there is a heightened pleading standard that's --

THE COURT:  I'm not talking about the 10(b) claims. I'm not talking about the 34 Act claims.  I'm talking about the 33 Act claims.

MR. SAMS:  Yes.

THE COURT:  The 33 Act claims under Section 11 is what requires traceability to the same registration statement. Right?

MR. SAMS:  Yes.

THE COURT:  So what I have in the pleadings -- I brought the complaint, obviously.

MR. SAMS:  Yes.

THE COURT:  The section -- I'm sure you all know this by heart.  I, candidly, don't.

There's a section on the parties.  It is page 9.

MR. SAMS:  Yes.

THE COURT:  When I get to page 9 for Mr. Wait and Ms. Harrison, who are the two remaining plaintiffs -- who are the named plaintiffs, what I have is that they purchased pursuant and/or traceable to the registration statement certain securities.

But the point I'm getting at -- there's a lot of things to be said about *Suprema* here.

And I think, Mr. Sams, you're starting with the argument that the defendants are kind of ignore one part of *Suprema* but it doesn't help for you to bring it up here, which is to say the part of *Suprema* that you want to lean on which says mere boilerplate invocation of traceability is okay, it strikes me as potentially a piece of *Suprema* that doesn't readily survive *Iqbal*.

MR. SAMS:  Well, I think for the Section 11 claims, Your Honor, it's important to note that those are governed by Rule 8 rather than Rule 9.  So under Rule 8 --

THE COURT:  This is not a Rule 8/Rule 9 issue.  *Iqbal* applies to both Rule 8 and Rule 9 context, as we know.  I think you need to reflect on this because, candidly, at this point I can think of some pretty ready fixes for this, I must tell you, but that's not my job.  I think you need to stop and reflect on this.

In paragraphs 19 and 20 what you have is a mere invocation of what is essentially statutory language.  *Iqbal* tells us that invocations of a statutory standard kind of done up as factual allegations don't count.  We all know that.

I don't have a factual allegation to tell me that these purchases of securities are traceable to the registration statement.  I just have an assertion that they are traceable.

MR. SAMS:  Yes, Your Honor.

THE COURT:  I don't know how you propose to fix it, but

that's that.

What about Section 12 under the 33 Act?

MR. SAMS:  With respect to standing?

THE COURT:  Yeah.

MR. SAMS:  The same argument applies there, as well.  I understand your concern about *Iqbal*.  Our argument would be that *Iqbal* does not alter *Suprema*'s standard governing standing with respect to Section 11 and Section 12.

We reference that within our opposition to defendants' previous motion to dismiss.

THE COURT:  On Section 12 you have a different problem. For Section 12 you need to be pleading, I think -- this is how I read the Third Circuit and the Supreme Court's case law: You need to be pleading for a Section 12 33 Act claim that this is a purchase that's not made on the aftermarket.

I don't know -- I don't think you have that pled in your complaint.

Is there somewhere that's pled?

MR. SAMS:  Well, the allegations regarding standing are pled in the paragraphs you mentioned, 19 and 20.  We're happy to --

THE COURT:  Right, but 19 and 20 says nothing about whether these purchases were made on the aftermarket or not. And with respect to Mr. Wait who buys his shares -- especially with respect to him, who buys his shares according to the

PSLRA certs in 2020 and 2021, that would be surprising if he didn't buy it on the aftermarket.

And then with respect to Ms. Harrison, there's no allegation she didn't buy it on the aftermarket.

MR. SAMS:  Plaintiffs are happy to provide more detail regarding those allegations.  Again, we feel they're sufficient under *Suprema*, but if the Court is concerned about that, we're happy to provide more detail about that.

THE COURT:  Why don't we talk toward the end.  But I think that the complexity you have is -- more detail in a letter you send me tomorrow is not an allegation in a complaint.

So I'm not sure -- you can make a different legal argument or make some kind of legal argument, but in the end -- in the end I just don't see the allegations that I expected in paragraphs 19 and 20 to trigger the 33 Act.

MR. SAMS:  As the Court notes, this isn't an issue that is well developed in our pleadings.  The parties haven't focused on the effect of *Iqbal* to *Suprema.*

So if the Court desires further briefing on it or an amended complaint, we --

THE COURT:  I'm going to think about whether further briefing -- this case is quite old.

Mr. Griffin, what's your view on all this?

Mr. Sams, thank you.

MR. SAMS:  Thank you.

MR. GRIFFIN:  Yes, Your Honor.  I think you got it right on both issues.  There is nothing -- no factual allegations supporting traceability beyond that conclusory statement about the standard here.  And there's nothing --

THE COURT:  Mr. Griffin, let's do the counter-argument.  The counter-argument on traceability is the IPO was August 14th, 2019.  And according to the PSLRA statement, Ms. Harrison buys her shares eight days later.

Is it the defendants' contention that there are multiple registration statements or that there's one?

MR. GRIFFIN:  There was only one registration statement.

THE COURT:  So the problem then with respect to the registration statement, which is to say with respect to the Section 11 claim under the 33 Act, is technical beyond compare.  Right?

Because if you agree, as you've just conceded, there's one registration statement.  Then Mr. Sams, to fix this problem, either needs to rest on your concession which you just made or needs to include another sentence in the complaint which maybe should have been there that says there's one registration statement.

So are you gonna jump up and down and argue that there's a problem with Ms. Harrison's standing under

Section 11 of the 33 Act?

MR. GRIFFIN:  Yes, Your Honor, there is.  Again, an additional registration statement isn't the only way that there could have been commingled shares in this case.  Frankly, plaintiffs don't address any other possibilities one way or another.

THE COURT:  But you don't really make that argument yourself too much.  Where do you make that argument about commingling?

MR. GRIFFIN:  We don't have any contrary allegations to offer because we're only at the 12(b)(6) stage.  But it's plaintiffs' burden to allege facts establishing that traceability, that there were no other offerings.

THE COURT:  I got it.  But what you just conceded was that there was only one registration statement.

What I'm getting at is to the extent *Suprema* on this point doesn't survive *Iqbal*, it only doesn't survive *Iqbal* in a world where there are multiple registration statements.

You agree?

MR. GRIFFIN:  Yes.

THE COURT:  So if you've agreed with that legal proposition, and I think you're right, and you've told me factually that there was only one registration statement, what's the issue with Ms. Harrison's Section 11 standing under the 33 Act?

MR. GRIFFIN:  For starters, Ms. Harrison is not the lead plaintiff here.  She did not go through the PSLRA appointment process.  She was not appointed lead plaintiff even at the outset of this stage in accordance with the statutory requirements.

We can't simply ignore the court-designated lead plaintiff and focus only on Ms. Harrison.  That's a threshold issue.

