# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRAIG J. HOLLAND, Individually and on behalf of all others similarly situated,<br><br><br>Plaintiff,<br><br><br>v.<br><br>9F INC., LEI SUN, YANJUN LIN, YIFAN REN, CHANGXING XIAO, FLYNN XUXIAN HUANG, IVAN XU, JUNSHENG ZHANG, WING HON CHEUNG, FANGXIONG GONG, DAVID CUI, LEI LIU, SIU FUNG MING, CREDIT SUISSE SECURITIES (USA) LLC, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CLSA LIMITED, CHINA INVESTMENT SECURITIES INTERNATIONAL BROKERAGE LIMITED, 9F PRIMASIA SECURITIES LIMITED, and COGENCY GLOBAL INC.,<br><br>Defendants. | **Case No: 2:21-cv-00948-MEF-MAH**<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Lead Plaintiff John S. Wait and named plaintiff Delanta L. Harrison ("Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters. These allegations are based upon, *inter alia*, the investigation conducted by Plaintiffs' attorneys, which included, among other things, a review of: (1) Defendants' public documents; (2) conference calls and announcements made by Defendants; (3) public filings, wire and press releases published by, and regarding, 9F Inc. ("9F," "JFU," or the "Company"); (4) statements made by former Company employees; and (5) other publicly available information. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.    This is a securities class action on behalf of all purchasers of 9F's American Depositary Shares ("ADSs") from August 14, 2019 to September 29, 2020, inclusive ("Class Period").[1]  Plaintiffs bring the following claims on behalf of

---

[1] American Depositary Shares, also known as ADSs, are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company. Each 9F ADS represents one Class A ordinary share.

the Class and seek to recover damages caused by Defendants' violations as a result: (1) Sections 11 and 15 pursuant to the Securities Act of 1933 ("Securities Act") for all purchasers of 9F ADSs pursuant or traceable to the Registration Statement and Prospectus issued in connection with 9F's initial public offering (collectively the "Registration Statement") held on or about August 14, 2019 (the "IPO" or "Offering"); and (2) Sections 10(b) and 20(a) pursuant to the Securities Exchange Act of 1934 ("Exchange Act") for all purchasers of 9F ADSs during the Class Period.[2]

2.      Defendant 9F is an online lending intermediary platform in China.  On its platform, 9F facilitates borrowers to borrow money through two channels: (1) from loan products directly funded by "institutional funding partners," or banks, with whom 9F partners through 9F's direct lending program; and (2) from loan products designed by 9F and funded by individual investors.  9F's revenue primarily comes from charging service fees for facilitating loan transactions between borrowers and banks/investors.

---

[2] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants, the present and former officers and directors of 9F at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

3.      Before 9F's IPO, its direct lending program – which was funded by institutional funding partners – had been quickly growing into the most significant business section for 9F.  For the three months ended June 30, 2019 (the quarter immediately before 9F's IPO) financial institutions issued RMB5.7 billion in loans to borrowers on 9F's platform in the direct lending program, accounting for 58% of all loans issued to borrowers on 9F's platform during the same period.  Before April 2019, 9F directly charged borrowers for 9F's loan facilitation service fees in its direct lending program, which, in a significant number of cases, were more than 36% of the loan principals those borrowers had obtained.

4.      However, starting in 2015 before 9F's IPO, China published a series of regulations and judicial interpretations to curtail usury loans, which materially negatively impacted 9F's operation.  These regulatory changes included: (1) bans on charging borrowers interest and any fees, or APR (annual percentage rate), exceeding 36% of the loan principal; and (2) a regulation promulgated four months before 9F's IPO prohibiting lending intermediaries, such as 9F, from collecting any interest or fees from the borrowers.  These regulatory restrictions directly impacted 9F's business practice of charging lucrative 36% or higher service fees from borrowers and forced 9F to terminate its practice of collecting any service fees from borrowers in 9F's direct lending program.  Facing this dire financial prospect, the Company was in desperate need of a new business model to maintain its revenue.

5.    As a result, 9F entered an arrangement with PICC Property and Casualty Company Limited ("PICC"), an insurance company in China, through two agreements.  One agreement, which was publicly disclosed to the investing public, provided that when a borrower obtained a loan on 9F's platform, PICC would simultaneously charge the borrower a certain amount of insurance premium to purportedly protect the lender's loaned fund.  The other agreement, which was secret and undisclosed to investors, provided that the insurance premiums were, in fact, loan facilitation service fees that PICC would remit to 9F upon receipt.

6.    This arrangement helped 9F continue secretly collecting service fees from borrowers.  Taking into account the purported insurance premiums, the total borrowing cost for a borrower on 9F's platform (including all fees and interest) frequently exceeded the legally permitted 36% APR ceiling.  Moreover, a governmental penalty notice later revealed that in this arrangement, 9F – in contravention of Chinese regulations governing an insurance company's duty to independently decide the premiums on a case-by-case basis – unilaterally and completely controlled which borrowers would pay a certain amount of insurance premiums.

7.    In its Registration Statement, 9F disclosed that when loans were issued to borrowers on the Company's platform, borrowers simultaneously paid insurance premiums to PICC.  Additionally, 9F represented that at the time of the IPO, the

Company did not have ***any*** outstanding loan balance issued since December 2017 with the total amount of fees and interest charged to any borrower exceeding 36% of the loan principal "***even inclusive of any additional fees*** incurred by borrowers in relation to third-party insurance and guarantee protection, ***such as insurance premiums*** to the insurer …"

8.    These statements were materially misleading when made because they failed to disclose that: (1) at the time of the IPO, with the partnership with PICC, the borrowing cost for a borrower on 9F's platform frequently exceeded the 36% APR ceiling contrary to 9F's own representations; (2) a secret arrangement existed whereby PICC would pay 9F service fees from the insurance premiums PICC collected from borrowers; (3) due to the secret arrangement with PICC, at the time of the IPO, 9F was facing a material risk that PICC would claim that the secret arrangement – according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance regulations – was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers over 36% for fees and interest; and (4) therefore, at the time of the IPO, there was a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming such funds as purely insurance premiums.

5

9.     With the materially misleading Registration Statement, Defendants conducted the IPO in August 2019, selling approximately 8.9 million ADSs to the investing public at $9.50 per ADS, and reaped $84.55 million from investors.

10.     These risks quickly materialized after 9F's IPO.  On June 12, 2020, 9F disclosed for the first time as a material adverse event that PICC withheld RMB 2.2 billion (US$350 million) in service fees from 9F in 2019.  The Company further disclosed that PICC filed a lawsuit against 9F, claiming that the agreement between 9F and PICC was invalid and that PICC had no duty to pay the service fees.  ("June 12, 2020 6K").  Specifically, the June 12, 2020 6K stated that "***PICC filed a civil lawsuit*** (the "PICC Initiated Legal Action") against Jiufu Shuke and Beijing Jiufu Lianyin Technology Co., Ltd., a wholly owned subsidiary of 9F (the "Jiufu Lianyin"), at a local court in Guangzhou (the "Guangzhou Local Court") ***claiming that the second amendment under the Cooperation Agreement is invalid***."  (emphasis added).    9F also disclosed that it filed a lawsuit against PICC for PICC's non-performance.  The Company, however, did not disclose in the June 12, 2020 6K that the real nature of the dispute related to the loan facilitation service fees that 9F asked PICC to illegally and secretly collect from 9F's borrowers.

11.     On June 24, 2020, 9F filed its 2019 annual report on Form 20-F ("2019 20F"), revealing for the first time the illegal nature of its agreement with PICC.  9F admitted that in 2019 "***PICC collected all of the loan facilitation service fees***" (not

insurance premiums) from borrowers and "***remitted*** [9F's] portion of the service fees to [9F]." 9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to borrowers, the Company started to charge service fees "***indirectly through*** . . . [an] insurance company." Given that PICC's withholding of 9F's loan facilitation service fees accounted for 29.9% of lost revenue in 2019, the market strongly reacted to 9F's revelation. Specifically, 9F's stock price fell by $0.38 per ADS, or 7.6%, on June 24, 2019, and another $1.12 per ADS, or 24%, over the next three days.

12.    9F continued to suffer financially because of the materialized risk of the failure to receive facilitation service fees from PICC in 2020. On September 29, 2020, 9F reported that its loan facilitation services revenue in the first half of 2020 decreased by 85.5% from the second half of 2019. 9F listed its ongoing legal dispute with PICC as the primary reason for such decrease. On this news, 9F's ADS share price fell $0.20 per ADS, or 18%, to close at $0.91 per ADS on September 30, 2020, further damaging investors.

13.    By the commencement of this action, the Company's shares traded significantly below the IPO price. As a result, the Company's investors suffered significant losses.

## JURISDICTION AND VENUE

14.    The claims alleged herein arise under, and pursuant to, Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act and 28 U.S.C. §1331 and §27 of the Exchange Act.

16.    This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of Defendants' actions and the subsequent damages took place within this District, and §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this District.

18.    In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails,

interstate telephone communications, and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of 9F securities in this District.

## **PARTIES**

19.     As set forth in the certification previously filed with the Court (Dkt. 9-2), Lead Plaintiff John S. Wait purchased 9F ADSs at artificially inflated prices during the Class Period for Plaintiffs' Exchange Act claims and was damaged upon the revelation of the truth.

