# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRAIG J. HOLLAND, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> 9F INC., LEI SUN, YANJUN LIN, YIFAN REN, CHANGXING XIAO, FLYNN XUXIAN HUANG, IVAN XU, JUNSHENG ZHANG, WING HON CHEUNG, FANGXIONG GONG, DAVID CUI, LEI LIU, SIU FUNG MING, CREDIT SUISSE SECURITIES (USA) LLC, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CLSA LIMITED, CHINA INVESTMENT SECURITIES INTERNATIONAL BROKERAGE LIMITED, 9F PRIMASIA SECURITIES LIMITED, and COGENCY GLOBAL INC., <br><br> Defendants. | **Case No: 2:21-cv-00948-MEF-MAH** <br><br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS .................................................................................. 4

III.   STANDARD OF REVIEW ................................................................................ 9

IV.   PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE
SECURITIES ACT .......................................................................................... 9

    A.    The Securities Act Places A Minimal Pleading Burden on Plaintiffs ................... 9

    B.    Defendants Do Not Meaningfully Dispute That Plaintiff Harrison Has
Standing for the Securities Act Claims, Which Are Not Barred by the
Statute of Repose .................................................................................... 11

    C.    Plaintiffs Adequately Allege that the Company's IPO was False and
Misleading ............................................................................................. 17

    D.    Defendants' Falsity Arguments Fail ...................................................... 24

    E.    Plaintiffs Adequately Allege that the Underwriters Were Negligent ................... 28

    F.    Defendants' Negative Causation Argument Fails ................................... 29

    G.    Plaintiffs Adequately Allege Control Person Liability Under the
Securities Act ......................................................................................... 30

V.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE
EXCHANGE ACT ........................................................................................... 31

    A.    Plaintiffs Adequately Allege that Defendants Made Materially False
and Misleading Statements ..................................................................... 31

        1.    Defendants' Statements Made in Connection with the Company's
IPO were False and Misleading ..................................................... 31

        2.    Defendants' Post-IPO Statement were False and Misleading ................. 32

    B.    Plaintiffs Adequately Allege that Defendants Acted with Scienter ...................... 32

    C.    Plaintiffs Adequately Allege Loss Causation ........................................ 37

    D.    Plaintiffs Adequately Allege Control Person Liability Under the
Exchange Act .......................................................................................... 40

VI.   CONCLUSION ................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3d Cir. 2004)..................................................................................................29

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002)...................................................................................................34

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
    532 F. Supp. 3d 189 (E.D. Pa. 2021) ...................................................................................37

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
    No. 05-232, 2007 WL 81937 (E.D. Pa. Jan. 9, 2007)..........................................................30

*Am. Pipe & Const. Co. v. Utah*,
    414 U.S. 538 (1974)....................................................................................11, 12, 13, 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................................9

*Bauer v. Prudential Fin., Inc.*,
    No. CIV.A. 09-1120 (JLL), 2010 WL 2710443 (D.N.J. June 29, 2010)................................30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................................9

*Bensinger v. Denbury Res. Inc.*,
    31 F. Supp. 3d 503 (E.D.N.Y. 2014) ....................................................................................13

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
    No. 17-CV-4846 (WFK), 2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020)...............................25

*In re Bradley Pharmas., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) .......................................................................................30

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997).................................................................................................28

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
    582 U.S. 497 (2017)........................................................................................................12, 16

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) .......................................................................................35

*In re Chambers Dev. Sec. Litig.*,
848 F. Supp. 602 (W.D. Pa. 1994).................................................................29

*Cosby v. KPMG, LLP*,
No. 3:16-CV-121-TAV-DCP, 2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) .......................12

*Crown, Cork & Seal Co. v. Parker*,
462 U.S. 345 (1983).................................................................17

*De Vito v. Liquid Holdings Grp., Inc.*,
No. 2:15 Civ. 6969 (KM), 2018 WL 6891832 (D.N.J. Dec. 31, 2018).......................14, 16, 17

*Dole v. Arco Chem. Co.*,
921 F.2d 484 (3d Cir. 1990).................................................................40

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................37, 38

*In re Enron Corp. Sec.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .................................................................15, 16

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000).................................................................39

*Fain v. USA Techs., Inc.*,
707 F. App'x 91 (3d Cir. 2017) .................................................................33

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004).................................................................14, 15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
352 F. Supp. 2d 429 (S.D.N.Y. 2005).................................................................15

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) .................................................................34

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d 2000).................................................................34

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004).................................................................34

*Henry v. Futu Holdings Ltd.*,
No. 2:23-CV-03222 (BRM) (CLW), 2024 WL 4285129
(D.N.J. Sept. 25, 2024) .................................................................26

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983).................................................................10

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004)....................................................................................14

*Hogan v. Pilgrim's Pride Corp.*,
    73 F.4th 1150 (10th Cir. 2023) .......................................................................13, 14

*In re Initial Pub. Offering Sec. Litig.*,
    No. 01 CIV 10899, 2004 WL 3015304 (S.D.N.Y. Dec. 27, 2004)
    ...................................................................................................17, 18, 19, 20

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) ................................................................16

*Kanefsky v. Honeywell Int'l Inc.*,
    No. 18-CV-15536, 2020 WL 2520669 (D.N.J. May 18, 2020)................................39

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)..................................................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................................................................................34

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..................................................................................25

*In re NIO, Inc. Sec. Litig.*,
    No. 19CV1424NGGJRC, 2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023)................12

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) .................................................................................33

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..............................................................................................10

*Operating Local 649 Annuity Trust Fund v.*
    *Smith Barney Fund Management LLC*,
    595 F.3d 86 (2d Cir. 2010)....................................................................................25

*In re Patriot Nat'l, Inc. Sec. Litig.*,
    2021 WL 3418615 (S.D.N.Y. Aug. 5, 2021)..........................................................16

*In re Providian Fin. Corp. Sec. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) ...............................................................27, 35

*Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v.*
    *Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) .................................................................................37

*In re RAIT Fin. Tr. Sec. Litig.*,
   No. 2:07CV03148-LDD, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)...................................16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)...........................................................................................25

*SEPTA v. Orrstown Fin. Servs.*,
   12 F.4th 337 (3d Cir. 2021) ................................................................................16, 17, 21

*Silvercreek Mgmt. v. Citigroup, Inc.*,
   248 F. Supp. 3d 428 (S.D.N.Y. 2017)...........................................................................13

*Slack Techs., LLC v. Pirani*,
   598 U.S. 759 (2023)......................................................................................................11

*In re Sotheby's Holdings, Inc.*,
   No. 00 CIV. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) .............................27

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
   No. CV2010100MASTJB, 2022 WL 17740482 (D.N.J. Dec. 16, 2022) ...............................35

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001)............................................................................................34

*Sun v. Han*,
   No. 15-703, 2015 WL 9304542 (D.N.J. Dec. 21, 2015).....................................................36

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)...........................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................ *passim*

*Vanderhoef v. China Auto Logistics Inc.*,
   No. 18-CV-10174, 2021 WL 3260849 (D.N.J. July 30, 2021)............................31, 36, 39, 40

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011).............................................................................17

*Xu v. Gridsum Holding Inc.*,
   No. 18 Civ. 3655 (ER), 2021 WL 773002 (S.D.N.Y. Feb. 23, 2021) (Motion )...............12, 13

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
   No. CV21815530KMJAD, 2020 WL 3169506 (D.N.J. June 12, 2020).................................39