As to Ms. Harrison's purchases themselves, again, these are not direct common stock that's traded on the exchange. These are American Depository Receipts that reference the company's common stock.  There are other ways to gain exposure to the company stock through the markets.

Plaintiffs just don't address what those other possibilities might be here or, more importantly, rule them out.  Now, it may well be the case that Ms. Harrison's shares purchased a week after the IPO are traceable, but they need to allege facts that establish that.

They also need to address the issue -- the more serious issue with their lead plaintiff who, as Your Honor noted, didn't buy until June of 2020.

Then turning to the Section 12 claim, as Your Honor noted, the problem is even more severe.  You're exactly right that they need to allege not just that these shares were traceable but that they purchased directly in this offering

from one of the defendants.

Not only have they not pled that, they have pled the opposite of that.  The timing of these trades alone established that neither of these individuals purchased their shares directly in this IPO from one of the defendants.  And that's dispositive and incurable here.

THE COURT:  Mr. Sams, what do you say to that last piece with respect to Section 12 of the 33 Act?

MR. SAMS:  Well, again, Your Honor, I think that's an issue that we can cure through amendment.  And as Your Honor noted, counsel's concession with respect to the one offering indicates that that's a problem that can be fixed through amendment.

THE COURT:  Look, there is a world of technicality on Section 11 and Section 12 in the modern era.  The statutes were written in a world where there were paper coupons, as we all know.  And the securities here are potentially a little bit unusual.  I just don't know.

I think the problem you have, Mr. Sams, is at least for the moment I'm not exactly seeing the right answer on the Section 11 and Section 12 pieces.  Why don't we come back to all of that at the end in terms of how to proceed.

Look, the Section 12 piece under the 33 Act I think is pretty seriously difficult.  The Section 11 piece is less obviously difficult, given the common-sense concession that

Mr. Griffin made.

Some of the complexities he glancingly alluded to, I'm aware of them.  But it's not clear to me whether you on the plaintiffs' side, Mr. Sams, need to check all of those boxes to satisfy your initial burden.

Why don't we come back to this.  Why don't we come back to this at the end.

MR. SAMS:  Yes, Your Honor.

THE COURT:  But I think it's a real issue here.

Mr. Sams, thank you.

Mr. Griffin, it's your motion.  Why don't you have at it however you might like.  You can stand wherever you want.

MR. GRIFFIN:  Thank you, Your Honor.  I'll use the podium.  It's easier.

THE COURT:  Sure.

MR. GRIFFIN:  As Your Honor knows, we are here on the second motion to dismiss this action.  So the question before the Court is whether plaintiffs have changed anything materially in the second amended complaint or the revised second amended complaint that warrants a different outcome than the last time we were here before Judge Arleo.

THE COURT:  I'm not sure if that framing is the framing I would adopt.  I think much of what Judge Arleo did -- I'm going off the transcript.

*United States District Court*
*District of New Jersey*

Much of what Judge Arleo did I think is best characterized as thoughtful, giving you a tentative sense of the Court's thinking in the manner of oral argument.

It seems like you agree with that.

MR. GRIFFIN:  Absolutely, Your Honor.  She said that.

THE COURT:  Right.  I could see it right from the get-go.  In the transcript, I mean.

MR. GRIFFIN:  Yes.

THE COURT:  I don't know if this is a classic "let's see if there's anything different" kind of situation.  Judge Arleo all but suggested there was enough on the 33 Act claims, and she essentially all but said there's not enough on the 34 Act claims.

I see you nodding.

But I think it's probably best understood, at least from the cold transcript, as a judge saying, "Here are my preliminary thoughts, and why don't you go re-plead in light of it," which is a fairly familiar thing to do in this courthouse.

I'm not sure that I accept the characterization that all we need to look at is the incremental shift.  I don't think that's really what happened last time.

What's up with the New York case?  Can you tell me about that?  No one is arguing for preclusion here.  Tell me why.

MR. GRIFFIN:  Yes, Your Honor.

The New York action has been dismissed with prejudice. It went through the same process that we went through here. There was an amended complaint.  We got it dismissed without prejudice.  We went back on a second amendment, got it dismissed with prejudice.

Plaintiffs have now filed a notice of appeal of that decision to the First Department.  Their brief will be due in October, but they have not yet perfected.

So that's the status of the state court action.

THE COURT:  And you have no preclusion argument based on that?

MR. GRIFFIN:  We think it's certainly persuasive, Your Honor.  It's not binding on this Court and it's not preclusive because they were a different plaintiff.

Neither of these classes were certified, so the decision not bind them.  But it's certainly very persuasive to the extent it's applicable here.

THE COURT:  The New York state case is a putative class, but it hadn't yet been certified so the preclusive effect --

MR. GRIFFIN:  That's exactly right.  Procedurally it was the same as this except that it didn't have a 10(b) claim.  It was Section 11 only because that's all you can bring in the state courts.

THE COURT:  Right.

MR. GRIFFIN:  It did have some different theories based on these same underlying facts, but it also had some identical theories.

The notion that the company did not adequately disclose the relationship with PICC, that it was charging these fees to PICC, that's the primary theory here.  And it's the primary theory that Justice Borrok rejected with prejudice based on the company's express disclosures in that case.

So while it's not binding on Your Honor, we certainly think it's persuasive, given that it addressed the exact same issue.  It's also the same issue that Judge Arleo indicated was sufficient to defeat the claims here on that mandatory piece of it.

Again, she had some concerns about some of the other claims that she wanted plaintiffs to address, but she held over and over again or at least stated -- I won't say "held," Your Honor, but she stated over and over again that the company expressly disclosed how it was charging the fees and the change that it made to those fees in the wake of that 2019 regulation.

We think that both Judge Arleo's prior comments and Justice Borrok's decision are directly on point as to that aspect of plaintiffs' claims here.

Turning to the issue that Judge Arleo did have,

Your Honor noted that she indicated that there's probably enough here to get by the Section 11 claims.

Respectfully, Your Honor, we disagree with that.  We disagreed at the time of the hearing.  We tried to move her off of that point.  We'll try again with Your Honor.

The fundamental issue is that the standard for misrepresentation is the same.  That first element of the claim is the same under Section 11 and Section 10(b).

So if the company didn't say anything that was false or misleading or omit to state a fact it was required to disclose, that's dispositive under both statutes.  So all the questions that Judge Arleo was raising about the fraud and the misrepresentation theories under 10(b), we would submit apply four square to the Section 11 claims as well.  That's regardless of the pleading standard.

Now, Judge Arleo was inclined to let the Section 11 claims go under Rule 8 under the *Suprema* decision that plaintiffs alluded to earlier.

We don't think that that decision requires the application of Rule 8(b) here.  We think that notwithstanding *Suprema*, plaintiffs' claims here still sounded fraud because the same core theory underlies both claims under both statutes.