20.     As set forth in the certification previously filed with the Court (Dkt. 44-1), Named Plaintiff Delanta L. Harrison purchased 9F ADSs pursuant and/or traceable to the Registration Statement issued in connection with 9F's August 14, 2019 IPO. Specifically, Plaintiff Harrison purchased 9F ADSs on August 22, 2019 – eight days after 9F's IPO. There was only one Registration Statement at the time Plaintiff Harrison purchased her shares: the Registration Statement associated with 9F's IPO.  Additionally, Plaintiffs are informed and believe, and thereupon allege, that there were no unregistered shares on the market at the time Plaintiff Harrison

purchased her shares.[3]   Thus, the shares that Plaintiff Harrison purchased are traceable to the Registration Statement associated with 9F's IPO.  Ms. Harrison's purchase was also made at an artificially inflated price during the Class Period for Plaintiffs' Exchange Act claims, and she was damaged upon the revelation of the truth.

21.    Defendant 9F is an online lending intermediary platform in China. The Company's primary products and services include consumer loan products, online wealth management products, and payment facilitation.  The Company is incorporated in the Cayman Islands and its head office is located at the Jiufu Building, Rongxin Technology Center, Chaoyang District, Beijing 100102, People's Republic of China ("PRC").  9F ADSs trade on the Nasdaq Exchange ("NASDAQ") under the ticker symbol "JFU."

22.    Defendant Lei Sun ("Sun") has served as the Company's Chairman and Chief Executive Officer ("CEO") since 2017 and was at the time of the IPO 9F's

---

[3] The Registration Statement provided that "[w]e, our directors and executive officers, our existing shareholders and certain option holders holding approximately 80% of the vested options of the company at the end of the 180-day lock-up period have agreed with the underwriters, subject to certain exceptions, not to offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any ADSs, ordinary shares or similar securities for a period of 180 days after the date of the final prospectus."  Dkt. 51-4 at 19, 276.

CEO and Chairman of the Board of Directors ("Board").  He is also a co-founder of the Company.  Defendant Sun signed the false and misleading Registration Statement.  Defendant Sun beneficially owned 77,526,800 ordinary shares (39.1% of the outstanding shares) of 9F just prior to the IPO.  Defendant Sun sold 2.15 million ADSs as a "selling shareholder" in the Company's IPO worth $20.425 million through Nine F Capital Limited, a British Virgin Islands company, which he controls, grossing more than $20 million in proceeds for himself.

23.     Defendant Yanjun Lin ("Lin") has served as the Chief Financial Officer ("CFO") since 2015 and was at the time of the IPO 9F's CFO and a member of its Board.  Defendant Lin has served as the CEO of Defendant 9F Primasia Securities Limited ("Primasia Securities") since 2016.  Defendant Lin signed the false and misleading Registration Statement.  Defendant Lin beneficially owned 2,490,700 ordinary shares (1.3% of the outstanding shares) of 9F just prior to the IPO.

24.     Defendant Yifan Ren ("Ren") was at the time of the IPO a member of 9F's Board.  He is also a co-founder of the Company.  Defendant Ren signed the false and misleading Registration Statement.  Defendant Ren beneficially owned 43,583,400 ordinary shares (23.3% of the outstanding shares) of 9F just prior to the IPO.

25.     Defendant Changxing Xiao ("Xiao") was at the time of the IPO a member of 9F's Board.  Defendant Xiao signed the false and misleading Registration

Statement. Defendant Xiao beneficially owned 13,920,300 ordinary shares (7.4% of the outstanding shares) of 9F just prior to the IPO.

26.    Defendant Flynn Xuxian Huang ("Huang") was at the time of the IPO a member of 9F's Board. Defendant Huang signed the false and misleading Registration Statement.

27.    Defendant Ivan Xu ("Xu") was at the time of the IPO a member of 9F's Board. Defendant Xu signed the false and misleading Registration Statement. Defendant Xu beneficially owned 7,237,000 ordinary shares (3.8% of the outstanding shares) of 9F just prior to the IPO.

28.    Defendant Junsheng Zhang ("Zhang") was at the time of the IPO a member of 9F's Board. Defendant Zhang signed the false and misleading Registration Statement. Defendant Zhang beneficially owned 3,912,700 ordinary shares (2.1% of the outstanding shares) of 9F just prior to the IPO.

29.    Defendant Wing Hon Cheung ("Cheung") was at the time of the IPO a member of 9F's Board. Defendant Cheung signed the false and misleading Registration Statement.

30.    Defendant Fangxiong Gong ("Gong") was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement.

31.    Defendant David Cui ("Cui") was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement.

32.    Defendant Lei Liu ("Liu") was named in the Registration Statement, with his consent, as having accepted appointment as a Company director effective upon the SEC's declaration of effectiveness of the Registration Statement.  He is also a co-founder of the Company and was, at the time of the IPO, its Executive President and Chief Risk Officer.  Defendant Liu beneficially owned 4,347,600 ordinary shares (2.3% of the outstanding shares) of 9F just prior to the IPO. Defendant Liu became the Company's Chief Risk Officer in June 2020 and replaced Defendant Sun as 9F's CEO in August 2020.

33.    The defendants named in ¶¶22-32 are referred to herein as the "Individual Defendants."

34.    Defendants 9F and Sun and Lin are sometimes referred to herein collectively as the "Exchange Act Defendants."

35.    Defendant Credit Suisse Securities (USA) LLC served as an underwriter for the Company's IPO.  Credit Suisse Securities (USA) LLC maintains an office at 2121 Avenue of the Stars, Los Angeles, CA 90067.

36.    Defendant Haitong International Securities Company Limited served as an underwriter for the Company's IPO.  The address of Haitong International

Securities Company Limited is 22/F Li Po Chun Chambers, 189 Des Voeux Road Central, Hong Kong Special Administrative Region of the PRC.

37.    Defendant CLSA Limited served as an underwriter for the Company's IPO. The address of CLSA Limited is 18/F, One Pacific Place, 88 Queensway, Hong Kong Special Administrative Region of the PRC.

38.    Defendant China Investment Securities International Brokerage Limited served as an underwriter for the Company's IPO. The address of China Investment Securities International Brokerage Limited is Unit Nos. 7701A & 05B-08 Level 77, International Commerce Center, No. 1 Austin Road West, Kowloon, Hong Kong Special Administrative Region of the PRC.

39.    Defendant Primasia Securities served as an underwriter for the Company's IPO. Primasia Securities is a subsidiary of the Company, and its address is Suite 4806-07, 48/F, Central Plaza, No. 18 Harbour Road, Wanchai, Hong Kong Special Administrative Region of the PRC.

40.    The defendants referenced above in ¶¶35-39 are referred to herein as the "Underwriter Defendants."

41.    Defendant Siu Fung Ming ("Ming") was at the time of the IPO 9F's duly authorized representative in the United States. Defendant Ming signed the false and misleading Registration Statement on his own behalf and on behalf of Defendant Cogency Global Inc. ("Cogency Global"), Defendant Ming's employer.

14

42.    Defendant Cogency Global was 9F's authorized U.S. representative for purposes of the IPO through its employee Defendant Ming, and Defendant Ming signed the Registration Statement for the IPO as an employee of Defendant Cogency Global. Defendant Cogency Global is additionally liable for the securities law violations alleged herein to have been committed by Defendant Ming as it controlled Defendant Ming at the time of the IPO.

43.    The Company, the Individual Defendants, the Underwriter Defendants, and Cogency Global and Ming are referred to herein collectively as "Defendants."

44.    Each of the Individual Defendants and Ming signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential 9F investors, all motivated by their own and the Company's financial interests.

45.    The Company is liable for the acts of the Individual Defendants and the Company's employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

## SECURITIES ACT CLAIMS

46. Plaintiffs specifically disclaim any allegation of fraud, recklessness, or intentional misconduct concerning allegations under the Securities Act. More specifically, this claim is not based on, and does not sound in, fraud. The allegations for this count are not based on any knowing or reckless misconduct on the part of the Defendants *i.e.*, they do not allege, and do not sound in, fraud. Rather, they are premised on the fact that there were material misrepresentations and omissions in the Registration Statement, and the negligence of all Defendants in failing to recognize this fact, including, but not limited to, the negligence of the Underwriter Defendants in failing to properly conduct due diligence to discover the material misrepresentations and omissions in the Registration Statement.

**9F's Business Model**

47. 9F is an online lending intermediary platform in China that enables people to borrow loans on its platform. The loans issued to borrowers on 9F's platform are funded by two sources: (1) funds that 9F receives from individual investors who purchase investment products sold by 9F on its platform; and (2) funds provided by 9F's "institutional funding partners" – which are small and medium sized banks – directly through 9F's "direct lending program." 9F charges loan facilitation service fees for facilitating loans between borrowers and lenders (*i.e.* individual investors and institutional funding partners). In 2018 and the first five

months of 2019, loan facilitation service fees accounted for 89% and 84% of the Company's respective net revenues.

48.     According to the Registration Statement, the borrowing costs payable by borrowers regarding loans in the direct lending program are: (1) interest to institutional funding partners; (2) prepayment fees and penalty fees to institutional funding partners; and (3) service fees to 9F before April 2019, or insurance premiums to the insurer after April 2019.[4]

49.     Since its inception, 9F's direct lending program grew rapidly and had become its main source of funding to loans offered to borrowers immediately before its IPO.  For the three months ended June 30, 2019, the completed quarter immediately before 9F's IPO, loan origination volume in the direct lending program was RMB5.7 billion, representing 58% of 9F's total loan origination volume for that quarter.[5]  As of June 30, 2019, 9F's institutional funding partners had approved the funding limit in the aggregate amount of over RMB70 billion (US$10.4 billion).

———————————————

[4] As to loans funded by individual investors, the borrowing costs payable by borrowers are: (1) interest to investors; (2) service fees to 9F for its loan facilitation services and post-origination services; (3) post-loan service fees to third party collection companies for loan collection services and arbitration services; and (4) insurance premiums to an insurance company or money contribution to the depository account.