**Statutes**

15 U.S.C. §77...............................................................................................................10

15 U.S.C. § 77(m) ...........................................................................................................13

15 U.S.C. § 77k(a) .............................................................................................................9

15 U.S.C. § 78j(b) ...........................................................................................................31

15 U.S.C. § 78u-4(b)(1)(B) .............................................................................................31

15 U.S.C. § 78u-4(b)(2) ..................................................................................................32

Exchange Act ........................................................................................................... *passim*

Securities Act ............................................................................................................ *passim*

# I.    INTRODUCTION

This is a securities class action on behalf of all purchasers of the American Depositary Shares ("ADSs") of 9F Inc. ("9F" or the "Company") from August 14, 2019 to September 29, 2020, inclusive ("Class Period"). Plaintiffs bring claims pursuant to: (1) Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") for all purchasers of 9F ADSs pursuant or traceable to the Registration Statement and Prospectus issued in connection with 9F's Initial Public Offering (collectively the "Registration Statement") held on or about August 14, 2019 (the "IPO" or "Offering"); and (2) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder for all purchasers of 9F ADSs during the Class Period.[1]

9F is an online peer-to-peer lending intermediary platform in China. On 9F's platform, its institutional funding partners lent money to individual borrowers

---

[1] Defendants are 9F, Chief Executive Officer Lei Sun, Chief Financial Officer Yanjun Lin, Board member Yifan Ren, Board member Changxing Xiao, Board member Flynn Xuxian Huang, Board Member Ivan Xu, Board member Junsheng Zhang, Board member Wing Hon Cheung, Director Fangxiong Gong, Director David Cui, Director Lei Liu, Company Representative Siu Fung Ming ("Offering Defendants"), Credit Suisse Securities (USA) LLC, Haitong International Securities Company Limited, CLSA Limited, China Investment Securities International Brokerage Limited, and Primasia Securities ("Underwriter Defendants") (collectively "Defendants"). Unless otherwise indicated, all emphasis is added, all internal citations and quotations are omitted, and all "Rules" references are to the Federal Rules of Civil Procedure. Unless otherwise stated, all paragraph ("¶") references are to Plaintiff's Third Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint" or "TAC").

1

through 9F's loan products.  9F charged facilitation service fees for facilitating loans between lenders and borrowers.

Starting in 2015, China published a series of regulations and judicial interpretations requiring that the total amount of interest and fees that a lender charges a borrower shall not exceed 36%.  The regulations and interpretations further required that lending intermediaries, such 9F, shall not charge fees from borrowers. To circumvent these restrictions, however, 9F struck an arrangement with Property and Casualty Company Limited ("PICC"), an insurance company in China. Specifically, 9F and PICC agreed that 95% of the funds that PICC would collect would be disguised as insurance premiums.  These premiums, however, were, in fact, loan facilitation service fees that PICC would remit back to 9F upon receipt. The Company failed to disclose this arrangement and its associated material risk in 9F's Registration Statement for its IPO and during the Class Period.  Once the truth became known, 9F's ADS share price plummeted, and the Company's investors suffered significant losses.

As shown below, because Plaintiffs have adequately alleged claims under the Securities Act and the Exchange Act, the Court should deny Defendants' Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Third Amended Class Action Complaint ("Motion").  Indeed, in evaluating a prior version of Plaintiffs' complaint, Judge Arleo found that although the complaint required

more specificity, additional details like those alleged in the TAC would render

Plaintiffs' claims actionable:

> [I]f [plaintiffs] made an argument that they were getting right after that '19 notice came out that it was effectively an end run around the Chinese law by taking a fee and having the insurance company charge a fee in excess of that and then kicking the bulk of it back to the Plaintiff -- I mean, not the Plaintiff, to 9F, ***that would be something that would certainly be enough on a pleading stage to probably get by a motion***, because the issue is, if you're disclosing that we're taking a fee, it has to be in compliance with the law, but there was an agreement, we'll call it an insurance payment, but we'll kick it all back to you anyway so you'll get your 50 percent, ***that would probably be something that should have been disclosed when they made their correction and when they start to lose revenue, but it wasn't disclosed***.

Doc. 43 at 22-23. The TAC demonstrates the false and misleading nature of

Defendants' statements as contemplated by Judge Arleo. Additionally, although

Defendants again attempt to rely upon their disclosures to shield themselves from

liability, Judge Arleo determined that while 9F made "some disclosures," the

"disclosures never disclosed that there was this illegal arrangement" between 9F and

PICC and "[t]hey never disclosed the amount of the interest or the amount that was

sent back to 9F." *Id*. at 7. Additionally, Judge Arleo rejected Defendants' attempt

to impose the same standard that Defendants raise again in their Motion:

> MR. GRIFFIN: Yes, and that's exactly the critical point that we wanted to highlight, Your Honor, is that, you know, ***they need to allege some law or regulation under Chinese law that says the amount that they are collecting from PICC is illegal, and that's what's missing here***.
>
> THE COURT: ***No, no, I'm not going to require that***, because -- that is not what I said. ***If they can argue that in response to that 2019 advice***

3

*that this was really an end run around because the amount was very high, that it was effectively -- for example, the example I used, it was a $50,000 loan and they took 25 percent in insurance premiums and gave 22 percent back, that would be enough for me. And even though that technically doesn't violate, that may not technically violate the law because the fee was taken out by -- was returned by PICC, it probably would be enough to allege securities fraud, because it would be an omission that should have been included and would be detrimental to the shareholders, because, if the Chinese government found that was an end run around their laws, they would risk not ever being able to collect those fees.*

*Id.* at 23-24. Because Plaintiffs allege facts that meet this standard precisely, the Court should deny Defendants' Motion.

## II.    STATEMENT OF FACTS

9F is an online peer-to-peer lending intermediary platform in China. ¶47. On 9F's platform, its institutional funding partners lent money to individual borrowers through 9F's loan products. *Id*. 9F charges facilitation service fees for facilitating loans between lenders and borrowers. *Id*. In 2018 and the first five months of 2019, loan facilitation service fees accounted for 89% and 84% of the Company's respective net revenues. *Id*.

Before April 2019, 9F charged loan facilitation service fees directly from borrowers. ¶50. Subsequently, however, China imposed increasingly stringent restrictions on peer-to-peer lending intermediary service providers like 9F. ¶¶51-55. For example, in August 2015, the Supreme People's Court of China, the highest court in China, issued the Provisions on Several Issues Concerning Laws Applicable

4

to Trials of Private Lending Cases ("2015 Judicial Provisions") providing that the aggregate rate of borrowing cost per year, including annual interest and all fees, shall not exceed 36% of the loan principal. ¶52. Additionally, *The Notice on Rectification of Cash Loan Businesses* promulgated at the end of 2017 (the "Circular 141") and *The Notice on Strengthening Business Standards and Risk Prevention by Loan Facilitation Institutions* promulgated in April 2019 (the "2019 Notice") prohibited companies like 9F from facilitating any loans whose applicable borrowing costs per annum (*i.e.*, the interest and fees) exceeded 36% of the loan principal. ¶53.

As a result, after April 2019, 9F had to cease collecting loan facilitation services directly from borrowers, which adversely impacted its business and financial performance. ¶¶56-57. However, 9F then partnered with PICC, an insurance company in China, to circumvent the regulations bans and to continue collecting loan facilitation service fees ***indirectly*** from borrowers via PICC. ¶¶58-61. On the surface, as disclosed in the Registration Statement, PICC provided credit insurance to institutional funding partners in 9F's direct lending program to "strengthen[] the credibility of [9F's] platform" and to "expand its institutional funding partner base and promote the rapid development of [the] direct lending program." ¶59. The Registration Statement stated that at the time a loan was issued to a borrower, the borrower would pay an insurance premium to PICC for providing the insurance protection. *Id*.