THE COURT:  How does that square with *Suprema*?

MR. GRIFFIN:  Because in *Suprema*, Your Honor, the issue

were some managers.  There were some lower-level employees who were engaging in essentially round-trip sales to the suppliers that they had conspired with.  And there were a bunch of guilty pleas.  None of that was from senior management.  That was not from the executives.

What *Suprema* held was that you could allege that the senior execs were merely negligent in failing to uncover this fraud being perpetrated by their underlings and that could be enough for Section 11.

You could also separately allege that they knew or recklessly disregarded it and that would be enough for 10(b)(2) but you could do that independently.

Here there are no --

THE COURT:  The distinction you just drew is not in *Suprema*.

MR. GRIFFIN:  I don't think that's right, Your Honor.

The *Suprema* decision expressly distinguishes between the outside directors and the auditor defendant and the executive directors, the two CEOs.

THE COURT:  I don't think that's right.  *Suprema* overrules Judge Walls's decision to say -- Judge Walls in *Suprema* in the district court says, hey, look, under *Shapiro* and under *CalPERS*, which were the then governing Third Circuit precedents, this is shot through with fraud.  And because it's shot through with fraud, you can't call it negligence and take

advantage of Rule 8.

This is Judge Walls, I'm being shorthanded, his holding.  And the Third Circuit says, no, no, no, there is segregation of the fraud claims and the negligence claims.

And I think what you'd like to argue here is that there are certain kinds of claims that are non-segregable as a kind of intrinsic matter.  I think the problem you have with that argument is twofold.

First, Judge Sloviter in *Suprema* is resting in part on the classic justification for 9(b), which is it's embarrassing to be accused of fraud.  And at least in the 33 Act counts the plaintiff is not accusing anyone of fraud.

More fundamentally, Judge Sloviter says:  Hey, for the Third Circuit in *Suprema*, we want to reach a decision that -- if we don't reach this decision, we're gonna end up in a place where you can't simultaneously have 33 Act and 34 Act claims.

But what you're arguing right now is that there's something intrinsic about certain claims such that there can't be 33 Act and 34 Act claims in those cases, which is to say in making that argument you run into the second of the two justifications Judge Sloviter puts forward in *Suprema*.  That's a big problem for your argument.

MR. GRIFFIN:  I don't think it necessarily is, Your Honor, for two reasons.

One, it's not the case -- no one is suggesting -- I

think *Suprema* was incorrect to suggest that this would somehow preclude bringing 33 Act and 34 Act claims together.

THE COURT:  Maybe incorrect to suggest but we live with it in this --

MR. GRIFFIN:  Of course.  I'm not suggesting you should overrule the court.

I'm saying really it was just a misstatement.  It's not that you can't bring these claims together.  It's that both are just subject to Rule 9(b) strictures.

It doesn't add additional elements to the Section 11 claims.  You still only have to plea that there was a misstatement, but you have to plead it with particularity.  That's all that changes.

THE COURT:  I agree with you that all we are talking about is whether it's Rule 9 particularity or Rule 8 normal pleading.  That's for sure.

But *Suprema* does make the point explicitly that I have invoked, which is Judge Sloviter's concern which I take you to be saying you don't think is right.  I got it.  I don't agree, but that's okay.  You don't need to lean on that.

But you still have the same problem, which is to the extent we're talking about whether it's Rule 8 or Rule 9, you have to confront the *Suprema* problem, which is that *Suprema* seemed to be pushing aside the distinction which had been latent in *Shapiro* and had been latent in *CalPERS* which

Judge Walls had picked up on a district court that said there's certain things that are just intrinsically shot through with fraud.

You're trying to skate around that here.  "Skate" is the wrong word.  I don't mean it in a derisive -- you're trying to move away from it by saying in *Suprema* it was about upper management versus middle management, but that's just not the case.

MR. GRIFFIN:  The only distinction -- and I'll move on from this point, Your Honor, because I don't think you need to apply Rule 9(b) in order to dismiss the Section 11 claims.

But to make one last point on this issue, the distinction I'm drawing is between what plaintiffs call a claim, what they call their allegations and what their allegations actually are.

*Chubb* said that you have to look through how they're labeled and actually analyze the facts and are the factual allegations allegations of fraud, regardless of how plaintiffs label them.

That's the distinction I'm relying on.  And notably *Suprema* does not overrule *Chubb* or *Shapiro*.

THE COURT:  It doesn't overrule *Chubb* but it goes -- *Chubb* is what I'm calling *CalPERS*.

MR. GRIFFIN:  *CalPERS,* sorry.  Yes.

THE COURT:  It's fine.

But the distinction you're drawing, which had been very important in the *CalPERS* case, I don't know if that distinction survives *Suprema*.

The idea that -- that's why it was so important for Judge Sloviter that she was arguing or rather ruling, I should say, forgive me, that what's at stake is whether or not you can have a 33 Act and a 34 Act claim in the same case.

If the distinction you're suggesting made sense -- gentlemen, gentlemen.

MR. GRIFFIN:  I'm sorry.

THE COURT:  If the distinction you're putting forward makes sense, then the way *Suprema* distinguishes *Chubbs/CalPERS* is unnecessary.

MR. GRIFFIN:  I think both courts, respectfully, Your Honor, just look to the factual allegations in those cases and decided them on that basis.

Here the facts are that 9F senior management concocted a secret and illegal scheme with PICC to circumvent these regulations and then lied about it.  That is fraud no matter how you slice it.

THE COURT:  So is *Suprema*.  *Suprema* is an intentional and indeed criminal accounting fraud.

The distinction you have just drawn, maybe, maybe, maybe, even if it were right on the law, who would it be available for on the facts here?  Maybe the corporation but no

one else?  It wouldn't help the underwriters.  It wouldn't help any of the executives because there's no allegation of what anyone's role was in anything.

So I think -- look, I brought up the issue.  I brought up the issue because it feels, to me, like your argument runs a little bit in the teeth of *Suprema*.

The reason I think it doesn't much matter is not because of what you're saying, which is the material misrepresentation piece, but it may not matter because it only conceivably matters on your distinction with respect to 9F itself, not with respect to underwriters for sure, not with respect to other named defendants who could conceivably be just as removed from the supposedly systematic fraud as people in *Suprema* were.

And by the way, in *Suprema*, talk about a systematic fraud.  I mean, the premise of your argument is *Suprema* was about certain people not knowing about the fraud but of course the *Suprema* fraud was top to bottom.

Let's keep going.  I think we have hashed this out a little bit.

Keep going, Mr. Griffin.

MR. GRIFFIN:  I agree, Your Honor.  But turning to the claims themselves, I'd like to go to the issue that Your Honor raised in your January 26 order about whether they have sufficiently pled that this scheme, as they call it, the

arrangement with PICC, was in fact illegal and whether Your Honor can conclude that based on the pleadings here.