[5] The Registration Statement defines "loan origination volume" as the total amount of loans originated to 9F's borrowers during a given period, regardless of the funding sources.  Loan origination volume for loans funded by institutional funding

**Increasing Regulatory Restrictions Forced 9F to Abandon its Previous Service Fee Practice**

50.    Before April 2019, for each loan referred by 9F to its institutional funding partners in the direct lending program, 9F directly charged the borrower a service fee.  As of March 31, 2019, the outstanding loan balance that 9F had facilitated prior to the promulgation of the below-mentioned Circular 141 (with the aggregated interest and all fees exceeding 36%) was RMB6.3 billion, accounting for 11.4% of the total outstanding loans that 9F had facilitated on its platform.

51.    But with China increasing its regulation on lending intermediary service providers to crack down on usury loans and protect borrowers, 9F was forced to abandon this lucrative business model.

52.    In August 2015, the Supreme People's Court of China, the highest court in China, issued the *Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases* ("2015 Judicial Provisions") providing that the aggregate rate of borrowing cost per year, including annual interest and all fees, shall not exceed 36% of the loan principal.

---

partners, regardless of the nature of loan products, are counted towards loan origination volume under 9F's direct lending program.

53.     In December 2017, China promulgated *the Notice on Rectification of Cash Loan Businesses* promulgated at the end of 2017 (the "Circular 141"), which, among other things, required online lending information intermediaries, such as 9F, to abide by the 2015 Judicial Provisions and prohibited them from facilitating any loans whose applicable borrowing costs per annum (*i.e.*, the interest and fees) would exceed 36% of the loan principal.

54.     In October 2018, the National Internet Finance Association of China, a regulatory agency that governed online lending information intermediaries, such as 9F, required that any and all fees and interest charged to a borrower who borrows a loan from an online lending intermediary platform (including interest payable to investors, service fees charged by online lending information intermediaries for their loan facilitation services and post-origination services, post-loan service fees payable to third party collection companies for loan collection and arbitration services, prepayment fees and penalty fees) shall be taken into account when calculating the applicable borrowing cost per annum, or APR.

55.     Additionally, on April 2, 2019, the Beijing Internet Finance Association, a regulatory agency that governs online lending information intermediaries based in Beijing (such as 9F), issued the Notice on Strengthening Business Standards and Risk Prevention by Loan Facilitation Institutions (the "2019

Notice"), prohibiting, among other things, loan facilitation service providers, such as 9F, from collecting any interests or fees from borrowers.

56.     The ban on collecting any fees from borrowers and the 36% fee ceiling significantly impacted 9F's business and completely impaired one of 9F's most important sources of revenue that represented over half of 9F's business.

57.     9F was now forced to seek another method to maintain this significant revenue stream.  It turned to PICC.

**9F Partnered with PICC**

58.     9F started to work with PICC in March 2018.  Initially, PICC had been providing third-party insurance protection to individual investors in the non-direct lending program since May 2018.

59.     In 2019, faced with "the continuing challenging regulatory environment," 9F was in desperate need of a new model to survive.  As a result, PICC and 9F struck a deal.  On the surface, it appeared that 9F and PICC entered into a normal cooperation agreement, according to which, as disclosed in the Registration Statement, PICC provided credit insurance to institutional funding partners in 9F's direct lending program to "strengthen[] the credibility of [9F's] platform" and to "expand its institutional funding partner base and promote the rapid development of [the] direct lending program."  The Registration Statement stated

that at the time a loan was issued to a borrower, the borrower would pay an insurance premium to PICC for providing the insurance protection.

60.    Unknown to the market, however, the cooperation agreement enabled 9F to use PICC as a conduit to continue funneling service fees from borrowers. According to the secret arrangement between 9F and PICC, PICC charged borrowers, as part of PICC's insurance premiums, loan facilitation service fees that 9F had previously directly charged borrowers before April 2019.  PICC then remitted the loan facilitation service fees back to 9F.  In this arrangement, PICC ignored its role and duties as an insurer under the Chinese law requiring an insurer to independently determine the insurance rate that an insurance policyholder should pay on an individual basis.[6]  Instead, PICC allowed 9F to unilaterally determine which borrowers should buy PICC insurance policies and how much insurance premium a borrower should pay to PICC.  As described below, 9F deducted the insurance premiums from the borrower's account for PICC within seconds of the

---

[6] For example, according to the *Measures for the Administration of Insurance Clauses and Premium Rates of Property Insurance Companies* issued by the China Banking and Insurance Regulatory Commission ("CBIRC") in 2010, an insurance company should file with the CBIRC its insurance premium rates for approval and record and calculate each individual policyholder's insurance premium in accordance with the approved insurance premium rates; an insurance company shall not change the pre-approved insurance premium rate. Arts. 14, 27, 29.

issuance of a loan principal to the borrower.[7]  Then the majority of the allegedly "insurance premiums" went from PICC's account back to 9F.  As stated below, the insurance premiums set by 9F for borrowers to pay PICC ranged from 50-100% of loan principals, and approximately 95% of the purported insurance premiums were returned by PICC to 9F.[8]

61.    In this way, at the time of the IPO, 9F successfully circumvented the regulatory bans on collecting any fees directly from borrowers and continued to collect fees through PICC as a conduit. Furthermore, as stated below, with the collaboration with PICC, 9F was still collecting fees that constituted more than 36% of loan principal at the time of the IPO.

**Contrary To Its Representation In The Registration Statement, with the Cooperation with PICC, 9F Collected Fees of More Than 36% At The Time Of The IPO**

62.    As stated above, in accordance with the National Internet Finance Association of China, 9F should have included any and all fees and interest that a

---

[7]

http://m.caijing.com.cn/api/show?contentid=4644856,%20last%20viewed%20on %20January%203,%202022, last reviewed on February 1, 2023.

[8] https://www.cs.com.cn/jg/05/202006/t20200618_6068596.html, last viewed on February 1, 2023.

borrower paid when calculating the annual percentage rate, or APR, of the loan issued to the borrower.  Indeed, 9F's Registration Statement represented that:

> We calculate APR for loans we facilitate to borrowers under our direct lending program by reference to the explanation of the National Internet Finance Association of China referred to above, and interest payable to institutional funding partners, service fees charged by us until April 2019 and prepayment fees and penalty fees are presented in the form of APR for loans we facilitate to borrowers under our direct lending program. As of the date of this prospectus, we ***do not have any*** outstanding loan balance that we have facilitated since the promulgation of Circular 141 ***with an APR of higher than 36%, even inclusive of any additional fees incurred by borrowers*** in relation to third-party insurance and guarantee protection, ***such as insurance premiums to the insurer***, money contributions to the depository account and guarantee fee to the guarantee company.

> (Emphasis added)

63.    However, these representations were false and misleading when made. At the time of the IPO, 9F facilitated many loans with total fees and interest exceeding 36% of the loan principal.

64.    A search of 9F's Chinese company name on Sina Black Cat revealed that 9F borrowers filed 70,026 complaints against 9F regarding its questionable practices, including the prohibitively high fees that 9F forcibly and secretly charged.[9]  A search of the term "9F Usury" on Sina Black Cat revealed 10,345

---

[9] Sina Black Cat is an online consumer complaint platform, in collaboration with many Chinese governmental agencies, which allows Chinese consumers to file their

complaints filed against 9F.  A search of "9F beheading interest" on Sina Black Cat revealed 8,256 complaints filed against 9F.[10]  Complaints on 9F's "beheading interest" reveal that in 2019, 9F secretly charged large amounts of insurance premiums from loan principals without informing borrowers in advance or even afterwards.  Additionally, borrowers were not allowed to cancel the insurance policies 9F purchased for them or to request refunds.  Indeed, tens of thousands of borrowers complained that premiums and interest on the premiums usually accounted for 50-100% of the loan principal they received and were illegal usury.

65.    For example, Ms. Xiaolin Liu states that on July 18, 2019, she applied for a RMB 20,000 loan with a repayment term of 24 months on 9F's platform (less than one month before 9F's IPO) and got approved.[11]  She was required to pay a RMB 1,435.11 installment every month for 24 months.  The borrowing cost for Ms.

---

complaints on product and service problems publicly online and coordinate with product or service providers to resolve complained issues. Sina Black Cat has been widely used by Chinese consumers and received over 9 million authenticated complaints as of 2022. Chinese mainstream media also frequently rely on complaints filed on the Sina Black Cat platform to report on consumer right violations. To publish a complaint on Sina Black Cat, a consumer must provide evidentiary records to support his complaint.

[10] "Beheading interest" is a term commonly used in China referring to prohibitively high interest rate or usury.

[11] https://tousu.sina.com.cn/complaint/view/17351724422/, last viewed February 1, 2023.

Liu was 72.2% of her RMB 20,000 loan principal. **The APR[12] Ms. Liu had to pay is 36.1%** [i.e., ((1,435.11 * 24 – 20,000)/20,000)/(365*2)*365*100], exceeding the legally allowed 36% APR ceiling:



---

**[12]** See "*How to Calculate APR on Money You Borrow*", available at https://www.capitalone.com/learn-grow/money-management/how-to-calculate-apr-on-credit-card/, last viewed February 1, 2023.

66.    Ms. Liu states that because she only received RMB 20,000, the exact amount she had requested, at her disposal, she had never suspected something was wrong with her loan until she later realized she had been paying larger installments than she thought she would have to pay.  Ms. Liu later learned that 9F issued an extra RMB11,100 loan, without her knowledge, to her account in addition to the RMB 20,000 loan she explicitly requested, and immediately removed the RMB11,100 from her account to buy a PICC policy.  In other words, 9F made her borrow, without her knowledge or consent, RMB 11,000 to pay the insurance premium (and, as stated below, pay banned service fees to 9F).  When Ms. Liu contacted 9F, 9F rejected Ms. Liu's demand to cancel the insurance policy or to return the insurance premium balance. Ms. Liu now must repay the additional RMB 11,100 loan/insurance premium and the interest levied on it as part of her repayment obligation.  The account record shows that Ms. Liu borrowed this loan from Jincheng Bank in 9F's direct lending program.[13]

_____

[13] According to the Registration Statement, 9F counted all loans funded by its institutional funding partners (*i.e.*, banks) as 9F's direct lending program, regardless of the nature of the loan products funded by the banks.  *See* Registration Statement at 15, "Loan origination volume for loans funded by institutional funding partners, regardless of its nature of revolving or non-revolving loans, are counted towards loan origination volume under our direct lending program."