However, the cooperation agreement enabled 9F to use PICC as a conduit to continue funneling service fees from borrowers. ¶60. According to the arrangement between 9F and PICC, PICC charged borrowers, as part of PICC's insurance premiums, loan facilitation service fees that 9F had previously directly charged borrowers before April 2019. *Id*. PICC then remitted the loan facilitation service fees back to 9F. *Id*. In this arrangement, PICC ignored its role and duties as an insurer under the Chinese law requiring an insurer to independently determine the insurance rate that an insurance policyholder should pay on an individual basis. *Id*. Instead, PICC allowed 9F to unilaterally determine which borrowers should buy PICC insurance policies and how much insurance premium a borrower should pay to PICC. *Id*. Indeed, 9F deducted the insurance premiums from the borrower's account for PICC within seconds of the issuance of a loan principal to the borrower. *Id*. Then, the majority of the allegedly "insurance premiums" went from PICC's account back to 9F. *Id*. Moreover, the insurance premiums set by 9F for borrowers to pay PICC ranged from 50-100% of loan principals, ***and approximately 95% of the purported insurance premiums were returned by PICC to 9F***. *Id*. As a result, at the time of the IPO, 9F successfully circumvented the regulatory bans on collecting any fees directly from borrowers and continued to collect fees through PICC as a conduit. ¶61. Furthermore, through its partnership with PICC, 9F was

6

still collecting fees that constituted more than 36% of loan principal at the time of the IPO. *Id.*

The risks of this arrangement quickly materialized after 9F's IPO. ¶87. On June 12, 2020, 9F disclosed for the first time that PICC withheld RMB 2.2 billion (US$350 million) in service fees from 9F in 2019. *Id.* The Company further disclosed that PICC filed a lawsuit against 9F, claiming that the agreement between 9F and PICC was invalid and that PICC had no duty to pay the service fees. *Id.* This disclosure, however, was a partial disclosure because the June 12, 2020 Form 6K did not disclose that such service fees were, in fact, loan facilitation service fees that 9F funneled through PICC to bypass legal restrictions. *Id.*[2]

Subsequently, on June 18, 2020, The China Securities Journal published a news article entitled "*The Drawer Agreement Pierced A "Big Hole"*; *The Lawsuits Between PICC And Jiufu Highlight The Predicament Of Credit Insurance*," that also partially revealed the details of the arrangement between 9F and PICC. ¶90. A senior expert in the Chinese peer-to-peer lending intermediary industry told The China Securities Journal that when the loan principal was issued to a 9F borrower's account, insurance premiums ranging from a few hundred RMBs to a few thousand RMBs were "transferred within seconds" to PICC from the borrower's account to

---

[2] Additionally, Chinese courts are authorized to exercise discretion to deem a contract to be unenforceable because it is illegal. ¶88.

"automatically be used for purchasing PICC's performance insurance." *Id*. PICC kept 5% of the premiums, while the remaining 95% would "make a twirl" in PICC's account and would be transferred to 9F. *Id*. The expert said that borrowers were probably unaware of the "drawer agreement" between PICC and 9F. *Id*.

On June 24, 2020, 9F filed its Form 20-F ("2019 20F"), revealing for the first time the true nature of its agreement with PICC. ¶¶89. 9F admitted that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "PICC collected all of the loan facilitation service fees" from borrowers and "*remitted* [9F's] portion of the service fees to [9F]." *Id*. 9F also revealed for the first time that since April 2019 when 9F stopped charging service fees directly to borrowers, the Company started to charge service fees "*indirectly through* … insurance company." *Id*. Given that PICC's withholding of 9F's loan facilitation service fees accounted for 29.9% of lost revenue in 2019, the market strongly reacted to 9F's revelation. ¶11. Specifically, 9Fs' stock price fell by 7.6% on June 24, 2019, and another 24% over the next three days. *Id*.

9F continued to suffer financially because of the materialized risk of the failure to receive facilitation service fees from PICC in 2020. ¶12. On September 29, 2020, 9F reported that its loan facilitation services revenue in the first half of 2020 decreased by 85.5% from the second half of 2019. *Id*. On this news, 9F's ADS

8

share price fell $0.20 per ADS, or 18%, to close at $0.91 per ADS on September 30, 2020, further damaging investors.  *Id*.  By the commencement of this action, the Company's shares traded significantly below the IPO price.  ¶13.

## III.    STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety. . . ."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## IV.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE SECURITIES ACT

### A.    The Securities Act Places a Minimal Pleading Burden on Plaintiffs

Section 11 of the Securities Act creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ."  15 U.S.C. § 77k(a).  "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."

9

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Id.* at 382; 15 U.S.C. §77 k(b).

"Section 11 is a virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006). "Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement— one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 179 (2015). "Either way, the buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Id*. Thus, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements. Other defendants bear the burden of demonstrating due diligence." *Herman*, 459 U.S. at 382. Accordingly, "Section 11 places a relatively minimal burden on a plaintiff." *Id*. And where, as here, a plaintiff's Section 11 claims "are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply." *Suprema*, 438 F.3d at 270.

10

**B.**    **Defendants Do Not Meaningfully Dispute That Plaintiff Harrison Has Standing for the Securities Act Claims, Which Are Not Barred by the Statute of Repose**

Defendants do not – and cannot – meaningfully dispute that Plaintiff Harrison has adequately alleged standing pursuant to the Securities Act.  Specifically, the TAC alleges that "[a]s set forth in the certification previously filed with the Court (Dkt. 44-1), Named Plaintiff Delanta L. Harrison purchased 9F ADSs pursuant and/or traceable to the Registration Statement issued in connection with 9F's August 14, 2019 IPO."  ¶20.   Additionally, the TAC alleges that "Plaintiff Harrison purchased 9F ADSs on August 22, 2019 – eight days after 9F's IPO" and that "[t]here was only one Registration Statement at the time Plaintiff Harrison purchased her shares: the Registration Statement associated with 9F's IPO."  *Id.*  Thus, it is undisputed that the TAC adequately alleges that the shares that Plaintiff Harrison purchased are traceable to the Registration Statement associated with 9F's IPO. *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023).

Faced with this reality, Defendants resort – as they did previously – to arguing that Plaintiffs' Securities Act claims are purportedly barred by the statute of repose. Motion at 6-10.  Defendants' argument, however, fails now as it did then.

First, Defendants do not even cite – much less address – the decision in *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974), the seminal case governing this issue.  As the Supreme Court declared in *Am. Pipe*, "the filing of a timely class action

11

complaint commences the action for all members of the class as subsequently determined." *Id*. at 550.  As Plaintiffs previously indicated (Doc. 108 at 2), Defendants fail to appreciate that Plaintiff Harrison has not filed a new case; rather she is a class member in an existing case that was brought timely.  Indeed, "the unnamed class members have already brought their claims unless they are excluded from any class definition or opt out of the class." *In re NIO, Inc. Sec. Litig.*, No. 19CV1424NGGJRC, 2023 WL 5048615, at *4 (E.D.N.Y. Aug. 8, 2023). Accordingly, "no tolling of the statute of repose is necessary here, as it is undisputed that this case was filed within the statute of repose and has continued uninterrupted, without prior denial of class certification (as in *Am. Pipe*), individual opt-outs (as in [*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497 (2017) ("*CalPERS*")]), or other disruption."  2023 WL 5048615, at *4.  Thus, Defendants' reliance upon *CalPERS* and *Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655 (ER), 2021 WL 773002 (S.D.N.Y. Feb. 23, 2021) (Motion at 7) is misplaced because no tolling of the statute of repose is necessary here because this case has continued uninterrupted.  This principle alone defeats Defendants' argument.