I think Your Honor hit the issue right on the head. Their core argument is that the company failed to disclose the incremental counter-party risk that PICC would later claim that disagreement was unenforceable because it was illegal.

THE COURT:  That's one of their essentially two theories.

MR. GRIFFIN:  Agreed, Your Honor.

But as to that theory, right, the key building blocks to that are that the agreement was in fact illegal, that it being illegal would make it unenforceable, and that PICC actually claimed that.

They don't allege facts to establish any of those three building blocks for this claim in the prior complaint or in the current complaint.

THE COURT:  So why does PICC need to assert that?  Why does PICC need to assert that in terms of the incremental counter-party risk?

The presence of the risk is -- the question of whether the risk materializes through an assertion and an adjudication or an assertion and a settlement is a question about damages and it's maybe a question about loss causation.

But the question of whether the risk materializes, why does it depend on the third piece, which is to say the piece

about PICC coming forward?

MR. GRIFFIN:  Because the materialization here is the only basis that plaintiffs have to make this claim at all.

If you take out what PICC did here, the dispute, the risk is entirely speculative.  No one other than plaintiffs has ever claimed that this arrangement was illegal.  PICC hasn't, the regulators haven't, the Chinese court hasn't, even their experts that they rely on haven't.

THE COURT:  I gotcha.  I hear that argument.  The thing I would say about that argument is with respect to 33 Act claims where loss causation is not gonna be necessary at the stage forum, that argument doesn't matter.

That argument may be a meaningful argument with respect to the 34 Act claims where there is a need to show loss causation at this moment, but as to the 33 Act claims, I'm not sure I see why that matters now.

MR. GRIFFIN:  It matters because it goes to the specificity with which the company needs to disclose the relevant risk.

There's no question here that the company disclosed generally that it could have contractual disputes with business partners, its business partners may fail to perform under their agreements, that could have a material adverse effect on the company.  That general risk was disclosed.

So the question is was there a more specific risk with

respect to this particular arrangement that the company should have disclosed at the time of the IPO.

THE COURT: Stop yourself right there. Right. That's the question.

But whether that increment does or does not exist, tell me why that turns on PICC's invocation of the non-enforceability of the contract.

MR. GRIFFIN: It doesn't turn on it, Your Honor. It's just simply one piece of relevant data. The fact that PICC has not even claimed this is illegal is relevant because in addition to PICC no one else has claimed it's illegal either.

There was no reason for the company to suspect at the time of the IPO that the agreement it just entered into with PICC would be declared illegal. And in fact it hasn't been declared illegal. It hasn't even been alleged to be illegal, other than by plaintiffs here.

That's what I'm getting at. We cited a case from the First Department in the *NIO* securities litigation that held that the company only has to disclose what it knows.

The issue in that case was some of *NIO*, which makes electric cars, their customers were front-loading purchases, expecting a subsidy to be eliminated. Even though that fact was existing at the time of the IPO, the front-loading was already happening.

There was no reason for the company to have known that

at the time, and therefore it had no obligation to disclose it.

THE COURT:  Right.  Those are familiar principles and they make sense.  But the argument from the plaintiff is, come on, an illegal agreement is not enforceable.  And people who try and enforce illegal agreements have fewer remedies, which is to say the added increment beyond the background counter-party risk flows from that.

It doesn't require us to talk about the principles you discussed.  It's an obvious fact about counter-party risk. Forgive me for this analogy, but if there's a deal between narcotics traffickers, they know they can't show up in court and get it enforced because it's illegal.

And that's the plaintiffs' argument, which is this is illegal and so therefore if there were a contractual dispute, they, 9F -- not "they" the plaintiff, but 9F and co. would have fewer remedies.  And indeed, says the plaintiff, that's what transpired.

What's complicated about that?

MR. GRIFFIN:  It presumes that the agreement -- there's some basis to think the agreement is in fact illegal.

THE COURT:  Right.

MR. GRIFFIN:  I think there's three separate points. There's does PICC ever claim it's illegal?  No.  Does anyone else?  No.  Is it possible at the outset that the agreement is

illegal?  It's certainly possible as a theoretical matter.

But there's no indication at the time or even now that that agreement was illegal.  Right?  That's the core issue with plaintiffs' claim here.

They don't rely on any authoritative source, any government regulation, any government fines, any legal decisions that say this arrangement that PICC had with 9F was illegal.  Their only basis for saying that is their own surmise and PICC's claim that it's invalid.

THE COURT:  I'm a little confused by that.

There are four pieces of information as to Chinese law which are alleged in the complaint.  The various circulars and the initial judicial opinion, if you add all those up, am I not allowed, in your judgment, to conclude clue that -- here is what the plaintiffs have alleged:

The plaintiffs have alleged that there's a secret agreement to evade all of those rules by disguising a payment. So your argument is that I can't make the leap to the idea that disguising a violation of all those alleged laws doesn't increase the difficulty of enforcement in the Chinese court. That leap is too big?

MR. GRIFFIN:  It is, Your Honor.  I also want to draw a distinction --

THE COURT:  Wait, wait.  Why is that leap too big?

MR. GRIFFIN:  Because none of those regulations say

anything about insurance.  They don't apply to insurance companies, they don't say anything about insurance premiums, they don't say whether insurance premiums should be included in that 36 percent calculation.

THE COURT:  But that's not what the allegations are.  I appreciate that they don't say anything about insurance, but the allegations are that -- the allegation is, right, they don't say anything about insurance, which is precisely why 9F turned to an insurance company to disguise its evasion of those rules.

My point is simply this:  What you're saying is the incremental counter-party risk, there's no basis for it.

What I'm wondering back to you is, well, the incremental basis is they have pled that there's an effort to evade the background rules that we just talked about.  And it sounds like you're conceding that a plan to evade those rules, an agreement to evade the rules would expose those who agree to the agreement to greater counter-party risk.

Are you agreeing to that or not?

MR. GRIFFIN:  I do not agree with that, Your Honor.

There's a difference here between circumventing the regulations, evading the regulations, as Your Honor says, and violating the regulations.

THE COURT:  How do you know that?

MR. GRIFFIN:  Getting around reconciliations is what

savvy lawyers and business people do all day long.  Right?  Regulation is passed, business people pivot, they see if they can come up with a new way to keep doing what they were doing.  That does not violate the regulation.

If it violates it, you have a violation that's a different issue.  Right?  But merely trying to come up with a new business model that is not implicated by the regulation is not a violation.

It doesn't suggest it's illegal, unless someone at a later point in time, a regulator, a government, or court says that that work-around was illegal.  That has never happened here, and no one has even claimed that's the case here.

That's the difference I would say, Your Honor.