67.    The insurance policy that Ms. Liu later obtained shows PICC as the insurer, policy No. PBAH20194406Q500H67008, Ms. Liu the policy holder, the insured Tianjing Jincheng Bank, the issuance date July 18, 2019, the covered loan principal RMB 31,100 (including RMB 20,000 Ms. Liu explicitly applied for and RMB 11,100 that 9F made her borrow without her knowledge or consent), and the covered interest RMB 3342.62 (including the interest Ms. Liu had to pay on the RMB 11,100 policy that 9F secretly purchased for her).

68.   The records that Mr. Kai Xu – another borrower who filed a complaint against 9F on Sina Black Cat – show the tactics that 9F employed for secretly lending borrowers additional money which 9F subsequently used to purchase insurance policies for borrowers without their knowledge or consent.[14]  On August 5, 2019,

---

[14] https://tousu.sina.com.cn/complaint/view/17353758383/, last viewed February 1, 2023.

Mr. Xu applied for a RMB 5,000 loan with a three-year term on the 9F platform and got approved.  Mr. Xu's bank account received RMB 5,000.  After a long while, when he reviewed the detailed transaction records, Mr. Xu saw, to his surprise, that 9F had secretly issued a RMB7,890 loan, not RMB 5,000 he had explicitly requested, through an "online lending new asset loan issuance transitioning account" on August 5, 2019, at 14:48:51.  Four seconds later at 14:48:55, 9F removed RMB 2,890 from Mr. Xu's account to PICC's account.  The main page of Mr. Xu's 9F app shows that he indeed borrowed RMB 5,000.  But when he clicked the RMB 5,000 loan entry to go in for details, the loan details page showed that 9F actually issued RMB7,890 to his account and immediately used RMB 2,890 of the issued RMB7,890 to buy a PICC policy.  Mr. Xu's 9F app record showed that Ningxia Yellow River Agriculture Commercial Bank funded the entire RMB 7,890 in 9F's direct lending program.  Based on Mr. Xu's monthly installment of RMB 336, the borrowing cost was RMB 7,096, an astonishing **1.42 times** his RMB 5,000 loan principal.  **His APR was 47%** [*i.e.*, (336*36-5,000)/5,000/(365*3))*365*100], well exceeding the 36% APR ceiling.









69.    Mr. Xu stated that when Sina Black Cat connected Mr. Xu with 9F, 9F insisted that Mr. Xu had a duty to pay the insurance premium.  The comments that 9F made on Mr. Xu's complaint page at the Sina Black Cat website also show 9F's refusal to return the insurance premium:

> The relevant staff of our company have provided the final solution to the problem you had encountered. At present, our company cannot meet your request. If you have other questions, please call the customer

service hotline 400-810-1555 for consultation.[15] Thank you for your understanding and support, thanks!

Sina Black Cat notes immediately below 9F's above comment that "the above content was filled out and submitted by the company."

70.    Mr. Jiaxu Xiong stated that he borrowed a RMB 4,900 loan with the 12 month loan term from the 9F's platform on May 25, 2019.[16]  According to the insurance policy issued by PICC, Mr. Xiong's insurance premium was RMB882 and the funding institution was Tianjing Jincheng Bank.  Mr. Xiong stated that he repaid the total of RMB6443.67 and RMB882 to pay off this RMB4900 loan.  **The APR for this loan is 49.5%,** well exceeding the 36% APR ceiling.

---

[15] 400-810-1555 is 9F's customer service number published at 9F's website. *See* https://wanka.9fbank.com/actives/pc-register1.html, last viewed February 1, 2023.
[16] https://tousu.sina.com.cn/complaint/view/17361577205/, last viewed February 1, 2023.

71.    Mr. Xiong also stated that he borrowed another RMB 5,000 loan with the 12-month loan term from 9F's platform on the same day, May 25, 2019.[17] According to the insurance policy issued by PICC, Mr. Xiong's insurance premium for this RMB5,000 loan was RMB1,274.5 and the funding institution was Tianjing

---

[17] https://tousu.sina.com.cn/complaint/view/17361577205/, last viewed February 1, 2023. Mr. Xiong's ID card number was redacted herein to protect his privacy.

Jincheng Bank. Mr. Xiong stated that he repaid the total of RMB6796.45 and RMB1,274.5 to pay off the RMB5,000 loan. **The APR for this loan is 61.4%,** well exceeding the 36% APR ceiling.



72.     These complaints and supporting records are merely a few examples from the tens of thousands of instances in which 9F illegally charged exorbitant fees and interest well exceeding 36% of loan principals.  When limiting the search of 9F

usury to 2019 (the year when 9F conducted the IPO) on Sina Black Cat, such search still yields 5,962 results.  It shows that at the time of the IPO, contrary to 9F's representation that "as of the date of this prospectus, we do not have any outstanding loan balance that we have facilitated since the promulgation of Circular 141 with an APR of higher than 36%, even inclusive of any additional fees incurred by borrowers," 9F still routinely had loan balances that it facilitated with APRs higher than 36%.

**The Registration Statement Failed To Disclose That 9F Received Loan Facilitation Service Fees From PICC**

73.    With the secret arrangement with PICC, since April 2019, 9F was able to maintain its revenue source in the direct lending program by routing service fees in the name of insurance premiums from borrowers' account to PICC and having PICC remit the fees back to 9F.

74.    But ***the Registration Statement did not mention that 9F charged loan facilitation service fees from PICC***, despite its disclosure that 9F "cooperate[d] with PICC to provide credit insurance to institutional funding partners under our direct lending program."

75.    The Registration Statement stated that 9F charged loan facilitation service fees in the direct lending program "to borrowers with whom we have stopped charging service fees since April 2019 or financial **institutional** partners in relation

to the services we provide such as traffic referral services and credit assessment." But the Registration Statement did not define "financial **institutional** partners." Neither did the Registration Statement refer to PICC as a financial institutional partner.

76.     Rather, considering the context of the Registration Statement, investors can **only** reasonably infer that the "financial institutional partners" **only** were "institutional funding partners", *i.e.* banks—and did **not** include insurance companies—because only banks entered "loan agreements" with borrowers, and only banks issued loans to borrowers. *See e.g.,* Registration Statement at 153 (Through our direct lending program, we provide traffic referral services to financial institutional partners, allowing the financial institutional partners to gain access to borrowers who passed our risk assessment. Our services provided consist of: a) Matching financial institutional partners to potential qualified borrowers, and *facilitating the execution of loan agreements between the parties* (also referred to as "loan facilitation service"); and b) Providing repayment processing services *for the financial institutional partners and borrowers over the loan term*, including repayment reminders and loan collection (also referred to as "post origination services"); *see also e.g.,* Registration Statement at 153 ("Revenues from loan facilitation services are recognized at the time *a loan is originated between the financial institutional partners and the borrowers* and the principal loan balance is

38

transferred to the borrowers, at which time the facilitation service is considered completed.)

77.    By contrast, "financial **institution** partners" was an explicitly defined term and the Registration Statement described PICC as a member of 9F's financial **institution** partners. *See* Registration Statement at 14-15 "Conventions that Apply to this Prospectus" ("[F]inancial institution partners" are to financial institutions that provide insurance and guarantee protection to our investors and institutional funding partners, as well as the institutional funding partners."); *see also* Registration Statement at 120 ("We partner with financial **institution** partners such as China Taiping and **PICC** to provide third-party insurance protection to investors that invest in loans we facilitate.").[18]

78.    Although the Registration Statement specifically stated that 9F provided traffic referral services and credit assessment services to its ***institutional*** funding partners, *i.e.*, banks, the Registration Statement never mentioned that 9F

---

[18] *See also* Registration Statement at 2-3 ("Our ecosystem brings together borrowers, investors, financial institution partners and merchant partners, each of whom contribute to, and benefit from the connectivity we provide as follows: ….
**Financial institution partners.** … We also cooperate with other financial institutions, including insurance companies and a third-party guarantee company to provide insurance and guarantee protection to our investors….")

provided traffic referral services and credit assessment services to financial institution partners, insurance companies or, in this case, specifically to PICC.[19]

79.    Therefore, reasonable investors would not have discovered that 9F provided either traffic referral services or credit assessment services to PICC. Additionally, reasonable investors would not have discovered the existence of an arrangement pursuant to which PICC would pay 9F service fees from the insurance premiums PICC collected from borrowers.

80.    Furthermore, reasonable investors would not have discovered that 9F unilaterally and completely controlled the credit insurance that PICC provided in the direct lending program.  A search on Sina Black Cat regarding 9F One Card and PICC reveals that at least 2,228 borrowers on 9F's platform reported the same failure to disclose as Ms. Liu and Mr. Xu described above.   Thus, 9F ensured that PICC was paid from every loan that 9F directed to PICC.