Second, the relation back doctrine also overwhelms Defendants' assertion. The relation back doctrine applies where, as here, "the Section 11 claims arose from the same documents, which satisfies the Rule 15(c)(1)(B) requirement." *Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2018 WL 3723712, at *12 (E.D. Tenn.

12

Aug. 2, 2018).  Where an "amended complaint relates back to the original complaint under Rule 15" a "Section 11 claim is not barred by the statute of repose." *Id.* Additionally, Defendants' attempt to distinguish between statutes of limitations and statutes of repose (Motion at 8 n.5) fails because they provide no rationale for a distinction.  *See Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1158 (10th Cir. 2023) ("it is well settled that an amendment that relates back to an earlier timely pleading is not barred by a statute of limitations. . . . We can think of no reason why a statute of repose should be treated otherwise.").

Moreover, contrary to the propositions contained within Defendants' authority (*Silvercreek Mgmt. v. Citigroup, Inc.*, 248 F. Supp. 3d 428 (S.D.N.Y. 2017), *Bensinger v. Denbury Res. Inc.*, 31 F. Supp. 3d 503 (E.D.N.Y. 2014), and *Gridsum*, 2021 WL 773002), Plaintiff Harrison is *not* a new party, and the Section 11 claim is *not* a new claim.  Rather, Plaintiff Harrison was always a member of the class in an existing case that was timely brought, and this action has always included Securities Act claims since January 20, 2021. Doc. 1. Thus, the initial complaint indisputably apprised Defendants within the period of repose of "the essential information necessary to determine both the subject matter and size of the prospective litigation . . . ." *Am. Pipe*, 414 U.S. at 555.  Indeed, Defendants face no prejudice as the statute of repose pertains to new *actions*, 15 U.S.C. § 77(m), and this *action* has been pending since January 2021 with Section 11 claims. *Cf. Hogan*,

13

73 F. 4th at 1157 (finding the plain reading of the statute of repose as pertaining to the filing of an action, not the continuation); *see also id.* n. 11 (noting the statute of repose must vest to prevent relation back under Rule 15).  At no point have these claims been extinguished or has Defendants' right to the repose period "vested."

Although Defendants attempt to rely heavily upon *De Vito v. Liquid Holdings Grp., Inc.*, No. 2:15 Civ. 6969 (KM) (JBC), 2018 WL 6891832 (D.N.J. Dec. 31, 2018), it is inapplicable on this point. In *De Vito*, the court held that "no party asserted a viable claim within the statute-of-repose period." 2018 WL 6891832, at *22. Here, Plaintiff Wait unquestionably has standing for the Exchange Act claims – which are timely and still viable – and "[n]othing in the [Private Securities Litigation Reform Act of 1995 ("PSLRA")] indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004).  Indeed, "it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Id*.

Defendants nevertheless argue that a lead plaintiff can never assert claims on behalf of other members of a class unless a named plaintiff is added within the applicable statute of repose.  Motion at 8.  Defendants are incorrect.  For instance, as Plaintiffs previously noted (Doc. 112), in *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004), Securities Act claims and Exchange Act claims were dismissed with leave to amend.  *Id*. at 254-74.  The court recognized

14

for the Section 12 claims under the Securities Act that lead plaintiffs "need not have standing to sue on each individual claim asserted in the complaint so long as other named plaintiffs have standing to pursue the claims at issue," but held that "plaintiff has not alleged that any of the named plaintiffs purchased securities in the IPO and has thus failed to allege that any of them has standing to pursue this claim." *Id.* at 257. Plaintiffs then amended with a named plaintiff with standing for the Section 12 claims. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454-55 (S.D.N.Y. 2005). Defendants subsequently argued that the Section 12 claims were "barred by the statute of repose." *Id.* at 455. The court rejected this argument, holding that the claims were tolled pursuant to *Am. Pipe.* *Flag Telecom*, 352 F. Supp. 2d at 455-56.

The court held similarly in *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006). The court recognized that "[t]he rationale for allowing legal tolling is to dissuade every potential class member from filing a separate action, resulting in a multiplicity of suits and judicial inefficiency and lack of litigation economy, which would defeat the goals of Rule 23." *Id.* at 708. The court reasoned that "the notice and opt-out provision of Rule 23(c)(2) would be irrelevant without tolling because the limitations period for absent class members would most likely expire, making the right to pursue individual claims meaningless." *Id.* Thus, although the defendants in *Enron* claimed "that because no named Plaintiff has standing to assert

15

the § 12(a)(2) claims, the tolling rule of *American Pipe* does not apply," (*id*. at 709), the court held that defendants' argument "that the doctrine of relation back cannot save claims of a newly added party fails." *Id*. at 711.  The court explained that "[i]f Lead Plaintiff had found class representatives with standing to pursue the § 12(a)(2) claims, the class might have proceeded on these claims since the class action has been tolled since the filing of the First Amended Consolidated complaint under *American Pipe*.").  *Id*.

Likewise, the court in *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037 (N.D. Cal. 2008) held that "[a]lthough the [company's] noteholders were not added by name until April 2007, when Plaintiffs filed the Amended Consolidated Class Action Complaint, the Garber Complaint was filed on behalf of all those who purchased Juniper 'securities,' not just stocks." *Id*. at 1052–53.  Therefore, the complaint "put Defendants on notice that anyone who relied on the allegedly false financial statements and purchased Juniper securities would be included in Plaintiffs' action." *Id*. at 1053.[3]

---

[3] Defendants' cases do not suggest otherwise.  Defendants claim that *In re RAIT Fin. Tr. Sec. Litig.*, No. 2:07CV03148-LDD, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) and *In re Patriot Nat'l, Inc. Sec. Litig.,* 2021 WL 3418615 (S.D.N.Y. Aug. 5, 2021) hold that at least one named plaintiff must have standing.  Motion at 5-6. But that is precisely the case here: Plaintiff Harrison has standing to pursue the Securities Act claims and Plaintiff Wait has standing to pursue the Exchange Act claims. *CalPERS* is similarly inapplicable because, unlike here, opting out of an action is significantly different from stepping forward in the same action as a named plaintiff.  Moreover, *De Vito* was reached prior to *SEPTA v. Orrstown Fin. Servs.,*

16

Finally, Defendants' rationale would punish Plaintiff Harrison and other "class members for relying on the very thing Rule 23 is intended to provide: an efficient method for resolving class claims common to a class of individuals without the need for wasteful and duplicative litigation." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 372 (S.D.N.Y. 2011); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350-51 (1983); *see also In re Initial Pub. Offering Sec. Litig.*, No. 01 CIV 10899, 2004 WL 3015304, at *5 (S.D.N.Y. Dec. 27, 2004) (holding that defendants' argument is "akin to establishing an obligation that class members must independently police the claims of their lead plaintiffs—a position wholly at odds with the spirit of *American Pipe*"). Thus, Defendants' argument is unavailing.