THE COURT:  That's a really -- that's a quite positivist view of what needs to be found before there can be any illegality.  So unless and until a judge says or a regulator says that's illegal, a court cannot say there's at least enough of a risk of illegality here that you have imported counter-party risk into the situation?

MR. GRIFFIN:  Not with respect to the U.S. securities law such that the companies would have a duty to disclose the mere possibility --

THE COURT:  Right.  You're restating it, but where were you getting that from?

I just said back to you the implicit premise of what

you said is until a court or regulator says it's illegal -- it's not even an implicit premise.  It's almost explicitly what you said.

Until a court or regulator says it's illegal, the possible incremental risk, which is counter-party risk, doesn't count as a matter of U.S. securities law.

Stop right there.  How do we know that U.S. securities law says, "Look, unless a judge or a regulator has said it's illegal, the risk doesn't matter"?

MR. GRIFFIN:  Now, the Third Circuit, Your Honor, has not addressed this issue specifically but the --

THE COURT:  Who has addressed that?

MR. GRIFFIN:  The Second Circuit has.  The *Danske* case we cited in our supplemental papers in response to the June 26 order, the motion to dismiss the revised second amended complaint, addresses this point head-on.

The allegation in that case was that a bank's deposits were unenforceable because the depositors violated the anti-money laundering statutes.  And because it was unenforceable it exposed the bank to greater risk and that should have been disclosed.

THE COURT:  Mr. Griffin, you and I both read disclosure statements for a living all of the time, all of the time. There are discussions that say things like there is legal risk in this area.  There could one day be a problem in this area.

There could one day be a judicial finding.

Those are not generic.  Those come up in areas where disclosure counsel understand the background legal principles differently than the way you're characterizing the Second Circuit.

The principle you'd have me base things on here would render basically a hundred years of pretty standard disclosure practices a little odd.  I've written those disclosures that say things like that.  You have read them all the time.  I'm just a little puzzled by that.

MR. GRIFFIN:  Because, again, I think it's about the degree of specificity here.  The company did disclose exactly what you just outlined as a hypothetical.  It's on page 35 of the registration statement.  It's the key disclosure that everyone has cited and talked about.

I'll read it expressly.  Quote:  (Reading.)

Under our direct lending program, we have stopped charging service fees from borrowers since April 2019.  We currently charge service fees from financial institutional partners under our direct lending program.

If our direct lending program is deemed to be in violation of Circular 141 or the 2019 notice, we may be required to modify our business practice and/or be subject to penalties.

That's the exact risk that we're talking about. Now, the precise way that that would materialize by PICC or someone else claiming that the insurance piece of this is the illegality, there was no specific reason to think that that was a risk at the time beyond this general risk that they say: Look, there was this new regulation in 2019. Here is how we changed our business model in response, and there's a chance that if somebody thinks that that violates that regulation, we could be in trouble.

That's exactly what the company disclosed at page 35, and that is the disclosure, Your Honor, that we think precludes plaintiffs' claims as a matter of law under Rule 8, Rule 9(b), Section 11, or Section 10(b)

THE COURT: What about the -- right. This is why I stopped you way at the beginning and said there are actually two arguments. There's a counter-party argument which I focused on in the short order, but there's also the argument that says: Gee, we, 9F, said that we have nobody who is paying more than 36 percent, but actually there are three people alleged in the complaint plus an allegation of thousands behind them.

I see the argument you're making as to two of the three. What's your argument about the allegation that there are thousands behind them?

MR. GRIFFIN: We don't know anything about those

thousands, Your Honor.  Most importantly, what we don't know about them is how they're calculating -- let me stake a step back.

All we know is that there are allegedly 5,962 hits on this complaint forum for 9F usury in the year 2019.  That's all that's alleged.

THE COURT:  That's not all that's alleged.  There's stuff later in the complaint that's a little more on point and a little more specific.

With respect to how much you need to know -- and this is part of why *Suprema* matters a lot here.  With respect to how much you need to know, it's your argument that under Rule 8 that's not enough?

Your papers argue Rule 9 and you say it's not enough until Rule 9.  And your argument here is that even if this is a Rule 8 case with respect to the 33 Act, that's still not enough for Rule 8?

MR. GRIFFIN:  Yes, Your Honor, because we have no idea how usury is being used in any of those 6,000 complaints.  All they did was a keyword search.

Any borrower who is upset about how much interest they're being charged could claim usury.  That doesn't necessarily mean or even imply that their total APR exceeded 36 percent.

THE COURT:  Right.  I'm just looking for the spot in

the complaint that I think is a little more pointed on that.

Give me one second, Mr. Griffin, if you don't mind.

MR. GRIFFIN:  Sure.

(Brief pause.)

THE COURT:  Paragraph 64.

MR. GRIFFIN:  I understand, Your Honor.  I was actually referring to paragraph 72 because I actually think 72 is a bit more detailed than 64 even.

THE COURT:  No.  Listen to my sentence from 64.  (Reading.)

Tens of thousands of borrowers complained that

premiums and interest on the premiums usually

accounted for 50 to 100 percent of the loan

principle they received and were illegal usury.

That's much more specific than the phrase that you read.  50 to 100 is different than:  We're at sea as to anything and all they did was a keyword search.

Indeed, the relevant footnote on that paragraph of the complaint alleges, that's the zone we're in, that there is backup evidentiary information submitted on this website.

MR. GRIFFIN:  The key problem with that allegation, Your Honor, is when.  When are all of those claims from?  When did those loans -- when were they issued?

The company disclosed in its registration statement that this had nearly a billion dollars -- U.S. dollars in

outstanding loans with an APR over 36 percent as of the IPO that were issued prior to these 2019 regulations.

So the question is:  Are those thousands of complaints from before that regulation or after?

It's completely silent on it.  That's the first critical piece.  That's what they at least limited in paragraph 72, which is what I referred to, to at least put aside the timing issue.

But that's a huge issue here because the company disclosed that it did issue loans above 36 percent prior to these regulations and there was still a billion dollars worth of them still outstanding as of the IPO.

The company had 2.8 million borrowers in 2019 alone. You're talk about a billion dollars of loans over millions and millions of borrowers.  The fact that thousands complained about the interest rate is not at all inconsistent with that disclosure.

So for them to use that to show that after the 2019 regulation an appreciable amount of borrowers were still being charged in excess of 36 percent, they need to do more than just search for the word "usury."

They tried to do that with the three examples that they gave here, but that's the kind of analysis that they would need to do with the other allegations beyond just a keyword search for the word "usury."  That alone doesn't tell us

anything.

THE COURT: I hear that argument. The difficulty is what's alleged is there are three and these three are alleged as examples of a broader group.

Why is the linking of the three not -- with the word "example" to the broader group, why does it not do it? What they say by using the word "example" is that that second group is not random, unconnected, temporally or otherwise. These are examples.