81.    A penalty notice issued by China Banking and Insurance Regulatory Commission regarding PICC's violations in its partnership with 9F reveals that 9F,

─────────────────────

[19] *See* Registration Statement at 35 ("In addition to our Online Lending Information Intermediary Services, we also provide traffic referral services to **institutional funding partners**, and in most cases, in collaboration with an insurance company under our direct lending program allowing the institutional funding partners to access borrowers who have passed our risk assessment, under which the insurance company, when it is engaged, provides credit insurances to the institutional funding partners.")

not PICC, was in complete control of PICC's issuing insurance policies to borrowers on 9F's platform.   The penalty notice entitled "Notice of the Consumer Rights Protection Bureau of the China Banking and Insurance Regulatory Commission on PICC's Infringement on Consumer Rights and Interests" (Yin Bao Jian Xiao Bao Fa [2021] No. 1), issued on January 6, 2021, reveals that in the arrangement between 9F and PICC, PICC ignored its role and duties as an insurer under the Chinese law requiring an insurer to independently determine the insurance rate on a case-by-case basis and failed to charge premiums according to the rates pre-approved by the Commission.[20]  Instead, 9F unilaterally and completely controlled and determined which borrowers should buy PICC insurance policies and how much insurance premium a borrower should pay to PICC.[21]  According to the penalty notice, PICC

---

[20] According to the *Measures for the Administration of Insurance Clauses and Premium Rates of Property Insurance Companies* issued by the China Banking and Insurance Regulatory Commission ("CBIRC") in 2010, an insurance company should file with the CBIRC its insurance premium rates for approval and records and calculate each individual policyholder's insurance premium in accordance with the approved insurance premium rates; an insurance company shall not change the pre-approved insurance premium rate. Arts. 14, 27, 29.

[21]   https://news.cnstock.com/news,bwkx-202101-4640974.htm, last viewed on February 1, 2023; https://finance.caixin.com/2021-01-06/101647196.html, last viewed on February 1, 2023; https://m.thepaper.cn/yidian_promDetail.jsp?contid=10682964&from=yidian, last viewed on February 1, 2023.

issued over seven million insurance policies to 9F's borrowers from March 2018 to December 2019.

82.    9F Former Employee 1 ("FE 1") confirms that neither 9F nor PICC informed borrowers that PICC collected loan facilitation service fees, disguised as insurance premiums, from borrowers for 9F.  FE1 worked as a Finance Manager at Jiufu Shuke Technology Group Co., Ltd. ("Jiufu Shuke") – the primary operating subsidiary of 9F – from March 2019 to May 2020.  His main job responsibilities included: (1) adjusting the differences between the Company's Chinese and U.S. financial statements in accordance with U.S. Generally Accepted Accounting principles ("GAAP"); (2) preparing monthly, quarterly, and annual financial statements for the purposes of filing with the SEC; and (3) conducting financial analysis, accounting, tax planning, year-end auditing.  According to FE 1, borrowers on 9F's platform were not aware that 9F received service fees from the insurance company because it was not specified in the insurance contracts into which borrowers entered.  FE 1 stated that "on the surface of [9F's] financial statements, it is claimed that PICC was obligated to pay service fees to 9F pursuant to the agreement.  But in fact, 9F gave such funds to PICC.  This was just a *formality*. PICC should return such funds to 9F."  FE1's statements are consistent with the fact that 9F was in control of deciding which borrowers should pay how much insurance

premiums and transferring such funds to PICC directly from borrowers' accounts on 9F's platform.

83.    Defendants' omissions constituted material information to the investing public at the time of the IPO because as disclosed in the Registration Statement, at the time IPO, China had imposed bans on collecting fees from borrowers and over 36% APR.  Due to the secret arrangement with PICC, at the time of the IPO, 9F was faced with the material risk that PICC would claim that the arrangement was invalid because 9F used PICC as a conduit to circumvent regulatory bans, and that therefore, PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all funds as purely insurance premiums.

**The Undisclosed Risks Quickly Materialized, Damaging Investors**

84.    With the Registration Statement omitting material information and risks, 9F proceeded with its IPO.  On or about July 25, 2019, 9F filed with the SEC a registration statement on Form F-1, which in combination with subsequent amendments on Forms F-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO.  The F-1 was signed by the Offering Defendants.  On August 14, 2019, 9F filed its final amendment to the Registration Statement with the SEC on Form F-1/A.  The SEC declared the Registration Statement effective after the close of trading that same day.

This F-1/A was signed by the Offering Defendants.[22]  On August 15, 2019, 9F filed its prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement.  In the IPO, 9F sold 8.9 million ADSs (including the full exercise of the Underwriter Defendants' over-allotment option), generating approximately $84.55 million in proceeds from the offering (before costs and expenses).

85.    In its Registration Statement, 9F described PICC as a key member to 9F's "upgraded" direct lending program, *i.e.* a tri-party cooperation model between 9F, PICC, and institutional funding partners, "helping us to expand our institutional funding partner base and promote the rapid development of our direct lending program, which may ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business."

86.    The Registration Statement, however, did not disclose that: (1) at the time of the IPO, with the partnership with PICC, borrowing costs for borrowers on

---

[22] The Registration Statement warned that "you [as an investor] should rely only on the information contained in this prospectus or in any related free writing prospectus.  We have not authorized anyone to provide you with information different from that contained in this prospectus or in any related free writing prospectus.  We are offering to sell, and seeking offers to buy the ADSs, only in jurisdictions where offers and sales are permitted.  The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or any sale of the ADSs."

9F's platform frequently exceeded the 36% APR ceiling, contrary to 9F's own representations; (2) a secret arrangement existed pursuant to which PICC would pay 9F service fees from the insurance premiums PICC collected from borrowers; (3) due to the arrangement with PICC, at the time of the IPO, 9F was facing a material risk that PICC would claim that the arrangement (according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance regulations) was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36% in fees and interest; and (4) therefore, at the time of the IPO, there was a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all funds as purely insurance premiums.

87.    The risks quickly materialized.  On June 12, 2020, 9F issued the June 12, 2020 6K that disclosed that 9F and PICC filed lawsuits against each other regarding the RMB 2.2 billion (US$350 million) service fees that PICC refused to pay 9F.  Specifically, the June 12, 2020 6K stated that "***PICC filed a civil lawsuit*** (the "PICC Initiated Legal Action") against Jiufu Shuke and Beijing Jiufu Lianyin Technology Co., Ltd., a wholly owned subsidiary of 9F (the "Jiufu Lianyin"), at a local court in Guangzhou (the "Guangzhou Local Court") ***claiming that the second amendment under the Cooperation Agreement is invalid***." (emphasis added).  The

June 12, 2020 Form 6K did not disclose that such service fees were, in fact, loan facilitation service fees that 9F funneled through PICC to bypass legal restrictions.[23]

88.    Additionally, Chinese courts are authorized to exercise discretion to deem a contract to be unenforceable because it is illegal.  Based upon the principle of autonomy of the parties, a Chinese court is generally limited to decide a dispute based upon the plaintiff's request.  This principle, however, is not absolute.  Indeed, Chinese law (including, but not limited to, Articles 115, 211, and 219 of Civil Procedure Law of the People's Republic of China (Amended 2023)) requires that the exercise of such autonomy power by the parties must not violate legally prohibited provisions, nor should it harm the public interest or the legitimate interests of other citizens.  Currently, in judicial practice in China, the principle of autonomy power mainly applies to private interest litigation.  If the original trial judgment violates legally prohibited provisions or infringes upon public interest, the People's Court can also conduct a review.  Thus, the court in the matter involving PICC and 9F has the discretion to rule that the cooperation agreement is illegal and therefore unenforceable.

---

[23]   It is Plaintiffs' understanding that China prohibits non-parties from obtaining or reviewing case records or filings without the consent of the parties involved and that such records and filings are not in the public domain.

89.    On June 24, 2020, the Company's 2019 20F revealed for the first time the illegal nature of 9F's partnership with PICC.  9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "***PICC collected all of the loan facilitation service fees***" (not insurance premiums) from borrowers and "***remitted*** [9F's] portion of the service fees to [9F]." 9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to borrowers, the Company started to charge service fees "***indirectly through*** … insurance company."

90.    On June 18, 2020, The China Securities Journal[24] published a news article entitled "*The Drawer Agreement Pierced A "Big Hole"*"; *The Lawsuits Between PICC And Jiufu Highlight The Predicament Of Credit Insurance*," revealing the details of the secret agreement between 9F and PICC on allocation of the purported "insurance premiums" that PICC charged borrowers.[25] A senior expert in the Chinese peer-to-peer lending intermediary industry told The China Securities Journal that when the loan principal was issued to a 9F borrower's account,

---

[24] The China Securities Journal is a national securities newspaper in China owned by Chinese central government and is one of the most important publications in the financial field.

[25] https://www.cs.com.cn/jg/05/202006/t20200618_6068596.html, last viewed on February 1, 2023.

insurance premiums ranging from a few hundred RMBs to a few thousand RMBs were "transferred within seconds" to PICC from the borrower's account to "automatically be used for purchasing PICC's performance insurance."  PICC kept 5% of the insurance premiums, while the remaining 95% would "make a twirl" in PICC's account and would be transferred to 9F.  The expert said that borrowers probably did not know about the "drawer agreement", *i.e.*, the secret fee allocation arrangement, between PICC and 9F.

91.    Since the exposure of PICC's refusal to remit 9F's RMB 2.2 billion service fees and the illegal nature of the collaboration between 9F and PICC, the price of 9F ADSs has plummeted in value.  As of the filing of the initial complaint, 9F ADSs were 85% below the IPO price.

## Defendants Had an Affirmative Obligation to Disclose Material Risks And Uncertainties Under SEC Regulations

92.    Provisions of SEC Regulation S-K govern the duty of affirmative disclosure imposed upon filers of various reports under the Securities Act and the Exchange Act. In connection with the IPO, these regulations imposed on each Defendant the duty to disclose in the Registration Statement Defendants' failure to take measures to heighten personal information protection and its associated imminent and known material risk.