## C. Plaintiffs Adequately Allege that the Company's IPO was False and Misleading

For several reasons, the Registration Statement for the IPO was negligently prepared, contained materially false and misleading statements, and failed to

---

12 F.4th 337 (3d Cir. 2021), in which the Third Circuit rejected defendants' argument. *Id.* at 346; *compare De Vito*, 2018 WL 6891832, at * 23 ("I have not identified a Third Circuit opinion that is on point.") *with SEPTA*, 12 F. 4th at 352 ("We acknowledge that several federal district courts have declined to permit relation back past statutes of repose. But those decisions rely on the premise that relation back would violate the defendants' substantive rights in those circumstances. Several of these cases involved entirely new claims or parties that were added after the repose period expired. As we have explained, a defendant does not have a substantive right to repose when—as here—a plaintiff brings an action against the defendant containing the claims at issue within the repose period.").

disclose facts required to be disclosed regarding 9F's business, operations, and prospects. ¶107.

First, the Registration Statement stated, in relevant part, that:

"We partner with financial institutions such as China Taiping and PICC to provide third-party insurance protection to investors that invest in loans we facilitate, which strengthens the credibility of our platform and further enlarges our investor base. PICC, when it is engaged under our direct lending program, also provides credit insurance to institutional funding partners, helping us to expand our institutional funding partner base and promote the rapid development of our direct lending program, which may ease the pressure brought about by the continuing challenging regulatory environment that negatively affect the growth of our business."

\* \* \*

"Loan facilitation services fees are the portion of service fees we charge to borrowers with whom we have stopped charging service fees since April 2019 or financial institutional partners in relation to the services we provide such as traffic referral services and credit assessment."

¶108.   The above statements were materially false and misleading because they implied that the full amounts that PICC charged borrowers were insurance premiums to be used for protecting loans and 9F did not charge PICC any service fees from PICC's insurance premiums. ¶¶8, 60, 86, 105, 109.   In fact, 9F used PICC as a conduit to collect service fees from borrowers *indirectly and disguised as insurance premiums*. *Id*.   For instance, 9F Former Employee 1 ("FE 1") confirms that neither 9F nor PICC informed borrowers that PICC collected loan facilitation service fees, disguised as insurance premiums, from borrowers for 9F. ¶82.   FE1

18

worked as a Finance Manager at Jiufu Shuke Technology Group Co., Ltd. ("Jiufu Shuke") – the primary operating subsidiary of 9F – from March 2019 to May 2020. *Id*. According to FE 1, borrowers on 9F's platform were not aware that 9F received service fees from the insurance company because it was not specified in the insurance contracts into which borrowers entered. *Id*. FE 1 stated that "on the surface of [9F's] financial statements, it is claimed that PICC was obligated to pay service fees to 9F pursuant to the agreement. But in fact, 9F gave such funds to PICC. This was just a ***formality***. PICC should return such funds to 9F." *Id*. FE1's statements are consistent with the fact that 9F was in control of deciding which borrowers should pay how much insurance premiums and transferring such funds to PICC directly from borrowers' accounts on 9F's platform. *Id*.

Additionally, a penalty notice issued by China Banking and Insurance Regulatory Commission regarding PICC's violations in its partnership with 9F reveals that 9F, not PICC, was in complete control of PICC's issuing insurance policies to borrowers on 9F's platform. ¶81. The penalty notice entitled "Notice of the Consumer Rights Protection Bureau of the China Banking and Insurance Regulatory Commission on PICC's Infringement on Consumer Rights and Interests" (Yin Bao Jian Xiao Bao Fa [2021] No. 1), issued on January 6, 2021, reveals that in the arrangement between 9F and PICC, PICC ignored its role and duties as an insurer under the Chinese law requiring an insurer to independently determine the insurance

19

rate on a case-by-case basis and failed to charge premiums according to the rates pre-approved by the Commission. *Id.* Instead, 9F unilaterally and completely controlled and determined which borrowers should buy PICC insurance policies and how much insurance premium a borrower should pay to PICC. *Id.* According to the penalty notice, PICC issued over seven million insurance policies to 9F's borrowers from March 2018 to December 2019. *Id.* Indeed, as noted above, Judge Arleo found that additional details like those alleged in the TAC would render Plaintiffs' claims actionable:

> [I]f [plaintiffs] made an argument that they were getting right after that '19 notice came out that it was effectively an end run around the Chinese law by taking a fee and having the insurance company charge a fee in excess of that and then kicking the bulk of it back to the Plaintiff -- I mean, not the Plaintiff, to 9F, *that would be something that would certainly be enough on a pleading stage to probably get by a motion*, because the issue is, if you're disclosing that we're taking a fee, it has to be in compliance with the law, but there was an agreement, we'll call it an insurance payment, but we'll kick it all back to you anyway so you'll get your 50 percent, *that would probably be something that should have been disclosed when they made their correction and when they start to lose revenue, but it wasn't disclosed*.

Doc. 43 at 22-23. Accordingly, the Registration Statement failed to disclose that: (1) the so called "strategic" partnership with PICC subjected 9F to an imminent and material risk because, at the time of the IPO, PICC could claim that the arrangement was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%; and (2) as a result, there was a material risk that PICC would seize all the funds that 9F

20

transferred from borrowers to PICC, claiming all funds as purely insurance premiums. ¶¶8, 60, 86, 105, 109.

Second, the Registration Statement also stated, in relevant part, that:

"As of the date of this prospectus, we do not have any outstanding loan balance that we have facilitated since the promulgation of Circular 141 with an APR of higher than 36%, even inclusive of any additional fees incurred by borrowers in relation to third-party insurance and guarantee protection, such as insurance premiums to the insurer, money contributions to the depository account and guarantee fee to the guarantee company….We may continue to facilitate loans at or above the APR of 24% but no more than 36%."

¶110.   The above statements were also materially false and misleading because they failed to disclose that through its arrangement with PICC, 9F used PICC as a conduit to circumvent Chinese regulatory bans and the borrowing cost for borrowers on 9F's platform frequently exceeded the 36% APR ceiling. ¶¶6, 65-72, 94, 111.  For example, Sina Black Cat – an online consumer complaint platform widely used by Chinese consumers to expose product and service problems – revealed that 9F borrowers filed 11,076 complaints against 9F regarding the prohibitively high insurance premiums that 9F charged. ¶64.  A search of "9F beheading interest" on Sina Black Cat further revealed 4,936 complaints filed against 9F. *Id.*[4]   All these complaints reveal that in 2019 9F secretly charged large amounts of insurance premiums from loan principals without informing borrowers

---

[4] "Beheading interest" is a term commonly used in China referring to prohibitively high interest rate or usury. *Id*.

21

in advance or even afterwards. *Id*. Additionally, the TAC includes several detailed examples of borrowers who were not allowed to cancel the insurance policies 9F purchased for them or to request refunds, and who were forced to pay more than the 36% APR ceiling. ¶¶65-72.

Third, the failure to disclose the true nature of the arrangement with PICC in the Registration Statement also violated Generally Accepted Accounting Principles ("GAAP"). ¶¶112-116. As Plaintiffs allege, ASC 606 requires 9F "to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. To achieve that objective, an entity shall disclose qualitative and quantitative information about all of the following: a. Its contracts with customers…." *Id*. 9F violated these principles by failing to separately disclose in the Registration Statement: (1) revenue recognized from its lending contracts with its borrowers that 9F indirectly collected through PICC; (2) the opening and closing balances of receivables from PICC because such receivables are loan facilitation service fees that 9F collected from its borrower through PICC; and (3) contingent liabilities applicable to any financial reporting period when 9F was exposed to the risk that borrowers would assert claims that 9F improperly charged loan fees. *Id*.