Why does that not do it?

MR. GRIFFIN: Because they need to allege some more basis about the particulars of what those other complaints were.

I would commend Your Honor to read the *LexinFintech* case from the District of Oregon, not binding on Your Honor of course, but it's strikingly similar.

*LexinFintech* was another Chinese online payment platform that was accused of violating this exact same regulation about the 36 percent. It was based on the exact same type of allegations.

A short-seller went and found one of these online complaint boards, pulled a few examples and said: Look, this establishes that there was widespread violation of this rule.

The court in that case rejected that. They say that merely citing a handful of examples is not enough unless you

describe with enough detail the other complaints to allow the court to conclude that they actually reflect the same issue.

Here simply saying that they contain the word "usury" is not enough for the Court to make that leap, we would submit, even under Rule 8.  That's not even a plausible inference that simply because a complaint uses the word "usury" it necessarily means that they were being charged in excess of 36 percent.

That's without even getting into the calculation issue, which is a totally separate issue that undermines this entire analysis.

As we explain in our papers, Your Honor, plaintiffs only conclude that the three examples they gave violated 36 percent by excluding the loan premium portion of the loan from the denominator when they calculate the 36 percent.

As alleged, plaintiff asked for a loan of $10,000. They're issued a loan of $12,000 and 2,000 is immediately paid to PICC for the insurance premium.  Right?

When plaintiffs do their APR calculation, they used the 10,000 that was originally requested, not the $12,000 that the borrowers actually loaned.  If you use the 12,000, even their examples are not above 36 percent.

THE COURT:  That's a tough argument.  The plaintiffs' argument is that the hypothesized $2,000 increment you're talking about was fraud, and you want that to be used as the

denominator?

MR. GRIFFIN:  If you're calculating borrowing costs, then it has to be because it was part of the loan.  And the company disclosed --

THE COURT:  A loan they didn't request as alleged and as alleged it was foisted upon them to facilitate an illegal payment.

You're saying that when I think about the appropriate denominator it should include what is alleged to be a secret, fraudulent, foisting upon consumers extra costs?  That should be part of what I think about?

MR. GRIFFIN:  It's not about what we want to think about.  It's what the regulation prohibiting interest and fees above 36 percent requires.

The company expressly disclosed that there is no agreement, there is no defined way to calculate APR.  There's no rule out there that says this is what you include, this is what you don't include.

You, for example, would not include an insurance premium in Your hypothetical Honor's, right, as plaintiffs allege here.

THE COURT:  You're making your own argument about how I should calculate APR and so you have to stand behind it yourself.

The argument you're asking me to accede to is that when

I think about the appropriate APR I should think about the incremental, alleged, secretly foisted upon consumers portion of things.

You can't lean on the disclosure that says how Chinese regulators might opt to analyze APR is complicated because you're affirmatively saying that their means of calculating APR is not right.

It strikes me as a strange argument for you to be resting on, that part of the denominator is funds allegedly secretly foisted upon a consumer.

MR. GRIFFIN:  I'm not saying that it's wrong.  I'm saying that it's not the same way the company did it.

So if you're saying that the company's disclosure was false, the company said:  We calculate it this way.  Under our calculation we came to this result.  There's a chance that regulators or other industry participants could calculate it differently, and if they do, there's a chance that our loans could be above 36 percent.

All of that is disclosed.

So for plaintiffs to then calculate it differently and say, "We found some over 36 percent.  Therefore, your disclosures were false," that's the part that breaks down.

It's not about what's the right way to calculate it here.  Again, everyone agrees that there is no defined right way to calculate it.  It's about disproving the company's

calculation.  They can't do that by using a different methodology.  That's my point here.

Whether this was illegally foisted upon consumers, et cetera, plaintiffs have a lot of allegations about that, the former employee that they allege that says borrowers weren't told about that, none of that is relevant to the company's U.S. securities disclosures.

This isn't a consumer action.  Whatever the merits of that practice under Chinese consumer laws is irrelevant to the disclosures in the company's offering documents here.

Those disclosures said how they calculate APR, said that others may disagree, have a different calculation.  If they do, some of our loans may exceed 36 percent.

Plaintiffs simply doing that with a different calculation and saying, "We found some above 36 percent," doesn't render any of the company's disclosures false or misleading.  It's simply an example of the very risk that the company warned about with respect to the 36 percent.

THE COURT:  Mr. Griffin, let me pause you for a second. I'm going to ask you to sit down for just a moment if I could and ask Mr. Sams to respond to something.  I'll explain why this is on my mind.  It comes back to what we talked about at the beginning.

Here is my issue:  It seems, to me, that where we are is that there's at best issues about the 33 Act standing, and

those issues are glancingly discussed in the papers.  They're certainly raised by the defendants but the plaintiffs don't really take them on.  Those need to be addressed in a more substantial way, to my mind.

The other issue here -- Mr. Sams, this is why I wanted to address this with you -- is if those claims disappear, I'd be curious to how you would suggest you're gonna establish scienter with respect to the 10(b)(5) claims, as to which there is certainly statutory standing.

Mr. Griffin has been focused on what, in his judgment, straddles the 33 and 34 Act, but in my mind much of it is about the 33 Act claims, which have a separate problem.

Mr. Sams, let's come back.

Mr. Griffin, let me ask you to sit if you could.

Mr. Sams, why don't you address if you could how you think you're establishing scienter as to the 10(b)(5) claims or claim.

MR. GRIFFIN:  Thank you, Your Honor.

MR. SAMS:  Yes, Your Honor.

I agree that much of the focus in this case has been on the falsity issue, which applies both to the Section 11 claim and the 10(b) claim, and there's much less focus currently on scienter; but I think in previous briefing we did with Judge Arleo, we set forth our arguments regarding scienter under the 10(b) claim.

To go back to some of those issues, I think we discuss -- first, in this circuit and other circuits there's a core operations inference that applies here, which states that for issues that are important for the company there's a presumption that the company's officers and directors would be aware of issues that are vital to the company.

There's allegations in the complaint that demonstrate that.  This aspect of the company's business represented approximately 90 percent of its revenues.  So for issues that are that important for the company, that inference applies here.

Second, there's allegations in the complaint about stock sales that were -- stock information that's relevant to the insiders here.  To give you the actual page citations for that and paragraph references, I believe those are set forth in the revised amended complaint at paragraphs 20, 22 through 25, 27 through 28, 32, and 44.

Those are allegations regarding the motivation of the defendants --

THE COURT:  Mr. Sams, I think we have to put that aside.

MR. SAMS:  Sure.

THE COURT:  There are certainly contexts in which the mix of motive and intent can be meaningfully helpful.  Maybe it's a little meaningfully helpful here to know that the

senior executives had skin in the game, but usually it's not the most important fact that there was a financial motive.