17 C.F.R. §229.105 – Item 105 (Risk Factors) [26]

93.    Issuers are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105.[27] The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id*. Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the **registrant** or offering speculative or risky." *Id*.

94.    At the time of the IPO, with the partnership with PICC, borrowing costs for borrowers on 9F's platform frequently exceeded the 36% APR ceiling, contrary to 9F's own representations. The secret arrangement between 9F and PICC allowed 9F to continue collecting service fees from borrowers through PICC as a conduit. Such an arrangement with PICC subjected 9F to a material risk that PICC would

---

[26] Item 105's requirements were previously set forth in 17 CFR §229.503 ("Item 503"). On April 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K.

[27] Item 105 was amended in October 2020, to expand the scope of required disclosure from "the most significant factors" to "material factors." The purpose of the revision was to "focus registrants on disclosing the risks to which reasonable investors would ***attach importance in making investment or voting decisions***." *See* 85 F.R. 63761, 63744-45 (Oct. 8, 2020).

claim that the arrangement (according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance regulations) was invalid. Therefore, at the time of the IPO, 9F was subject to a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all such funds as purely insurance premiums.

95.    Thus, Defendants had a duty to disclose their failure to comply with the regulatory authorities' express order and the associate material under Item 105.

Form F-1 – Item 5(D) (Material Events and Uncertainties)

96.    SEC Regulation S-K (17 C.F.R. 229.10) provides that registration statements such as the one filed by 9F on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." Part I, Item 4(a) of Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

97.    Part I, Item 5(D) Form 20-F, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

98.    Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact on the company must be disclosed.

99.     Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K".[28]  And pursuant to Item 303, issuers must disclose actual and contemplated regulatory action or "changes in" the "regulatory environment[.]"  *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 nn.1, 27.

100.    Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results

---

[28] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303 …" FRM §9410.1.  FRM §9410.2 further provides: "The requirements of Item 5 of Form 20-F are as follows:  … d. Trend information – Item 5.D."

of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[29]

101.   Item 5(D) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

102.   Item 303 demands disclosure of known trends unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

1989 Interpretive Release, 1989 WL 1092885, at *6

---

[29] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

103.    Issuers must disclose regulatory actual or contemplated regulatory action, as shown by an example provided by the 1989 Interpretive Release:

> Facts: A registrant has been correctly designated a PRP by the EPA with respect to cleanup of hazardous waste at three sites. No statutory defenses are available. The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites. Other PRPs also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any. Management is unable to determine that a material effect on future financial condition or results of operations is not reasonably likely to occur.

> Based upon the facts of this hypothetical case, MD&A disclosure of the effects of the PRP status, quantified to the extent reasonably practicable, would be required. [Footnote omitted]. For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a PRP is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.

> *Id.* at *6.

104.    Issuers must disclose both: (a) known trends and uncertainties and (b) any potential material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6; *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

105.    As stated above, at the time of the IPO, with the partnership with PICC,

the borrowing cost for borrowers on 9F's platform frequently exceeded the 36% APR ceiling, contrary to 9F's own representations. The arrangement between 9F and PICC allowed 9F to continue collecting service fees from borrowers through PICC as a conduit and therefore subjected 9F to a material risk that PICC would claim that the arrangement was invalid. Thus, at the time of the IPO, 9F was subject to a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all funds as purely insurance premiums.

106. Accordingly, pursuant to Item 5(D), 9F had an affirmative duty to disclose such material risks in connection with the secret arrangement with PICC in the Registration Statement.

## DEFENDANTS' MATERIAL OMISSIONS
## IN THE REGISTRATION STATEMENT

107. The Registration Statement for the IPO was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding 9F's business, operations, and prospects.

108. **First**, the Registration Statement stated, in relevant part, that:

"We partner with financial institutions such as China Taiping and PICC to provide third-party insurance protection to investors that invest in loans we facilitate, which strengthens the credibility of our platform and further enlarges our investor base. PICC, when it is engaged under our direct lending program, also provides credit insurance to institutional funding partners, helping us to expand our institutional

funding partner base and promote the rapid development of our direct lending program, which may ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business."

* * *

"Loan facilitation services fees are the portion of service fees we charge to borrowers with whom we have stopped charging service fees since April 2019 or financial institutional partners in relation to the services we provide such as traffic referral services and credit assessment."

109.    The above statements were materially false and misleading because they implied that the full amounts that PICC charged borrowers were insurance premiums to be used for protecting loans and 9F did not charge PICC any service fees from PICC's insurance premiums.  In fact, 9F used PICC as a conduit to collect service fees from borrowers *indirectly and disguised as insurance premiums*.  The Registration Statement failed to disclose that: (1) the so called "strategic" partnership with PICC was illegal and subjected 9F to an imminent and material risk that due to the secret arrangement with PICC, at the time of the IPO, 9F was facing a material risk that PICC would claim that the secret arrangement was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%; and (2) as a result, at the time of the IPO, there was a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all funds as purely insurance premiums.

110.    **Second**, the Registration Statement also stated, in relevant part, that:

"As of the date of this prospectus, we **do not have** any outstanding loan balance that we have facilitated since the promulgation of Circular 141 with an APR of **higher than 36%, even inclusive of any additional fees incurred by borrowers** in relation to third-party insurance and guarantee protection**, such as insurance premiums to the insurer,** money contributions to the depository account and guarantee fee to the guarantee company….We may continue to facilitate loans at or above the APR of 24% but no more than 36%.

(Emphasis added.)

111. The above statements were materially false and misleading because they omitted to disclose that by means of a secret arrangement, 9F used PICC as a conduit to circumvent Chinese regulatory bans and the borrowing cost for borrowers on 9F's platform frequently exceeded the 36% APR ceiling. The Registration Statement failed to disclose that: (1) the secret arrangement with PICC had subjected 9F to an imminent and material risk that at the time of the IPO, 9F was facing a material risk that PICC would claim that the arrangement was invalid for the reasons specified above; and (2) as a result, at the time of the IPO, there was a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all funds as purely insurance premiums.

112. **Third**, failure to disclose the true nature of the arrangement with PICC in the Registration Statement also violated GAAP. GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

56

GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

113.    The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the U.S. Financial Accounting Standards Board ("FASB").  *See* Release Nos. 33-8221; 34-47743; IC-26028; FR-70.  The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1.  SEC and NASDAQ rules and regulations require that publicly traded companies such as 9F include financial statements that comply with GAAP in their annual and quarterly reports, as well as registration statements filed with the SEC.  *See* §13 of the Exchange Act; Regulation S-X.  SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing financial statements that conform to GAAP, as provided in the Public Company Accounting Oversight Board standards that govern financial statement auditors ("PCAOB Standards").

114.    ASC 606 requires 9F "to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. To achieve that

objective, an entity shall disclose qualitative and quantitative information about all of the following: a. Its contracts with customers…."  ASC 606-10-50-1.  9F "shall aggregate or disaggregate disclosures so that useful information is not obscured by either the inclusion of a large amount of insignificant detail or the aggregation of items that have substantially different characteristics."  ASC 606-10-50-2. Additionally, 9F "shall disclose all of the … amounts of …. revenue recognized from contracts with customers, which the entity shall disclose separately from its other sources of revenue."  ASC 606-10-50-4.  Furthermore, 9F "shall disaggregate revenue recognized from contracts with customers into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors."  ASC 606-10-50-5.  9F shall also disclose "the opening and closing balances of receivables from contracts with customers, if not otherwise separately presented or disclosed."  ASC 606-10-50-8. ASC 450-20 requires a loss contingency to be accrued by a charge to income if it is probable and estimable. ASC 450-20-25-2.  A disclosure is required if: (1) there has been a manifestation of an unaccreted claim; or (2) it is probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.  ASC 450-20-50-3.

115.   Accordingly, 9F should have separately disclosed in the Registration Statement, but failed to disclose, revenue recognized from its lending contracts with its borrowers that 9F indirectly collected through PICC.   ASC 606-10-50-4.

Additionally, 9F should have separately disclosed, but failed to disclose, the opening and closing balances of receivables from PICC because such receivables are loan facilitation service fees that 9F collected from its borrower through PICC. ASC 606-10-50-8. Such disclosures do not require subjective judgment because the timing and the amount of revenues to recognize are indisputable.

116. Furthermore, contingent liabilities apply to any financial reporting period when 9F was exposed to the risk that borrowers would assert claims that 9F improperly charged loan fees, either in violation of the law, or by deceiving borrowers into thinking they were paying insurance premiums which, unknown to them, included service fees. PICC started to charge 9F's borrowers for insurance premiums since May 2018, starting which time 9F was subject to the risk that borrowers would assert claims against 9F for its improper charges. Therefore, the Registration Statement should have disclosed 9F's contingent liability. ASC 450-20.

117. **Fourth**, the Registration Statement failed to disclose, pursuant to Items 105 and 303, that by means of the partnership with PICC, the borrowing cost for borrowers on 9F's platform frequently exceeded the 36% APR ceiling. The secret arrangement between 9F and PICC allowed 9F to continue collecting service fees from borrowers through PICC as a conduit. This arrangement with PICC subjected 9F to a material risk that PICC would claim that the secret arrangement (according to which 9F unilaterally and completely controlled PICC's insurance policy issuing

process in contravention of Chinese insurance regulations) was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%. Therefore, at the time of the IPO, 9F was subject to a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all such funds as purely insurance premiums. Accordingly, this secret arrangement with PICC which 9F failed to disclose to investors was reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition and also had rendered investment in 9F's ADSs speculative and risky.

## **THE UNDERWRITERS' VIOLATIONS OF THE SECURITIES ACT**

118. Each Underwriter Defendant is an investment banking firm whose activities include, *inter alia*, the underwriting of public offerings of securities.