Fourth, the Registration Statement failed to disclose, pursuant to Items 105 and 303, that by means of the partnership with PICC, the borrowing cost for

22

borrowers on 9F's platform frequently exceeded the 36% APR ceiling.  ¶117.  SEC Regulation S-K (17 C.F.R. § 229.10) provides that registration statements such as the one filed by 9F on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act."  ¶¶96-104.  Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K".  *Id.*  Item 303 of SEC Regulation S-K required the Company to disclose "any known trends or uncertainties that have had or that [9F] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *Id.*  Moreover, Item 105 of Regulation S-K required disclosure in the Registration Statement of "the most significant factors that ma[d]e an investment in [the IPO] speculative or risky," and an explanation of "how the risk affect[ed] [9F] or the securities being offered."  *Id.*[5]

The arrangement between 9F and PICC allowed 9F to continue collecting service fees from borrowers through PICC as a conduit.  ¶117.  This arrangement with PICC subjected 9F to a material risk that PICC would claim that the arrangement was invalid because 9F used PICC as a conduit to circumvent regulatory bans on collecting fees from borrowers that exceeded 36%.  *Id.*

---

[5] To address Defendants' footnote regarding Items 105 and 303 within the context of Plaintiffs' Exchange Act claim, Plaintiffs rely upon Items 105 and 303 for their Securities Act claims but not their Exchange Act claims.  And as Plaintiffs stated previously (Doc. 101), because their Exchange Act claims do not rely upon pure omissions, Defendants' arguments to the contrary fail.

Accordingly, this arrangement with PICC that 9F failed to disclose to investors was reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition and also had rendered investment in 9F's ADSs speculative and risky in violation of Items 105 and 303. *Id.*; *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) ("plaintiffs have adequately pleaded a presently existing trend, event, or uncertainty, and the sole remaining issue is whether the effect of the known information was reasonably likely to be material for the purpose of Item 303 and, in turn, for the purpose of Sections 11 and 12(a)(2)."). Thus, Plaintiffs adequately allege that the Registration Statement was false and misleading.

### D. Defendants' Falsity Arguments Fail

Defendants contend that Plaintiffs have not adequately alleged falsity because: (1) the Company purportedly disclosed the relevant information and risks regarding PICC; (2) no additional disclosure was required; and (3) no one has found that 9F's contract with PICC was illegal. Motion at 11-31. These arguments fail.

First, Defendants claim that the Company purportedly disclosed the relevant information and risks regarding PICC. Motion at 11-15. Not so. Although the Company made some disclaimers, 9F did not disclose the risk alleged here: that the majority of the allegedly "insurance premiums" went from PICC's account back to 9F, that the insurance premiums set by 9F for borrowers to pay PICC ranged from

24

50-100% of loan principals, and that approximately 95% of the purported insurance premiums were returned by PICC to 9F.  ¶60.  Indeed, none of the disclaimers that Defendants cite include this information.  As Judge Arleo found, while 9F made "some disclosures," "[t]hey never disclosed the amount of the interest or the amount that was sent back to 9F."  Doc. 43 at 7; *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (holding that it is ineffective to warn "there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"); *In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17-CV-4846 (WFK), 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.").

Second, Defendants contend that no additional disclosure was required. Motion at 15-19.  Defendants are again incorrect.  Defendants suggest that none of 9F's reported financial results were inaccurate while ignoring the principle that "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86, 92 (2d Cir. 2010).  Additionally, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250

25

(2d Cir. 2014). Defendants also attempt to rely upon the disclosures that 9F made without acknowledging – as Judge Arleo found – that the Company "never disclosed the amount of the interest or the amount that was sent back to 9F." Doc. 43 at 7.

Third, Defendants' assertion that Plaintiffs have not adequately alleged falsity because no one has found that 9F's contract with PICC was illegal also fails. Motion at 19-31. Indeed, Defendants are again attempting to revive an argument that Judge Arleo squarely rejected:

> MR. GRIFFIN: Yes, and that's exactly the critical point that we wanted to highlight, Your Honor, is that, you know, ***they need to allege some law or regulation under Chinese law that says the amount that they are collecting from PICC is illegal, and that's what's missing here***.
>
> THE COURT: ***No, no, I'm not going to require that***, because -- that is not what I said. ***If they can argue that in response to that 2019 advice that this was really an end run around because the amount was very high, that it was effectively -- for example, the example I used, it was a $50,000 loan and they took 25 percent in insurance premiums and gave 22 percent back, that would be enough for me. And even though that technically doesn't violate, that may not technically violate the law because the fee was taken out by -- was returned by PICC, it probably would be enough to allege securities fraud, because it would be an omission that should have been included and would be detrimental to the shareholders, because, if the Chinese government found that was an end run around their laws, they would risk not ever being able to collect those fees.***
>
> Doc. 43 at 23-24.[6]

---

[6] Defendants attempt to rely upon *Henry v. Futu Holdings Ltd.*, No. 2:23-CV-03222 (BRM) (CLW), 2024 WL 4285129 (D.N.J. Sept. 25, 2024), but the facts there were significantly different from those here. In *Futu*, the court found that the company adequately warned of the risks alleged. Here, however, 9F did not warn about the

The Complaint, moreover, does, in fact, demonstrate the illegality of Defendants' conduct and how Defendants' representations regarding such conduct were false and misleading.  For instance, among other things, Plaintiff alleges that a penalty notice issued by China Banking and Insurance Regulatory Commission regarding PICC's violations in its partnership with 9F also confirms that 9F, not PICC, played the leading role in collecting insurance premium.  ¶81.  Additionally, the Complaint also alleges that the arrangement between 9F and PICC subjected the Company to heightened risks because Chinese courts are authorized to exercise discretion to deem a contract to be unenforceable because it is illegal.  ¶88.  The Company further disclosed that PICC filed a lawsuit against 9F, claiming that the agreement between 9F and PICC was invalid and that PICC had no duty to pay the service fees.  ¶10.  These allegations, among the others alleged, are sufficient.  *See, e.g.*, *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001) (holding that allegations that defendants "engaged in a series of illegal or fraudulent business practices" were sufficient because they "would clearly alter the mix of information available to the public"); *In re Sotheby's Holdings, Inc.*, No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) ("[w]hen a corporation does make a disclosure-whether it be voluntary or required-there is a

---

amount of "premiums" that PICC was collecting and kicking back to 9F, nor of the risks associated with this arrangement.  Doc. 43 at 7.