It's just too generic a makeweight to work that well in a scienter context from a plaintiff's perspective.  So I appreciate it does a little bit of work but not that much work.

What do you have besides the besides the stock holdings, the core operations doctrine?  What else do you have?

MR. SAMS:  I understand what you're saying about the motivation, but under the *Tellabs* case, courts must look at this holistically.  So it's not just one issue in isolation.

THE COURT:  I get it, but under *Tellabs* the Court has to look to the most plausible -- I'm saying that not correct. The plausibility is confusing because of *Iqbal*, but it's not just an inference that might be drawn but a more persuasive one.  I appreciate the background legal standard.

What do you have besides the core operations doctrine and financial incentive to see the P&L, the profit and loss statement, look a certain way?

MR. SAMS:  Also, Your Honor, we have the company's admissions themselves.  They admitted when they disclosed this information that they secretly use PICC --

THE COURT:  I don't know if that's the right way to characterize that.  I think there's an argument in the papers

between the plaintiff and the defendant.  The defendant says:  Oh, gee, the plaintiff is calling these corrective disclosures.

And you are, without using the phrase, calling them corrective disclosures.  I see that.

Is your contention that those disclosures admit scienter?

MR. SAMS:  They admit the facts that were not disclosed to investors.

THE COURT:  I got it, but how does that function as an admission of scienter?

It's not like you have a criminal guilty plea where a person stands up and says:  Yeah, last year here is what I knew.

That's not what the corrective disclosure, to use your conceptual way of thinking about it --

MR. SAMS:  That's true but that's not necessary.

THE COURT:  But help me on scienter, then.  How does that speak to the mental state when those acts took place?

MR. SAMS:  Because they're admitting to the facts that were not disclosed to investors.  The fact that they admitted that they used PICC as a conduit to indirectly charge borrowers when the company was prohibited from doing so directly is an admission that speaks to scienter.

THE COURT:  But why is it an admission that speaks to

scienter?  They could have had a new general counsel who tells them:  Hey, look, this is too risky.

There could be a new CFO that says:  Let's not run this risk.

There could be new personnel in the regulatory sphere in China that makes people think:  Let's get this disclosure behind us.

There's so many possible reasons why a corrective disclosure is made.  Only one of them is that we had scienter before.  So what I'm trying to understand is why this disclosure sheds retrospective light, given that there are other possibilities as to why you'd make a subsequent disclosure.

MR. SAMS:  It's relevant, Your Honor, because this was not a mistake.  It was an intentional act that they did to get around Chinese law.  That's why it's relevant for scienter because they chose to do this willingly.  That shows a deliberate conduct on their part.

THE COURT:  Let me ask you a slightly different question.  If 10(b)(5) here is certainly subject to a Rule 9 standard and there's the familiar mantra -- you know, for Rule 9 you have to plea the whos and the whats and the wheres.

What are the whos and the whats and the wheres that you allege as to the so-called secret agreement?

MR. SAMS:  With respect to this intentional act,

Your Honor, it's company management that made this change.

THE COURT:  I don't mean the corrective disclosure, as you would put it.  I mean the actual underlying secret agreement, quote-unquote.

That agreement, who made it?  When did they make it?  Where is that alleged?

MR. SAMS:  We allege when it was done.  It was done after the April 2019 --

THE COURT:  Yeah, right.

MR. SAMS:  -- regulation.

THE COURT:  But there's no other details about this agreement.  Am I right?  There's no piece of paper.  Right?

MR. SAMS:  No specific document that we allege but that's not required under the PSLRA.

THE COURT:  Understood and agreed, but I'm just trying to understand some of the conversations.  Who was part of them?

It's the invocation of an agreement without saying anything -- and I agree with you, you certainly allege that it happens after the April 2019 regulatory shift that is the final step in a cascade of regulatory shifts.

But aside from that, what are you saying about the -- what are you saying specifically about that agreement?

MR. SAMS:  We're saying that the company entered that agreement with PICC in order to circumvent the laws that were

implemented at that time.  They did it as an end-around run around the Chinese regulations.

THE COURT:  I hear that.

MR. SAMS:  Going back -- I'm sorry, Your Honor.

THE COURT:  That's about the hoped-for effect, the function of the agreement.  It's not really about allegations that speak in a detailed way to the agreement, which is to say who sat in the room and did this.

MR. SAMS:  Well, if I could go back to Judge Arleo's comments at the motion to dismiss hearing, Your Honor, I think she got it exactly right when -- this was something that you alluded to in your conversation with counsel, that it's not about whether or not there was an illegal agreement that was formed.  It has to do with whether or not there was an end around the regulations that were in place.

Judge Arleo specifically found that if we allege that the company had this end-around system where they were trying to circumvent Chinese laws, that's sufficient for securities fraud.

THE COURT:  Right.  But let's put aside what Judge Arleo held because that's complicated here for the reasons that Mr. Griffin at least agreed to.  I don't mean "complicated."  It's just that she engaged in an oral argument.  I think much of what she said was in the nature of a back-and-forth with counsel, not a holding.

But nonetheless, what I'm getting at is the idea of an end around might be okay under Rule 8 but you have a problem because the claims that are your Rule 8 claims are the 33 Act claims as to which you have a standing issue.

So I'm pivoting us to the place that's Rule 9. And under Rule 9, invoking an agreement that has the effect of an end around seems a much harder row to hoe for you.

MR. SAMS: Again, Your Honor, I think when Judge Arleo specifically raised this it was in the context of the complaint in general, both the Section 11 claims and the 10(b) claims.

THE COURT: Put aside what Judge Arleo said because there's some complexity I think in characterizing a given word of that as a holding versus a thoughtful interaction with counsel.

What is the reason, as you stand here, that you've done enough to meet Rule 9 standards with respect to the existence of an agreement?

MR. SAMS: Well, I think we set forth the requirements under both Section 11 and 10(b). With respect to misrepresentations, I think we set that out, that they didn't fully disclose the risk that existed in the registration statement.

With respect to scienter, there's a collective body of allegations that shows that defendants had knowledge regarding

what was going on.  And with respect to loss causation, we alleged the stock price drops that occurred as a result of the disclosures.

So all of that together forms the elements of the 10(b) claim.

THE COURT:  Okay.  Thank you, Mr. Sams.  That's very helpful.

I want to just put out there how I think we should proceed.

And then I'm happy to hear from you again, Mr. Sams and Mr. Griffin again as well if that's, in your judgment, useful.

Here is what I think:  It seems to -- Mr. Sams made this point that -- I made the point to Mr. Griffin that the briefing doesn't very heavily cover the 33 Act issues.  And Mr. Sams made the point that the briefing doesn't very heavily cover the scienter issues.