119. In connection with the IPO, the Underwriter Defendants drafted and disseminated the Registration Statement and were collectively paid nearly $8 million in underwriting discounts and fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

120. In the Underwriting Agreement, attached to the Registration Statement, the non-lead underwriters gave the Lead Underwriters full legal authority to act on their behalf in connection with their underwriting of the IPO. In communications

with the SEC, Lead Underwriters stated that they were acting as representatives for all of the underwriters.  Thus, the actions of Lead Underwriters bound the non-lead underwriters in connection with the IPO.

121.   The Underwriter Defendants participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  The Underwriter Defendants' participation in, and their solicitation of offers in connection with, the IPO was motivated by their financial interests.  As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees.

122.   As underwriters, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

123.   The Underwriter Defendants also assisted 9F, the Individual Defendants, and Ming in planning the IPO.  They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.

During their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

124.   In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to 9F's management, directors, and lawyers to determine: (1) the strategy to best accomplish the IPO; (2) the terms of the IPO, including the price at which 9F's ADSs would be sold; (3) the language to be used in the Registration Statement; (4) what disclosures about 9F would be made in the Registration Statement; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and 9F's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of 9F's undisclosed then-existing problems and the Registration Statement's materially inaccurate, misleading, and incomplete statements and omissions as detailed herein.

125.   The Underwriter Defendants also demanded and obtained an agreement from 9F under which 9F agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

126.   The Underwriter Defendants caused the Registration Statement to be

filed with the SEC and declared effective in connection with the IPO, so that Defendants could offer to sell, and sell, 9F ADSs to Plaintiffs and the members of the Securities Act Class pursuant (or traceable) to the Registration Statement.

127. Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

128. Section 11 provides that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

129. In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers." As gatekeepers, underwriters must *independently* verify all material facts in offering documents, such as the Registration Statement. The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditor's opinion at face value. The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. To conduct proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of

the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

130.   It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

131.   It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for 9F's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

132.   Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors.  There is much literature that supports the premise of investment banks being gatekeepers.  For example, Goldman Sachs published the *Report of the Business Standards Committee*, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." *Id*. Goldman Sachs also

acknowledges its role as a gatekeeper stating: "[a]n underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*. at 14.

133. In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (Emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriters Defendants here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriters Defendants here had this role and duty in underwriting 9F's ADSs. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to

make full disclosure in the Prospectus.

134.   Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the Registration Statement and the Prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided.  If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing.  When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading.  This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

135.  The Underwriter Defendants failed to conduct a reasonable due diligence investigation with regard to 9F's IPO.  In particular, the Underwriters Defendants, had they performed adequate due diligence, would have discovered that (1) at the time of the IPO, with the partnership with PICC, the borrowing cost for borrowers on 9F's platform frequently exceeded the 36% APR ceiling, contrary to 9F's own representations; (2) a secret arrangement existed pursuant to which PICC would pay 9F service fees from the insurance premiums PICC collected from borrowers; (3) due to the secret arrangement with PICC, at the time of the IPO, 9F

was facing a material risk that PICC would claim that the secret arrangement—according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance regulations—was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%; and (4) therefore, at the time of the IPO, there was a material risk that PICC would seize all the funds that 9F transferred from borrowers to PICC, claiming all funds as purely insurance premiums.

136.   Accordingly, the Underwriter Defendants' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

## THE DIRECTORS' AND OFFICERS' DUE DILIGENCE OBLIGATIONS AND VIOLATIONS OF THE SECURITIES ACT

137.   The senior management of 9F, including the Individual Defendants, as executive officers and authorized representatives of 9F, participated in the solicitation and sale of 9F securities to investors in the IPO, motivated to serve their own and the Company's financial interests.

138.   The Individual Defendants, along with other 9F senior executives, attended investor roadshow presentations and met with investment analysts and large

investors in the weeks leading up to the IPO to persuade investors that 9F was a worthy investment and solicit investors to purchase 9F securities in the IPO, all to further the financial interests of 9F.  Each of the Individual Defendants:

a.      directly participated in the management of the Company;

b.      was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was privy to confidential proprietary information concerning the Company and its business and operations;

d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls; and/or

f.      approved or ratified these statements in violation of the federal securities laws.

139.   As directors and/or officers of 9F and as signatories to the Registration Statement, each of the Individual Defendants had a duty to conduct a thorough due diligence investigation of 9F's operations and ensure that all of the statements in the Registration Statement were true and not misleading in any respect.

140.   The Individual Defendants had the ability and duty to inquire into

financial information, including revenue sources and associated material risks to 9F's business and operation.  Given the strategic significance that 9F had given to PICC and the cooperation agreement with PICC, at least one 9F executive negotiated and signed off on the secret arrangement with PICC. Accordingly, the Individual Defendants were negligent for failing to inquire into the secret arrangement between PICC and 9F.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

141.   Plaintiffs bring this action as a class action on behalf of all those who purchased the Company's securities pursuant and/or traceable to the Registration Statement and/or during the Class Period ("Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

142.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

143.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

144.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

145.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws;

(b)    whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and to what extent the members of the Class have sustained damages and the proper measure of damages;

(c)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(d)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(g)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     to what extent the members of the Class have sustained damages and the proper measure of damages.

146.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### For Violations of Section 11 of the Securities Act
### Against All Defendants

147.   Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein.

148.   This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. For purposes of this Count, Plaintiffs expressly disclaim any allegations based upon fraud.  This cause of action does not sound in fraud.  Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This cause of action is based solely on strict liability as to 9F and negligence as to the remaining Defendants.  Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims.

149.   The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

150.   9F is the registrant and issuer of the ADSs offered pursuant to the Registration Statement. As such, 9F is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate. By virtue of the Registration Statement

72

containing material misstatements and omissions of material fact necessary to make the statements therein not false and misleading, 9F is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

151. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

152. The Individual Defendants each signed the Registration Statement and/or was a director of 9F at the time of the IPO. Each of the Individual Defendants caused the issuance of the Registration Statement. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

153. Defendant Cogency Global was 9F's Authorized U.S. Representative for the Offer. Defendant Cogency Global employed and directed Defendant Ming

who signed the Registration Statement.  Therefore, Cogency Global is responsible for Defendant Ming's violations of the Securities Act under principles of agency and *respondeat superior*.  As such, Defendant Cogency Global is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

154.    The Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, the Underwriter Defendants participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Registration Statement.  The Underwriter Defendants, as underwriters of the ADSs offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Underwriter Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading.  As such, the Underwriter Defendants are liable under Section 11 of the Securities Act to Plaintiffs and the Class.

155.   None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

156.   Each of the Defendants issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misstated and failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated Section 11 of the Securities Act.

157.   Plaintiffs acquired the Company's securities pursuant to the defective Registration Statement.  Plaintiffs and the Class have sustained damages.  The value of 9F ADSs have declined substantially subsequent to, and due to, violations by the Defendants.

158.   At the time of their purchases of 9F securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

159.   This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering.  It is therefore timely.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants, Ming, and Cogency Global**

160.   Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein.

161.   This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants, Ming, and Cogency Global.

162.   This cause of action does not sound in fraud.  Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This cause of action is based solely on strict liability as to 9F and negligence as to the remaining Defendants.  Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims.

163.   As alleged herein, each of the Defendants named in the cause of action committed primary violation of the Securities Act or are directly responsible and primarily liable for such violations, by committing conduct in contravention of Section 11 of the Securities Act or having responsibility for such conduct.

164. Defendant 9F controlled all of the Individual Defendants and Defendants Cogency Global and Ming. Cogency Global, through Defendant Ming, executed the Registration Statement on behalf of Defendant 9F at its direction, and committed primary violations of the Securities Act as a result.  Alternatively, because Defendant Ming possessed and exercised the authority to sign the Registration Statement and bind the Company accordingly, he had control over the Company in connection with the IPO.

165. The Individual Defendants each were control persons of 9F by virtue of their positions as directors and/or senior officers and/or major shareholders of the Company.  The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors and/or officers and/or major shareholders of 9F.  Alternatively, the Company controlled each of the Individual Defendants given the influence and control the Company possessed and exerted over each of the Individual Defendants.

166. Each of the Individual Defendants participated in the preparation and dissemination of the Registration Statement, signed or authorized the signing of the Registration Statement and otherwise participated in the process necessary to conduct the IPO.  Because of their positions of control and authority as senior officers and/or directors, major shareholders of the Company, and/or signers of the Registration Statement, each of the Individual Defendants, as well Defendants

Cogency Global and Ming, were able to, and did, control the contents of the Registration Statement, which contained materially untrue information or omitted material information required to be disclosed by rule or regulation to prevent the statements made therein from being misleading.

167.    As control persons, each of the Defendants named in the cause of action are liable jointly and severally with and to the same extent as the primary violators of Section 11 of the Securities Act whom they controlled.

168.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering.  It is therefore timely.

## SECURITIES EXCHANGE ACT CLAIMS

### Registration Statement

169.    Plaintiffs repeat and reallege each and every allegation set forth above in ¶¶107-117 regarding the materially misleading statements and omissions concerning the Registration Statement as if fully set forth herein.

### Post-IPO Materially False and Misleading Statements

170.    On June 12, 2020, 9F filed the June 12, 2020 6K disclosing its ongoing dispute with PICC.  According to 9F, the dispute involved RMB2.2 billion ($324.5 million) in unpaid service fees and RMB1.4 billion ($206.5 million) in service fees

that had previously been recorded as accounts receivable and which were then recognized as fully impaired, resulting in multiple legal actions in China. The June 12, 2020 6K is materially false and misleading because it failed to disclose the disputed service fees in the two lawsuits were, in fact, loan facilitation service fees that 9F collected from borrowers through PICC pursuant to a secret agreement between PICC and 9F to help 9F circumvent regulatory bans on collecting fees from borrowers that exceeded the 36% APR ceiling. The June 12, 2020 6K is materially false and misleading also because it failed to disclose that the lawsuits represented transpiration of the material risks that: (i) PICC would claim that the secret arrangement—according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance regulations—was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%; and (ii) therefore, PICC would seize all the funds that 9F transferred from borrower to PICC, claiming all funds as purely insurance premiums.