27

duty to make it complete and accurate" and "[t]his duty to disclose exists even where the omitted information relates to allegedly illegal conduct"). Thus, Defendants' arguments fail.[7]

**E.    Plaintiffs Adequately Allege that the Underwriters Were Negligent**

The Underwriters assert that Plaintiffs have not adequately alleged that they acted negligently. Not true. The Complaint contains detailed allegations regarding their negligence and failure to conduct an adequate due diligence investigation. ¶¶118-136. The Underwriters' only argument to the contrary is that Plaintiffs' allegations regarding a secret agreement between 9F and PICC purportedly show that the Underwriters could not possibly have discovered the facts or risks related to this agreement. On the contrary, Plaintiffs allege that had the Underwriters conducted an adequate due diligence investigation, they, in fact, would have

---

[7] Defendants' other arguments also fail. For example, Defendants criticize FE 1, the expert cited in the Complaint, and the accounts of borrowers by suggesting that they do not prove that 9F engaged in an illegal scheme. Motion at 25-27. But Plaintiffs need not prove that Defendants engaged in an illegal scheme to adequately allege their claims. This is a repeated fallacy that permeates Defendants' Motion – a fallacy that Judge Arleo rejected. Doc. 43 at 23-24. And Defendants' dispute regarding the calculation of APR (Motion at 28-29) fails because courts must construe the allegations in Plaintiffs' favor at the pleading stage. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997). Defendants' suggestion, moreover, that Plaintiffs' estimates "appear to be incorrect" is wrong. The calculations made are clearly set forth within the Complaint, and Defendants' attempt to include the cost of the insurance premium in the calculation would force the Court to view the facts alleged in Defendants' favor, not Plaintiffs. Additionally, the outcome of other cases (Motion at 2-4) has no bearing on the adequacy of the claims alleged here.

discovered the facts and risks associated with the arrangement by, among other things, "cross examin[ing] participants by asking many questions," "obtain[ing] and analyz[ing] various information concerning all aspects of the issuer's business," and "follow[ing]-up with more work as appropriate depending upon what is learned and what 'red flags' surface, if any." ¶129.  Thus, these allegations are sufficient.  *In re Chambers Dev. Sec. Litig.*, 848 F. Supp. 602, 624 (W.D. Pa. 1994).

## F.    Defendants' Negative Causation Argument Fails

Defendants also suggest that an affirmative defense of negative causation impacts the propriety of Plaintiffs' Securities Act claims.  Motion at 35-39.  The Third Circuit has made it clear, however, that "[u]nder sections 11 and 12(a)(2), plaintiffs do not bear the burden of proving causation." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004).  "It is the defendants who may assert, as an affirmative defense, that a lower share value did not result from any nondisclosure or false statement."  *Id.* "While a defendant may be able to prove this negative causation theory, an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."  *Id.*

Thus, *Adams* forecloses Defendants' argument.  Even if the Court were to entertain Defendants' argument, moreover, it would still fail.  As one court held:

> Here, Plaintiff has pled that, at the date of the original filing, the price of the Notes were trading at 48% below the offering price. Defendants, in their reply, do not address this allegation or the plain language of § 11(e) as interpreted by the Third Circuit. Rather, they emphasize that

29

the Notes are currently trading above their offering price and rely on a Southern District of New York case . . . that dismissed a complaint where it found that the absence of loss causation was apparent on the face of the complaint. This Court does not find *Blackmoss* persuasive in light of Third Circuit law. Plaintiff's Amended Complaint pleads that, as of the filing date, the Notes had lost value. Pursuant to § 11(e), causation is then presumed at this stage of the litigation. Therefore, the Court finds that Plaintiff has adequately pled a compensable loss.

*Bauer v. Prudential Fin., Inc.*, No. CIV.A. 09-1120 (JLL), 2010 WL 2710443, at *8 (D.N.J. June 29, 2010). Similarly, Plaintiffs here allege that "[b]y the commencement of this action, the Company's shares traded significantly below the IPO price." ¶13. Thus, Defendants' argument is meritless.[8]

## G. Plaintiffs Adequately Allege Control Person Liability Under the Securities Act

Contrary to Defendants' assertion (Motion at 40 n.19), Plaintiffs have sufficiently alleged a control person claim under Section 15 of the Securities Act. ¶¶22-32, 41-42, 160-168; *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, No. 05-232, 2007 WL 81937, at *12 (E.D. Pa. Jan. 9, 2007). Thus, Plaintiffs have sufficiently pled claims under the Securities Act.

---

[8] Defendants' argument also ignores the fact that 9F made partial disclosures that did not fully reveal the extent of Defendants' misrepresentations. *See, e.g., In re Bradley Pharmas., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) ("The revelation of the truth . . . did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events."). And as alleged, the Company's later disclosures did, in fact, reveal new information that was not previously disclosed. ¶¶10-12.

## V.    PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."   15 U.S.C. § 78j(b).   "To state a viable claim for securities fraud under Section 10(b) and Rule 10b-5 of the Exchange Act, Plaintiffs must plead: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."   *Vanderhoef v. China Auto Logistics Inc.*, No. 18-CV-10174, 2021 WL 3260849, at *3 (D.N.J. July 30, 2021).

### A.    Plaintiffs Adequately Allege that Defendants Made Materially False and Misleading Statements

Under the PSLRA, a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).

#### 1.    Defendants' Statements Made in Connection with the Company's IPO Were False and Misleading

As demonstrated above, Plaintiffs adequately allege that the Company's Registration Statement for the IPO was false and misleading.   Accordingly, these

31

false and misleading IPO statements also demonstrate falsity for Plaintiffs' Exchange Act claims.

> ### 2. Defendants' Post-IPO Statements Were False and Misleading

Defendants' post-IPO statements were also false and misleading. Specifically, on June 12, 2020, 9F disclosed its ongoing dispute with PICC. ¶170. The June 12, 2020 6K is materially false and misleading because it failed to disclose that the dispute represented a materialized risk that PICC would claim the arrangement with 9F was illegal and hence refuse to remit the loan facilitation service fees that 9F transferred from borrowers' accounts to PICC's account. *Id*. Additionally, on June 15, 2020, 9F stated that the Company could not timely file its annual report because of its dispute with PICC. ¶171. This announcement was materially false and misleading for the same reasons. And on June 17, 2020, moreover, 9F announced the Company's fourth quarter and full-year 2019 financial results and the financial consequences of the Company's dispute with PICC. ¶172. The June 17, 2020 6K was similarly materially false and misleading for the same reasons. *Id*.

> ### B. Plaintiffs Adequately Allege that Defendants Acted With Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Tellabs*, 551 U.S. at 314. To adequately plead scienter, a

complaint must state with particularity facts giving rise to a strong inference that the defendants acted with intent to defraud. *Fain v. USA Techs., Inc.*, 707 F. App'x 91, 95 (3d Cir. 2017).  Importantly, "courts must consider the complaint in its entirety . . . [t]he inquiry is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original).  A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324-26.  A plaintiff establishes a "strong inference" of scienter by alleging facts showing that Defendants had "motive and opportunity to commit fraud" or "circumstantial evidence of either reckless or conscious behavior." *Fain*, 707 F. App'x at 95.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Tellabs*, 551 U.S. at 324.  "Where there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff on a motion to dismiss." *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214 (5th Cir. 2023).

Here, Plaintiffs adequately allege scienter based upon motive and opportunity

33

and circumstantial evidence of reckless or conscious behavior. First, Plaintiffs allege that Defendants beneficially owned 9F shares or obtained proceeds through the sale of their shares in the Company's IPO. ¶¶22-25, 27-28, 32. Unlike the situation in *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) cited by Defendants (Motion at 32), where, as here, "financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *Frank v. Dana Corp.*, 646 F.3d 954, 960-62 (6th Cir. 2011). Because these allegations demonstrate that there was "a likelihood that defendants could realize concrete benefits through the deception," Plaintiffs have adequately alleged motive and opportunity. *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d 2000).[9]

Second, Plaintiffs adequately allege scienter based upon circumstantial evidence of reckless and conscious behavior. For instance, the allegations in the TAC relate to 9F's core business. Indeed, in 2018 and the first five months of 2019, loan facilitation service fees accounted for 89% and 84% of the Company's respective net revenues. ¶47. Where allegations "permeated core aspects" of a

---

[9] The Supreme Court has also declared that the "absence of a motive allegation" is "not dispositive." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *see also Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").