I would add to that it doesn't very heavily cover the question of whether either, either, either as to the 36 percent or the agreement there's specificity enough for Rule 9 purposes.

What I would say is that I have no desire to ask you all to do more work, but I'm gonna ask you to do more work in the following sense:

I do need the parties' positions on the 33 Act.  This is a little bit -- Mr. Griffin, I'm telegraphing nothing to

say that I disagree with you on *Suprema* and Rule 9 versus Rule 8.

This case is quite a bit different, depending on whether we're in Rule 8 zone or Rule 9 zone.  Rule 8 zone versus 9 basically runs through whether you have 33 Act claims or just 34 Act claims.

So what I would say is I'm gonna want to get briefing -- I'll put an order on the docket because I'll figure out how long I want it to be.  But I want to get very brief briefing from the parties on whether the plaintiff has pled what it needs to to get into Section 11 and to get into Section 12.  I'll give both parties obviously a chance to have a back-and-forth.

Then a little bit, depending on where things go from there, I would imagine that I'm going to ask you all for more briefing as to the question that I think is likely to be with us, which is as to the 10(b)(5) claim whether or not Rule 9 standards are met as to the 36 percent and also as to the agreement's existence and beyond that whether scienter has been alleged -- I mean, Mr. Sams makes the argument of core operations, and that struck me as both the plaintiffs' best argument and also as a little bit underdeveloped.

Although I of course had gone back and read the prior briefing you alluded to you.

That's my hunch about where to go.  I would propose to

do it serially and quickly because I think this case -- I don't want to be engaged in asking you to do more than you need to, and I also don't want to issue an advisory opinion.

I think quite a bit here is gonna swing on whether we have just section -- whether we have Section 11 and 12 claims.

Mr. Sams, Mr. Griffin, does that kinda make sense as a way forward from each of your perspectives?

MR. SAMS:  Yes, Your Honor.

THE COURT:  Mr. Griffin, what do you think?

MR. GRIFFIN:  Agreed, Your Honor.

MS. RAMESH:  Your Honor, respectfully, for the underwriters for a moment.

THE COURT:  Yes.

MS. RAMESH:  While we join strongly with our colleagues at Skadden's arguments, we think there is also a separate way forward for the underwriters here.  Plaintiffs have not satisfied their obligation of alleging that the underwriters were negligent in failing to uncover misrepresentations and issues.

We raised that in our opening brief.  They didn't respond in opposition.  We'd respectfully submit that the underwriters should be dismissed.

THE COURT:  Mr. Sams.

MR. SAMS:  We could cover that under the supplemental briefing, Your Honor.

THE COURT:  We didn't get there because I think this is the horse that comes before the cart.  I appreciate that the underwriters are in a different position maybe, but a little bit of that also runs through this question of whether we're in 10(b)(5) land or in 33 Act land, at least it does in my mind.

So I hear you but -- you don't have to participate in this briefing if you don't think it's useful, but I think this is the first thing to do.

MS. RAMESH:  We certainly will, Your Honor.  I just thought I would raise it for your --

THE COURT:  I appreciate it.  I saw that point in the papers, for sure.

MS. RAMESH:  Thank you.

THE COURT:  Thank you.

So in light of this hypothesis, which I'll reduce to an order and a very short one when I just walk back to chambers, anything else that anyone wants to add in light of the morning's conversation?

Mr. Sams, anything you want -- do you want to huddle? You all want to chat a little bit?  Do that if you want.

(Brief pause.)

MR. SAMS:  Your Honor, if it's okay with the Court, we would propose simultaneous briefing with simultaneous responses for the parties.

THE COURT:  Why?

MR. SAMS:  That would provide the parties with an opportunity to see the other's position and respond to it.

MR. GRIFFIN:  Your Honor, I think it makes more sense to do them in the normal sequence for the exact reason Mr. Ex Kano *[sic]* says, so that we can see plaintiffs' position, respond to it accordingly, rather than kind of shooting at the dark.

THE COURT:  I'm sorry.  Your last name is "Sacano"?

MR. GRIFFIN:  I meant "Mr. Sams."

THE COURT:  Okay.  I thought I got your name wrong.  I wanted to apologize.  Instead, Mr. Griffin needs to apologize.

Mr. Griffin, continue.

MR. GRIFFIN:  I think it makes more sense to do them one at a time so the parties know exactly what they are responding to and not talking past each other.

THE COURT:  I think that's right.  I'm not sure I exactly get it.

There's a motion to dismiss argument.  We all live under page limits, and there is a motion to dismiss argument about the 33 Act.  It was a little bit lean.  I would like to see more on it.  Then you can respond to it however you want to respond.  I think that's more useful.

Take your time if you want to chat together.

(Brief pause.)

MR. SAMS:  Your Honor, if that would envision a short reply in the process, that would be fine with the plaintiffs.

THE COURT:  It's gonna be Mr. Griffin, then you.  You could each have short replies -- Mr. Griffin will get -- it will be an opening, very short brief, a very short response, very short reply.

And what you want is a very short surreply, as well?  That's fine.

This is gonna be a long run for a short slide, I think.  These are gonna be short filings that I'm gonna ask you all to produce pretty quickly.

MR. SAMS:  That's fine, Your Honor.

THE COURT:  Okay.  Does it make sense from all of your perspectives to do it the way I'm proposing, which is we first deal with the 33 Act issues and then discuss the 34 risk factor merits?  Make sense?

MR. SAMS:  Yes, Your Honor.

THE COURT:  Mr. Griffin, that's fine for you?

MR. GRIFFIN:  Agreed.

THE COURT:  So that's what we'll do.  I'll write a quick order when we get back and I will not say anything as to 34 Act merits because I want to resolve the 33 Act threshold issues before we spend your time or mine on that.

Anything else that we should cover while we're all here together from the plaintiff?

MR. SAMS:  No, Your Honor.

THE COURT:  Thank you.

From the defendant?

MR. GRIFFIN:  No, thank you.

THE COURT:  From the underwriter separately?

MS. RAMESH:  No, thank you.

THE COURT:  Thank you all.  The papers were really strong.  I want to just be clear in saying that asking for more briefing is not a sign that I thought anything but that they were really well done, so I thank you all very much.  It was very helpful and much appreciated.  So was today.

MR. SAMS:  Thank you, Your Honor.

MR. GRIFFIN:  Thank you, Your Honor.

THE COURT:  We're adjourned.  Thank you all.

(Which were all the proceedings held in the

above-entitled matter on said date.)

*   *   *   *   *

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court Reporter of the United States District Court for the District of New Jersey, do hereby certify that the foregoing proceedings are a true and accurate transcript from the record of proceedings in the above-entitled matter.

*/S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

Official U.S. District Court Reporter ~

District of New Jersey

DATED this May 22, 2024

*United States District Court*
*District of New Jersey*