171. On June 15, 2020, 9F filed a Form NT 20-F with the SEC stating that the Company could not timely file its annual report because of its dispute with PICC. The Form NT 20-F is materially false and misleading because it failed to disclose that the disputed service fees in the two lawsuits were, in fact, loan facilitation service fees that 9F collected from borrowers through PICC pursuant to a secret

agreement between PICC and 9F to help 9F circumvent regulatory bans on collecting fees from borrowers that exceeded the 36% APR ceiling. The June 12, 2020 6K is materially false and misleading also because it failed to disclose that the lawsuits represented transpiration of the material risks that: (i) PICC would claim that the secret arrangement—according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance regulations—was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%; and (ii) therefore, PICC would seize all the funds that 9F transferred from borrower to PICC, claiming all funds as purely insurance premiums.

172.  On June 17, 2020, 9F issued a press release on a Form 6-K ("June 17, 2020 6K") which provided the Company's fourth quarter and full-year 2019 financial results and the financial consequences of the Company's dispute with PICC. The June 17, 2020 6K is materially false and misleading because it failed to disclose that the disputed service fees in the two lawsuits were, in fact, loan facilitation service fees that 9F collected from borrowers through PICC pursuant to a secret agreement between PICC and 9F to help 9F circumvent regulatory bans on collecting fees from borrowers that exceeded the 36% APR ceiling. The June 12, 2020 6K is materially false and misleading also because it failed to disclose that the lawsuits represented transpiration of the material risks that: (i) PICC would claim

that the secret arrangement—according to which 9F unilaterally and completely controlled PICC's insurance policy issuing process in contravention of Chinese insurance regulations—was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%; and (ii) therefore, PICC would seize all the funds that 9F transferred from borrower to PICC, claiming all funds as purely insurance premiums.

## THE TRUTH GRADUALLY EMERGED
## CAUSING PLAINTIFFS' LOSSES

173.    Soon after the IPO, several directors resigned from 9F's Board.  On October 10, 2019, Defendant Cheung resigned from 9F's Board purportedly for "personal reasons."  Defendant Xu resigned on January 20, 2020, also purportedly for personal reasons.  Defendants Zhang and Huang resigned on March 16 and March 27, 2020, respectfully, also purportedly for personal reasons.  Defendant Cui also subsequently resigned his directorship despite serving in the position for only approximately one year.

174.    On June 17, 2020, 9F issued the June 17, 2020 6K which provided the Company's fourth quarter and full-year 2019 financial results, which described the devastating financial consequences of the Company's dispute with PICC.  The June 17, 2020 6K disclosed for the first time that since November 2019, PICC had stopped providing insurance protections to 9F's new loans with terms of no more than 12

months.   The June 17, 2020 6K further disclosed for the first time that 9F had suspended its cooperation with PICC since December 2019.   9F's total net revenues decreased by 54.4% and 20.4% in the fourth quarter of 2019 and in full-year 2019 "primarily due to the decrease in loan facilitation services revenue."   Loan facilitation services revenue decreased by 90.5% and 29.9% in the fourth quarter of 2019 and in full-year 2019 "primarily because the loan facilitation services revenue under our direct lending program in the fourth quarter of 2019 was not recognized due to our dispute with PICC."

175.   On this news, shares of 9F fell $0.165 per ADS, or 2.7%, from its closing price on June 16, 2020 to close at $6.00 per ADS on June 17, 2020, damaging investors.

176.   As the result of failure to manage the material risks associated with the secret arrangement with PICC causing severe damages to 9F's businesses, on June 22, 2020, after the market closed, 9F issued a press release on Form 6-K ("June 22, 2020 6K"), announcing that Zengxiao Jin was removed from the chief risk officer position. Lei Liu, president of 9F directly assumed the role of chief risk officer.

177.   On this news, shares of 9F fell $1.13 per ADS, or 18%, from its close on June 22, 2020, to close at $5.00 per ADS on June 23, 2020, further damaging investors.

178.   On June 24, 2020, the Company filed a 2019 20-F with the SEC, revealing for the first time the illegal nature of 9F's partnership with PICC. 9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "***PICC collected all of the loan facilitation service fees***" from borrowers and "***remitted*** [9F's] portion of the service fees to [9F]." 9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to the borrowers, the Company started to charge service fees "***indirectly through*** … insurance company."

179.   On this news, 9F's ADS price fell by $0.38 per ADS or 7.6% on June 24, 2019, and another $1.12 per ADS or 24% over the next three days.

180.   On September 29, 2020, after the market closed, 9F reported its first half 2020 financial results. 9F's financial performance continued drastically declining because 9F was no longer able to collect large amounts of loan facilitation fees from borrowers via a conduit like PICC. The Company's total net revenues plummeted 61% during the first half of 2020 as compared to the latter half of 2019.

181.   On this news, ADSs of 9F fell $0.20 per ADS, or 18%, to close at $0.91 per ADS on September 30, 2020, further damaging investors.

182.   Since the IPO, and as a result of the disclosure of material adverse facts and risks omitted from the Company's Registration Statement, 9F's stock price has significantly fallen below its IPO price, damaging Plaintiffs and Class members.

183.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

<u>**COUNT III**</u>
<u>**Violation of Section 10(b) of The Exchange Act and SEC Rule 10b-5**</u>
<u>**Against the Exchange Act Defendants**</u>

184.   Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

185.   9F is liable for the acts of Defendants Sun and Lin and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

186.   The scienter of Defendants Sun and Lin Defendants and other employees and agents of the Company is similarly imputed to 9F under *respondeat superior* and agency principles.

## Applicability of Presumption of Reliance:
### *Affiliated Ute*

187.    The statements made by the Exchange Act Defendants during the Class Period were misleading for omitting to disclose information as alleged above which rendered statements in the Registration Statement and subsequent SEC filings misleading.

188.    Neither Plaintiffs nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972).  All that is necessary is that the facts that 9F withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## Application of Presumption of Reliance:
### *Fraud on the Market*

189.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) the Exchange Act Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being

misleading during the Class Period; (b) the omissions were material; (c) 9F ADSs were traded in efficient markets during the Class Period.

190.    9F's ADSs were traded in efficient markets during the Class Period for the following reasons: (i) the ADSs were traded on NASDAQ; (ii) on average shares representing more than 2.0% of the securities' float were traded weekly during the Class Period; (iii) during the Class Period, 9F was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available; (iv) 9F met the criteria for eligibility to file a Registration Statement during the Class Period; (v) 9F could timely file all required annual, quarterly and material event reports with the SEC during the Class Period; (vi) 9F regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vii) the price of 9F ADSs responded quickly to incorporate and reflect new public information concerning 9F during the Class Period; (viii) numerous market makers made a market in 9F ADSs during the Class Period.

191.    During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly

86

or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class. The Exchange Act Defendants also made various untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of 9F ADSs; and (iii) cause Plaintiffs and other members of the Class to purchase 9F ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

192.    Pursuant to the above plan, scheme, conspiracy and course of conduct, the Exchange Act Defendants each participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for 9F ADSs.  Such reports, filings, releases and statements were materially false

and misleading in that they failed to disclose material adverse information and misrepresented the truth about 9F's finances and business prospects.

193.   By virtue of their positions at 9F, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

194.   Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard or the truth is peculiarly within the knowledge and control of the Exchange Act Defendants. As the senior managers and/or directors of 9F, Defendants Sun and Lin had knowledge of the details of 9F internal affairs.

195.   Defendants Sun and Lin are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority,

88

Defendants Sun and Lin were able to and did, directly or indirectly, control the content of the statements of 9F. As officers and/or directors of a publicly held company, Defendants Sun and Lin had a duty to disseminate timely, accurate, and truthful information with respect to 9F's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market prices of 9F securities were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning 9F's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased 9F ADSs at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants and were damaged thereby.

196.  During the Class Period, 9F ADSs were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased 9F securities at prices artificially inflated by the wrongful conduct of the Exchange Act Defendants. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have

purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of 9F ADSs was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of 9F securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

197.   By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

198.   As a direct and proximate result of the wrongful conduct of the Exchange Act Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT IV**
**Violation of Section 20(a) of The Exchange Act**
**Against Defendants Sun and Lin**

199.   Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein.

200.   During the Class Period, Defendants Sun and Lin participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their

senior positions, Defendants Sun and Lin knew the adverse non-public information regarding the Company's business practices.

201.   As officers and directors of a publicly owned company, Defendants Sun and Lin had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

202.   Because of their positions of control and authority as senior officers, Defendants Sun and Lin were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Defendants Sun and Lin exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Defendants Sun and Lin, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

203.   By reason of their senior management positions and/or being directors of the Company, Defendants Sun and Lin had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Defendants Sun and Lin exercised control over the general

operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.  Defendants Sun and Lin also had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.  Additionally, Defendants Sun and Lin had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

204.  By reason of the above conduct, Defendants Sun and Lin are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs, and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: December 23, 2024               Respectfully submitted,

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**

By:   _/s/ James E. Cecchi_
James E. Cecchi
Donald A. Ecklund
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994 -1700

*Liaison Counsel for Plaintiffs and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067

93

Telephone: (310) 201-9150

*Counsel for Plaintiffs and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*