34

company's business, an inference arises that company executives were reckless in not knowing of the circumstances alleged, thereby supporting a strong inference of scienter. *Providian*, 152 F. Supp. 2d at 825 (E.D. Pa. 2001); *see also Strougo v. Mallinckrodt Pub. Ltd. Co.*, No. CV2010100MASTJB, 2022 WL 17740482, at *9 (D.N.J. Dec. 16, 2022) (denying motion to dismiss and holding that scienter was adequately alleged based in part upon the core operations doctrine); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business").

Additionally, the penalty notice issued by China Banking and Insurance Regulatory Commission regarding PICC's violations in its partnership with 9F is also indicative of scienter. ¶81. The penalty notice issued on January 6, 2021, reveals that in the arrangement between 9F and PICC, PICC ignored its role and duties as an insurer under the Chinese law requiring an insurer to independently determine the insurance rate on a case-by-case basis and failed to charge premiums according to the rates pre-approved by the Commission. *Id*. Instead, 9F unilaterally and completely controlled and determined which borrowers should buy PICC insurance policies and how much insurance premium a borrower should pay to PICC. *Id*. According to the penalty notice, PICC issued over seven million insurance policies to 9F's borrowers from March 2018 to December 2019. *Id*. This

35

notice demonstrates that 9F's management acted deliberately with respect to Company's arrangement with PICC, further demonstrating scienter.

Defendants' GAAP violations further support a strong inference of scienter. ¶¶112-116. Numerous courts have recognized that violations of GAAP can contribute to allegations supporting a strong inference of scienter. *Vanderhoef*, 2021 WL 3260849, at *4–5; *Sun v. Han*, No. 15-703, 2015 WL 9304542, at *15–16 (D.N.J. Dec. 21, 2015). Here, Plaintiff alleges numerous significant GAAP violations that provide powerful evidence of scienter. ¶¶112-116.

Additionally, the resignations alleged in the Complaint further bolster the strong inference of scienter alleged. ¶173. Specifically, on October 10, 2019, Defendant Cheung resigned from 9F's Board, Defendant Xu resigned on January 20, 2020, and Defendants Zhang and Huang resigned on March 16 and March 27, 2020, respectfully. *Id*. Defendant Cui also subsequently resigned his directorship despite serving in the position for only approximately one year, and on June 22, 2020, Zengxiao Jin was removed from the chief risk officer position. ¶¶173, 176. These allegations also add to the strong inference of scienter alleged. *Vanderhoef*, 2021 WL 3260849, at *4–5. When considering these facts collectively – as the Court is required to do under *Tellabs* (551 U.S. at 323) – Plaintiff has adequately alleged scienter.

### C.    Plaintiffs Adequately Allege Loss Causation

Plaintiffs have also sufficiently alleged loss causation under the Exchange Act.    "Importantly, as to loss causation there is not a heightened standard of pleading." *Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 239 (E.D. Pa. 2021).  To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Plaintiffs have satisfied this standard.  ¶¶173-183.  Specifically, Plaintiffs allege that: (1) on June 17, 2020, 9F issued the June 17, 2020 6K which provided the Company's fourth quarter and full-year 2019 financial results and described the devastating financial consequences of the Company's dispute with PICC; on this news, shares of 9F fell $0.165 per ADS, or 2.7%, from its closing price on June 16, 2020 to close at $6.00 per ADS on June 17, 2020, damaging investors (¶¶174-175); (2) on June 22, 2020, after the market closed, 9F issued a press release on Form 6-K ("June 22, 2020 6K"), announcing that Zengxiao Jin was removed from the chief risk officer position; on this news, shares of 9F fell $1.13 per ADS, or 18%, from its close on June 22, 2020, to close at $5.00 per ADS on June 23, 2020 (¶¶176-177);[10]

---

[10] *See Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014) ("While nothing in the resignation

(3) on June 24, 2020, the Company filed a 2019 20-F with the SEC, admitting that in 2019, under the Cooperation Agreement, 9F "predominantly partnered with PICC who provided the credit insurance service to institutional funding partners on the loan origination" and that "***PICC collected all of the loan facilitation service fees***" from borrowers and "***remitted*** [9F's] portion of the service fees to [9F];" on this news, 9F's ADS price fell by $0.38 per ADS or 7.6% on June 24, 2019, and another $1.12 per ADS or 24% over the next three days (¶¶178-179); and (4) on September 29, 2020, 9F reported its first half 2020 financial results and announced that 9F's financial performance continued drastically declining because 9F was no longer able to collect large amounts of loan facilitation fees from borrowers via a conduit like PICC; on this news, ADSs of 9F fell $0.20 per ADS, or 18%, to close at $0.91 per ADS on September 30, 2020.  ¶¶180-181. These allegations provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.

Defendants' arguments to the contrary fail. Motion at 35-39.  First, Defendants contend that the June 17, 2020 Form 6-K, the June 22, 2020 Form 6-K, and 9F's September 29, 2020 announcement did not reveal to the market the falsity of Defendants' misrepresentations.  Motion at 34-37.  Defendants are incorrect.

---

announcement alone reveals the truth behind earlier misstatements . . . this too may constitute a portion of the totality that we must consider.").

Defendants improperly seek to impose a mirror-image requirement for loss causation and improperly view the disclosures in isolation rather than collectively. "To be significant, such a corrective disclosure must at least relate back to the misrepresentation and not to some other negative information about the company." *Zhengyu He v. China Zenix Auto Int'l Ltd.*, No. CV21815530KMJAD, 2020 WL 3169506, at *11 (D.N.J. June 12, 2020); *Vanderhoef*, 2021 WL 3260849 at *5. "The corrective disclosure need not, however precisely mirror the earlier misrepresentation." *Zhengyu*, 2020 WL 3169506, at *11; *Vanderhoef*, 2021 WL 3260849, at *5. "[N]either a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation." *Zhengyu*, 2020 WL 3169506, at *11; *Vanderhoef*, 2021 WL 3260849, at *5. "Instead, a plaintiff need only allege that the market was able to infer from the corrective disclosure that the misrepresentation at issue had occurred." *Vanderhoef*, 2021 WL 3260849, at *5; *Zhengyu*, 2020 WL 3169506, at *12. Plaintiffs have done so here. Plaintiffs also adequately allege loss causation under a materialization-of-the-risk theory. *Kanefsky v. Honeywell Int'l Inc.*, No. 18-CV-15536, 2020 WL 2520669, at *7 (D.N.J. May 18, 2020). Finally, the Third Circuit has cautioned courts that loss causation is ordinarily an issue for the trier of fact. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884-85 (3d Cir. 2000). Thus, Plaintiffs have adequately alleged loss causation.

**D.    Plaintiffs Adequately Allege Control Person Liability Under the Exchange Act**

Contrary to Defendants' assertion (Motion at 40 n.19), Plaintiffs have pled a primary violation and the Individual Defendants' control over the Company. ¶¶22-23, 200-204; *Vanderhoef*, 2021 WL 3260849, at *6.

**VI.    CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiffs respectfully request leave to amend. *Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-89 (3d Cir. 1990).

DATED: March 27, 2025

Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

By: ___/s/ Donald A. Ecklund___
James E. Cecchi
Donald A. Ecklund
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994 -1700

*Liaison Counsel for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

*Lead Counsel for the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

41